*Univ. served on 12/14/17*



# IN THE 13TH JUDICIAL CIRCUIT COURT, BOONE COUNTY, MISSOURI

| Judge or Division:<br>JEFF HARRIS | Case Number: 17BA-CV03170 |
|---|---|
| Plaintiff/Petitioner:<br>JEREMEY ROWLES<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>JOHN ANDREW HIRTH<br>TGH LITIGATION LLC<br>913 EAST ASH STREET<br>COLUMBIA, MO 65201 |
| Defendant/Respondent:<br>BOARD OF CURATORS OF THE UNIVERSITY<br>OF MISSOURI | Court Address:<br>705 E Walnut<br>COLUMBIA, MO 65201 |
| Nature of Suit:<br>CC Employmnt Discrmntn 213.111 | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: **BOARD OF CURATORS OF THE UNIVERSITY OF MISSOURI**
Alias:

**227 UNIVERSITY HALL**
**COLUMBIA, MO 65211**

*COURT SEAL OF*

*BOONE COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

12/06/2017                                    /s/ S. Smith
_____        _____
Date                                                     Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
_____ a person of the Defendant's/Respondent's family over the age of 15 years.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
_____ (name) _____ (title).
☐ other _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____                    _____
Printed Name of Sheriff or Server                    Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*

Subscribed and sworn to before me on _____ (date).

My commission expires: _____        _____
                                              Date                                    Notary Public

| Sheriff's Fees | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (7-08) SM30 (SMCC) *For Court Use Only:* **Document Id # 17-SMCC-1127**          1 of 1          Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 2:17-cv-04250-BCW   Document 1-1   Filed 12/15/17   Page 1 of 150

**EXHIBIT 1**

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

**IN THE CIRCUIT COURT FOR BOONE COUNTY
STATE OF MISSOURI**

| | | |
|---|---|---|
| JEREMY A. ROWLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17BA-CV03170 |
| | ) | |
| CURATORS OF THE UNIVERSITY OF MISSOURI, | ) ) | Hon. Jeff Harris |
| | ) | |
| **Serve: Stephen J. Owens** | ) | |
| **227 University Hall** | ) | |
| **Columbia, MO 65211** | ) | |
| | ) | |
| CATHY SCROGGS, in her individual capacity, | ) ) | |
| | ) | |
| **Serve: Cathy Scroggs** | ) | |
| **1008 Maplewood Dr.** | ) | |
| **Columbia, MO 65203** | ) | |
| | ) | |
| ELLEN EARDLEY, in her individual capacity, | ) ) | ***JURY TRIAL DEMANDED*** |
| | ) | |
| **Serve: Ellen Eardley** | ) | |
| **Mehri & Skalet, PLLC** | ) | |
| **1250 Connecticut Ave. N.W.** | ) | |
| **Suite 300** | ) | |
| **Washington, DC 20036** | ) | |
| | ) | |
| SALAMA GALLIMORE, in her individual capacity, | ) ) | |
| | ) | |
| **Serve: Salama Gallimore** | ) | |
| **Armstrong Teasdale LLP** | ) | |
| **2345 Grand Blvd., Ste 1500** | ) | |
| **Kansas City, MO 64108** | ) | |
| | ) | |
| and | ) | |

ANDREA HAYES, in her official            )
capacity as Interim Assistant Vice       )
Chancellor for Civil Rights & Title IX   )
                                         )
    **Serve:**   **Andrea Hayes**            )
                **202 Jesse Hall**             )
                **Columbia, MO 65211**        )
                                         )
                          Defendants.            )

## FIRST AMENDED PETITION
## FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Jeremy A. Rowles states the following in support of his First Amended Petition for Damages and Injunctive Relief against Defendants Curators of the University of Missouri, Cathy Scroggs, Ellen Eardley, Salama Gallimore, and Andrea Hayes:

## INTRODUCTION

1.      This case involves an African-American male graduate student named Jeremy Rowles ("Rowles"), who was removed from his doctoral program and effectively expelled from the University of Missouri System for writing a letter expressing his feelings to a white female undergraduate named Annalise Breaux ("Breaux").

2.      Breaux was never Rowles's student, employee, or coworker, and he held no position of authority over her.  On the contrary, *she was Rowles's instructor* at the Student Recreation Center ("Rec Center").

2

3.     After exchanging flirtatious posts on social media in April 2016, Rowles asked Breaux out on a date.  Breaux told Rowles she couldn't go out with him the following weekend because she was going out of town. Rowles then asked if they could celebrate his defense of his master's thesis when she returned, to which Breaux agreed. Rowles wrote her several times over the following week, after which Breaux texted him that she only wanted their relationship to remain professional.  Rowles profusely apologized and did not ask her out again. With Breaux's permission, he continued taking her classes.

4.     Over the next several months, Rowles spoke to Breaux only in passing immediately before and after class.  Occasionally he asked her for dance and exercise tips, and Breaux suggested he take private lessons. Rowles attempted to sign up for private lessons at the Rec Center but was unable to do so. Breaux became increasingly distant over time, avoided Rowles before and after class. After several failed attempts to speak with her, Rowles handed Breaux a three-page letter apologizing for the awkwardness between them, expressed his feelings for her, and asked if they could start over.

5.     After she received the letter, Breaux submitted a formal complaint to the University's Title IX office. Breaux did *not* allege that Rowles ever intimidated, threatened, or stalked her, nor that he ever touched

her inappropriately or made her feel unsafe; she alleged only that he made her feel "uncomfortable."

6.     When he was informed of the complaint against him, Rowles requested that Deputy Title IX Coordinator Salama Gallimore not be involved in his case because he believed Gallimore had discriminated against him during a prior Title IX investigation. In the earlier case, Gallimore told Rowles that she thought he "looked like someone who might commit sexual assault" and recommended discipline against him.  Gallimore was eventually overruled by Senior Associate Vice Provost Ken Dean, who found the allegation of sexual misconduct against Rowles unsubstantiated. Rowles feared Gallimore would push to discipline him for the current complaint based on the prior allegations against him.  He was assured by the Title IX Office that Gallimore would not be involved this time.

7.     In addition to Breaux's formal complaint, the Title IX Office received an email from Breaux's supervisor, Rec Center Associate Director Emily McElwain, identifying three other female fitness instructors whom she believed Rowles had also made "uncomfortable." Despite repeated efforts by Title IX investigator Amber Lammers to contact them, none of the three other instructors ever spoke with the Title IX Office or submitted any first-hand allegations against Rowles. Nonetheless, Lammers included McElwain's allegations about the other three women in her Investigative Report.

8.     In March 2017, Title IX Administrator and Assistant Vice Chancellor Ellen Eardley issued written "Findings by the Administrative Officer" in which she concluded that Rowles "does not appear to set appropriate boundaries with undergraduate students…." And though the earlier Title IX complaint against him was *unsubstantiated*, Eardley expressed concern "that [Rowles] failed to learn from [his] previous warning regarding his conduct with an undergraduate female student."

9.     On information and belief—and contrary to Lammers's assurances—the Findings of the Administrative Officer signed and issued by Ellen Eardley were drafted in substantial party by Salama Gallimore.

10.     Evidently relying on hearsay about the other fitness instructors as well as the prior unsubstantiated Title IX complaint against him, Eardley and Gallimore concluded that Rowles's conduct violated University policies prohibiting sexual harassment and stalking on the basis of sex. Based on the "totality of the circumstances," Eardley and Gallimore barred Rowles from entering all four campuses of the University system for four years, permanently barred him from entering the Rec Center or any University residential hall, and imposed a draconian remediation plan that would have to be completed before Rowles could return to the University.

11.     Rowles's "suspension," which Vice Chancellor for Student Affairs Cathy Scroggs affirmed but shorted from four years to two, terminated

Rowles's participation in his doctoral program and effectively ended his academic career.

12. The University treated Rowles differently from similarly situated students based on his race and gender and violated his rights under the First and Fourteenth Amendments to the Constitution of the United States, the Civil Rights Act of 1964, the Education Amendments of 1972, and the Missouri Human Rights Act.

**PARTIES, JURISDICTION, AND VENUE**

13. Plaintiff Jeremy A. Rowles ("Rowles") is a resident of Boone County, Missouri, and a former doctoral candidate in Cultural Anthropology at the University of Missouri.

14. Rowles is an African-American man.

15. Race and sex are protected classes under the Missouri Human Rights Act ("MHRA"), § 213.010 et seq., RSMo.

16. Defendant Curators of the University of Missouri is the corporate name of the body politic governing the state university system, which has the power to sue and be sued. Mo. Const. Art. IX, sec. 9(a); §§.172.010-.020 RSMo.

17. The University of Missouri is a place of public accommodation under the Missouri Human Rights Act, § 213.065 RSMo.

18.     Defendant Cathy Scroggs was Vice Chancellor for Student Affairs at the University of Missouri when Rowles was investigated and sanctioned by the University's Title IX Office. Scroggs is sued in her individual capacity.

19.     Defendant Ellen Eardley was Assistant Vice Provost for Civil Rights and Title IX at the University of Missouri when Rowles was investigated and sanctioned by the Title IX Office. Eardley is sued in her individual capacity.

20.     Defendant Salama Gallimore was Director of Investigations and Deputy Title IX Coordinator at the University of Missouri when Rowles was investigated and sanctioned by the Title IX Office. Gallimore is sued in her individual capacity.

21.     Defendant Andrea Hayes is the Interim Assistant Vice Chancellor for Civil Rights & Title IX at the University of Missouri. Hayes is sued in her official capacity solely for prospective injunctive relief under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908).

22.     Defendant Hayes is the successor to Defendant Eardley in the office of Assistant Vice Chancellor for Civil Rights & Title IX.

23.     On or about May 23, 2017, Rowles filed a charge of discrimination in public accommodations with the Missouri Commission on Human Rights ("MCHR"), alleging race- and sex-based discrimination in the University's investigation of a Title IX complaint filed against Rowles and the

7

resulting sanctions imposed on him. A copy of Rowles's Charge of Discrimination is attached as Exhibit A.

24. Rowles's charge was filed within 180 days of the discriminatory conduct alleged within it.

25. MCHR closed its investigation and issued a Notice of Right to Sue on November 27, 2017. A copy of Rowles's Notice of Right to Sue is attached as Exhibit B.

26. Rowles filed this Petition no later than 90 days after receiving his Notice of Right to Sue and within two years of the discrimination alleged.

27. Rowles has fully complied with all conditions precedent under the MHRA.

28. This Court has subject-matter jurisdiction over Rowles's claims pursuant to Article 5, section 14 of the Missouri Constitution.

29. Venue is appropriate in this Court because the discrimination alleged herein occurred in Boone County, Missouri.

## GENERAL ALLEGATIONS

**A.    Rowles meets Breaux and tries to ask her out on a date.**

30. Rowles was a doctoral candidate and graduate instructor in Cultural Anthropology at the University of Missouri-Columbia.

31. While in graduate school, he regularly worked out and took various dance fitness classes at the Rec Center.

8

32.     During the 2015-2016 school year, Rowles developed a friendship with Breaux, one of the dance instructors from whom he took dance fitness classes at the Rec Center.

33.     Interpreting their early interactions as mutually flirtatious, Rowles asked Breaux out of a date on or about April 12, 2016.

34.     Breaux told Rowles she was busy for the next week, but the two discussed going out to celebrate when Rowles defended his Master's thesis later in the month.

35.     Over the next week, Rowles sent Breaux flirtatious messages via social media in anticipation of what he understood to be an upcoming date.

**B.     Breaux turns Rowles down but says he can still come to her dance classes.**

36.     On or about April 18, Breaux sent Rowles a message stating that she wanted their friendship to remain professional and asked him to stop making romantic overtures toward her.

37.     Breaux told Rowles she still wanted him to come to dance classes at the Rec Center, but she said she needed her space outside of class.

38.     Rowles immediately apologized and promised to keep their relationship professional.

39.     With Breaux's express consent, Rowles continued to attend dance classes at the Rec Center, included classes taught by Breaux.

9

40.    The following fall, Rowles asked Breaux to recommend some YouTube videos he could watch to improve his dance technique.

41.    Breaux suggested that he take private dance lessons, which are available through the Rec Center.

42.    When Rowles had difficulty signing up for private lessons, he followed up with Breaux.

43.    Believing that he was seeking private lessons from her, Breaux told Rowles she didn't teach private lessons.

44.    Breaux became increasingly withdrawn during her dance classes over the next week, frequently moving to the other side of the room from him.

45.    Not understanding what he had done to upset her, Rowles attempted to speak with Breaux after class but she avoided him.

46.    On October 14, Rowles gave Breaux a gushing, three-page letter in which he apologized for being awkward around her, expressed sincere feelings for her, and asked what if anything she wanted from him.

**C.    Rowles's letter is reported to the Title IX Office as a possible violation of University Rules.**

47.    After Rowles gave Breaux the letter, Rec Center Associate Director Emily Bach McElwaine emailed the University's Title IX office, alleging that Rowles "had engaged in a sexually harassing and stalking

behaviors toward four female students" who worked at the Rec Center. A copy of McElwaine's report is attached to this petition as Exhibit C.

48.     In addition to Breaux, McElwaine purported to submit allegations on behalf of Rose Nash, Ashlyn Balch, and Hannah Turnbull.

49.     The Title IX office interviewed Breaux on October 20 and asked her to submit a formal complaint.

50.      On October 21, Breaux submitted a formal complaint alleging that Rowles's conduct and communications were "bizarre" and made her "uncomfortable." A copy of Breaux's Formal Complaint is attached to this Petition as Exhibit D.

51.     The allegations in Breaux's complaint consisted solely of Rowles's interactions with her at the Rec Center, his asking Breaux out on a date in April, a few dozen flirtatious instant messages over social media, high fives during and after their dance classes, and the October 14 letter.

52.     Breaux never alleged that Rowles touched her inappropriately or made her feel unsafe, intimidated, or threatened.

53.     Breaux did not accuse Rowles of "stalking" her.

54.     Indeed, aside from the occasional in-class high five, Breaux accused Rowles of nothing more than speech.

11

**D.** **The Title IX Office initiates an investigation into Rowles's behavior at the Student Rec Center.**

55.     On or about November 7, 2016, Title IX Investigator Amber Lammers sent Rowles a Notice of Investigation of Potential Sex Discrimination, a copy of which is attached to this Petition as Exhibit E.

56.     The Notice of Investigation identified potential violations of Section 200.010 of the University of Missouri Collected Rules and Regulations, which provides in pertinent part:

> Conduct for which students and student organizations, when applicable, are subject to sanctions falls into the following categories: . . .
>
> 7. Violation of the University's Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/Employment Policy in Section 600.020 of the Collected Rules and Regulations. These violations include: . . .
>
> b. **Sexual Harassment**. Sexual harassment is defined as:
>
> 1) Unwelcome sexual advances or requests for sexual activity by a person or persons in a position of power or authority to another person, or
>
> 2) Other unwelcome verbal or physical conduct of a sexual nature by a person to another person, when:
>
> a) Submission to or rejection of such conduct is used explicitly or implicitly as a condition for academic or employment decisions; or

12

    b) Such conduct creates a hostile
       environment by being sufficiently severe
       or pervasive and objectively offensive
       that it interferes with, limits or denies
       the ability of an individual to participate
       in or benefit from educational programs
       or activities or employment access,
       benefits or opportunities. . . .

    d. **Stalking on the Basis of Sex**. Stalking on the
       basis of sex is following or engaging in a course
       of conduct on the basis of sex with no legitimate
       purpose that puts another person reasonably in
       fear for his or her safety or would cause a
       reasonable person under the circumstances to
       be frightened, intimidated or emotionally
       distressed.

57.    When Lammers interviewed Rowles, he raised concerns that Title IX Investigator Salama Gallimore had discriminated against him on the grounds of race during a prior Title IX investigation.

58.    Rowles told Lammers that Gallimore had been predisposed to find him guilty of sexual harassment because he was an African-American man and the complainant was a white woman.

59.    Rowles relayed to Lammers that Gallimore had told Rowles during her earlier investigation that he "looked like someone who might commit sexual assault."

13

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

60.     Rowles was worried that Gallimore could not be impartial and would be out to get him this time because she was unable to prove he had sexually harassed the earlier complainant.

61.     Lammers assured Rowles that Gallimore would have no role in the current investigation.

62.     On information and belief, however, Gallimore did interject herself into the case with the hopes of getting Rowles expelled.

63.     None of the other three Rec Center employees on whose behalf McElwaine purported to submit allegations ever responded to Lammers's inquiries, and they were never interviewed as part of the investigation.

64.     Nonetheless, Lammers's 54-page Investigative Report (a copy of which is attached to this Petition as Exhibit F) includes the hearsay allegations McElwain purported to submit on their behalf.

**E.      Rowles agrees to an "Informal Resolution Process" without meaningful notice that he could be expelled without a hearing.**

65.     On or about December 13, the Title IX Administrator and Assistant Vice Chancellor Ellen Eardley emailed Rowles a Notice of Charges, which formally accused him of violating CRR 200.010 and asked Rowles to elect between an Informal or Formal Resolution Process ***within three business days***. A copy of the Notice of Charges is attached to this Petition as Exhibit G.

66.     The Notice stated that the Informal Resolution Process would be decided without a hearing by Eardley herself based upon Lammers's Investigative Report, whereas the Formal Resolution Process would be decided by a panel of three administrators who would conduct a formal hearing in which Lammers, Rowles, and Breaux could all testify and ask to present additional witnesses.

67.     The Notice also listed a dozen possible sanctions that could be imposed for violations of University policy, including a written warning, probation, loss of privileges, restitution, work assignments, service to the University, completion of educational or counseling programs, residence hall suspension or expulsion, University suspension, withdrawal of recognition for University organizations, and expulsion.

68.     The Notice provided no information regarding what kinds of violations are likely to result in written warnings as opposed to expulsion or some intermediate sanction.

69.     Amber Lammers had previously sent a separate email to Breaux on December 9, asking whether she preferred the Informal or Formal Resolution Process.  A copy of Lammers's email is attached as Exhibit H.

70.     Unlike the Notice of Charges, which gave Rowles *only three days* to choose between formal and informal resolution, the email to Breaux did

15

not specify any time frame within which she had to decide, and she did not

inform Lammers of her decision until six days later.

71.    Unlike the Notice of Charges, the email to Breaux stated in bold

letters that she could have an advisor of her choice help her chose between

resolution processes.

72.    Rowles selected Informal Resolution without any understanding

that he could be expelled from the University by a single administrator

without a hearing.

73.    Two months later, Ellen Eardley sent Rowles a Notice of Intent to

Render Findings via the Informal Resolution Process "regarding the charges

that you violated Section 200.010 of the Collected Rules and Regulations by

allegedly sexually harassing and stalking Annalise Breaux *and three other*

*MizzouRec staff members*." A copy of the Notice of Intent to Render Findings

is attached as Exhibit I.

74.    Confusingly, the Notice of Intent included both of the following

statements:

> You have selected informal resolution of this matter.
>
> This is your last opportunity to request that this
> matter be resolved through Formal Resolution before
> the Equity Resolution Hearing Panel.

16

75. For the first time in any of the Title IX Office's communications with Rowles, the Notice of Intent to Render Findings quoted the following provisions of section 200.025(G)(5) of the Collected Rules and Regulations:

> At any point during the Investigation and Informal Resolution process prior to the finding (i.e.: the conclusion of the Informal Resolution process), either party may request that the matter be referred to the Formal Resolution for presentation before The Equity Resolution Hearing Panel.
>
> At least three business days prior to rendering a finding on disputed violations, the Appropriate Administrative Officer will provide the parties with written notice of intent to render a finding using Informal Resolution…
>
> If, after at least three business days neither of the parties request in writing that the matter be referred to the Formal Resolution process, the Appropriate Administrative Officer will render a finding on the disputed violations. Once findings have been made, the right to the Formal Resolution process is waived and the Informal Resolution process is complete. The finding of the Informal Resolution process remains subject to appeal.

76. The Notice further provided, "You will receive the Investigative Report soon."

77. Rowles was not permitted to see or review the Title IX Investigative Report detailing the allegations and evidence against him until after his last opportunity to demand a formal hearing.

17

**F.    Rowles is "suspended" from all four campuses of the University System for four years.**

78.    On March 15, 2017, the Title IX Office issued the "Informal Resolution Findings by the Administrative Officer," which concluded that Rowles had violated the University's prohibitions against sexual harassment and stalking on the basis of sex. A copy of the Informal Resolution Findings is attached to this petition as Exhibit J.

79.    On information and belief, Salama Gallimore played a substantial role in drafting the Findings of the Administrative Officer even though the document was signed by Ellen Eardley.

80.    Finding a violation, Eardley and Gallimore next considered "the nature of and circumstances surrounding the violation, [Rowles] disciplinary history, and the need to prevent future recurrence of violations, as well as any other information deemed relevant" to determine the appropriate sanctions to impose.

81.    Regarding his "disciplinary history," Eardley and Gallimore opined that "[Rowles] does not appear to set appropriate professional boundaries with undergraduate students in workplace environments throughout campus—whether in academic settings or at the Rec Center."

82.    Eardley and Gallimore observed that "[i]n September 2015, it was alleged that [Rowles] invited an undergraduate student to office hours in

18

the evening and insinuated that as her Teaching Assistant he would provide questions or answers to an exam if she provided him sexual favors."

83.    While conceding that "Senior Associate Provost Ken Dean determined in March 2016 that [Rowles] *was not responsible for violating the sexual harassment policy*," Eardley and Gallimore wrote that Rowles "*failed to learn from [his] previous warning* regarding his conduct with an undergraduate female student."

84.    Based on the "totality of circumstances"—which evidently included *both* hearsay allegations about the three other Rec Center instructors the Title IX investigator never interviewed, *as well as* unsubstantiated allegations from the prior Title IX complaint which the University ultimately dismissed—Eardley and Gallimore "suspended" Rowles from all four campuses of the University of Missouri system for four years, barred him from entering campus except to seek medical treatment for four years, permanently expelled him from the Student Rec Center and all University residential halls, and told Rowles he could seek reenrollment in four years only if he satisfactorily completed all required steps of a Remediation Plan. Ex. J at 4-6.

85.    The severity of Rowles's punishment took him completely by surprise.

19

86. Though suspension and expulsion were listed among the dozen possible sanctions for *any* violation of University rules in the Notice of Charges he received, Rowles had no idea either punishment was a remote possibility.

87. Had he known he was facing any real possibility of expulsion, Rowles would never have opted for an "Informal Resolution Process" in which his culpability would be decided by the very administrators charged with investigating the complaint against him.

88. He certainly wouldn't have entrusted his future career to Informal Resolution had he known that Salama Gallimore would have any influence on the outcome.

89. No rational person would waive his right to a formal hearing before a neutral fact finder if he believed expulsion was even remotely likely.

**G.    The Vice Chancellor for Student Affairs upholds Rowles's suspension but arbitrarily cuts it in half.**

90. Rowles appealed Eardley and Gallimore's Informal Resolution and Sanctions timely to University Vice Chancellor for Student Affairs Cathy Scroggs on the grounds that the sanctions imposed fell far outside the range typically imposed for the offenses alleged. A copy of Rowles's appeal is attached as Exhibit K.

20

91.     Among other arguments, Rowles noted that because he is an

African-American male,

> he is the subject of stereotyping regarding his
> motives for taking dance classes. Also, in his previous
> Title IX investigation, he was told by an investigator
> that he "looked like someone who might commit
> sexual assault." This type of stereotyping affected the
> severity of the sanctions issued in this case. Even
> though Mr. Rowles was found not to have violated the
> sexual harassment policy in the previous
> investigation, Ms. Eardley clearly focused on the
> facts from the previous investigation in issuing
> sanctions in this case.

92.     He also argued that Eardley and Gallimore's

> reference to the Principals of Professional
> Responsibility from the American Anthropological
> Association is inappropriate in this matter. Mr.
> Rowles is accused of behavior that occurred entirely
> in the course of his participation in the MizzouRec.
> These allegations do not relate to his role in the
> Anthropology Department and are unrelated to his
> comportment as a TA or teacher in Anthropology.
> Social interactions at a sports facility are not
> governed by miscellaneous codes of conduct related to
> work in the Anthropology Department.

93.     On April 18, 2017, Scroggs issued a decision upholding Eardley

and Gallimore's findings of conduct violations but modifying the sanctions

imposed. A copy of Scroggs's appeal decision is attached to this Petition as

Exhibit L.

94. While "acknowledg[ing] that [Rowles] do[es] not have a record of previous discipline," Scroggs cited a "distinct common thread" between Breaux's allegations and the prior *unsubstantiated* Title IX complaint.

95. Rejecting each of Rowles's arguments on appeal, Scroggs nonetheless found a "compelling justification to modify the sanction" imposed from four years to two.

96. The "compelling justification" is never identified or explained in her ruling.

97. A sanction so capriciously halved cannot have been reasonable to begin with.

98. Regardless of whether the suspension from all four campuses lasts for two-years or four, the sanctions imposed on Rowles effectively terminated his participation in his doctoral program and ended his academic career.

**H. Rowles's suspension is part of a larger pattern and practice of race and gender discrimination at the University of Missouri in general and within the Title IX office in particular.**

99. Since the student protests that resulted in the resignations of System President Tim Wolfe and Chancellor Bowen Loftin during fall semester 2015, the University of Missouri-Columbia has found itself at center stage in the national debate about racial disparity and discrimination on college campuses. *See, e.g.*, Andy Thompson, *What Is Going On at the*

22

*Electronically Filed - Boone - December 06, 2017 - 04:09 PM*

*University of Missouri,* CHRONICLE OF HIGHER EDUCATION, November 6, 2015 (available at: https://www.chronicle.com/blogs/ticker/what-is-going-on-at-the-university-of-missouri/106430); Scott Jaschik, *Racial Tensions Escalate*, INSIDE HIGHER ED, November 9, 2015 (available at: https://www.insidehighered.com/news/2015/11/09/racial-tensions-escalate-u-missouri-and-yale); Katherine Mangan, *After Missouri's Leadership Exodus, Hard Questions Loom on Race, Power, and Culture*, CHRONICLE OF HIGHER ED, November 11, 2015 (available at: https://www.chronicle.com/article/After-Missouri-s-Leadership/234145?cid=cp15); Beth McMurtrie, *'I Believe I Can Leave This Place Better Than I Found It': Black students describe racial division, isolation, and prejudice at the U. of Missouri*, CHRONICLE OF HIGHER ED, January 3, 2016 (available at https://www.chronicle.com/article/What-Its-Like-to-Be-Black-at/234771?cid=cp15).

100.   Informing this debate are the numerous studies finding that African-Americans are far more likely than whites to be suspended or expelled from primary and secondary schools, stopped by police, and incarcerated in state and federal correctional facilities, to wit:

> a. According to the U.S. Department of Education, "Black children represent 18% of preschool enrollment, but 48% of preschool children receiving more than one out-of-school suspension; in comparison, white students represent 43% of

23

preschool enrollment but 26% of preschool children receiving more than one out of school suspension." U.S. DOE, Civil Rights Data Collection, Data Snapshot: School Discipline, Issue Brief No. 1 (March 2014), available at https://www2.ed.gov/about/offices/list/ocr/docs/crdc-discipline-snapshot.pdf (using 2011-2012 data).

b. "Black students are suspended and expelled at a rate three times greater than white students. On average, 5% of white students are suspended, compared to 16% of black students." Walter S. Gilliam et al., *Do Early Educators' Implicit Biases Regarding Sex and Race Relate to Behavior Expectations and Recommendations of Preschool Expulsions and Suspensions?* YALE CHILD STUDY CEN. (Sept. 28, 2016).

c. "While black students represent 16% of student enrollment, they represent 27% of students referred to law enforcement and 31% of students subjected to a school-related arrest. In comparison, white students represent 51% of enrollment, 41% of students referred to law enforcement, and 39% of those arrested." Id.

24

d.  The disparate treatment of black and white students is even greater when it comes to ill-defined conduct violations such as "disrespect" and "excessive noise" as compared with more clearly defined offenses such as smoking and vandalism.  *See* Russell J. Skiba et al., *The Color of Discipline: Sources of Racial and Gender Disproportionality in School Punishment*, 34 URBAN REV. 317, 332 (2002) (finding black students are far more likely than white students to be sanctioned for "defiance" while the punishment rates for vandalism are similar).

e.  The Annual Vehicle Stops Reports issued by the Missouri Attorney General's Office in each of the last ten years (2007 through 2016) show that African-American drivers in Missouri are 60% more likely to be stopped by police than white drivers.  Reports available at https://ago.mo.gov/home/vehicle-stops-report.

f.  Even though African Americans make up only 13% of the U.S. population, more than 35% of offenders incarcerated in state and federal correctional facilities are black.  *See* U.S. Dep't of Justice, Bureau of Justice Statistics, "Prisoners in 2015" (NCJ 250229), p. 6, tbl. 3 (Dec. 2016).

101.   Citing these and other data, University of Missouri-Columbia Law Professor Ben Trachtenberg has suggested that "it would be a miracle if university disciplinary procedures did not produce outcomes that excessively punish black students, along with members of other disadvantaged minority groups." Ben Trachtenberg, *How University Title IX Enforcement and Other Discipline Processes (Probably) Discriminate Against Minority Students*, 18 NEVADA LAW JOURNAL (forthcoming 2018).

102.   Professor Trachtenberg's supposition is supported by the Justice Department Office of Civil Rights' report on implicit racial bias in Title IX enforcement at Colgate University, which found, "In the 2013–14 academic year, 4.2 percent of Colgate's students were black. According to the university's records, in that year black male students were accused of 50 percent of the sexual violations reported to the university, and they made up 40 percent of the students formally adjudicated." *See* Emily Yoffee, *The Question of Race in Campus Sexual-Assault Cases: Is the system biased against men of color?* THE ATLANTIC, September 11, 2017 (available at https://www.theatlantic.com/education/archive/2017/09/the-question-of-race-in-campus-sexual-assault-cases/539361/).

103.   Professor Trachtenberg has identified several aspects of university discipline programs which increase the likelihood that Title IX investigations lead to racially disparate outcomes, including minimal data

26

collection on the racial impact of discipline systems; nondisclosure of what data is collected; broad and vague definitions of offenses; proceedings conducted in secret; informal and nonuniform procedures; limited access to counsel; and collective American attitudes toward race and interracial sex. Trachtenberg, NEVADA LAW JOURNAL, at 14.

104. Many of Professor Trachtenberg's risk factors for disparate treatment are endemic to the University of Missouri's Title IX Office.

105. The University of Missouri does not disclose what percentage of students and faculty accused of Title IX violations are African Americans, the rate at which allegations against African Americans are substantiated, or the frequency of specific sanctions imposed on African Americans.

106. On information and belief, the University of Missouri has made a deliberate choice *not* to collect demographic information about students and faculty accused of or disciplined for violating Title IX in order to conceal the disproportionate rate at which the University investigates and disciplines male students and students of color.

107. While serving as chair of the University of Missouri Faculty Council from 2015 to 2017, Professor Trachtenberg was surprised to find he "had no way of evaluating whether Mizzou's student discipline system produced racial bias at greater or lesser rates than peer institutions and national averages" because the University did not collect the data necessary

27

to determine whether the Title IX office produced racially disparate outcomes. *Id.* at 40.

108. Precise definitions within the University of Missouri's collected rules on sexual misconduct range from vague to nonexistent, giving immense discretion to Title IX officials to decide which students to charge and discipline.

109. For example, the University of Missouri defines "Stalking on the Basis of Sex" as "following or engaging in a course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed," Univ. of Missouri, CRR 600.020(C)(4); however, neither "legitimate purpose" nor "emotionally distressed" are defined.

110. "As a result," argues Professor Trachtenberg, "the practical definition of 'stalking' on campus is largely at the discretion of university staff." 18 NEVADA LAW JOURNAL, at 24.

111. Moreover, "because the records of prior campus cases are confidential and in any event lack the sort of reasoned statutory analysis useful in defining ambiguous terms, the accused would have no case law available to resolve his confusion." *Id.*

112.    The secretive nature of Title IX proceedings at the University of Missouri provides the accused with no means of anticipating what kind of sanction is likely for a particular wrong and hinders his ability to appeal on the theory that his punishment is outside the norm for similar behavior. *Id.* at 28.

113.    Trachtenberg argues that discrimination by the University's Title IX office is particularly severe "when black male students are accused of sexual misconduct toward white female students" because "investigators and factfinders will bring to the table centuries of cultural baggage." Trachtenberg, 18 NEVADA LAW JOURNAL, at 37-38.

114.    "Given the history that this country has of treating the sexual interest of black men as dangerous and the other implicit biases that people have," Professor Trachtenberg "find[s] it hard to believe that similar conduct of black men might not be perceived as more threatening and more likely to be called harassment than the same thing done by white people." Nwadi Oko, *Minorities potentially discriminated against in Title IX processes,* Columbia Missourian, Sep 19, 2017 (available at https://www.columbiamissourian.com/news/higher_education/minorities-potentially-discriminated-against-in-title-ix-processes/article_931e9ba6-9cae-11e7-b865-976abf9c1a53.html).

29

115.    Professor Trachtenberg's research suggests it is more likely than not that the University of Missouri's Title IX Office disproportionately investigates, substantiates, and disciplines African-American men for alleged violations of the University's Code of Sexual Conduct.

116.    On information and belief, the University of Missouri investigates Title IX complaints against male students at a far greater rate than it investigates similar complaints against female students.

117.    On information and belief, the University of Missouri investigates Title IX complaints against African-American students at a far greater rate than it investigates similar complaints against white students.

118.    On information and belief, the University of Missouri substantiates Title IX complaints against male students at far greater rate than it substantiates similar complaints against female students.

119.    On information and belief, the University of Missouri substantiates Title IX complaints against African-American students at a far greater rate than it substantiates similar complaints against white students.

120.    On information and belief, the sanctions imposed on male students by the University's Title IX Office are substantially more severe than those imposed by it on female students accused of similar conduct.

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

121.   On information and belief, the sanctions imposed on African-American students by the University's Title IX Office are substantially more severe than those imposes on white students accused of similar conduct.

122.   On information and belief, racial and gender stereotypes significantly affect the results of Title IX investigations at the University of Missouri.

123.   On information and belief, racial and gender stereotypes significantly affect the sanctions imposed for Title IX violations at the University of Missouri.

124.   The presence of Professor Trachtenberg's risk factors within the University of Missouri's Title IX Office strongly suggests that its investigation and discipline of Jeremy Rowles was discriminatory.

125.   Defendants Eardley, Gallimore, and Scroggs were substantially influenced by racial and gender stereotypes in finding that Rowles's non-threatening communications with Breaux constituted sexual harassment and stalking based on sex.

126.   Based on their racial and gender stereotypes about African-American men, Eardley and Gallimore found it hard to believe that Rowles had enrolled in dances classes at the Student Rec Center out of a genuine interest in dance.

31

127.   Based on their racial and gender stereotypes about African-American men, Eardley and Gallimore assumed instead that Rowles enrolled in dances classes at the Rec Center to get close to and initiate sexual relationships with female dance instructors.

128.   Based on their racial and gender stereotypes about African-American men, Eardley and Gallimore found it hard to believe that Rowles continued to attend Breaux's dance classes at the Rec Center after she rejected his romantic overtures because he was genuinely interested in becoming a better dancer.

129.   Based on their racial and gender stereotypes about African-American men, Eardley and Gallimore assumed instead that Rowles continued to attend Breaux's dance classes at the Rec Center after she rejected his romantic overtures because he was obsessed with her and was stalking her on the basis of sex.

130.   Based on their racial and gender stereotypes about African-American men, Eardley and Gallimore found it hard to believe that Rowles took three or four dances classes every week out of a genuine interest in dance.

131.   Based on their racial and gender stereotypes about African-American men, Eardley and Gallimore assumed instead that Rowles took

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

three or four dances classes every week to be close to Breaux and other female instructors to whom he was sexually attracted.

132.   Based on their racial and gender stereotypes about African-American men, Eardley and Gallimore found it hard to believe that Rowles wanted to sign up for private dance classes due to his genuine interest in dance.

133.   Based on their racial and gender stereotypes about African-American men, Eardley and Gallimore assumed instead that Rowles wanted to sign up for private dance classes with Breaux because he was obsessed with her and was stalking her on the basis of sex.

134.   Salama Gallimore's comment that Rowles "look[s] like someone who might commit sexual assault" further demonstrates the existence of implicit racial and gender bias within the University's Title IX Office.

## COUNT I – FREEDOM OF SPEECH
42 U.S.C. § 1983
(against Defendants Scroggs, Eardley, and Gallimore in their individual
capacities and Defendant Hayes in her official capacity)

135.   Rowles restates and incorporates by reference all prior

allegations in this petition.

136.   Rowles was purportedly suspended from the University for

violating its policies against sexual harassment and stalking on the basis of

sex.

137.   At the time of his alleged conduct, University Rules defined

sexual harassment as:

> unwelcome verbal or physical conduct of a sexual
> nature by a person to another person, when: . . . Such
> conduct creates a hostile environment by being
> sufficiently severe or pervasive and objectively
> offensive that it interferes with, limits or denies the
> ability of an individual to participate in or benefit
> from educational programs or activities or
> employment access, benefits or opportunities.

CRR 200.010.

138.   At the time of his alleged conduct, University Rules define

stalking on the basis of sex as:

> following or engaging in a course of conduct on the
> basis of sex with no legitimate purpose that puts
> another person reasonably in fear for his or her
> safety or would cause a reasonable person under the
> circumstances to be frightened, intimidated or
> emotionally distressed.

34

CRR 200.010.

139. In their Findings by the Administrative Officer, Defendants
Eardley and Gallimore found the following facts by a preponderance of
evidence:

> In April 2016, [Breaux], an undergraduate student,
> directly informed [Rowles], a doctoral candidate, that
> his communications towards her were unwelcome,
> unprofessional and crossed the line. After learning
> that his behavior made [Breaux] uncomfortable,
> [Rowles] chose to attend [Breaux]'s TigerX classes
> multiple times each week, stare at her, make efforts
> to speak with her, and make efforts to be near her.
> He then requested to take private classes with her,
> left a token for her, and then wrote a three-page
> letter describing his very detailed romantic feelings.

140. Based on their factual findings, Eardley and Gallimore
concluded, "From an objective standard, such conduct is unwelcome and
hostile. It is also pervasive in that it lasted over the course of several
months."

141. Eardley and Gallimore further concluded that Rowles's "actions
from March 2016 through October 2016 constitute a course of conduct
towards [Breaux] that would cause a reasonable person under the
circumstances to be frightened, intimidated or emotionally distressed.

142. Defendant Scroggs upheld Eardley and Gallimore's findings and
sanctions, though she reduced Rowles's suspension from four years to two.

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

143. Defendant Hayes is the University official charged with the ongoing enforcement of the sanctions against Rowles.

144. Other than attending Breaux's classes, "staring" at her while she was teaching such classes, and "making efforts to be near her" during class, everything for which the Defendants suspended Rowles consists of *speech*.

145. The speech for which Rowles was suspended contained no threats, nor did Breaux report that she ever felt intimidated or unsafe because of Rowles's speech.

146. Indeed, the speech for which Rowles was suspended was conveyed to Breaux in writing when the two were not at the same location.

147. At most, Rowles's speech made Breaux "uncomfortable."

148. Speech on a public university campus, even speech that makes the listener uncomfortable, is fully protected by the First Amendment.

149. To the extent Rowles's speech violates the University's sexual harassment and stalking policies, the offended policies are content-based restrictions on speech.

150. Content-based restrictions on speech violate the First Amendment unless narrowly tailored to achieve a compelling governmental interest.

151. The state entity restricting speech based on its content bears the burden of persuasion that such restrictions are narrowly tailored.

36

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

152. While prohibiting sexual harassment and stalking on the basis of sex are certainly compelling governmental interests, suspending a graduate student for two years simply for asking another student out on the date is not narrowly tailored to achieve that interest.

153. Defendants' actions in suspending Rowles for two years for engaging in protected speech on campus violated Rowles's constitutionally secured rights under the First Amendment and caused Rowles damage, including but not limited to, loss of education and future earnings, damages to his reputation, emotional distress, embarrassment, humiliation, and loss of enjoyment of life.

154. In all their conduct alleged herein, Defendants acted under color of state law.

155. Defendants' actions were the direct and proximate cause of Rowles' injuries.

156. Defendants' actions were outrageous because of Defendants' evil motives or reckless indifference to the rights of Rowles, thereby entitling Rowles to an award of punitive damages in an amount that will punish Defendants and will deter Defendants and others from like conduct.

157. Rowles is entitled to reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT II – SUBSTANTIAL OVERBREADTH
### 42 U.S.C. § 1983
### (against Defendant Hayes in her official capacity)

158.   Rowles restates and incorporates by reference all prior allegations in this petition.

159.   To the extent the University's rules against sexual harassment and stalking on the basis of sex contemplate the suspension of students based solely on speech, the rules are overbroad in that a substantial number of their applications are unconstitutional, judged in relation to their plainly legitimate sweep.

160.   As enforced by the Title IX office, the University's rules against sexual harassment and stalking prohibit a student from asking another student out on a date or otherwise expressing interest in a romantic relationship—something that surely happens on the University's campus thousands of times every day—as long as a Title IX investigator deems the comment or proposal to be "offensive."

161.   The University's rules against sexual harassment and stalking on the basis of sex are substantially overbroad as defined in First Amendment jurisprudence.

162.   Judicial construction cannot sufficiently limit the application of the University's rules against sexual harassment and stalking on the basis of

sex so as to sever from its proscriptions speech protected by the First Amendment.

163. The University's rules against sexual harassment and stalking on the basis of sex necessarily chill speech that is protected by the First Amendment, including compliments about someone's appearance or asking someone out on a date.

164. Defendant Hayes is the University official charged with enforcing the University's rules against sexual harassment and stalking.

165. When enforcing the University's rules against sexual harassment and stalking, Defendant Hayes is acting under color of state law.

166. Hayes' ongoing enforcement of Rowles's sanctions for engaging in protected speech on campus violates Rowles's constitutionally secured rights under the First Amendment and continues to cause Rowles injury, including but not limited to, loss of education and future earnings, damages to his reputation, emotional distress, embarrassment, humiliation, and loss of enjoyment of life.

167. Hayes' ongoing enforcement of Rowles's sanctions for engaging in protected speech on campus is the direct and proximate cause of Rowles' injuries.

168. Rowles is entitled to reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

## COUNT III – VOID FOR VAGUENESS
### 42 U.S.C. § 1983
(against Defendant Hayes in her official capacity)

169.   Rowles restates and incorporates by reference all prior allegations in this petition.

170.   To the extent CRR 200.010 provides a basis for suspending students based solely on their speech toward other students, it is unconstitutionally vague.

171.   A person of common intelligence could not reasonably know that asking another student out on a date or giving her a nonthreatening letter expressing romantic interest could constitute a violation of CRR 200.010 or result in the speaker's expulsion from the University.

172.   The vague language of CRR 200.010 grants the Title IX office unbounded discretion to discipline some students while excusing others for a broad range of otherwise protected speech.

173.   Defendant Hayes is the University official charged with enforcing CRR 200.010.

174.   When enforcing the CRR 200.010, Defendant Hayes is acting under color of state law.

175.   Hayes' ongoing enforcement of CRR 200.010 against Rowles continues to cause Rowles injury, including but not limited to, loss of

40

education and future earnings, damages to his reputation, emotional distress,

embarrassment, humiliation, and loss of enjoyment of life.

176.  Hayes' ongoing enforcement of CRR 200.010 against Rowles is

the direct and proximate cause of Rowles' injuries.

177.  Rowles is entitled to reasonable attorneys' fees pursuant to 42

U.S.C. § 1988.

**COUNT IV – PROCEDURAL DUE PROCESS**
42 U.S.C. § 1983
(against Defendants Scroggs, Eardley, and Gallimore in their individual
capacities and Defendant Hayes in her official capacity)

178.  Rowles restates and incorporates by reference all prior

allegations in this petition.

179.  Upon his acceptance in to the Ph.D. program in Cultural

Anthropology at the University of Missouri, Rowles held a property

interested in his continued enrollment so long as he made sufficient progress

toward his degree.

180.  Rowles's property interest is protected by the Due Process Clause

of the Fourteenth Amendment to the Constitution of the United States.

181.  Rowles was deprived of his protected property interest in

continued enrollment on March 15, 2017 when he was erroneously suspended

from the University for allegedly violating University policies prohibiting sexual harassment and stalking on the basis of sex.

182.   Rowles was entitled to procedural safeguards commensurate with the seriousness of the allegations made and the severity of the sanctions he faced.

183.   Public university students are generally entitled to adequate notice, a definite charge, and a hearing with the opportunity to present their own side of the case and with all necessary protective measures.

184.   Defendants Scroggs, Eardley, and Gallimore did not afford Rowles adequate procedural rights before depriving him of his property interest.

185.   While Rowles received notice that a Title IX complaint had been filed against him, he was not given meaningful notice of his right to a formal hearing.

186.   On the contrary, he was told on December 13 that he had to elect between formal and informal resolution processes *within three days*.

187.   Rowles was not told that he could have an advisor assist him in electing between formal and informal resolution.

188.   At the time he was forced to elect between the formal and informal resolution processes, Rowles was not provided the Title IX Office's Investigative Report detailing the evidence against him.

42

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

189.   Indeed, the Investigative Report had not yet been written at the time he was forced to choose.

190.   At the time he was forced to elect between the formal and informal resolution processes, Rowles was not told that hearsay allegations about his conduct toward three women never interviewed by the Title IX Office would be considered in determining his liability and imposing sanctions.

191.   At the time he was forced to elect between the formal and informal resolution processes, he was not told that allegations from a prior, unsubstantiated Title IX claim would be considered in determining his liability and imposing sanctions.

192.   Defendants Scroggs, Eardley, and Gallimore did not provide Rowles with a hearing.

193.   Defendants Scroggs, Eardley, and Gallimore did not provide Rowles with a meaningful opportunity to refute the hearsay allegations submitted by a third party about three other women he had allegedly harassed.

194.   Instead, Scroggs, Eardley, and Gallimore used an "Informal Resolution" process that did not afford Rowles any opportunity to challenge the witnesses against him, especially those who never spoke to the Title IX

43

investigator but about whom hearsay allegations were considered nonetheless.

195.   Rowles's suspension was based in part on a report submitted by a University Rec Center Assistant Director purporting to relay hearsay allegations from three undergraduate Rec Center employees, none of whom were ever interviewed by a Title IX investigator.

196.   More disconcertingly, Rowles's suspension was also based in part on allegations from a *prior* Title IX investigation in which Rowles was *exonerated* of sexual harassment.

197.   Scroggs, Eardley, and Gallimore did not meet personally meet with any of the witnesses against Rowles, relying instead on the written investigative report from a different Title IX investigator when making credibility determinations about witnesses.

198.   On information and belief, Eardley was influenced in her findings by Salama Gallimore, who had investigated the prior unsubstantiated allegations of harassment against Rowles.

199.   In their investigation and punishment of Rowles, Scroggs, Eardley, and Gallimore acted under color of state law.

200.   As a direct and proximate result of Defendant Scroggs, Eardley, and Gallimore's failure to provide Rowles adequate notice and a meaningful opportunity to be heard Rowles suffered damages including but not limited to

44

his wrongful expulsion from the University, damage to his reputation, loss of future earning potential, extreme emotional distress, and loss of his civil rights.

201.   Defendants' actions were outrageous because of Defendants' evil motives or reckless indifference to the rights of Rowles entitles Rowles to an award of punitive damages in an amount that will punish Defendants and deter them and others from like conduct.

202.   Defendant Hayes is the University Official charged with the ongoing enforcement of the sanctions imposed on Rowles by Scroggs, Eardley, and Gallimore.

203.   While enforcing the sanctions against Rowles, Defendant Hayes is acting under color of state law.

204.   Rowles is entitled to reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

45

## COUNT V – SUBSTANTIVE DUE PROCESS
### 42 U.S.C. § 1983
(against Defendants Scroggs, Eardley, and Gallimore in their individual capacities and Defendant Hayes in her official capacity)

205.   Rowles restates and incorporates by reference all prior allegations in this petition.

206.   Rowles had a protected property interest in his continued enrollment in the doctoral program at the University so long as he was making sufficient progress in his program.

207.   Rowles had a protected liberty interest in being treated equally under law to similarly situated white and female students.

208.   Rowles had a protected liberty interest in pursuing his chosen profession of cultural anthropology.

209.   Rowles had a protected property and/or liberty interest in his reputation.

210.   Rowles had a protected liberty interest in having the Title IX complaint against him investigated, competently, fairly, and impartially.

211.   Prior to his suspension, Rowles was making sufficient progress toward his Ph.D.

212.   Defendants Scroggs, Eardley, and Gallimore intentionally or recklessly failed to fully investigate the complaints against Rowles.

213.   Defendants Scroggs, Eardley, and Gallimore intentionally or recklessly considered hearsay allegations submitted by a third-party without actually speaking to the subjects of the hearsay.

214.   Defendants Scroggs, Eardley, and Gallimore intentionally or recklessly considered a prior *unsubstantiated* complaint of sexual harassment against Rowles in determining his culpability and sanctions for the complaint at issue in this case.

215.   On information and belief, Salama Gallimore participated in the investigation and drafted the findings in Rowles' case even though he specifically asked Title IX investigator Amber Lammers that Gallimore recuse based on her comment during his prior investigation that he "looked like someone who might commit sexual assault."

216.   On information and belief, Salama Gallimore maliciously pushed to sanction Rowles for sexual harassment and/or stalking based on sex despite the lack of evidence supporting those charges in the current case because she was disappointed her recommendation to sanction him for the earlier Title IX complaint had been overruled by Senior Vice Provost Ken Dean.

217.   Defendants Scroggs, Eardley, and Gallimore effectively expelled Rowles from the University, ended his academic career, damaged his

reputation, and treated him differently from similarly situated white male students and black female students.

218.   In all the actions alleged herein, Defendants Scroggs, Eardley, and Gallimore acted under color of state law.

219.   Defendants Scroggs, Eardley, and Gallimore's actions were the direct and proximate cause of Rowles's injuries, including the deprivation of his federal rights.

220.   Defendants Scroggs, Eardley, and Gallimore's actions in effectively expelling Rowles from the University for writing a letter expressing his feelings in a nonthreatening manner is so outrageous that it shocks the conscience, interferes with rights implicit in the concept of ordered liberty, and offends judicial notions of fairness and human dignity.

221.   Defendant Hayes is the University official charged with enforcing the ongoing sanctions Defendants Scroggs, Eardley, and Gallimore imposed against Rowles.

222.   When enforcing the sanctions against Rowles, Defendant Hayes is acting under color of state law.

223.   Rowles is entitled to reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

## COUNT VI – RACE DISCRIMINATION
## IN FEDERALLY ASSISTED PROGRAMS
### 42 U.S.C. § 2000d
### (against Defendant Curators)

224.   Rowles restates and incorporates by reference all prior allegations in this petition.

225.   As a recipient of federal funding, Defendant Curators are prohibited under Title VI from discriminated on the basis of race.

226.   As an African-American, Rowles is a member of a class protected under Title VI.

227.   Rowles successfully defended his master's thesis in April 2016 and was making sufficient progress toward his Ph.D. in cultural Anthropology when he was suspended from the University.

228.   Rowles was effectively expelled from the University after expressing his feelings in a letter to a white undergraduate who taught Rowles's dance fitness classes.

229.   The formal complaint submitted to the Title IX office by the undergraduate instructor did not allege that Rowles ever intimidated, threatened, stalked, or touched her inappropriately—only that his "bizarre" behavior made her feel "uncomfortable."

230.   Rowles was investigated once before by the Title IX office for quid pro quo sexual harassment of a white female student.

231.    The prior Title IX complaint against Rowles was unsubstantiated.

232.    During that prior investigation, Defendant Salama Gallimore told Rowles that he "looked like someone who might commit sexual assault."

233.    On information and belief, Defendant Gallimore's statement that Rowles looked like someone who might commit sexual assault was motivated by his race and the race of the complainant.

234.    On information and belief, Salama Gallimore was instrumental in drafting the Findings that Rowles had violated University policy at the conclusion of the investigation into the current allegation.

235.    Though Lammers told Rowles that Gallimore would not be involved in the current investigation, Rowles believes that Gallimore was instrumental in drafting the document finding Rowles to have violated University Policy.

236.    Rowles's suspension occurred in circumstances giving rise to an inference that the University discriminated against him on the basis of race.

237.    A law professor and former chair of the Faculty Council at the University of Missouri-Columbia argues in a forthcoming law review article that the University's enforcement of Title IX likely discriminates against African Americans.

238.   Curators have exclusive possession and control of records showing the disparate outcome of disciplinary proceedings involving similarly situated black and white students, and they deliberately conceal such information from the public.

239.   On information and belief, a statistical analysis of Title IX sanctions imposed by the University over the last several years will show a pattern and practice of selective enforcement against male students.

240.   Curators subjected Rowles to discrimination on the basis of his race.

241.   Curators would not have treated a white Ph.D. student the same way that they treated Rowles if the white student had pursued a romantic relationship with a white fitness instructor.

242.   Rowles's race motivated Curators' decision to suspend him from the University.

243.   As a direct and proximate result of Curators' actions, Rowles has suffered damages, including, but not limited to, emotional distress, embarrassment, humiliation, and loss of enjoyment of life.

244.   Curators' actions were outrageous because of their evil motives or reckless indifference to the rights of Rowles, thereby entitling Rowles to an award of punitive damages in an amount that will punish Curators and will deter Curators and other from like conduct.

51

245.   Rowles is also entitled to reasonable attorneys' fees.


## COUNT VII – SEX DISCRIMINATION IN EDUCATION
## Title IX, 20 U.S.C. § 1681
(against Defendant Curators)

246.   Rowles restates and incorporates by reference all prior allegations in this petition.

247.   As a recipient of federal funding, Defendant Curators are prohibited under Title IX from discriminating on the basis of sex.

248.   Defendant Curators have delegated their powers and duties to enforce the non-discrimination provisions of Title IX to the University's Title IX Office.

249.   Rowles's gender is a protected class under Title IX.

250.   Rowles successfully defended his master's thesis in April 2016 and was making sufficient progress toward his Ph.D. in cultural Anthropology when he was suspended from the University.

251.   Rowles was effectively expelled from the University after expressing his feelings in a letter to a female undergraduate who taught Rowles's dance fitness classes.

252.   The formal complaint submitted to the Title IX office by the undergraduate instructor did not allege that Rowles ever intimidated,

52

threatened, stalked, or touched her inappropriately—only that his "bizarre"

behavior made her feel "uncomfortable."

253.    Rowles was investigated once before by the Title IX office for quid

pro quo sexual harassment of one of his students.

254.    The prior Title IX complaint against Rowles was

unsubstantiated.

255.    During that prior investigation, Defendant Salama Gallimore

told Rowles that he "looked like someone who might commit sexual assault."

256.    On information and belief, Salama Gallimore was instrumental

in drafting the Findings that Rowles had violated University policy at the

conclusion of the investigation into the current allegation.

257.    Though Lammers told Rowles that Gallimore would not be

involved in the current investigation, Rowles believes that Gallimore was

instrumental in drafting the document finding Rowles to have violated

University Policy.

258.     The Title IX Office's investigation, finding of culpability, and

imposition of a two-year suspension was motivated by Rowles's gender.

259.    On information and belief, similarly situated female students

accused of substantially similar conduct have not been treated as harshly as

Rowles.

260. Curators have exclusive possession and control of records showing the disparate outcome of disciplinary proceedings involving similarly situated male and female students, and they deliberately conceal such information from the public.

261. On information and belief, a statistical analysis of Title IX sanctions imposed by the University over the last several years will show a pattern and practice of selective enforcement against male students.

262. As a direct and proximate result of the Title IX Office's actions, Rowles has suffered damages, including, but not limited to, emotional distress, embarrassment, humiliation, and loss of enjoyment of life.

263. Rowles is also entitled to reasonable attorneys' fees.

## COUNT VIII – RACE DISCRIMINATION
## IN PUBLIC ACCOMMODATIONS
### § 213.065 RSMo
### (against all defendants)

264. Rowles restates and incorporates by reference all prior allegations in this petition.

265. Defendants subjected and continue to subject Rowles to discrimination on the basis of his race.

54

266.   Defendants would not have treated a white Ph.D. student the same way that they treated Rowles if the white student had pursued a romantic relationship with a white fitness instructor.

267.   This discrimination denied and continues to deny Rowles the accommodations, advantages, facilities, services, or privileges made available in a place of public accommodation, and/or discriminated against him in the use thereof on the grounds of his race in violation of §213.065-213.070 RSMo.

268.   Rowles's race was a contributing factor in the decision to expel him from the University.

269.   The actions of Defendants subject the University to vicarious liability.

270.   As a direct and proximate result of Defendants' actions, Rowles has suffered and continues to suffer damages, including, but not limited to, emotional distress, embarrassment, humiliation, and loss of enjoyment of life, all to Rowles's damage and detriment.

271.   Defendants' actions were outrageous because of Defendants' evil motives or reckless indifference to the rights of Rowles, thereby entitling Rowles to an award of punitive damages in an amount that will punish Defendants and will deter Defendants and other from like conduct.

272.   Rowles is also entitled to reasonable attorneys' fees.

## COUNT IX – SEX DISCRIMINATION
## IN PUBLIC ACCOMMODATIONS
§ 213.065 RSMo
(against all defendants)

273.   Rowles restates and incorporates by reference all prior allegations in this petition.

274.   Defendants subjected and continue to subject Rowles to discrimination on the basis of his sex.

275.   Defendants would not have treated a female Ph.D. student the same way that they treated Rowles if the female student had pursued a romantic relationship with a male fitness instructor.

276.   This discrimination denied and continues to deny Rowles the accommodations, advantages, facilities, services, or privileges made available in a place of public accommodation, and/or discriminated against him in the use thereof on the grounds of his sex in violation of §213.065-213.070 RSMo.

277.   Rowles's sex was a contributing factor in the decision to expel him from the University.

278.   The actions of Defendants subject the University to vicarious liability.

279.   As a direct and proximate result of Defendants' actions, Rowles has suffered damages, including, but not limited to, emotional distress,

56

embarrassment, humiliation, and loss of enjoyment of life, all to Rowles's damage and detriment.

280. Defendants' actions were outrageous because of Defendants' evil motives or reckless indifference to the rights of Rowles, thereby entitling Rowles to an award of punitive damages in an amount that will punish Defendants and will deter Defendants and other from like conduct.

281. Rowles is also entitled to reasonable attorneys' fees.

## JURY TRIAL DEMAND

282. Rowles demands a jury trial of all issues triable to a jury.

WHEREFORE, Plaintiff Jeremy Rowles requests that the Court enter judgment in his favor and against Defendants and award the following relief:

    a. compensatory damages in an amount to be determined at trial;

    b. punitive damages in an amount sufficient to punish defendants and deter future wrongdoing by defendants and others;

    c. an injunction vacating the findings and sanctions imposed against Rowles by the University's Title IX Office;

d.  an injunction ordering the University to reinstate Rowles as a full-time doctoral candidate in good standing with the Department of Cultural Anthropology;

e.  an injunction prohibiting enforcement of the University's sexual harassment and stalking rules to the extent they are void for vagueness or substantially overbroad;

f.  and injunction prohibiting further discrimination on the basis of race or gender;

g.  costs and attorneys' fees;

h.  post-judgment interest; and

i.  such other relief as this Court deems just and proper.


Respectfully Submitted,

*J. Andrew Hirth*

J. Andrew Hirth, #57807
TGH Litigation LLC
913 E. Ash St.
Columbia, MO 65201
573-256-2850
andy@tghlitigation.com

*Counsel for Plaintiff*

58

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

MISSOURI DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS
COMMISSION ON HUMAN RIGHTS
**CHARGE OF DISCRIMINATION**

Enter Charge Number
☐ FEPA  P 05/17-04376
☐ EEOC  28E-2017-01022 F

*This form is affected by the Privacy Act of 1974; see Privacy Act Statement before completing this form.*

## Missouri Commission on Human Rights and EEOC

| Name (Indicate Mr., Ms., or Mrs.)<br>Mr. Jeremy Aaron Rowles | Date of Birth<br>04/04/1976 | Home Telephone No. (Include Area Code) |
|---|---|---|
| Street Address<br>1100 Kennesaw Ridge Unit 305 | City, State and Zip Code<br>Columbia, MO 65202 | County<br>Boone |

**Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship, Committee, State or Local Government Agency who discriminated against me (if more than one list below).**

| Name Curators of the University of Missouri; Cathy Scroggs; Ken Dean | No. of Employees/Members<br>10,000+ | Telephone No. (Include Area Code)<br>573-882-2388 |
|---|---|---|
| Street Address<br>316 University Hall | City, State and Zip Code<br>Columbia, MO 65211 | |
| Name Ellen Eardley; Salama Gallimore; Amber Lammers | No. of Employees/Members<br>10,000+ | Telephone No. (Include Area Code)<br>573-882-3880 |
| Street Address<br>202 Jessee Hall | City, State and Zip Code<br>Columbia, MO 65211 | |

Cause of Discrimination based on (Check appropriate box(es))
☑ Race ☐ Color ☑ Sex
☐ National Origin ☐ Religion ☐ Age
☐ Disability ☑ Retaliation ☐ Other (Specify)

Date Discrimination took Place (Month, Day, Year)
October 2016
☑ Continuing Action

The Particulars Are (If additional space is needed, attach extra sheet(s)):
I am an a 40-year-old African-American male. Until March 15, 2017, I was a doctoral student in Cultural Anthropology at the University of Missouri. Between March 2016 and October 2016, I attempted to form a friendship and/or a romantic relationship with Annalise Breaux, a white fitness instructor with whom I had taken dance classes at the Student Recreation Center. Ms. Breaux and I engaged in flirtatious interactions in person and over Facebook for several months before I asked her out. At that time, she told me she was not interested in a romantic relationship, but encouraged me to continue taking the dance classes she was teaching at the Rec Center. Per her suggestions, I continued taking the classes she taught, but I made no further overtures of a romantic nature and did not communicate with her outside of class over the next few months. In October, I responded to an email Ms. Breaux sent our entire class to ask for help with certain dance moves. She suggested the possibility of individual dance lessons. Her subsequent responses to me appeared to contained mix messages about the scope of our friendship so I wrote her a letter expressing feelings for her and asking whether she wanted to have a relationship with me or whether she wanted me to give up.  Ms. Breaux filed a complaint against me with the university's Title IX office.  She did not allege that I ever touched, threatened, or intimidated her in any way, merely that my letter made her feel uncomfortable.

In March 2017, Assistant Vice Provost for Civil Rights and Title IX Ellen Eardley concluded that my verbal interactions with Ms. Breaux between March 2016 and October 2016 constituted sexual harassment and stalking in violation of the Student Standard of Conduct and Title IX.  She imposed a four-year suspension from all four campuses of the University system. I appealed AVP Eardley's ruling to Cathy Scroggs, Vice Chancellor for Student Affairs, who reduced the suspension from four years to two. Nonetheless, being suspended from all four campuses for two-years effectively terminates my graduate studies and ends my academic career.

☑ I want this charge filed with both the EEOC and the Missouri Commission on Human Rights. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – (When necessary to meet State and Local Requirements)
FILED
I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

X_____  X_____
Charging Party (Signature)   Date   Signature of Complainant

MO Commission on Human Rights
Jefferson City Office

Subscribed and sworn to before me this date (Day, month and Year)

MCHR-27 (4-99) AI

I believe the investigation of Ms. Breaux's complaint was influenced by racial stereotyping, and the severity of the sanction I received from the University is due to my race. Other than occasional high-fives after class, I never touched Ms. Breaux. She did not allege that she ever felt threatened or intimidated by me , only that she felt "uncomfortable" when she got my letter. Our country has a long history of viewing friendly and/or romantic interaction between black men and white women with suspicion. Ms. Breaux told Title IX investigators that she flirted with me during the first three months of our friendship because she thought I was gay--perhaps because I was taking dance classes from her at the Rec Center, which she assumed a heterosexual black man would not take. She only became "uncomfortable" after I asked her out on a date.

This is the second Title IX complaint I have received in my time at the University. The first involved another white female student in a class for which I was a Graduate Instructor. That complaint was ultimately unsubstantiated, but not before Title IX investigator Salama Gallimore told me during the course of her investigation that I "looked like someone who might commit sexual assault." I'm not sure what that could possible mean other than the I am black and the complainant was white. I suspect my exoneration from that earlier complaint contributed to the Title IX office wanting to substantiate the complaint this time around despite a total absence of threatening or intimidating behavior. Indeed, the Office's findings specifically reference allegations from the earlier, unsubstantiated complaint.

I believe the University of Missouri's Title IX office treats complaints against African-American men more severely than white men, especially when they are made by white women. I have been barred from every campus of the state university system for two years--effectively ending my academic career--because a letter I wrote to a white female student made her feel uncomfortable. I doubt the university has every imposed such a severe sanction against a white male student in the same circumstances.

FILED

MAY 2 3 2017

MO Commission on Human Rights
Jefferson City Office

☒ I want this charge filed with both the EEOC and the Missouri Commission on Human Rights. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

X_____
Signature of Complainant

X_____
Charging Party (Signature)          Date

Subscribed and sworn to before me this date (Day, month and Year)

MCHR-27-2 AI




MISSOURI DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS
# MISSOURI COMMISSION ON HUMAN RIGHTS

| ERIC R. GREITENS | ANNA S. HUI | SARA NELL LAMPE | ALISA WARREN, PH.D. |
|---|---|---|---|
| GOVERNOR | ACTING DEPARTMENT DIRECTOR | COMMISSION CHAIRPERSON | EXECUTIVE DIRECTOR |

Jeremy A. Rowles
1100 Kennesaw Ridge, Unit 305
Columbia, MO 65202

RE:  Jeremy A. Rowles vs. CURATORS OF THE UNIVERSITY OF MISSOURI ET AL
      P-05/17-04376

The Missouri Commission on Human Rights (MCHR) is terminating its proceedings and issuing this notice of your right to sue under the Missouri Human Rights Act because you have requested a notice of your right to sue.

You are hereby notified that you have the right to bring a civil action within 90 days of the date of this letter against the respondent(s) named in the complaint. Such an action may be brought in any state circuit court in any county in which the unlawful discriminatory practice is alleged to have occurred, either before a circuit or associate circuit judge. Not only must any action brought in court pursuant to this right to sue authorization be filed within 90 days from the date of this letter, any such case must also be filed **no later than two years after the alleged cause occurred** or your reasonable discovery of the alleged cause.

**IF YOU DO NOT FILE A CIVIL ACTION IN STATE CIRCUIT COURT RELATING TO THE MATTERS ASSERTED IN YOUR COMPLAINT WITHIN 90 DAYS OF THE DATE OF THIS NOTICE (AND WITHIN TWO YEARS OF THE ALLEGED CAUSE, OR THE DISCOVERY OF THE ALLEGED CAUSE, OF YOUR COMPLAINT), YOUR RIGHT TO SUE IS LOST.**

You are also notified that the Executive Director is administratively closing this case and terminating all MCHR proceedings relating to your complaint.  You may not reinstate this complaint with the MCHR or file a new complaint with the MCHR relating to the same act or practice, but rather, if you choose to continue to pursue your complaint, you must do so in court as described in this letter. This notice of right to sue has no effect on the suit-filing period of any federal claims.

This notice of right to sue is being issued as required by Section 213.111.1, RSMo, because it has been requested in writing 180 days after filing of the complaint.  **Please note that administrative processing of this complaint, including determinations of jurisdiction, has not been completed.**

In addition to the process described above, if any party is aggrieved by this decision of the MCHR, that party may appeal the decision by filing a petition under § 536.150 of the Revised Statutes of Missouri in state circuit court.  Any such petition must be filed in the circuit court of Cole County.

Respectfully,

Alisa Warren, Ph.D.
Executive Director

November 27, 2017
Date

C:   additional contacts listed on next page

☒      ☐      ☐      ☐      ☐

3315 W. TRUMAN BLVD.
P.O. BOX 1129
JEFFERSON CITY, MO 65102-1129
PHONE: 573-751-3325
FAX: 573-751-2905

111 N. 7TH STREET, SUITE 903
ST. LOUIS, MO 63101-2100
PHONE: 314-340-7590
FAX: 314-340-7238

P.O. BOX 1300
OZARK, MO 65721-1300

1410 GENESSEE, SUITE 260
KANSAS CITY, MO 64102
FAX: 816-889-3582

108 ARTHUR STREET
SUITE D
SIKESTON, MO 63801-5454
FAX: 573-472-5321

*Missouri Commission on Human Rights is an equal opportunity employer/program. Auxiliary aides and services are available upon request to individuals with disabilities.*
TDD/TTY:   1-800-735-2966 (TDD)   Relay Missouri: 711
www.labor.mo.gov/mohumanrights     E-Mail: mchr@labor.mo.gov

CURATORS OF THE UNIVERSITY OF MISSOURI ET AL
ATTN: Human Resources Director
316 UNIVERSITY HALL
Columbia, MO 65211

ATTN: Ken Dean and Cathy Scroggs

University of Missouri
ATTN: Human Resources Director
202 Jesse Hall
Columbia, MO 65211

ATTN: Ellen Eardley; Salama Gallimore; and Amber Lammers

Nicholas S. Beydler, Office of General Consel
CURATORS OF THE UNIVERSITY OF MISSOURI
Office of General Counsel
227 University Hall
Columbia, MO 65211

J. Andrew Hirth
ATTORNEY AT LAW
913 E. Ash Street
Columbia, MO 65201

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

**From:** "Bach, Emily Ann" <BachE@missouri.edu>
**Date:** Friday, October 14, 2016 at 4:34 PM
**To:** Ellen Eardley <eardleye@missouri.edu>
**Subject:** Potential Student Conduct Violation

Good Afternoon Ellen-

On behalf of one of my program (TigerX/LHP) coordinator's, Pangku Cardona, and several students, we would like to refer the conduct of Jeremy Rowles (Student number 10204280) as a potential violation of the

University's Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/Employment Policy

in Section 600.020 of the Collected Rules and Regulations.

The following information was collected and submitted to me by Pangku – *her personal notations are*

*included in some of the statements as well*:

**Rose Nash** began receiving Facebook messages from Jeremy shortly after he took her classes in January of 2015. Two of the messages have been attached via screenshot. In addition to the messages, in class he would make her uncomfortable with his looks/staring as well as trying to give her high fives after class. In various Instagram posts, which have now been deleted, he also referred to her as "velvet lighting," which made her very uncomfortable. Once she messaged him that she was

**Rowles Petition Ex. C**

not interested, he stopped messaging her. She has since blocked him from social media and he has not made contact with her.

Similar to Rose, **Annalise Breaux** began receiving Facebook messages from Jeremy shortly after he started taking classes from her. The messages are attached. The messages started making her uncomfortable as they started to become intimate and as he also left a comment on one of her pictures which made her uncomfortable. He asked her out on a date to which she declined, but he had continue to push the subject of a date. She then made it clear through Facebook messaging she was not interested in and wanted to keep their interactions professional. He then backed off (as noted in the messages).

Recently, he has come back to her classes and continued to make her uncomfortable. She has noticed him staring at her in the classes that she teaches (in a way that is out of the ordinary of students and instructors). He also finds a way to stand near her to give her high fives and also clasps his hands around hers after/during the high fives to keep the interaction going longer. Other instructors have noticed his stares at her. He recently left her a note (pictured attached) with a song and token/gift card attached to Kaldi's coffee. We can assume the song is a request for the dance class.

During fall of 2015 **Ashlyn Balch** had a few interactions with Jeremy. It started with him talking to her during workouts at the Rec. She did not know him, but he came up to her to ask her about her workouts. He then messaged her on Facebook and asked her out on a date. When she did not respond to him on Facebook, he found her in person and asked her out. She then told him "no." At this time she was also working at Lucky's Market and she noticed he would go to Lucky's a great deal while she was working. One day while she was working, he came into the store and asked her out again to which she said no. He then walked around the store and then came back to her and asked her out again in a very aggressive manner. After this interaction, she blocked him on social media and had not interacted with him since. He has started attending her Wednesday Functional Fitness classes this fall, but has not made her uncomfortable. She keeps her interaction with him very professional and tries to not allow him the opportunity to ask further questions/extra time with her. I have attached a picture of the message he sent her (asking her out the first time).

**Hannah Turnbull** also had a similar with Jeremy. During Fall of 2015 he started coming to her cycling classes. He was very friendly and talkative with Hannah. As the weeks progressed, he started bringing her snacks after classes and messaged her a great deal about the TigerX instructor position (which he had enrolled in our Instructor Training Course and was applying for during the semester). One week, Hannah deactivated her Facebook account due to finals/exams and he got upset about it and thought she was blocking him. One day after a cycling class after Hannah had just broken up with her boyfriend, Jeremy gave her the impression that he was interested in her (in the way of "now that you're broken up, we should go out.") and she then distanced herself from him. He continued to message her about not meaning to have given her that impression and still wanting to be in her life. He continued to send messaged disclosing personal information about himself to her, which made her uncomfortable and he would find things to comment/message on her profile to continue to talk to her. After he thought she had blocked her on Facebook, he then shared that he did have feelings for her and asked her out. She then was very clear that she no longer wanted him to message her. Since then (around January 2016), he has not made contact with her. (Once I get the messages from Hannah, I will pass those along.) On another note, in the message exchange with Hannah, Jeremy makes references to the Wilson's position. He shared that there was a trainer/instructor at that location which he had been talking to who he claimed used their "relationship" to break up with her fiancé. She apparently got him banned from her group fitness classes at Wilson's and then there was a huge blow up which resulted in the SWAT team going to his house to arrest him while they searched his house. It's clearer in the messages that were sent to help why he said the SWAT team had been called. - I'm not sure if this is true or not, but it may speak to a potential reaction he may have if we are to ban him from our Fitness Programs (depending on where this goes).

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

Thank you in advance for considering the matter – I would like to discuss with you at your soonest convenience what we can do as the employer to ensure our staff feel safe and secure as we know at this point we (MizzouRec/TigerX program) have no justification to remove or preclude him from accessing the building or program.

Please let me know if you have any additional questions or need more information to contact our staff.

**Emily McElwain**
*Associate Director*
*Team Mizzou – Marketing - Fitness Programs*
**MizzouRec Services & Facilities**
573.882.5375 (office)
573.884.5404 (fax)
http://mizzourec.com/

**Rowles Petition Ex. C**

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

**FORMAL COMPLAINT**

October 21, 2016

On this date, I am writing to state that I would like to file a complaint against Jeremy Rowles for events that occurred on or around March 2015-October 2016 which harassment on the basis of [my] sex.

On March 2, 2015 the following incidents occurred on Facebook and at the MizzouRec. Jeremy began a private message thread that consisted of complimenting me on my dance choreography, dance skills, the way my body moved, and other inappropriately intimate comments about myself. On April 12, 2015, Jeremy cornered me at the MizzouRec while I was on my way to clock off after a class I taught that he attended and asked me on a date. This made me extremely uncomfortable and I declined saying I was "too busy this week". He continued to message me on Facebook after that and the incessant messaging lasted until April 18, 2015 when I told him he needed to stop messaging me and keep our relationship strictly professional because he was making me uncomfortable. He apologized and did not attempt to message me after that but continued to attend the TigerX classes that I taught. This semester (Fall Semester 2016), he began attending all four of the TigerX classes that I teach and would do things such as linger after class to make sure he was able to say something to me, consistently high five and grab my hand intimately before, during, and after my classes, and stare me down the entirety of my class whether I was directly teaching or not. All of these things made me very uncomfortable. On September 27, 2016, Jeremy emailed me privately asking for tips on how to develop his skills for the contemporary dance class I teach. I replied with a short and professional response that included private lessons as an option. He then replied saying how adamant he was on taking those private lessons, especially with me. I did not respond. On October 3, he emailed me again complaining about how ZouLife would not allow him to sign up for private lessons and then confronted me after class about it. He told me again how much he wanted to take private lessons from me which I responded that I was not currently and would not offer private lessons. He was very peeved about this. On October 7, 2016, Jeremy stayed behind after class again but I dashed off to the bathroom before he could say anything to me. He waited around for me to come back, but my co-instructor Maddie made him leave and so he handed her a note and told her to give it me. The note contained a Kaldi's Coffee free drink token and "The Scientist" by Coldplay written down. Jeremy knows I work at Kaldi's Coffee and I was not sure what this note was supposed to mean but it was very bizarre. On October 14, 2016, Jeremy again lingered after class and approached me and handed me a three-page typed letter and said it was an apology note for the other week. I told him I would not accept it because his actions were making me uncomfortable and I promptly listed the reasons why and asked him what he thought was going on here because we did not have a personal relationship. I am the instructor and he is the member. That was the extent of our "relationship". I told him I have taken this situation to my supervisor and that larger measures will be taken because of it. I did not specifically mention Title IX. I ended up taking the letter anyways to use as evidence in this investigation. It was a letter that

contained apologies and a confession for his "love" for me.

I am giving the Office for Civil Rights & Title IX permission to contact witnesses and proceed with an investigation.

Below are some witnesses who might have information about this:
Maddie Dingman, who is my co-instructor who witnessed Jeremy hand me both notes and has seen him staring at me during class.
Kasey Long, who is another co-instructor who witnessed him coming to my class last spring semester when the incidents began to take place and also when he confronted me about the private lessons after class.
Danielle Zoellner, who is a co-instructor who witnessed Jeremy staring me down and lingering after my contemporary class to talk to me. She was also aware of the incidents that happened last spring semester.

Sincerely,

Annalise Breaux

# UNIVERSITY *of* MISSOURI

**OFFICE FOR CIVIL RIGHTS & TITLE IX**

November 7, 2016

<u>**VIA ELECTRONIC MAIL AND HAND-DELIVERED**</u>
Jeremy Rowles
████████████████

**RE: Notice of Investigation of Potential Sex Discrimination**

Dear Mr. Rowles:

      As an Investigator in the Office for Civil Rights & Title IX, I write to inform you that our office has received a formal complaint and other allegations of potential discrimination naming you as the Respondent (or Accused). The University is initiating an investigation of the allegations made against you. Please understand that at this point these are only allegations, which I am tasked with investigating.

      I will investigate allegations that on or about March 2015-October 2016 you engaged in the following behaviors which impacted Annalise Breaux:

- Starting on March 2, 2015, you sent multiple Facebook messages in a private thread to Breaux, including comments about her dance choreography and skills and the way her body moved. In several messages, you call her "Silky," in reference to her body and movements.
- On April 12, 2015, Breaux reported that you waited after class and "cornered" her to ask her out. After she declined to go on a date with you, you continued to message her "incessantly" until April 18 when she told you that you needed to stop messaging her, and she specifically expressed to you that she wanted to be professional in her interactions with you.
- During the fall 2016 semester, you attended all four weekly TigerX classes that Breaux teaches. She reported that you "lingered" after class to talk to her multiple times. Additionally, she alleges that on various occasions this semester you gave her many high fives; grabbed her hand in an "intimate" way before, during, and after classes; and stared at her intensely for the "entirety" of classes.
- On October 3, 2016, you emailed Breaux insisting on taking private lessons with her. You reportedly complained to her via email and "confronted" her after class, stating that ZouLife would not allow you to sign up for private lessons with her.
- On October 7, 2016, you reportedly gave one of Breaux's coworkers a note to give her after you were unable to talk directly to Breaux after class. The note contained song lyrics and a free drink token to Kaldi's, which is where Breaux works.
- On October 14, 2016, Breaux alleges that you stayed after class and handed her a three-page typed apology letter, which she did not want. However, Breaux eventually took the letter from you, which contained apologies and a "confession" of your love for her.

Case 2:17-cv-04250-BCW Document 1-1 Filed 12/15/17 Page 69 of 150
Rowles Petition Ex. E
145 Heinkel Bldg. Columbia, MO 65211 Phone: 573-882-3880 Email: civilrights-titleix@missouri.edu

# UNIVERSITY *of* MISSOURI
### OFFICE FOR CIVIL RIGHTS & TITLE IX

Breaux stated that the accumulation of these incidents made her feel uncomfortable and interfered with her ability to focus on work at the Rec Center. In addition, the Office for Civil Rights & Title IX received reports about your interactions of a similar nature with multiple other Rec Center employees, including frequent unwanted Facebook and text messages. Information about those reports may be forthcoming, and you will have a chance to respond to all allegations during the investigation.

The University utilizes the Equity Resolution Process to respond to concerns of discrimination and harassment. The Equity Resolution Process for students is set forth in the University of Missouri Collected Rules and Regulations (CRR) Section 200.025. I will be conducting an investigation pursuant to this Policy.

The alleged conduct may violate CRR 200.010, which is the Standard of Conduct for Students and Student Organizations. At this time, I am considering the allegations to fall under the sexual harassment and stalking provisions, but as the investigation proceeds, I may have reason to change my understanding of the complaint.

...

**200.010.C. Conduct** for which students and student organizations, when applicable, are subject to sanctions falls into the following categories:

...

7. **Violation of the University's Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/Employment Policy in Section 600.020 of the Collected Rules and Regulations.** These violations include:

   ...

   b. **Sexual Harassment.** Sexual harassment is defined as:
      1) Unwelcome sexual advances or requests for sexual activity by a person or persons in a position of power or authority to another person, or
      2) Other unwelcome verbal or physical conduct of a sexual nature by a person to another person, when:
         a) Submission to or rejection of such conduct is used explicitly or implicitly as a condition for academic or employment decisions; or
         b) Such conduct creates a hostile environment by being sufficiently severe or pervasive and objectively offensive that it interferes with, limits or denies the ability of an individual to participate in or benefit from educational programs or activities or employment access, benefits or opportunities.

   ...

   d. **Stalking on the Basis of Sex.** Stalking on the basis of sex is following or engaging in a course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed.

   ...

The policies referenced in this letter are also attached or enclosed.



Electronically Filed - Boone - December 06, 2017 - 04:09 PM

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

# UNIVERSITY *of* MISSOURI

### OFFICE FOR CIVIL RIGHTS & TITLE IX

<u>Please refer to the attached list of your rights as I investigate and resolve the complaint.</u> Two in particular are relevant at this stage:

- **You have the right to have an Advisor** of your choice (attorney, parent, friend, professor etc.) accompany you to any meeting or proceedings. Having an Advisor is optional, at your discretion. The Advisor may not speak for you but you may consult with your Advisor.

- You have the right to provide evidence and to provide me with a list of potential witnesses who may have relevant information. Any relevant documentation may also be provided.

<u>In addition to your rights, there are some responsibilities of which you should be aware</u>:

- On November 7, 2016, you received a notice of interim remedies letter from Ellen Eardley which explained that you are prohibited from visiting the Rec Center for the duration of the investigation.

- I have also issued a No Contact Directive which prohibits further communication between you and Breaux.

- Also, please note that *at no time should you engage in any type of retaliation against the complainant or anyone who participates in the investigation and/or resolution process.* Retaliation is strictly prohibited and would constitute a separate policy violation. Retaliation is any adverse action taken against a person because of that person's participation in protected activity (making a good faith report of discrimination, participating in the investigation, testifying, etc.).

I also ask that you *please keep this investigation private* in order to protect the integrity of the investigation, though you may speak with an advisor.

The University is charged with completing a thorough, reliable, and impartial investigation. I have been assigned as the investigator in this case and will be contacting you shortly. Please feel free to contact me if you have any questions as this investigation proceeds.

Sincerely,

*Amber Lammers*

**Amber Lammers, J.D.**
Investigator, Office for Civil Rights & Title IX

Enclosures

cc: Ellen Eardley, Asst. Vice Chancellor for Civil Rights & Title IX and Title IX Administrator



University of Missouri
Office for Civil Rights & Title IX
Name of Investigator: Amber Lammers
Date of Report: February 27, 2017

# INVESTIGATIVE REPORT

**Parties:**

Annalise Breaux: Complainant, MU undergraduate student, MizzouRec employee

Jeremy Rowles: Respondent, MU graduate student

**Witnesses:**

Bailey Baucum: MU undergraduate student, MizzouRec employee

Madeline Dingman: MU undergraduate student, MizzouRec employee

Kasey Long: MU undergraduate student, MizzouRec employee

Danielle Zoellner: MU undergraduate student, MizzouRec employee

**Others:**

Ashlyn Balch: MU undergraduate student, MizzouRec employee

Taeler De Haes: Former MU undergraduate (SP14) and graduate student (SP16)

Peyton Downs: Former MU undergraduate student (transferred to another school SP14)

Jacqueline Hermanson: Former MU undergraduate student (FS15) and former MizzouRec employee

Rose Nash: MU undergraduate student, MizzouRec employee

Hannah Turnbull: MU undergraduate student, MizzouRec employee

**Relevant Dates Alleged:**

January 30, 2015
  • Rowles sent Rose Nash a message[1] via Facebook
June 12, 2015
  • Rowles sent Rose a second message[2] via Facebook

---

[1] Exhibit 1 (JR message to Nash 1.30.15)
[2] Exhibit 2 (JR message to Nash 6.12.15)

Rowles Petition Ex. 1

<u>August 13, 2015</u>
- Rowles sent Ashley Balch a message[3] via Facebook

<u>Fall 2015</u>
- Rowles and Turnbull exchanged text messages[4]

<u>March 2-April 18, 2016</u>
- Rowles and Breaux exchanged Facebook messages[5]
- On or around April 18, Rowles commented[6] on Breaux's Instagram photograph, as referenced in their Facebook messages

<u>October 3, 2016</u>
- Rowles sent an email[7] to Breaux expressing frustration that he cannot take private dance lessons with her

<u>October 14, 2016</u>
- Rowles gave Breaux a letter[8] after class, containing apologies and expressions of his feelings for her
- Emily Bach McElwaine, Assoc. Director for Team Mizzou, Marketing & Fitness Programs at MizzouRec, submitted a report[9] via email to the Office for Civil Rights & Title IX alleging that Jeremy Rowles engaged in sexually harassing and stalking behaviors toward several student staff members, including Annalise Breaux

<u>October 20, 2016</u>
- Meeting with Breaux to discuss the allegations

<u>October 21, 2016</u>
- Breaux submitted a complaint to the Office for Civil Rights & Title IX[10]

<u>November 7, 2016</u>
- Notice of Interim Suspension of MizzouRec Privileges[11] emailed to Rowles
- Notices of Investigation[12] and No Contact Directives[13] emailed to the parties

<u>November 9 and 11, 2016</u>
- Meetings with Rowles to discuss the allegations

<u>December 13, 2016</u>
- Ellen Eardley, Title IX Administrator and Asst. Vice Chancellor for Civil Rights & Title IX, emailed Notice of Charges[14] to the parties, notifying them of her

---

[3] Exhibit 3 (JR message to Balch 8.13.15)
[4] Exhibit 4 (Rowles and Turnbull text messages)
[5] Exhibit 5 (Rowles and Breaux Facebook messages). On April 5 at 10:03pm, Rowles allegedly sent Breaux a Facebook message that appears as a photograph of a floor in the exhibit document. Rowles and Breaux both explained to me that this was a video of Breaux dancing during class that was recorded and sent by Rowles. They discuss the video in the messages that follow. During our meeting, Breaux explained that the class had broken up into smaller groups, and Rowles was recording her instead of dancing.
[6] Exhibit 6 (JR Instagram comment)
[7] Exhibit 7 (JR emails re private dance lessons)
[8] Exhibit 8 (JR letter to Breaux 10.14.16)
[9] Exhibit 9 (Incident Report 10.14.16)
[10] Exhibit 10 (AB Formal Complaint)
[11] Exhibit 11 (JR Interim Suspension of MizzouRec Privileges)
[12] Exhibit 12 (JR Notice of Investigation)
[13] Exhibit 13 (JR No Contact Directive)
[14] Exhibit 14 (JR Notice of Charges)

Rowles Petition Ex. 1

determination that there was sufficient evidence to proceed to the resolution phase of the Equity Resolution Process.

December 15, 2016
- Both parties selected Informal Resolution to resolve the allegations[15]

February 24, 2017
- Notice of Intent to Render Findings[16] sent to the parties


**History of the Case:**

On October 14, 2016, Emily Bach McElwaine, an Associate Director at MizzouRec, submitted a report via email stating that Jeremy Rowles had engaged in sexually harassing and stalking behaviors toward four female students employed by MizzouRec. The report included documentary evidence of the respondent's communications and the names of the potential victims/complainants: Ashlyn Balch, Annalise Breaux, Rose Nash, and Hannah Turnbull.

Upon receipt of the report, I attempted to contact each of them by telephone and email. Breaux is the only student of the four who responded to me. We met on October 20 to discuss the allegations, as well as, her rights and options in the Equity Resolution Process. The next day, Breaux filed a formal complaint with the Office for Civil Rights & Title IX accusing Rowles of violating University policy.

Hereinafter, Breaux is referred to as the "complainant" in this case. Information in the report regarding the other three employees is also included below and may be considered as evidence of a possible pattern of discriminatory behavior. However, Balch, Nash, and Turnbull did not file complaints against Rowles. The three women spoke with their supervisors at MizzouRec about their interactions with Rowles, but they did not speak to me directly.

I met with Rowles on November 9 and 11 in my office, and we spoke again via telephone on December 14. We discussed the allegations made against him, the Equity Resolution Process, and his rights therein. His responses to the allegations are included in this report.


**Potential Violations:**

I sent a Notice of Investigation (NOI) to Rowles via email on November 7, 2016, and I provided him with a hard copy of the NOI during our meeting on November 9, 2016. Rowles acknowledged receipt of the NOI, which informed him that an investigation was being conducted pursuant to the University of Missouri Collected Rules and Regulations (CRR) Chapter 200.025(E).

---

[15] Exhibit 15 (AB and JR Selected Informal Resolution)
[16] Exhibit 16 (JR Notice of Intent to Render Findings)

On December 13, 2016, Ellen Eardley sent a Notice of Charges letter (NOC) to Rowles' University email account. The NOC stated that Rowles was accused of violating University policy, specifically CRR 600.020 (Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/Employment Policy), by engaging in sexual harassment and stalking on the basis of sex toward several student MizzouRec employees. The NOC contained the following allegations:

- Starting on March 2, 2015, Rowles reportedly sent multiple Facebook messages in a private thread to Breaux, including comments about her dance choreography and skills and the way her body moved. In several messages, he called her "Silky," in reference to her body and movements. Breaux stated that the increasing sexual/romantic nature of the messages was unwanted.
- On April 12, 2015, Breaux reported that Rowles waited after class and "cornered" her to ask her out. After she declined to go on a date with him, Rowles continued to message her "incessantly" until April 18 when she told him that he needed to stop messaging her, and she specifically expressed to him that she wanted to be professional in her interactions with him. Breaux reported that Rowles' advances were unwelcome, and they interfered with her ability to feel safe and comfortable in the Rec Center, which is her workplace.
- During the Fall 2016 semester, Breaux reported that Rowles attended all four weekly TigerX classes she taught. She reported that Rowles "lingered" after class to talk to her multiple times. Breaux explained that she took extensive measures to avoid contact with Rowles after classes, such as leaving the room quickly and sometimes making up excuses such as going to the restroom in order to do so, standing on the other side of the room from the door as students left class, and asking her coworkers to step in and talk with Rowles instead.
- Additionally, Breaux alleged that on various occasions during the fall 2016 semester Rowles gave her many high fives; grabbed her hand in an "intimate" way before, during, and after classes; and stared at her intensely for the "entirety" of classes. She characterized the way Rowles stared at her as more intense and personal than the way he looked at other instructors who led classes. Further, she reported that Rowles made a purposeful effort to stand in front of her during class, rather than in front of the other instructors, so that he could more easily look at her. Breaux reported that on at least a few occasions she asked the second instructor of a particular class to switch sides so that she could put more space between her and Rowles because she felt uncomfortable.
- On October 3, 2016, Rowles reportedly emailed Breaux insisting on taking private dance lessons with her. According to Breaux, Rowles complained to her via email and "confronted" her after class, stating that ZouLIFE would not allow him to sign up for private lessons with her. She interpreted his tone as frustrated, and she reported that she felt intimidated and confused by Rowles' persistence.
- On October 7, 2016, Rowles reportedly gave one of Breaux's coworkers a note to give her after he was unable to talk directly to Breaux after class. The note contained song lyrics and a free drink token for Kaldi's, which is another location where Breaux works.

4

- On October 14, 2016, Breaux alleged that Rowles stayed after class and handed her a three-page typed letter, which she did not want to take from him. However, Breaux eventually took the letter, which contained apologies and a "confession" of Rowles' love for her. She reported that his romantic sentiments were unwanted and persistent even after she asked him to stop communicating with her in that way.

In addition, the Office for Civil Rights & Title IX received reports that Rowles engaged in interactions of a similar nature with multiple other female MizzouRec employees, including unwanted Facebook and text messages sent to Balch, Nash, and Turnbull. Rowles and I discussed the allegations pertaining to all four individuals at our meetings during the investigation, and I gave him the opportunity to respond.

These allegations are categorized as sexual harassment and stalking on the basis of sex, as defined in CRR 600.020(C) and 200.010(C)(7). Relevant provisions state:

> …
> **Sexual Harassment**. Sexual harassment is defined as:
>   a. Unwelcome sexual advances or requests for sexual activity by a person or persons in a position of power or authority to another person, or
>   b. Other unwelcome verbal or physical conduct of a sexual nature by a person to another person, when:
>      1) Submission to or rejection of such conduct is used explicitly or implicitly as a condition for academic or employment decisions; or
>      2) Such conduct creates a hostile environment by being sufficiently severe or pervasive and objectively offensive that it interferes with, limits or denies the ability of an individual to participate in or benefit from educational programs or activities or employment access, benefits or opportunities.
> …
> **Stalking on the Basis of Sex**. Stalking on the basis of sex is following or engaging in a course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed.

**Jurisdiction:**

For the duration of the fall 2015, spring 2016, and fall 2016 semesters, both Breaux and Rowles were, and currently are, enrolled students[17] at the University of Missouri.

---

[17] Meeting the definition as set forth by CRR 200.025.B.7, "A person having once been admitted to the University who has not completed a course of study and who intends to or does continue a course of study in or through one of the campuses of the University…"

**Standard of Proof:**

When this matter is reviewed by the decision maker [or panel] pursuant to the University's Equity Resolution Process, the standard of proof will be "preponderance of the evidence," defined as determining whether evidence shows it is more likely than not that a policy violation occurred.[18]

**Information from Complainant Annalise Breaux:**

In her complaint dated October 21, 2016, Breaux described the following allegations against Rowles:

> On March 2, 2016, the following incidents occurred on Facebook and at the MizzouRec. Jeremy began a private message thread that consisted of complimenting me on my dance choreography, dance skills, the way my body moved, and other inappropriately intimate comments about myself. On April 12, 2016, Jeremy cornered me at the MizzouRec while I was on my way to clock off after a class I taught that he attended and asked me on a date. This made me extremely uncomfortable and I declined saying I was "too busy this week".

> He continued to message me on Facebook after that and the incessant messaging lasted until April 18, 2016, when I told him he needed to stop messaging me and keep our relationship strictly professional because he was making me uncomfortable. He apologized and did not attempt to message me after that but continued to attend the TigerX classes that I taught. This semester (Fall Semester 2016), he began attending all four of the TigerX classes that I teach and would do things such as linger after class to make sure he was able to say something to me, consistently high five and grab my hand intimately before, during, and after my classes, and stare me down the entirety of my class whether I was directly teaching or not. All of these things made me very uncomfortable.

> On September 27, 2016, Jeremy emailed me privately asking for tips on how to develop his skills for the contemporary dance class I teach. I replied with a short and professional response that included private lessons as an option. He then replied saying how adamant he was on taking those private lessons, especially with me. I did not respond.

> On October 3, he emailed me again complaining about how ZouLIFE would not allow him to sign up for private lessons and then confronted me after class about it. He told me again how much he wanted to take private lessons from me which I responded that I was not currently and would not offer lessons. He was very peeved about this.

---

[18] Per CRR 200.025.G.3(a)

On October 7, 2016, Jeremy stayed behind after class again but I dashed off to the bathroom before he could say anything to me. He waited around for me to come back, but my co-instructor Maddie made him leave and so he handed her a note and told her to give it me. The note contained a Kaldi's Coffee free drink token and "The Scientist" by Coldplay written down. Jeremy knows I work at Kaldi's Coffee and I was not sure what this note was supposed to mean but it was very bizarre.

On October 14, 2016, Jeremy again lingered after class and approached me and handed me a three-page typed letter and said it was an apology note for the other week. I told him I would not accept it because his actions were making me uncomfortable and I promptly listed the reasons why and asked him what he thought was going on here because we did not have a personal relationship. I am the instructor and he is the member. That was the extent of our "relationship". I told him I have taken this situation to my supervisor and that larger measures will be taken because of it. I did not specifically mention Title IX. I ended up taking the letter anyways to use as evidence in this investigation. It was a letter that contained apologies and a confession for his "love" for me.

I met with Breaux on October 20, 2016, in my office. She recalled that she met Rowles while working at Kaldi's about a year ago; she explained that Rowles was a "regular" there. She said, "I would see him in the evenings at Kaldi's, and I would talk to him casually." Breaux stated that she was hired to be a TigerX instructor at the end of the fall 2015 semester, and then she started working in spring 2016.

Breaux explained that Rowles started taking her classes "right away" when she started working as an instructor. She said she recognized him from Kaldi's, and he recognized her too. Breaux recalled that their interactions became more "personal," such that Rowles would speak to her more often, even about things unrelated to the classes. She said he seemed friendly.

Breaux also told me that, at first, she did not interpret Rowles' behavior or comments as flirting or uncomfortable because she thought he was gay, and thus, he would not pursue a romantic relationship with her. She added, "During one conversation at Kaldi's, he was talking about a relationship with a 'partner,' and not a lot of older straight men come to our classes. That's why I was not cautious in the beginning. That's why I accepted his compliments for a while."

When asked, Breaux stated she was not aware that other female instructors had concerns about Rowles until more recently. She said she is aware that Rose Nash had similar experiences with him, but she was not aware of incidents involving other staff members.

Breaux expressed that she appreciated Rowles' Facebook messages at first, but then they overwhelmed her as they became more frequent and increasingly romantic in nature. She also recalled when Rowles "crossed the line" in person:

He cornered me after class one day. I was going downstairs to clock out. He stopped me and asked me to go on a date. He refers to that in the Facebook messages. He was standing very close to me and made me uncomfortable. He crossed that line and told me that he thinks something is going on, but it's not.

I asked Breaux which classes Rowles attended at the beginning of the fall 2016 semester. She replied,

All the dance classes. Dance Fitness, Tiger Tease, Life Works…he took all of them. He came to Tiger Tease on Tuesdays and Fridays. Something came up for him on Tuesdays, but he kept coming on Fridays. Last semester, in the spring, he took one at a time, but then he started taking all them at the same time this semester. He kept coming to my classes and staring me down in the mirror. He would linger after class to have the last word. He would do anything he could do to still be around me in the professional environment.

Breaux referenced the emails[19] Rowles sent her in which he inquired about taking private dance lessons with her. After exchanging those emails, Breaux recalled that Rowles stayed after class to ask the instructors about taking private dance lessons, and he seemed "very irritated." Breaux reported that Rowles' persistence made her feel uncomfortable. She told me that she felt this was his attempt to spend more time with her in a professional setting since he could not spend time with her outside of classes.

I asked Breaux to describe Rowles' activity on her Instagram account. Breaux said that she posted a photograph that she had taken of herself to her Instagram account, and then she was surprised and embarrassed to see Rowles' comment, which she felt was flirtatious, inappropriate, and inconsistent with the relationship they had. Breaux reiterated at several points during our conversation that she never had romantic feelings for Rowles, and she never intended to suggest otherwise during their interactions. Rather, she said her goal was to maintain a strictly professional relationship.

Regarding the letter Rowles gave to Breaux, she explained,

He was shaky and nervous on Friday when he was holding the letter. He couldn't make words. I was telling him why it was inappropriate, and he couldn't respond. He said he was sorry, and he's not that that kind of guy. I told him that I told my supervisor [about his inappropriate interactions with me]. I said it was a pattern of behavior that had been done to previous instructors, and it was not right. He said, "Do you want me to stop coming?" I said, "Yes, that's what I want, but it still might go further than that."

I asked Breaux when she found out that Rowles was behaving similarly toward other female staff members. She said, "This summer or just before. At one of our staff meetings, it was brought up. Rose said that Rowles sent her messages too." Breaux described Rowles as "delusional," and stated that he ignored "obvious social cues" that

---

[19] Exhibit 7 (JR emails re private dance lessons)

she did not want a romantic relationship with him. Breaux explained that other male customers have flirted with her and fellow instructors in the past, but she thought Rowles was different—more inappropriate—because he was significantly older and his communications were more personal and frequent. Breaux stated, "[Rowles] has an inability to read social cues. It's not necessarily malicious, but he does pick up on some cues in other instances. It's not universal. He didn't understand that things were over, and that we couldn't be friends."

Breaux described various instances of physical contact and interactions with Rowles during class, such as staring at her. She said,

> He would high five me before class. It was just the feelings I got from these interactions…little things like him trying to grab my hand. He would come up during class, and I would reach out to hit his hand when he wanted me to. I would try to barely touch him, but he would grab my hand. Other instructors would notice too. There are two of us teaching each class. When I was teaching, he would stare at me. When I would get down to do floor work, he would stay standing and watch me. All of this started happening last semester, but it was more intense this semester.

I asked Breaux why Rowles called her "Silky" in his messages. She told me that he made up that nickname, and she thinks it is meant to describe the way her body moves— "smooth like silk." Breaux explained that Rowles called Nash "Velvet," and he said similar things to Nash, such as, "Your body is like velvet."

Breaux informed me that she first told her supervisor, Pangku Cardona, about Rowles' inappropriate interactions with her shortly before she sent Rowles a message via Facebook alerting him that his messages were becoming excessive and asking to keep their relationship professional. Breaux stated that this conversation with Cardona occurred before the staff meeting at which she found out about Nash's experiences with Rowles. She recalled that she deleted and blocked Rowles on all of her social media accounts, and she has not received any further communication from him since the report was made to our Office.

**Information from Respondent Jeremy Rowles:**

I met with Rowles on November 9, 2016, in my office. He explained that he first met Breaux in late 2015 or early 2016 at Kaldi's. He stated that he was sick and stressed out at the end of December and around New Years, so he went to Kaldi's several times to get hot tea. He said that he became a "regular," and the employees got to know him, including a woman named Abagael. Rowles explained that he frequently talked to her when she was working. He said that he also met Breaux who often worked at Kaldi's in the evening, and he started to get to know her through multiple conversations. Rowles recalled one occasion where he did not receive the correct order:

9

Annalise came to the side of the counter that was closest to my table and apologized from her side of the counter. I got up, approached the counter, and told her that it was not a big deal. Annalise apologized again and gave me a token for a free drink. It was Annalise who gave me the free token. She also asked me for my name, and after I gave it to her, I asked for hers.

Rowles continued,

A couple days later, I went back to Kaldi's again. Annalise was working, and I was drinking my tea. She came to my table as she was cleaning the floor and started talking to me. We talked about more details. She said she was from Dallas, and that she was a student at MU studying accounting. There was another time when she initiated a conversation with me at Kaldi's; she told me something about relationships. At that point, I was thinking she was attractive, and she was talking to me about personal things. She said she was talking to this guy in St. Louis. I gave her advice about that. I used to be in a long-distance relationship.

A couple weeks later, around MLK Day, I asked about the St. Louis guy, and she hinted that it wasn't working out. I didn't make a move on her because I was going through other relationship troubles at the time. I was stressed out. Something happened that really bothered me and put me in a funk. I wasn't looking for anybody at that point.

Next, Rowles explained,

The semester started. I went to the Rec Center a lot to work out. Since January 2015, I have routinely lifted weights almost every weekday morning, and Saturdays when it's open. Also, since Fall of 2014, I have gone to a lot of the TigerX fitness classes, usually about seven per week. During fall 2015, I went to eight or nine per week. I was doing double on some days —one in the morning and one at night. I routinely attended the Insanity, Functional Fitness, Dance Fitness, and Tiger Tease classes. I have also attended many other classes several times, including Endurance Cycling, Intermediate Cycling, Pump (a strength conditioning class), and HIIT (high intensity interval training).

At the beginning of the semester, they have a TigerX kickoff event where they do free demos of the classes. I went to the kickoff for winter 2016. While I was there, I talked to the instructors because they know me. I trained last fall (fall 2015) to be a TigerX instructor. I wasn't hired, but I know a lot of people in my training group who were.

At the kickoff, an instructor named Drea came up to me. She asked if I was going to come to her Dance Fitness class that semester. I had started going to Dance Fitness in fall 2015**.** In the fall of 2015, Dance Fitness was taught only by Drea and Kasey. I loved that class. It reminded me of a type of class taught at Wilson's Fitness that I loved so much that I thought about getting certified as an instructor

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

so that I could teach it. I confirmed to Drea that I would be attending her class. She told me that Kasey would no longer be teaching Dance Fitness; instead, she would be training two new instructors, Bailey and Natalie. She told me Kasey would be teaching Tiger Tease with her that semester. Then, Drea began trying to convince me to come to their Tiger Tease class. At that time, I had never gone to Tiger Tease. I told Drea that I thought it was intended to be a "girls only" type of class, and that it would awkward for guys to attend the class. Drea told me that, actually, of all the classes she teaches, Tiger Tease has the highest male attendance.

Right after that, Annalise came up and said, "Hey." She had a TigerX uniform on. I said, "What are you doing here? I didn't know you were a TigerX instructor." She told me she was just hired and it was her first semester. Soon after that, a class demo began. I believe it was Zumba. Me, Drea, and Annalise danced near each other through the whole demo. Afterwards, Annalise told me "goodbye" and left. Drea said to me, "You're coming to Tiger Tease, right?" I told her that I would give it a try. Through the whole interaction with both Annalise and Drea, neither one of them told me that Annalise would be the third instructor for Tiger Tease that semester, along with Drea and Kasey. I only began attending Tiger Tease because Drea pitched it so hard to me.

Rowles continued,

I started going to classes. I was going to Insanity, Dance Fitness, and Functional Finesses classes. I also went to Tiger Tease classes taught by Annalise and two other instructors: Kasey [Long] and Drea. The first class was the first time I realized that Annalise was an instructor for Tiger Tease. Right before the class, she came up to me and asked if I was doing Tiger Tease. I said "yes," and then asked if she was teaching. She said yes. We both seemed excited at our respective affirmative answers.

I really enjoyed the class. It's sexy, and we have fun with it. Tiger Tease is a class where you learn dance routines in the style called "jazz burlesque." It has a lot of sexual movements in that style. It was awkward for us to do sexy movements taught by the instructors in front of strangers, so the entire class would joke around a lot to ease the awkwardness. Each instructor had their favorite moves: Drea would always swivel her hips, Kasey would break it down and slowly bring it up, and Annalise's favorite move was the booty drop. I have stiff knees, and I would joke with Annalise about how I can only do it about eight times. After that, I wouldn't be able to get my booty back up from dropping. When she taught the classes, I immediately saw that she was a trained dancer. Her technique was so good.

After the first time [Breaux] was the lead instructor for the Tiger Tease class, in February 2016, she kept apologizing to the class. She couldn't remember the steps. She was out of it. After that class, I went up to her and said, "Is it possible

that I can give you advice? I'm not trying to take control or tell you how to run the class. I used to be an instructor." She said, "Sure."

I told her again that I wasn't trying to take over the class. It's annoying when a guy tries to do that; I know that. I said, "It has been my experience that it's best not to apologize to the class when you mess up. If you mess up, just play if off and keep going. We don't know when you do something wrong unless you draw attention to it. There are always going to be people in the class who doubt you, and when you apologize, they may start to disrespect or suspect you don't know what you are doing. Just play it off and keep going." She said, "Thank you so much."

Rowles explained to me that he used to be a certified instructor at Wilson's Fitness Center. Rowles told me about another interaction with Breaux in early February:

It was before class. We were outside the studios. Annalise ran up and gave me a booty bump from the back. It was before the class where I told her not to apologize for messing up. I was filling up my water bottle at the fountain. She came up from the side and bumped me with her hips. She asked if I was coming to class. I said, "Yes," and she said, "Sweet!"

Rowles explained that Breaux is not the only instructor he complimented. He also said, "One time when Kasey was teaching, she instructed us to get from our knees in a difficult movement.  Annalise got up from her knees effortlessly and pointed her toe while doing so. It was impressive. I could tell she was really good, and I told her so. She said she really appreciated me telling her that."

Next, Rowles and I reviewed his Facebook conversation with Breaux. He recalled that when they were exchanging messages, in March and April 2016, he only saw Breaux once per week at the Rec Center because she was not teaching many of the classes he attended at that time. He emphasized that every interaction he had with Breaux outside of class was the result of Breaux approaching him, rather than the other way around, "except when [he] ordered a burrito from her at Kaldi's and when [he] gave her advice."

On March 2, 2016, Rowles sent Breaux a message saying,

3/2, 5:55am

**Jeremy Rowles**

Hey, thank you again for that dance last night. I was having a horrible day, but your class and routine made me feel so free last night. I really appreciate that! Also, please note my booty dropping skills are getting better because of you 😊😊😊. thanks again

Rowles explained to me,

I was having a rough day. The Title IX case was dragging on. I didn't know what was going on. I was stressing out, and I was having trouble functioning. It was

about the time that a decision was going to be made. Annalise taught a good dance, and it relieved my stress.

The rest of the conversation on March 2 went as follows:

3/2, 7:25am

**Annalise Breaux**

You are so welcome!! Thank you for letting me know that because I was worried it was too hard for people to have fun with, but even if it makes a positive difference in one person's day, it's still worth it 😊. You and your booty dropping skills were great last night 😄. Have a better day today!

3/2, 1:36pm

**Jeremy Rowles**

It was hard for me, but I'm not the best dancer. I like the challenge though, and that routine pushed me to expand my limits, which is always good. But, I did notice some other people got it down pat. So don't worry, just do what you think is a good routine and trust in your own judgement. You're good, and it shows!

3/2, 1:47pm

**Annalise Breaux**

Well thank you very much! I'll ease up on the choreo next week but definitely will keep it fun and sassy 😉.

At 3:25pm, Rowles replied,

**Jeremy Rowles**

Sounds good! But definitely don't forget to include the booty drop! 🔽😄.

Breaux sent the final message on March 2:

3/2, 7:19pm

**Annalise Breaux**

Always 😄😄.

Their conversation resumed on April 2 at 11:32am when Rowles said, "Hey, Silky! Are you having a good spring break?" Breaux replied that evening at 6:21pm, "I am! I just got home actually!" I asked Rowles why he referred to Breaux as "Silky" or "Silkiness" in several messages. He said,

In one of the classes, she did a move. I can't remember what it was. She did it, and I didn't know how she did it so smoothly. We would joke around a lot in class. It's awkward all around because some of the moves are sexual, I guess. I told Annalise that I was going to start calling her Silky because she moves so smoothly and her technique is done so effortlessly. She laughed. I didn't think it was inappropriate. It was intended to be a compliment to her dancing skills. She never said, "Don't call me that," or otherwise indicated that she didn't like it.

On April 3 at 11:40am, Breaux asked Rowles, "Did you have any song suggestions for your bday [sic] dance??" Rowles replied at 12:42pm:

**Jeremy Rowles**

Hey, Silkiness! Sorry I'm so late in replying. My best friends treated me to birthday dinner and drinks last night, and I'm just now recovering. I hardly ever partake of alcohol, so I'm a lightweight, but apparently very enjoyable, drinker 😄. Anyway! I'm glad you enjoyed your break! Did you just go to Chicago? I wanted to tell you that the pies you posted.... beautiful! Just... beautiful..... Anyway, birthday dance, yes I do have suggestions. I really appreciate you doing this, Silky. So, my top suggestion is a song that might not be good for Tiger Tease, so if you don't think the class will like it, by all means just ignore it. It's called "Chronicles of a Fallen Love" by the Bloody Beetrootz Listen to Chronicles of a Fallen Love by The Bloody Beetroots & Greta Svabo Bech on @AppleMusic. https://itun.es/us/JPqAV?i=795418761 (long story, but that song means a lot to me). My other, more TigerTease-like suggestions: "Take Care" by Drake, "Watch N' Learn" by Rihanna, "Where Are U Now" by Skrillex and Bieber, and "Motivation" by Kelly Rowland. Any of those would be awesome to me!

The conversation continued,

4/3, 3:20pm

**Annalise Breaux**

Okay I'll definitely be doing a silky Justin Bieber song this week 

4/3, 3:45pm

**Jeremy Rowles**

Thanks, Silky! 😄 I can't wait to see what you come up with, you're dances are always awesome to me

^your
4/3, 6:16pm

**Annalise Breaux**

Aw well thanks! Hopefully this one is good I'm being lazy with choreographing lol

At 7:40pm, Rowles replied,

Like I said, your dances are always awesome, lazy or not, it doesn't matter. And please don't think I'm pressuring you. It's still Spring Break, so you deserve to be lazy while it still lasts! Just be you, cuz you is awesome!

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

Breaux sent the final message on April 3:

4/3, 8:48pm

**Annalise Breaux**

Thank you so much Jeremy! Seriously glad you come to tiger tease because you always put a smile on our faces 😊.

Rowles replied the next morning:

4/4, 6:35am

**Jeremy Rowles**

You're so welcome! And you put a smile on my face, too! It is hard to explain, but dancing your dances set me free, every time. My previous lifestyle, about five years ago, I was sedentary and extremely overweight, so much that it was hard on my body to move (that's why my knees are still fucked up! lol). The "new" me is still not sure what this new body can do, so seeing your dances and being reasonably successful in emulating them is so amazing to me, it's like taking a new sports car around a race track! And your movements, the little things you do, pointing your toes, the lines of your arms and legs, your posture frame, so magical, so silky smooth! And just you, talking to you makes me smile every time, even when I first met you and you messed up my breakfast burrito order at Kaldi's lol 😆! So, again, you're welcome for me bringing a smile to your face, but really I thank you, thank you for freeing my body, thank for making me smile, and really just thank you for being the enchanting, magical creature known as ✨ Annalise Breaux ✨!

Rowles told me,

> My birthday is April 4th. At the class before spring break, I asked Annalise, "Are you teaching the class on April 5th?" She said, "Yeah." I asked, "Is there any way, because my birthday is that Monday, I could request a birthday song, and you could choreograph the dance routine to that song?" She said, "Sure. Do you have a song in mind?" I couldn't really think of any good songs at that moment. She said, "You could message me the songs over spring break when you think of them" I asked, "What's the latest I can message you?" and "How long does it take to choreograph a song?" She said it would take a couple hours. She said she was going to Chicago for spring break, but she should be back the weekend before spring break ends. I asked if it would be okay If I messaged her when she gets back, and she said, "Sure."

> I started following her on Instagram a couple weeks before that, and she had started following me. There were a couple pictures I posted that she liked. I liked some of hers. There was a picture of her standing in front of the "Bean" sculpture in Chicago. I said it was a really beautiful picture in the Facebook message I sent at 12:42pm on April 3rd.

> On April 3rd and March 31st, she liked my pictures. She also liked a picture on April 4th, which was the day of my birthday.

Breaux replied to Rowles at 9:31am, "Thank you so much, you rock! Also, HAPPY BIRTHDAY!!" Rowles ended the conversation by saying, "Thank you, Silky!" and sending a smiling emoji.

On April 5, 2016, Rowles told me that he recorded a video of Breaux doing his birthday routine in class. He sent this video to Breaux via Facebook message, saying,

4/5, 10:02pm

**Jeremy Rowles**

I'm exhausted from a long stressful day, but I didn't want to go to sleep without sharing this with you. I don't know what was more beautiful tonight, your dance... or you! Sorry this filmed sideways, even my camera was overwhelmed by the power of your silk! 😁.

Six minutes later, in response to the video, Breaux said,

**Annalise Breaux**

The video is playing staticky so I can't really see it! But thank you for sharing this with me, I'm glad you enjoyed this dance.

The next morning, Rowles replied,

4/6, 6:57am

**Jeremy Rowles**

Sorry I'm just now replying back, I literally passed out on my couch last night, I was so exhausted from the day.... but damn, the video won't play! Grrr!! It plays well on my phone, but yeah it's staticky on my Ipad and won't play on my laptop! I need a better way to connect with you.... I didn't just love this dance, though, I 🩷.ed this dance!! That leg swirl motion, it reminded me of an Argentine Tango move, and just doing that alone was pure 👌.! It really made my day, I was so stressed and tired, and your silk comforted me and set me free.

The conversation continued through the evening of April 6:

4/6, 7:44am

**Annalise Breaux**

Aw yay well again I'm glad you loved it! It was different than what I've choreographed in the past so it was definitely fun trying something new.

4/6, 1:04pm

**Jeremy Rowles**

Wait, whuh?? I thought for sure burlesque style dances were the standard for Texas high school club dances! Who knew?? 😬😅. Seriously, what is your favorite style? If you had a dream dance, what type would it be? What music? Where at?

**4/6, 1:15pm**

**Annalise Breaux**

Probably hip hop and to some bad ass beyonce 😊, but I do like a good contemporary dance because that type of dance is very emotional

**4/6, 5:42pm**

**Jeremy Rowles**

I can see the hip hop, you're the most hip hoppy of all the TigerX instructors that I've danced with... and now that I think about it, I see the bad ass Beyoncé, too! I noticed you couldn't resist putting in some "Single Ladies" moves last night 😊 👌 ➡️ 🔲🔲 But I'm intrigued about the contemporary! What emotions do you prefer expressing in that dance? Anger? Love? Sadness?

**4/6, 6:21pm**

**Annalise Breaux**

All of them! I did ballet most of my life actually so I like the graceful side of dance too. I like contemporary better though because it is more free.

**4/6, 9:14pm**

**Jeremy Rowles**

So, no one is putting Silky in the corner, she has to be free! LOL I hear what you are saying. One, on the graceful, I've already told you how amazed I am by your grace, hell you even speak gracefully. It radiates from you, so if that is from ballet, then next time you see your ballet instructors tell them I said good job and thank you! But two, I feel you on the freeness and emotional aspect of dance, especially contemporary. For the longest, the only dance I was exposed to was from music videos and movies, or street dancers...and bump 'n grind house party/club dancing lol. Then this show called So You Think You Can Dance came on, and It blew my mind what styles are out there. I vividly remember seeing this contemporary dance routine at on a park bench between two lovers http://youtu.be/AXPc-HNh-Js and it just floored me the emotions I was able to feel just from their movements, it is so beautiful! And I've been hooked on the emotion side of dance ever since. That is why I love your dances so much, because I can feel you putting at least a little bit of heart in it, which is impressive because most people instructing dance at a gym don't lol. ......I rarely tell people this because most people don't believe me, they assume "big guy who looks like football player or a bouncer, no connection to emotion other than anger or wanting to fuck" but yeah, I have a big heart and it feels wonderful when artists like you fill that heart up with your gifts

At 10:41pm, Breaux said, "I think you have a big heart!! Ugh thanks for such this seriously makes my day." Rowles said,

**4/7, 12:06am**

**Jeremy Rowles**

You're oh so welcome! It sounds from your message that you had a rough Wednesday? What happened? I hope you are okay. I'm sending this kind of late, so you're probably asleep. If you are, I'm wishing that you are having peaceful sleep with wondrous dreams, and you wake up to great Thursday!

At 11:39am, Breaux replied, "It's just been stressful because I have a big test tonight that I've been studying for!" At 2:53pm, Rowles responded, "Good luck on your test! I'd love

to hear how it went afterwards, to hear the good news of you acing it! If there is a moment of doubt in answering a question, just believe in yourself and your intuition! Why? Cuz [sic] you is [sic] awesome, that's why!"

At 2:59pm, Rowles said that he sent Breaux a "first pump" sticker, and she replied with a disco ball sticker at 3:16pm. Next, Rowles sent Breaux the following messages:

4/7, 8:24pm

Jeremy Rowles

How'd your test go?? I hope you're stress free relaxing right now. What class was it?

4/9, 1:18pm

Jeremy Rowles

Hey, Silky! Are you having a good weekend?

Breaux did not respond to these messages. At this point in the meeting, I asked Rowles whether his goal in taking fitness glasses was to meet women and to try to start romantic relationships with them, including the instructors. He said,

> No. It helps me maintain my weight. Several years ago, I was morbidly obese. I was also diagnosed with sleep apnea. The doctor said I had the body of a 78-year-old, and I was 30. I had lost the weight in part by attending group fitness classes. From that, group fitness has become a critical component of my lifestyle. One, it helps me to avoid gaining my weight back because I gain weight very easily when I do not exercise. Two, group fitness is a major component of me coping from the stress of my personal life and academic workload.

> I wasn't going to 'holler' at people. I didn't go to all four classes. Why is that part of the complaint? They assume I was there to pick up people. That is an issue I have had with the Rec Center, something I actually complained about in an anonymous survey I filled out last spring (spring 2016). There is a culture there, something that it practiced by a lot of TigerX instructors and other Rec Center personnel, where it is automatically assumed that if a guy attends a TigerX class, it is because he "likes" one of the instructors. And it is so wrong for them to assume that.

Going back to the messages he sent to Breaux on April 7 and April 9, I asked Rowles why she was not responding. He said, "I didn't know what was going on." He continued,

> At that point, I thought maybe it was developing into something more. I thought it was all green light signals. I thought it might develop into something. The lack of response was the first yellow light. I'm not the smoothest person. I hate asking people out. I usually avoid it because I don't know how. I err on the side of

caution. I'm really bad. Definitely not cocky. At the first sign that someone isn't into it, I back off.

Next, Rowles explained his interactions with Breaux on April 10, 2016:

> I went to work out. I didn't go to any classes. I didn't realize it at the time, but Annalise taught a class called Ballet Boot Camp on Sundays. I did a couple laps on the track on the same level as the class studios. Afterwards, I went downstairs to check in my towel. I walked to the lower level. As I turned to go downstairs, Annalise was coming up. I wasn't sure if she wasn't feeling me. I didn't say anything to her.
>
> I'm not sure if we made eye contact. I think we did. When I got to my car in the garage, I thought if there was a chance, I blew it by walking past her without saying anything.

Thereafter, Breaux and Rowles exchanged the following messages:

4/10, 4:12pm

Jeremy Rowles

Hey, I just now realized that I might have acted rude to you today at the gym. I really apologize, I was deep in thought about a life situation of mine, and the music in my headphones made me think deeper.... I just fucked up, I don't even think I said hi, did I? Again I'm really sorry if I was rude, you of all people deserve better from me!

Breaux responded, "No don't worry! I figured you were just out of it." Rowles said,

4/10, 8:06pm

Jeremy Rowles

Thank you for understanding! I'll do better. It might be late, but it was good to see you. And, just in case I go into dumbass mode again, please never doubt the fact that it is always good for me to see you 😊.

Breaux said, "Will do." She also sent Rowles a smiley face. Referring back to the start of their Facebook conversation, Rowles wanted to provide more background information. He said,

> After the March 2nd message, at the end of the next class, I said "thank you" and "goodbye" to Annalise and another instructor as I was leaving. I told them they did a good job. I do that for everyone. Annalise said, "I want to thank you." I said, "For what?" She said, "I want to thank you. That meant a lot to me. I appreciate you enjoying my class and the things you said. That makes my day." I thought that was really cool. That was around March 9th.
>
> Maybe a week later, there was an interaction where I had just finished a class and Annalise was there. I was checking in my towel, and she was there clocking in. She said "Hi," and we started walking in the same direction. The stairs go up two

levels. I was going to get off on the second floor, but it looked like she was going to the third. We both stopped on the second-floor landing, and we were talking to each other. I said, "You're a good dancer." I asked, "What kind of dancing do you do?" She said, "Ballet." I asked if she was thinking of going professional, and she said, "No." She told me about her dancing experience in Dallas, including being a part of a dance club at her high school and taking ballet lessons as a child. We kept talking until she had to leave because the class she was teaching that day was about to start. I said, "Good to talk to you." And then we parted ways.

Rowles described another interaction with Breaux on April 11:

Around morning or lunchtime, she approached me. I was in the basement of the Student Center, lying on the couch in front of the Women's Center entrance. I was exhausted and decided to take a nap. I was dozing off when I heard, "Jeremy!" Annalise was laughing at me and waving from about six or seven feet away. I started to get up to talk to her, but she said, "No, no. Go back to sleep." I saw her go into the Women's Center. She waved at me, and I waved back. I didn't go back to sleep. I decided to open my laptop and start studying. About ten minutes later, she exited the Women's Center. She waved and smiled at me as she did so, and I waved and smiled back.

That evening, Rowles and Breaux exchanged the following text messages:

4/11, 6:05pm

**Jeremy Rowles**

Maaaaaannn, you cannot go around the Student Center basement making noise waking people up like you did to me today!! 😂😂😂 ⏃ Seriously, I thought it was good just seeing you, it is even better waking up to you. I thought I was still dreaming! What were you all doing wandering around?

4/11, 8:19pm

**Annalise Breaux**

Haha thanks 😄. and we were just checking some stuff out at the women's center!

4/11, 8:23pm

**Jeremy Rowles**

You're welcome! And I hope you found what you were looking for at the women's center. It's a great resource (don't ask me how I know that.... long story!! 😄:)

4/11, 10:27pm

**Annalise Breaux**

It is! I've never really been down there before

4/11, 10:49pm

Jeremy Rowles

.... I was going to write a long thing about female business and engineering major students don't tend to go there enough, but it is late so I hold that for later! Instead, I'll wish you a good night and sweet dreams! See you tomorrow! 😊

Breaux replied at 11:43pm, "Can't wait!" The next morning at 6:54am, Rowles said to Breaux, "Honestly? ….I can't hardly wait either!" Later, Rowles said,

4/12, 10:05pm

Jeremy Rowles

As always, it was very good seeing and talking to you tonight! I hope the rest of your night is wonderful, Silky. Sweet dreams!

I asked Rowles if he was trying to flirt with Breaux by sending the proceeding messages on April 11-12. He said, "Yes, I thought [her approaching me at the Student Center] was a green light." Rowles added that Breaux's message saying, "Can't wait!" was a "big flashing green light." He added, "She was literally telling me that she couldn't wait to see me." Regarding his comment about the Women's Center and a "long story," Rowles told me, "I used to be married. My ex-wife got her PhD at Mizzou and worked at the Women's Center while doing so. I got to know several of the programs at the Women's Center, along with people who used to work there."

Next, Rowles explained what happened when he asked Breaux to go on a date with him:

> I was feeling pretty good. I didn't go to the Tiger Tease class planning to ask her out. We had a class the night of April 12th. Usually, I briefly talk to the instructors before I leave. After that class, Annalise was like, "How are you doing, Jeremy?" I hadn't even gotten to the point of saying "good job" and "thank you" to them yet, like I usually do.

> I was near the cubby holes where people store their personal belongings during class. She leaned over the trash canister and addressed me, from about 15 feet away. I walked over to her, and I asked how her test went. She gave me this look like she didn't do well. She said that she didn't want to talk about it. At that point, I realized that might be the reason she didn't respond to the messages on April 7th and 9th, as those messages were about how she did, and she didn't want to talk about it. We started talking about other things, like how I was a teaching assistant. She began asking me questions about that.

> Drea was at my side, and she began talking to me. Drea asked me "Aren't you glad I talked you into coming to Tiger Tease?" I turned to Drea to say "yes," and when I turned back to look at Annalise, I remember Annalise had this look, kind

21

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

of like…I don't know how to describe it. It was an intense look. It wasn't negative.

I asked Rowles what Breaux was trying to communicate with this "intense look." He replied,

> I don't know. I don't know if I should try to say she was trying to communicate anything, considering the accusations she is now making against me. I don't feel comfortable doing that. I don't want to say sultry…I need to look at a thesaurus. I can't find the right word. It seemed passionate and seductive, but like I said, I don't want to speak for her. She was leaning into me, though, over the trash canister. I'm sure it was not negative.

Rowles continued,

> I left and went to the Brewer Station desk. I checked in my towel and went to the locker room. As I came out, I was getting ready to leave. The main floor of the Rec Center is shaped like a street. As I came out, Annalise was walking down the street to go to Brewer Station to clock out. We saw each other and it was a brief recognition. It seemed like we both felt something, and we both briefly stopped walking. I got anxious. I'm just not good with girls. Both of us decided to start walking toward each other. I reached out my hand and she took it. I gently held onto it and pulled her in my direction. We had been walking in opposite directions before. There were no corners. I did not corner her. It was in the middle of a heavily trafficked walkway that is probably 20 feet wide. There are literally no corners. I hold on and gently pulled her toward me. I did not yank.

> I was really excited. I said, "Would you be interested in us hanging out sometime?" I remember she got this big smile. It was almost like the room lit up. I remember she was smiling. She said, "Maybe. When are you thinking about hanging out?" I said, "Friday?" She said she couldn't do that. She said she was going on a retreat at the Lake of the Ozarks with her coed business major fraternity that weekend. I said, "What about Sunday?" She said, "I don't know what time I'll be back then. I assume we'll be back late."

> I said, "How about this, I'm defending my master's thesis next Friday. How about you and I celebrate defending my thesis together on that Friday?" She was like, "Sure. Do you have anything in mind that we are going to do?" At this point, I couldn't believe it. She was smiling and not backing away. Like an idiot, I answered her question by saying "I have no idea." I didn't anticipate that this was actually working. I'm really bad at asking people out. She said, "How about this, when I get back we'll talk about what we are going to do?" I said, "Sure," and she said, "Okay, we'll talk next week about what we're doing."

> We didn't have each other's phone numbers. All of our communications were on Facebook. Later, in a Facebook message, I gave her my phone number. She went

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

to clock out, and I left the Rec. She didn't say "no" at all. When I got to my car, I called my best friend, Amber, and said, "I think I'm going to go on a date."

The Facebook messages continued,

4/13, 5:56pm

**Jeremy Rowles**

Hey, Silky! I hope you are enjoying this wonderful sun today. I've been cooped up inside all day, but this right now feels wonderful! Also, I totally forgot to ask you last night for your phone number. I know some people don't like getting personal on FB. It doesn't matter to me, I talk the same everywhere. But, if you want to take our conversations elsewhere, feel free to text/call me at 573-424-7290 . You can add me on Snapchat too @ jay_blue44 , but I warn you I'm a horrible snapchatter.... just awful! 😊 Whichever way you prefer, I'm game for! And I wanted to ask you, what is the organization that is holding your retreat this weekend? PSE, I think you said it was called? Is that an accounting major thing, or something else?

4/15, 2:58pm

**Jeremy Rowles**

Hey! I wanted to... well first! I wanted to say THANK YOU for blessing the world with that pic you posted to Instagram last night! Simply beautiful, Annalise. I might have said too much in my comment on that pic, I'm still laughing at your friends' reactions to it, but I have no shame in saying it because it came honestly straight from my heart. You are so beautiful to me, in pictures AND in real life, and I really just wanted to let you know that 😊. So, IIRC, you're leaving today for your Lake of the Ozarks retreat, yes? I hope you have a good time! This Missouri boy has always loved trips to The Lake, so I'm glad a Texas gal gets to experience it too! I'm actually a liiiittle jealous lol, as my weekend is going to be mostly spent preparing for my thesis defense next Friday. But, I'm looking forward to when I get to see you again, and I'm definitely looking forward to us continuing our conversation about us going out somewhere together next weekend. Enjoy your retreat, Annalise! Ttys 😊.

4/18, 6:24pm

**Jeremy Rowles**

Hi, Wondrous One! It seems from the smiles in your pictures that your retreat was a success! ⬜ Did you have a good time at The Lake?

Rowles told me, "I sent the message on April 18th to start the conversation so we could figure out details of the date." Breaux replied to Rowles,

4/18, 7:10pm

**Annalise Breaux**

Jeremy, I really appreciate your feedback about my class and choreography, but these messages are getting excessive. I think our friendship needs to remain in the professional setting. Many of the things you say, like that Instagram comment for example, is over the top and I wouldn't be comfortable hanging out outside of my places of

work. I still want you to come to Tiger Tease and enjoy your time there, but I need my space outside of class and I think a line has been crossed here.

Regarding the Instagram comment, Rowles explained to me,

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

A lot of people were commenting. It was a good picture, a portrait picture. Guys and girls were commenting on how beautiful she looked. I thought, "I'm about to go on a date with this woman. I think I can comment on how beautiful she looks." I said something like, "If this picture is the last thing I see at the final closing of my eyes, then I will float to Heaven a happy man. #beautiful"

Regarding Breaux's response, he told me, "That was the first time she indicated that we should be professional." Their Facebook conversation continued,

4/18, 7:16pm

Jeremy Rowles

Oh my god, I am so sorry Annalise!! I thought... I am so sorry, I took our conversation last Tuesday as you agreeing to a date... I am so sorry, I read your reaction completely the wrong way. I feel so bad that I caused you to be uncomfortable, I really apologize, I feel so horrible that was the way I came across. I did not mean to make you feel that way, and I really apologize. I am so sorry. I'll keep it strictly friendly from here on out. I appreciate you telling me this, the last thing I wanted to do was make you feel uncomfortable. Please accept my apologies, the very last thing I wanted to do was make you feel badly.

At 7:18pm, Breaux replied, "Thank you for understanding." One minute later, Rowles said, "No, seriously, thank you for telling me. I never want to make a woman feel uncomfortable, especially you. I am really sorry." At 7:24pm, Breaux said, "I accept your apology." Rowles responded at 7:49pm, saying,

> I deleted that Insta [sic] comment, and I tried to undo the "love" reactions on your FB pic, but it will only let me change it to just a "like." Thank you for accepting my apology. I…I won't ever do anything to make you feel that way again, I feel so bad for making you upset. I'll see you in class tomorrow, and I'll be the best and most professional class member, I promise.

Rowles stated that he only interacted with Breaux at her places of work after April 18, and he did not message her after that. He said, "I was more reserved than usual in her classes because she said she was uncomfortable, and I promised her that I would be professional. I stopped calling her Silky."[20]

---

[20] Upon reviewing this summary, Rowles requested to add the following information on February 6, 2017:

> She did appear to be comfortable with me in class afterwards for the remainder of the semester. In one class, near the end of the semester, she was teaching a routine with her back to the class, going through steps. Before the last step of the movement, she paused and looked over her shoulder in my direction, and said, "Are you ready for my patented move?" and then did a booty drop. I felt that her reference to our inside joke was a sign that she was at the very least comfortable again with me being a class participant in her classes.

Rowles Petition Ex. 1

Rowles continued,

That summer (summer 2016), I went to Kaldi's hoping to drink tea and see Abagael. I had a very difficult summer, where I experienced a very severe financial crisis followed by a very severe family crisis. I was depressed, and I was hoping that Abagael and tea could help me recover, similarly to how it helped me during the previous winter. Annalise was working.

When Annalise saw me, she said, "Hi, Jeremy!" She sounded excited to see me, but I just said, "Hey," in a low tone, as I was in a very bad depressed mood. She scowled at me; I believe that she interpreted my tone as being directed at her. Annalise was cleaning a coffee machine when I ordered my drink. I asked the barista who took my order whether Abagael still worked there. Annalise scowled at me again and said, "No, she quit in May."

I brought my tea back up to the counter and asked Annalise to re-steep it. At Kaldi's, when they steep your tea, they bring it to your table. When you finish your tea, you can bring it back to the counter and ask them to re-steep the tea leaves. After the re-steep, they're supposed to bring the tea back to your table again. She didn't bring it out to me when it was finished. She put it on the counter and yelled my name. I drink a lot of tea. Over winter break, I would get five or six re-steeps. I asked for another re-steep again later, and she avoided it and had someone else do it. I brought it up to the counter again later, and she was talking to who I think was Abagael's ex-boyfriend, and they were looking at me and talking. I'm not sure what they were saying.

About a week later, I went to Kaldi's and Annalise was there studying. I wanted to say "hi" in a friendlier manner. I thought maybe she thought I was rude the last time I saw her at Kaldi's. She had her head down. I gently knocked on the table so she would look up at me. I said "hey," and she said "hey" in a way that made it seem like she didn't want to talk to me. I could not understand why. She said she wanted to maintain our friendship at her places of work in her Facebook message. It was at her workplace no less. We were at Kaldi's. Thereafter, I didn't approach her at Kaldi's.[21]

When the fall 2016 semester started, I decided to go to Dance Fitness and Tiger Tease classes, as well as others. I was planning out my schedule of group fitness classes I would attend for the semester. This semester was when she started teaching Dance Fitness. I didn't know she was going to teach it. I thought it was

---

[21] Upon reviewing this summary, Rowles requested to add the following information on February 6, 2017:

I didn't want to risk making her upset again, so I started avoiding Kaldi's altogether. My best friend, Amber, and I typically go to have coffee together on Sundays, and we would typically have coffee at one of the 9th Street coffeehouses downtown (Kaldi's, Lakota, The Coffee Zone). After my summer interactions with Annalise at Kaldi's, I told Amber that I didn't want to go to Kaldi's because of what happened with Annalise, and so we took Kaldi's out of the coffee meeting place rotation. I have not been to Kaldi's since, I believe, July 2016.

going to be taught by just Natalie and Bailey, as they were the ones who were trained to teach it by Drea the previous winter semester. Annalise didn't teach Dance Fitness that winter. They don't post the instructors online so it's hard to know who will teach each course. I figured she was teaching Tiger Tease on Tuesdays because that's the one she taught last year, and she had said she wanted me to keep coming to her Tiger Tease class in her last Facebook message she sent me.

On February 6, 2017, upon reviewing this summary, Rowles requested to add,

The following is a clarification of my schedule of Tiger X classes that I planned on attending for Fall 2016. At the beginning of semester, I planned on attending: Monday night Dance Fitness; Tuesday night Functional Fitness; followed by Tuesday night Tiger Tease. I was looking for a high intensity aerobics class as TigerX sharply reduced the number of Insanity classes that semester, and the only ones were scheduled during the time of the class that I was a teaching assistant for. I couldn't find one, so I believe that first week I settled on attending Thursday night Tiger Tease, as well (which was taught by Kasey, Maddie, and Bailey).

After the meeting time for my graduate seminar was set for Tuesday night, the Lifeworks Dance classes started, and my off-campus job work schedule was changed, my fitness class schedule was thus: Monday night Dance Fitness, Wednesday morning Functional Fitness (which was the class taught by Ashlyn Balch), Friday afternoon Tiger Tease, Sunday Lifeworks Dance Hip-hop, followed by Sunday Lifeworks Dance Contemporary, and occasionally Monday and Friday morning HIIT.

It should be clearly noted that at no time that semester did I attend all four of Annalise's classes in a week. Also, Annalise's classes were never the only classes I planned on attending that semester.

And finally, it should be clarified that attending TigerX classes are not a privilege. You can't just "show up" to a class; you have to pay to attend TigerX classes. I bought the semester long TigerX pass, which cost me $59. In addition, I paid for the Lifeworks Dance membership add-on to my TigerX pass, which cost an additional $19. There is nothing in the purchase agreements that says you would be judged negatively if you attended too many classes. In fact, TigerX would often celebrate participants who attend many classes. An example of this is an Instagram post the TigerX account made in the Spring of 2016, where a picture of a participant was posted and the caption explained how the participant regularly attended many of the dance classes. Annalise commented on the post, giving the participant a positive compliment. https://instagram.com/p/BEtQ8yRuYiI/

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

Next, at our meeting, Rowles explained,

> I went to Tiger Tease first this semester. It was fine. Annalise said she had a
> birthday a couple days before. So, she taught us a dance routine to a song called
> "Birthday Sex." Afterwards, I told her "happy birthday" and that was it. I left.
> That Sunday, I went to the TigerX Kickoff for fall 2016 demos for the different
> classes at the Rec Center, like they do every semester. I participated in almost all
> the demos except yoga. At that kickoff, they did a demonstration of Lifeworks
> Hip-Hop and Lifeworks Dance.
>
> I went to Dance Fitness class the following Monday. That was when I found out
> that Annalise was now a Dance Fitness instructor. Everything seemed fine.[22]

Regarding physical contact with Breaux during class, Rowles stated:

> I never grabbed Annalise's hand during class. The only thing was a high five or
> high grasp. The only time we touched was in a way where I would offer my hand
> and she had the choice of touching it, like in a high five or shaking hands. I
> definitely never grabbed her hand in an intimate way. When I did training to be a
> TigerX instructor, we were encouraged as instructors to give high fives to
> participants.

Next, I asked Rowles when he first noticed that Breaux seemed uncomfortable:

> During the second or third week of classes, I started noticing when Annalise
> would see me, there was something wrong. I'm really hyper aware. I'm a war
> veteran, and I had a traumatic childhood. I'm really aware of people's
> movements. I have gotten better. I used to monitor how many times people would
> come into and out of a room. I'm really aware of people's movements, and I
> notice things out of the ordinary. I was starting to notice that several times when
> she saw me, she would tense up. We would be 50 feet apart.
>
> One time, I was at the bottom of the three floors in the Rec Center. She was at the
> top of the stairwell. We saw each other. There were 15-20 people on the stairs.
> She stiffened her back straight up. Like she was wondering whether she should
> come down. I was nervous because she seemed nervous. We passed each other on
> the second level landing at the same time. I turned off onto the second floor, and
> she kept going. I said, "See you Monday?" She gave a quick nod to me to answer
> yes, but she kept going. That happened on a Sunday.

---

[22] Upon reviewing this summary, Rowles requested to add the following information on February 6, 2017:

> My interactions with Annalise in her classes were going so well that I talked to my counselor
> about it. I remarked how glad I was that we could be comfortable around each other during class,
> especially given how my poorly my interactions with Annalise went at Kaldi's over the summer.

27

I didn't know what that was about. As I would leave classes, I said, "Thank you. Goodbye." The instructors stand by the door after classes finish, to be available for questions and comments from participants after class. I think that's what they're trained to do. I remember when I said "goodbye," I noticed a weirdness about it from Annalise.

Rowles continued,

At the beginning of the semester, I was going to her Monday and Tuesday classes. I was not going to her Friday class. I was enrolled in a graduate level seminar, Anthropology 8187. Anthropology seminars like Anthropology 8187 are often listed in the course catalog as having meeting times of "Arranged." This means that the participants of the seminar, students, and the instructor, decide together when the seminar should meet. It was decided that the best time we could all meet for Anthropology 8187 was Tuesday nights from 6:00 to 9:00pm.

In the beginning, I went to the Tiger Tease classes on Tuesdays, until the seminar started. After Dance Fitness on the Monday night before the seminar started, I asked Annalise if she taught Tiger Tease on Friday afternoons. She said she did, and asked why was I asking. I told her that I couldn't come to her Tuesday night Tiger Tease anymore because I had a seminar that is meeting at that time. She then asked, "You can or you can't come?" and I said, "I can't." She seemed annoyed at my answer. She rolled her eyes and looked away from me. She then said there was also a Tiger Tease class on Thursdays, and I should think of going to that one. Somebody else got her attention, and she started talking to them.

At the beginning of the semester, I went to just two of her classes each week. Then I went to the Life Works demo free day to see if I liked it. You can buy a pass to the Lifeworks dance classes. This is another time she said I lingered. I stayed after her Tiger Tease Friday class on, I believe September 9, 2016, because she was telling the class about the Lifeworks Dance Free Day event on Sunday, September 11th. She was pitching this to the entire class. It was a day where all students could attend all of the Lifeworks Dance classes for free to see if they liked them.

Lifeworks Dance is a "subprogram" of TigerX, where each class teaches a different genre of dance, and you have to buy an extra pass to be able to attend. That semester, there were 5 Lifeworks Dance classes: Ballet, Contemporary, Hip-Hop, As Seen On Screen (which taught dances seen in music videos), and Jazz. I went to a temporary demo of Lifeworks Contemporary and Hip-Hop during the TigerX Kickoff event at the beginning of the semester, and enjoyed it. I thought I was interested but wanted to ask Annalise about it. She was talking to someone else for five minutes. So, I wanted to ask Maddie, the other instructor, but she was talking to another participant, too.

Rowles continued,

> Finally, I talked to Annalise… She told me that each Lifeworks class begins by teaching a skill for that type of dance, and then spends the rest of the class teaching a dance routine, similar to how Tiger Tease teaches a dance routine each class. So, it was "like Tiger Tease, but more advanced." I told her that I was concerned because I wasn't an experienced dancer. She said that classes were designed for all levels of experience, except for ballet. She said ballet would be teaching difficult techniques… She told me that I should definitely do it. I gave her a hand clasp. I said, "Thank you," and she said, "You're welcome."
>
> I went to try it. They didn't post who the instructors were, but I assumed it would be Danielle because she was the instructor who taught the demo of Contemporary at the TigerX Kickoff event… I didn't know Annalise was teaching Contemporary too until I saw her there. So, that's when I started going to three of Annalise's classes. I really enjoyed the Contemporary class. I never did four classes at a time.[23]

I asked Rowles to respond to the allegation that he stared "intensely" at Breaux during classes. He explained,

> I don't know where that comes from. She's an instructor so I have to look at her. There are three instructors for Dance Fitness, and I don't always look at her. The Dance Fitness instructors rotate who leads the class; one instructor leads the first third of the class, then another leads the middle third, and then the last instructor leads the final third of the class. They line up in front with the lead instructor in the middle and then one at each side. They would rotate positions throughout the class. When one instructor would assume the role of lead instructor, she would move from the side position into the middle, and the instructor who was previously in the middle would move to a side position. I look at the primary instructor the whole time. If you want to slow down, you can follow the ones on the sides as they would be doing the "low option," which is an easier version of the movements that the lead instructor was doing, but I never did the low options.
>
> In Tiger Tease and Contemporary, each class had one instructor who choreographed the routine for that class and led the entire class. They alternated classes as to who would be the lead instructor. Again, I would look at the lead instructor the whole time in those classes. There would be no way I could participate in those classes if I was staring at Annalise the "entirety" of the time, especially when Annalise was not functioning as the lead instructor in the class.

---

[23] Upon reviewing this summary, Rowles requested to add the following clarification on February 6, 2017:

> After reading this now, I realize now that I had informed Annalise that I intended to come her Contemporary class, even while I had no clue that Annalise was teaching it. She had encouraged me to come and give it a try, and I feel like if she was averse to me coming to her class, she would have not encouraged me. I was really hesitant in doing the Lifeworks dances, and her encouragement was what really won me over and convinced me to give it a try.

Rowles Petition Ex. F

The only time I really looked closely at Annalise, specifically, was when I asked her to do a move slowly because I learn visually, and I couldn't tell what she did. For example, she did a move in Tiger Tease where she squatted down and then rotated her whole body. I couldn't figure out how she rotated. I asked, "How did you do that? Could you slow it down?" That was the only thing. I explained to her that's why I was doing looking closely.

I asked Rowles to respond to allegations relating to his requests for private dance lessons with Breaux. He stated,

> First, I want to make it clear that I did not approach her asking for private dance lessons. It was she who recommended that I take private dance lessons. My email to her was asking for links to YouTube videos, not dance lessons.

> Things started getting weird. Things were getting more tense. I was only saying "hi" and "bye" to Annalise. As I would leave, she would abandon her post, sometimes quickly or frantically. I thought something was going on. At this point, I was talking to my counselor about it. I said, "I don't know what I'm doing. I'm acting professional." I don't know what was going on. She was having this strange reaction to me.

> All I was doing was asking Annalise professional questions—about Life Works and whether she teaches certain classes. Otherwise, just "thank you" and "goodbye" or asking how to do a particular dance move. There was nothing personal going on at this point between me and her.

Regarding the emails he exchanged with Breaux, Rowles said,

> I struggled with some of the more formal moves. I tried to do a leap in the Contemporary class on September 25, 2016, and it was really bad. I was going to ask Annalise after Dance Fitness on Monday, September 26th, about what I put in the email, asking if there were resources I could find—like YouTube channels or books—that could teach me basic dance skills that I could practice alone at home. I picked up my stuff and was heading to the door. She saw me and frantically moved to the other side of the studio. I ended up talking to another instructor, Bailey, who doesn't teach Contemporary.

> Annalise had sent an email to whole Contemporary class asking if anyone had questions. I replied to Annalise on Tuesday, September 27th and asked for YouTube channels or books that I could find to use to practice dancing by myself at home. She replied to my email on Wednesday, September 28th. The very first sentence of her reply was her recommending that I should sign up for private dance instructions with a Lifeworks dance instructor. After that, she gave very basic advice on how to find dance resources on the Internet and how to practice at home.

I did not know that Lifeworks Dance offered private dance instruction. I looked at the Rec Center website and found the pricing and description of the private dance lessons. I was very intrigued by doing the lessons, but I wasn't sure if I could fit the price in my budget. I replied back to Annalise on Thursday, September 29th, stating that I was very interested in doing private lessons, but I wasn't sure how many lessons I could afford until I paid my monthly bills that weekend. I said that I would want to do them. It was a question of whether I could afford just one lesson, or several lessons.[24]

Rowles continued,

On the morning of Monday, October 3rd, I decided that I was going to purchase four private dance lessons. I followed Annalise's advice in her email and went to the ZouLIFE office to book dance lessons, with Annalise as my preferred instructor. Originally, the person working at the zouLIFE desk said that the Rec Center does not do private dance lessons. I said "insisted" in the email because of that. That was the only time I "insisted" because I had to argue with the ZouLIFE worker and insist that the Rec Center does do private lessons as it was on the website that the Rec Center *does* do that.

Eventually, the person at zouLIFE admitted that she didn't know how to book reservations for private lessons. She told me to go back and ask the instructor who told me about the private dance lessons if she knows how they're supposed to do it. I went home and sent Annalise an email explaining the situation with ZouLIFE and asked her if she could tell me if there was another way I could buy private dance lessons, with her being my preferred choice of instructor.

Every October, you get a prize if you go to enough classes. You have to fill up your card with enough hole punches. You then turn in your card once it's full. After Dance Fitness on the night of Monday, October 3rd, I went up to Annalise to get my card hole punched, and while she was doing so, I asked if she got my email. She said, "Which one?" I said, "The one I sent this morning." She said, "No, I haven't read it." I told her that zouLIFE couldn't book me for private dance lessons because they don't know how, and they told me to come to her to ask how to do the booking. Annalise said, "I don't have anything to do with private dance lessons." She said it in a normal tone of voice. I said, "Oh. I didn't

---

[24] Upon reviewing this summary, Rowles requested to add the following information on February 6, 2017:

After I sent that email on Sep 29th, I attended three classes of Annalise's: Tiger Tease on Friday, September 30th, Contemporary on Sunday, October 2nd, and Dance Fitness on Monday, October 3rd. In all three of those classes, Annalise showed no discomfort with me. In fact, those three classes were the best classes I had with her the entire semester. I did not expect her to have a bad reaction to me discussing private dance lessons with her because my interactions with her were going so well after that I had sent that email saying I was eventually going to be following up on her recommendation of getting private dance lessons.

know that. I thought you did private lessons because you suggested them to me." She repeated that she didn't have anything to do with private dance lessons.

At that class, Annalise was being evaluated. They do peer review evaluations, and Kasey Long was the peer evaluator for that class. Kasey saw that I looked very confused and asked me what I was asking Annalise about. I turned to face her, and I told her that I was asking about private dance lessons. Kasey replied, "Oh, that is something that Lifeworks Dance offers. You can sign up to take lessons with a Lifeworks Dance instructor." I replied back, "Yes, I'm trying to figure out how I can do that." Suddenly, Annalise interrupted and said, very forcefully, "I don't have anything to do with that." I said, "Okay."

The other Dance Fitness instructor that day, Bailey Baucum, then approached me and asked what was going on. I turned to her and told her that I was asking about how to sign up for private Lifeworks Dance instruction. Bailey told me that all I had to do was fill out a form on the Rec Center website requesting private dance instruction, and the form would be sent to their supervisor who would arrange the dance instruction based on instructors' availability. I said, "I'm not okay with that because I want a choice of who my instructor is."

Rowles explained further,

I get the feeling their supervisor, Pangku, doesn't like me. Because I wasn't hired. I had paid $90 for a TigerX Instructor Training Course in the fall of 2015. I was told throughout the course that if we passed the exam at the end of the training course and gave a good audition in front of Pangku, we were virtually guaranteed to be hired. I had passed the course, and I had a good audition and got good feedback, but I wasn't hired.

The email saying that I wasn't hired was just a generic email stating that they had received an overwhelming number of applicants and could not hire me because of the high demand for a limited number of positions. I felt that was not fair because, "Why did they take my money for the training course if they knew enrollment exceeded the supply of positions available? Why did they not cap enrollment?" I emailed Pangku, and she wouldn't explain to me why I wasn't hired. I assumed that if I let Pangku assign my private dance instructor, she would just take my money and then send an email saying something like "due to overwhelming demand for private dance instruction, we are unable to assign you a private dance instructor. Thank you for your interest in private dance, and good luck in your future endeavors."

When I told Bailey that I wanted to be able to choose my instructor, she said, "There is a box in the website form where you can state who you want your instructor to be." Then, suddenly and very loudly, Annalise said, "I'm not doing private dance instruction!" At that point, I wasn't thinking of her. I was thinking

of maybe asking Megan. It was so loud. She was angry. I quickly turned around to her and said "Okay!" Then I left.

I didn't end up signing up for private lessons because I don't trust Pangku. Also, I was still confused on which of the Lifeworks Dance instructors did have something to do with private lessons. I did not want to risk another instructor being mad at me just because I asked her about dance lessons. I didn't want to be yelled at again. Like I said, through this whole semester, it was this weird emotional thing happening. It seemed like Annalise's reaction to that conversation was disproportionate. We weren't even talking to her, and she was still angry and insisting. I had a weird feeling. I left. That was intense, and I didn't know why. That whole night and the next day, I felt like something bad happened. I had checked Instagram to see if she blocked me. I had gotten into the habit of checking whether someone blocks or unfriends me as an indicator of whether they were angry at me or not. I discovered that indeed Annalise had blocked me on Instagram sometime during that night.

Rowles continued,

> Four days later, I decided to give Annalise the token. I wanted to figure out what was going on. I had triggered something in her. The idea was to go to her Tiger Tease class on Friday, October 7th, and hopefully talk to her about what's going on after class. I happened to find the Kaldi's token that she gave me for the breakfast burrito order error when we first met. I had found it in the front pocket of my book bag a month earlier. I wrapped it in paper, and on the paper, I wrote, "'The Scientist' by Coldplay."

> I did not write lyrics; I just wrote the song title and band name. The song goes, "Take me back to the start…" I wanted to talk to Annalise and address it. The token and song were supposed to be a symbolic ice breaker of me possibly being able to talk to Annalise about how we could take our friendship back to the start. I wanted to go back to the start when she felt comfortable booty bumping me from behind, and we could have fun conversations about dance and other things.

> What happened was, she was still upset with me. The lead instructor who teaches the Tiger Tease classes is usually on the right. That day, Maddie was the lead instructor and was on the right side of the class. Annalise was originally on the left. I always take a position on the far-left side in Tiger Tease, so Annalise was originally almost directly in front of me.

> After Annalise finished her warm up, she got up and moved way over to the right side of class. Maddie went over to the left instead. I thought she was moving away from me. She announced to the class that she was moving. I thought, "This isn't the time to talk to her because she's still mad." I decided that I would just focus on Maddie for the rest of class and not react at all to Annalise and not talk to her because I did not want to risk making her angrier.

33

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

After class, Annalise was punching the participation cards at the door. As I approached the door to exit, Annalise quickly gave Maddie the hole punch and said, "I have to go to bathroom." She then ran away, down the walkway outside the class studio. She was sprinting. She ran so fast. Maddie punched my card. I didn't know what to do. I figured that there would not be an opportunity to talk to Annalise if she was literally running away from me.

I was confused on what to do. I gave Maddie the token wrapped in paper and asked her to give it to Annalise. Maddie asked me what it was. I told her that it was just a song recommendation for a dance routine for the Contemporary Lifeworks class. That was Friday's class. When I saw Annalise on the following Sunday, in her class, I didn't bring up the song recommendation. I acted normal when I saw her again. On Sunday, after class, she smiled at me.

Regarding the letter that he gave to Breaux, Rowles explained,

I really cared about her. I was starting to realize I still had feelings for her. The day after the argument about private dance lessons, I talked to my close friend, Dana, about my situation with Annalise. She said Annalise's behavior sounded ridiculous, but then asked me why did care so much about an instructor who acted that way toward me. That was when I realized my feelings for Annalise were still there. That was problematic because I had promised Annalise I would be professional around her, and it would be difficult honoring that promise while knowing I had feelings for her.

The point of the letter was that something bad was happening between us. I didn't know what it was that was causing her not to be happy. I felt that I couldn't talk to her about it, because she ran away from me the previous Friday. So, I decided to write everything I wanted to say in a letter. The letter was a request to her to communicate to me what she would want me to do to stop making her unhappy. I decided to also communicate that I had feelings for her in the letter so that she would know that information in making her decision about what she wanted to do to prevent the unhappiness between us. I decided to give the letter to Annalise after the Tiger Tease class on Friday, October 14th.

I asked Rowles whether it seemed like Breaux wanted to take the letter from him, or if she was reluctant to do so. He said,

When she asked what it was, I said it was an apology and explanation. She did back away so I lowered it closer to my side. I said, "Look, I'm just trying to find out…there is something I'm doing that is causing you to be upset. I just don't know what it is. I'm trying to keep the promise I made to you after the Instagram comment." She asked, "Jeremy, what was it that you gave Maddie on Friday?" She was referring to the token I had given Maddie the previous Friday. I said it

was just an apology. At that point, she took the letter out of my hands. She hadn't read it yet.

She said, "Jeremy, this needs to stop." I said, "What needs to stop?" She said, "You've done this to other instructors, and now you're doing it to me." I said, "What other instructors? What have I done to other instructors?" I was confused. She said, "First, you do this to Rose and now you're doing it to me." I said, "Did what to Rose?" She said, "You sent inappropriate messages to Rose." I said, "No, I didn't. I haven't sent any messages to her in a year, and it's nothing sexually inappropriate." She was like, "It's not just Rose, it's all the instructors." I said, "All the instructors?" She said, "Yes, you 'oogle' at us during class. There are consequences to your actions." I said, "I don't know what you're talking about. I don't 'oogle' at anybody during class." She said, "You tried to reach out to me and request private lessons." I said, "I reached out for YouTube videos though." She said, "And you come to all my classes. This needs to stop." I said, "That is not true. I do not come to all of your classes." She said, "You need to learn there are consequences to your actions."

She said that Pangku had already told her about all the things that I had done to other instructors and that they reported me to Pangku. She also said that she already reported me to Pangku too. I told her that I had no idea what she was talking about, that nobody had ever told me that I was being reported. She kept saying that "I need to learn the consequences to my actions," and I kept telling her I did not know what actions she was talking about. Finally, I said, "Look, in the letter, I ask you if it would be better if I just stop coming to your classes." She said, "Yes." I then said, "Okay, I'll stop coming to your classes then. If that is what you want, I'm willing to do that." She then said, "No! You need to learn, Jeremy! There are going to be consequences to your actions!" She backed up and slammed the door in my face.

Rowles explained,

I sent one flirty message to Rose nearly two years ago and that was it. I thought Rose was flirting with me. Rose approached me over the summer of 2016, and she never gave me an indication that she was upset with me or had reported me.

I have not gone to any classes since I gave Annalise the letter on October 14th. I voluntarily avoided Annalise after that. I stopped going to Dance Fitness and Lifeworks Contemporary classes. Also, I stopped going to the Friday Tiger Tease class, and I started attending the Thursday night Tiger Tease, as that was the only Tiger Tease class not taught by Annalise.

For her to say I'm stalking her when I have gone out of my way to avoid her is not fair. I have stopped going to Kaldi's, a "safe place" for me to recover from life stresses, since July 2016. And it had been nearly a whole month of me avoiding her fitness and dance classes, classes that were a critical part of my fitness and

stress coping strategies, before she reported me for stalking to the Title IX Office. There are classes I want to go to, and I'm not going.

On November 11, 2016, Rowles and I resumed our meeting to discuss three other potential complainants in this matter: Ashlyn Balch, Hannah Turnbull, and Rose Nash. First, Rowles stated,

> I'm concerned about how Ashlyn Balch is on this list. One, when I had messaged Ashlyn, she was *not* an employee of the Rec Center at that time. Why is the Rec Center keeping track of messages I send to people who do not work at the Rec Center? Two, I'm confident that the message I sent Ashlyn was not sexually inappropriate because another person on this list, Hannah Turnbull, actually read that message and confirmed to me that there was nothing inappropriate about that message.

> I believe another woman who used to be an instructor at the Rec, Taeler De Haes, spread false information about me. She was waging a false campaign against me. I have a history with her. She is connected to Ashlyn, Hannah, and Rose.

Rowles explained,

> I met Ashlyn in the summer of 2015. At that time, she did *not* work at the Rec Center. She worked at Lucky's Market. I believe Ashlyn just started working as a Rec Center employee in the fall of 2016. Throughout the summer of 2015, I saw Ashlyn because we lifted weights in the Pump Room weight room at the Rec at approximately the same time daily. I introduced myself to her last year because we worked out at the same time. When I approached Ashlyn, it was before she was a Rec Center employee. I was attracted to her. She looked like a character from a movie, *Some Kind of Wonderful*. She reminded me of Watts from that movie. The top of her hair is pale blond and then darker everywhere else. When I was a kid, I wanted to date someone like Watts.

> I was really cautious though. After two or three months of seeing her around the Rec Center, I saw her at Lucky's. I shop at Lucky's all the time, and I found out she works there. I was developing a friendship with someone else who worked there at the same time, Hannah Turnbull. I asked another employee who Ashlyn she was and whether she was single. I was going to approach Ashlyn at the Rec Center after that.

> I introduced myself and tried to get to know her. She told me that she's a Nutrition major but wants to go into Dietetics. I asked her about workouts. She does really intense workouts. That's when Ashlyn told me that she knew Hannah and Taeler. I asked her if it was okay if I added her as a Facebook friend so I could get to know her, and she said, "Sure." She also gave me her Instagram handle. I was nervous. I didn't ask her out or anything.

Rowles continued,

> Taeler had been at an internship in Washington DC during the summer of 2015 with CBS News. The next time I saw Ashlyn, she was working out with Taeler after she returned to Columbia. I told Taeler "good job" because I had read her news articles. I said "hey" to Ashlyn. She is really reserved, especially when she's around Taeler who is boisterous and calls herself an "alpha female."

> Here in town, Taeler worked at GNC off of Grindstone. I would see her there when buying products. At the Rec, I asked Taeler when she worked at GNC because I needed to buy workout supplements. She told me that she worked that afternoon and invited to come by.

> That afternoon, I went to GNC. I talked to Taeler for some time. Eventually, I asked Taeler how she knew Ashlyn. She said, "Why?" I said, "I'm thinking about asking her out." She said, "No." I asked, "Why?" She just said, "Don't ask her out." She wasn't saying that Ashlyn didn't want me to ask her out; it was Taeler who had the problem with it. She said, "You shouldn't do it."

> I asked Taeler, "Could you just not talk about me to her?" Taeler said, "Okay. It's between you and her." She also said, "Don't be creepy and send her a Facebook message." I said, "What do you mean?" She said, "Don't just appear out of the blue and send her a message." I said, "But I already know her and introduced myself in person." Then she said, "That's okay, since you met her in real life."

> A couple days later, I was going to ask Ashlyn out in person. I don't know why I didn't. I ended up asking her out via Facebook in a very gentlemanly way—not anything sexually suggestive. I asked her out to dinner. I said, "I'd really like to get to know you better. You're attractive and appear to be a smart woman with an outstanding set of moral values, and I admire your determination. You appear to be a woman I want to get to know better. Would you be interested in having dinner with me?" She didn't respond. I took that as, "I guess not."

> That's the thing, you ask people out, and they don't respond. It's like, "Okay." The next day I was working out, and Taeler called me over. She and Ashlyn were working out together. After I finished talking to Taeler, I asked Ashlyn if she received my message. She told me that she hadn't received it. I said, "I was asking if you'd be interested in going to dinner with me." She said, "I don't think I have time for going out with anyone right now. I have a very busy schedule between school, cheerleading, and work. I just don't think I have time to do dinner. I'll have to check my schedule, but I don't think I have time for dinner." I took that as a rejection. That was a clear decline. I said, "Okay," and I moved to the other side of the room to do my workout.

Rowles described another conversation with De Haes at GNC after she invited him to visit during her shift:

Rowles Petition Ex. F

We briefly talked about Ashlyn, and I expressed my disappointment that she had declined my date invitation. Taeler did not say anything about that, and she changed the subject. That was a Friday. Sometime that weekend, I noticed Ashlyn blocked me on Instagram. I found out she blocked me because a post of hers I was viewing in my Instagram feed literally disappeared while I was looking at it. I thought that was odd. Later, she blocked me on Facebook. I thought, "Okay, she's really rejecting me," but I didn't take it personally.

Later that week, by the end of the following Wednesday, I was working out on a weight machine that has four sides. I was sitting on one side. Suddenly, Ashlyn and Taeler came over and started working out in front of me on the other sides of the machine. It was like they "bum rushed" me, they both ran over to the machine in an aggressive way. Also at that time, I was starting to suspect, based on previous interactions I had with Taeler, that she had broken her promise and told Ashlyn not to go out with me. I thought Taeler was involved in Ashlyn blocking me.

Taylor was staring at me. My gut was telling me that Taeler was doing something. I turned away, and Ashlyn was working out on the right side of the machine. I was looking to the right and down. I didn't want to look at Taeler. It was this weird interaction.

A couple days later, I approached Ashlyn soon thereafter at Lucky's. I said, "I noticed you blocked me. I'm not complaining about that. I'm just wondering why you did that? What did I do wrong so I don't make the same mistake in the future?" Ashlyn said, "Yeah, when you asked me out, the message had too many compliments. If you knew me, you'd know that I don't like compliments." I said, "Okay, I'm sorry about that. Anything else?" She said, "Yeah, when we were working out the other day, Taeler told me you were looking at me in a creepy way." I said, "I wasn't looking at you. I was trying to look away." She said, "That's not what Taeler said. It creeps me out." I said, "I didn't mean to do that. I was looking away from Taeler. Wait, you blocked me before that day when we were working out." When I said that, she said, "Taeler said you're a creep. I have to get back to work."

Rowles explained,

I went to GNC. Usually when Taeler is there, she works by herself. She often invites people to come in and talk to her. She was in the back, and she invited me to come back there. I said, "I'm not trying to cause an argument, but I want to talk to you. You told me you weren't going to get involved, and Ashlyn just said you called me a creep." Taeler said, "Jeremy, you're too old for her! You shouldn't have asked her out."

At the time, I was 39. I'm 40 now. I asked, "Did Ashlyn say that?" Taeler wouldn't answer that question. She just kept saying I was too old. I said, "That is not your decision to make. That's Ashlyn's decision. She didn't say anything to me about me being too old." She said, "You don't look 20." I said, "I wasn't trying to look 20." She said, "You come off as a creep." I said, "What do you mean? That's a loaded term." She said, "The messages you send to people, they come off as creepy. They're way too long. Nobody wants to read that."

I asked Taeler, "Did you read the message I sent to Ashlyn? That was like five sentences." She wouldn't say. I asked, "Did you get involved in Ashlyn's decision when I asked her out?" Taeler wouldn't answer. She said that other friends of hers had told her I sent them messages that were way too long, and that I was a creep for doing so. I asked her who those people were, but she wouldn't tell me. She kept calling me a creep, and I said, "Look, I'm starting to get offended." I was starting to feel harassed at that point.

I had just taken the Title IX training. If someone says something offensive based on sexual behavior, protected class, or whatever, it is best to tell the person that their behavior is offensive. I told her that I find "creep" to be a very derogatory term and that it tends to have the similar effect for men that slut shaming does for a woman. That has such a load to it. I said, "I'm warning you, I find you calling me a creep offensive." She said, "How dare you warn me. I'm about to call the cops. I'm going to call my manager. You're threatening me." I said, "I'm not threatening you." At that point, even though I felt I was in the right, I was worried that the cops would take her side if she called.

Taeler said, "Ashlyn contacted me and asked me about you." Taeler told me that she said, "I know him." I asked her whether she said anything else. She said, "No." I thought she was lying, but I can't prove it. She said, "Yeah, I got involved because Ashlyn contacted me and asked if I knew you." I said, "Whatever, just stop calling me a creep." She said, "Just stop sending long messages to people."

I asked Rowles whether he has been in contact with Balch since then. He said,

Yeah. Not about dating. I didn't talk to her for almost an entire year, but we work out at the same time a lot. Later in the semester, Taeler and Ashlyn were working out together and they came over to me. I would talk to Taeler, and Ashlyn would be there. It's complicated.[25]

About his interactions with Balch this semester, Rowles explained,

One of my favorite classes is Functional Fitness. I started going to the Wednesday morning Functional Fitness class, and that happened to be the one Ashlyn teaches.

---

[25] Upon reviewing this summary, Rowles requested to add the following clarification on February 6, 2017: "The only message I ever sent Ashlyn was the one asking her out to dinner. I have not sent her any messages since then."

I didn't know that. I didn't even know she was hired by the Rec Center. I went to the class. I thought me and Ashlyn had a good working relationship. We interacted in the class. She hasn't given me any indication that she's uncomfortable with me.

One time, I asked for food advice: "Is there anything I can eat that would help me sleep through the night?" She gave me advice, and I followed it. I said "thanks" the next week, and she gave me more advice. She wanted to know if what she was telling me was helping my sleeping problems. I really enjoy her classes. It has been great to see her come out of her reserved shell and become such a great instructor. I have a lot of respect for Ashlyn as a fitness professional. She is really good. Our interactions since the Facebook message have been purely professional. Ashlyn told me, "There wasn't anything inappropriate about the message. It was just too many compliments."

Next, Rowles focused on his interactions with Turnbull. He stated,

When this situation happened with Taeler and Ashlyn, I went to Hannah. We had a friendship at the time. Hannah also worked at Lucky's. I contacted her and asked for advice. I said, "I feel like Taeler is interfering in my relationships." I felt like it had happened before with Peyton Downs, who used to go to school here. She dropped out. We had an "on again, off again" relationship.

I had met Peyton in 2014 when I hired her as my personal trainer at Wilson's Fitness. We developed a good relationship. You know, we had a lot of similarities. I called her "the little white girl version of me," and she agreed with me when I said that. We have had similar life events. Our personalities are similar. We are both confident and funny on the outside but insecure and reserved and fighting a lot on the inside. We both lost parents when we were young; she lost her dad, and I lost my mom.

Peyton moved to Florida to start a nutritional supplement company after she dropped out of school in the fall of 2014. It seemed like I was her only customer. She asked me to keep in contact with her. She wanted me to give her updates. I was sending long messages to Peyton, and she replied back from time to time. In the spring of 2015, Peyton seemed kind of erratic, and I think she was lying about things—like where she was living. She shut down her business. That's how I got to know Taeler. They were friends. I met Taeler at the gym. She apologized for Peyton. I became friends with Taeler then. Something happened between me and Peyton at the beginning of summer 2015, as I was concerned about Peyton's erratic behavior, but Peyton took my concern as me being too nagging, and I think Taeler told Peyton to stop contacting me and to block me on Facebook and Instagram. Hannah knows Taeler and Peyton too.

**Rowles Petition Ex. F**

Rowles continued,

> I went to Hannah and asked if I could message her for advice. I went to Hannah because she was the only person who knew Ashlyn, Taeler, and Peyton very well; she was friends with all of them. I was developing a good relationship with Hannah. She said, "Sure." I sent her a Facebook message explaining my concern about Taeler getting involved in my relationships, particularly with Peyton and Ashlyn, and convincing them to stop talking to me and blocking me.
>
> In the message, I also sent a copy of the message I sent Ashlyn—the one asking her out to dinner—for Hannah to review for appropriateness, to see if it was "creepy" like Taeler said it was. She replied back that it would be better if we talk about it in person, and said we should meet at the café in Hy-Vee on Nifong. When we met, Hannah said there was nothing wrong with what I had done to either Peyton or Ashlyn, and that the message I sent Ashlyn was appropriate. She said there was nothing creepy about it.
>
> She said she didn't consider Taeler a friend anymore. She said Taeler is mean and can't be trusted. She said I should just avoid Taeler, and don't let her bother me. Hannah and I would talk about other stuff, too, like her boyfriend, my ex-wife, our respective majors, and our hometowns. She said I was a really good guy and that I was "awesome."

I asked Rowles when his relationship with Turnbull started to deteriorate. He explained,

> Through the summer, we developed a friendship. She is really happy to talk to, like sunshine. I would see her at Lucky's. She would give me motivational advice. She asked me to check out in her lane, or she would shut down her lane if she saw me in another lane so that she could come over and bag my groceries in the lane I was in. She would help me with nutrition advice. She helped convince me to try out for TigerX instructor. She thought I would be good at it. I asked her to not tell Taeler that I was trying out for TigerX, and she promised me that she would never tell Taeler anything about me, and that I need not worry about Taeler affecting my hiring for TigerX.
>
> I felt so grateful for Hannah. I thought she helped me out a lot. I started taking two of her cycling classes. At her morning classes, she would complain that she forgot to eat. I started to bring fruit for her to eat. I bought her a couple candy bars at Lucky's. She would say "thank you" and tell me that she really appreciated it. I made it a habit to bring her food to eat. I brought food for the other cycling instructor in Hannah's Wednesday class too. I didn't want to be rude to her.
>
> I guess Hannah's boyfriend saw us interacting on Instagram. Before I asked Hannah for advice, I told her boyfriend that I was asking Hannah for advice. I told him that it was something personal, but it was something that did not involve me trying to start a romantic relationship with Hannah. I told him as a man talking to

41

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

another man. His name is Ethan. I said, "I'm not trying to take her away." As time progressed, though, I thought Ethan was becoming jealous.

Hannah never said I was doing anything wrong. In October of 2015, Taeler was sitting outside of Hannah's class. I came out, and Taeler called me over. She was looking pitiful. I talked to her, and it seemed like she was trying to be friends with me again. Later that night, Taeler started liking my posts on Instagram. I made black bean chocolate brownies the week before, and I shared some of them with Hannah and her co-instructor in her cycling class. Hannah said I should share the recipe because they were so good. That night, I posted a picture of the brownies on Instagram. I tagged Hannah in the caption and said that I had shared some with her, and she wanted me to give the recipe.

Taylor liked that post and commented. She said, "Those look really good." I commented back. She had a nickname for Ashlyn: "pumpkin muffins." I joked back and said, "We should trade: I deliver black bean brownies, and you help me with pumpkin muffins." She responded back, saying, "Deal." We arranged that I would make a pan of black bean brownies, and I would deliver them to her at GNC. Even though I had proposed the trade as a joke, I understood that by her saying "deal" and actually agreeing to brownie delivery, she would in turn keep her side of the deal by at least correcting the damage she had done by calling me a creep to Ashlyn. However, when I made the delivery, Taeler said that she wouldn't get involved with Ashlyn for me.

Rowles continued,

Taeler said, "I guess I'll be single for forever. I thought you made [the brownies] for me." I said, "No, I was hoping you'd help me with Ashlyn." Even still, Taeler and I continued talking. I felt that Taeler was trying to bury the hatchet and wanted us to be friendly again. I left the brownies at GNC. Taeler invited Hannah to come to GNC. She told me to leave so she could do her homework, but she invited Hannah over. Hannah started acting weird around me then.

The next week, I was in Hannah's class. I was the only one who showed up for class that day so it was cancelled; cycling class needs at least two participants, or else the class is cancelled. We were waiting outside for someone else to come. Taeler and Ashlyn walked downstairs about that time. Hannah waved, and they waved back. She said, "Me and Taeler are friends again." I told Hannah that I trust her, so if she trusts Taeler, then I was going to start trusting Taeler too.

I told Hannah that I had delivered brownies to Taeler the weekend before, and Hannah said, "I know. I ate some of them." Afterwards, I asked if she and Ethan were doing okay. She said, "I dumped him, but I'm not looking to date anybody." I wasn't going to go there, but she kept telling me that she didn't want to date anybody. It was like she was anticipating me asking her out. She said she was tired of Ethan being "all up under her."

Hannah said again, "I'm not dating anybody." We left. We both went to work out. Then things started going downhill. Hannah started acting negative toward me. Later that week, she stopped following me on Instagram. The week after that, she defriended me on Facebook. I texted her and asked if I did something wrong. She said, "Yeah, I didn't appreciate you thinking that just because me and Ethan broke up that we could be more. You think that just because someone is nice, they want to be with you." I didn't know where that was coming from. I replied back, telling her that I didn't say that we could be more. I said, "I was asking because I was concerned. I was asking to see if you were okay. I didn't give that inclination at all." She replied back that she could no longer "defend me" from what people were saying about me and that I had let her down. I replied that I didn't let her down and that I wasn't trying to get with her. I also asked who were the people that she had to defend me from. She didn't reply back.

Rowles stated,

The next week, I saw Hannah, Rose, and Taeler. We were at opposite ends of the walkway at the Rec Center. They all huddled together and decided to ignore me. It was like a bullying tactic. They refused to look in my direction or acknowledge my presence. They walked past and ignored me. I asked Hannah to talk to me, and she refused to acknowledge me. It really hurt. Also, in her cycling classes, Hannah would not acknowledge me. She would not look at me or talk to me. I stopped going to her classes soon afterwards.

A month later, I bought groceries from Lucky's and went through Hannah's checkout lane. She barely spoke to me and got really upset when I asked her to put my bottle of iced tea in a bag. Later that afternoon, I was completing my application paperwork to audition to be a TigerX instructor. I got really emotional because I thought about how I wouldn't be auditioning at all if it wasn't for Hannah, and how our relationship had deteriorated to the point where she couldn't bag my groceries without getting upset with me.

I reached out to Hannah via text. I said, "I feel bad about the bad blood between us. I don't know how it got that way. I want to understand." She said, "There's nothing bad between us." She said, "Everything is cool, we're okay, but you need to watch what you say to people, especially other TigerX instructors." I didn't know what she was talking about.

Around that time, Taeler posted things on social media that were offensive— Things about men being fuck boys. I called her out. We had an argument on Instagram. I assume Taeler was the "other TigerX instructor" who Hannah was saying that I need to watch what I say to, as she was the only instructor that I was interacting with like that. I started going to Hannah's classes again and bringing Hannah food. About the last week of class in December, Hannah defriended me again. I had a panic attack. I emotionally vomited all over her in a text. I

apologized to her in a follow-up text, and Hannah replied back that she was not upset about it, and she accepted my apology.

I was at the gym the next day. I was really embarrassed about the text. Hannah saw me and smiled, and she signaled to me that she wanted me to come to her class. I went to class. It seemed like everything was okay. It was awkward. Christmas break started. I think she went out of town. Around Christmas, I started talking to another girl. Apparently, that girl and Hannah are also close. She is a triathlete, and Hannah was thinking about doing that. It seemed like Hannah was monitoring my interactions with her friend. I also asked an employee Lucky's to do an informal interview for my dissertation research, where I would be asking the employee personal questions about her family. I also felt like Hannah was monitoring my interactions with the employee, leading the employee to start questioning my motives in asking her personal questions.

In January 2016, I texted Hannah asking if I could briefly talk to her in person so that I could discuss with her my concerns about her monitoring my interactions with women she knows. She replied back asking me to not speak to her anymore. I replied back that I would agree to not speak to her, and that she should not gossip about me to anymore.

I have not spoken to Hannah since then, either online or in person, except for one time in September 2016 when she approached me in the weight room to ask me if she could use the weight that I was lifting with.

Regarding his interactions with Nash, Rowles explained,

I met her in the fall of 2014. I was fired from Wilson's. I started working out at the Rec. I wasn't sure about group fitness at the Rec. They classes are different there than at Wilson's. I went to Insanity. She taught that, along with another instructor named Jackie Hermanson

I became a regular in the classes. Rose was really motivating. She said, "You did a good job." I was out of shape. Maybe a week or so later, I was walking through white campus toward the Rec. I was near the archway between Waters Hall and Whitten Hall, the one that leads to the parking lot behind Memorial Union. Rose was near the patio of Memorial Union. She said, "Hey!" from really far away. I didn't know who she was calling to at first because she was so far away. Eventually, I realized she was calling at me. I walked over to her, and we started talking We talked for half an hour. It was a really personal conversation. In that conversation, I was telling her that I used to be an instructor. She said I should try being an instructor at the Rec. I said, "I need to get back in shape." She looked me up and down and said, "You're looking pretty good to me." I wondered, "Did she just flirt with me?"

She gave me a couple other compliments, but that's the one I remember the most. She had called at me from half a football field away. I asked if I could be her Facebook friend to keep in touch. She said, "Yeah," and gave me her last name. The Facebook message I sent in January 2015 was after this in-person conversation. She didn't respond back so I guessed she was just being friendly when we talked before. I was just testing the waters.

I interacted with Rose after that. I contacted her in May 2015. She also worked part-time at 9 Round. I sent another message then about 9 Round. She told me to give it a try, so I did. I started at the beginning of May or June. She wasn't there; she was in Chicago. She came back the first or second week of July. About the June 2015 message, she posted this interesting article on Facebook. It really got me thinking. I can't remember what the article was about. It was related to my anthropology studies. There was nothing romantic or sexual at all in that message; it was just to respond to the article she posted on Facebook because it was interesting. She didn't respond.

Upon reviewing this summary, Rowles requested to add the following clarification on February 6, 2017:

I have not messaged Rose since the summer of 2015. I also did not interact with her in person outside of her fitness classes at all until she approached me at Lakota Coffee in July 2016 to ask me how I was doing.

I do believe that Rose is involved with Taeler for several reasons. One, Rose constantly referred to Taeler as her "role model." She idolized Taeler. Two, when Taeler said to me at GNC that I was a creep for sending her friends long Facebook messages, Rose was one of the two friends of Taeler that I had messaged at that time (Peyton Downs was the other one). Three, Rose participated in the bullying tactic of ignoring me with Hannah and Taeler. And finally, about the time when Hannah said she could no longer defend me from people talking about me (and I assume that person was Taeler), Rose blocked me on Facebook, even though it had been almost a year since I had last interacted with Rose on Facebook.

On December 14, 2016, I spoke with Rowles again via telephone. Regarding the allegation that he positioned himself on the same side of the room as Breaux during classes, so that he could be in front of her instead of other instructors, he stated,

That's absolutely false. I'll explain. There are three class that I attended with her as an instructor: Tiger Tease, Dance Fitness, and Contemporary Life Works. With Tiger Tease and Dance Fitness, I treated them like all the other fitness classes I go to. One of the things that I have a habit of doing, even when I was at Wilson's, is that I select a side of the room for that class, and then that's where I position myself every time. I am always in the front, no matter which class.

For Dance Fitness, I was always center right, and I've been in that position since fall 2015. Not extreme right but halfway between center and right, facing the front mirror. On my right, as I face forward toward the instructors.

For Tiger Tease, I would set up pretty much to the front left of the class. I was usually the one farthest to the left. I would put my water bottle and towel in front of me at the mirror. I was far left, still in the front. Regardless of where the instructors were at, those were my positions. Even if Annalise was or wasn't there, I was in that position. People get kind of territorial of their positions. I would have to…not physically nudge people…but take up space so people know it's my spot. Other people do that too.

In Contemporary, it was different because we moved around a lot in that class. It's not a traditional workout class, but when we would go through dances, we would do other exercises and go around the room. The second half of Contemporary class was taught like a traditional class, and we would be lined up in our spots. It was hard to have a certain spot, but I will say I remember that at all the Contemporary classes, I was not in front of Annalise. It just happened that way.

For the kickoff class, I was to the far left, and she was at the far to the right—so far that I didn't recognize that she was the backup instructor. Then, in the Lifeworks free day class, I was in the back right because it was so packed that I couldn't get a front spot; she was to the left. The next class, I was to the left in the front, and she was to the right. In the class after that, I was front right, and she was left. In the class after that, I was right, and she was left. Then, in the next class, I was far left, and she was to the right. She was left, I was right. Then I started noticing things were getting weird. In the next class, I made sure I went to the other side, and that was the last class I went to with her (Contemporary class). I was going to go to the right, but we had the conversation about asking for private dance instructions. She was to the right so I moved to the other side.[26]

---

[26] Upon reviewing this summary, Rowles requested to add the following clarification on February 6, 2017:

I'm able to remember the positioning of the Contemporary dance classes because there were so few of them, and in each one, something happened that makes me able to visually remember where we were in each class. For example, in the first Contemporary class after the Lifeworks Free Day, I remember Annalise was the lead instructor that day, and she taught a dance routine to "Trouble" by Coldplay. It was such an emotional dance that it affected me deeply and almost had me crying. I can clearly remember the emotions that day, and it helps me visualize where we were all positioned in the class.

The next class was the class where I injured myself trying to do a leap. I can remember where I turned to for help when I messed up trying that leap, and that helps me remember our positioning. And so on. Again, it just so happened, by random chance, that Annalise's and my positioning were opposite of each other for each class for all the classes except the last one I attended. The last one I intentionally moved to the opposite side.

46

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

I asked Rowles if it was possible that Breaux was deliberately avoiding him because I thought it seemed unusual that so often they would *not* be on the same side of the room. He responded,

> No, she wasn't avoiding me. There were times in other classes where she was in front of me the whole time. I made a concerted effort to honor that promise I made to her. I asked her out, and she did not want to do it, so I promised to be professional. I made sure that I did not do things like that—leer at her and act in a way that was unprofessional. I was very aware in Tiger Tease especially because the moves are very sexual. I monitored my positioning to make sure there was nothing unprofessional going on.

> There was one class where I was to the left, and Annalise started on the right. Usually the instructor who teaches choreography is on the right because that's where the music controls are. Annalise stepped in front of me to continue teaching the moves. She came to the left. She was just a couple feet from the other instructor.

> She was bent over in front of me with her rear facing me. It was a very sexual move. I stepped to the right so I didn't look directly at her rear end while she was bent over. I tried to make an effort to avoid that situation.

> She never gave me a suggestion that this was inappropriate or she was uncomfortable. There were five or six times in Tiger Tease where I stepped aside when she was directly in front of me. All of this was this happened this semester.

Moments after our phone call ended, Rowles called back. He said,

> Another quick thought. I want to be honest. You asked if there was a time she moved away from me based on where I was at. I think I mentioned this before. The same class period where she ran to the bathroom, she did switch with the instructor. Now that I'm thinking about it, when I intentionally moved away from her was the next class after that. There was one time she switched, that was after the private dance lesson discussion. When she switched, I didn't move my position at all. I focused on the other instructor, Madeline Dingman, instead.

**Summary of Information from Witnesses and Others:**

Bailey Baucum

I spoke with Baucum, a MizzouRec instructor, via telephone on November 17, 2016. Regarding her interactions with Rowles, she explained,

> He has come to my classes. I teach three of them, and he comes consistently to all three of them. I have only heard stories of others feeling uncomfortable around

him; I have not felt uncomfortable myself, and I haven't witnessed any incidents with others.

He is very friendly and conversational. It never made me feel uncomfortable. He was one of our more talkative and engaged members. He made an effort to talk to us before and after classes.

I asked Baucum to describe concerns expressed by other staff members. She replied,

I know they were having problems with him sending direct messages on Facebook. For one of our classes, we send an email to the class members. Jeremy has responded to that email before with suggestions for the class. The only reason I eventually started to feel uncomfortable was because I had heard stories from others. Otherwise, it was professional and looked fine to me.

He had given Annalise notes with a coupon to the place she works. He reached out to her on social media, but she asked him to stop. I heard that there is another instructor who has had problems. Her name is Rose Nash, but I don't know the details.

When asked about her observances of Rowles' behavior during class, Baucum said, "Annalise felt uncomfortable that he was watching her inappropriately. I tried to watch for that after she mentioned it, but I didn't see it. He comes to Tiger Tease, which involves more sexual movements than other classes. To be honest, I haven't seen it."

Baucum explained that she has worked as an instructor since November 2015. I asked when she first met Rowles. She explained,

I remember taking classes with him before I started working there. He was very loud and outspoken in class. Now, he comes to my Life Works class which is a smaller group of people, so I've gotten to talk to him. He comments about the choreography. He hasn't asked any personal questions or said anything inappropriate.

He wanted to work as an instructor. He was disappointed when he didn't get it. He said that he doesn't know why he didn't get an interview. Otherwise, he only talks about what we do in class. Annalise has mentioned him lingering after class. I have seen him do that with her. She'll walk away and try to avoid him. She will walk away, and the other instructors will wait and let people out. He eventually leaves.

I asked Baucum if she knows *why* Rowles seems to takes a special interest in the instructors, especially Breaux. She replied,

I don't know. I would be uncomfortable if he did that to me—if he waited for me and always wanted to talk outside of class. His intentions haven't seemed to be in

a bad place to me though. I can only base this on what I have heard. I like talking to people and I'm comfortable talking to people I don't know. But with the stories of things I've heard, I would be concerned if it went farther than our interactions have gone.

I asked Baucum if she spoke with Rowles about private dance lessons. She said,

> He did stop after class and ask about that. He asked if he could recommend an instructor. He didn't say anything about who he would ask for, but Annalise later approached me and said that he asked for her specifically. We told him that he could request someone if he wanted to, but it's mostly randomized. It depends on the instructor who responds when the requests are sent out. This happened around the time that there were stories going around about Rowles' creepy interactions with the instructors.

Madeline Dingman

I met with Dingman, a MizzouRec instructor, on November 16, 2016, in my office. She explained, "I was hired last November. In order to be hired, there is an eight-week training course. It doesn't guarantee that you'll be hired. Then there is an exam and you can apply to be interviewed for the open positions." Dingman continued,

> Jeremy did the training course. He is a lot older than the rest of us. I didn't have any problems with him personally. He didn't get the job. I found out later that part of the reason why he didn't get the job was that he made people feel uncomfortable, and he had advanced toward someone who has already graduated.

I asked Dingman to describe her observations of interactions between Rowles and Breaux. She said,

> He has come to some classes this semester. I teach Tiger Tease, one section with Annalise and one without. He comes to both, but he misses some Thursday sessions. There were some times when we were teaching together, and he would not do the moves when she did them. Instead, he would watch her. He would wait around after class, and he would see her at work at Kaldi's.
>
> There were times where he tried to hand her letters after class. It was to the point where he would wait, and she would run to the bathroom to avoid a confrontation. I knew she was uncomfortable, so I would be on his side of the room so she didn't have to be.

Dingman stated that she teaches six classes per week. She told me that she has talked to Breaux about her concerns related to Rowles and her desire to avoid him whenever possible. I asked Dingman if Breaux seemed to feel threatened by Rowles. She said, "She

was more frustrated [than threatened] because he wasn't comprehending what she was saying to him. He wasn't registering that what he was doing was wrong."

I asked Dingman if she felt uncomfortable around Rowles herself. She said,

> There were no separate issues with me. I was most uncomfortable with him watching Annalise. He is really enthusiastic with the choreography. They are sexy and sassy moves. Some people do half of it, but he does all the moves and doesn't hold back.
>
> I heard Rose had issues with him too. I know she has felt awkward, but I haven't talked to her about it. When we were going through the training sessions, Hannah [Turnbull] said he made her feel uncomfortable.

Regarding Rowles' behaviors during class, Dingman added, "He would stare intensely at Annalise. He would try to get in the middle of the room, but we would make people spread out. He was usually positioned toward the front of the room." Dingman explained that there were usually between four and twelve people who attended each class. She said the first classes she taught with Breaux were this semester, and the incidents she described above all occurred during Tiger Tease classes in the fall 2016 semester.


Kasey Long

I met with Long, a MizzouRec instructor, on November 17, 2016, in my office. She explained that she has worked at the Rec for two years, and she teaches a lot of classes with Breaux. Long also stated that she knew Rowles before she was hired to be an instructor. She described,

> He was friendly and didn't say anything strange. When I started teaching Tiger Tease with Annalise, he would come to those classes. Annalise told me they were messaging each other on Facebook, which she thought was fine because she thought he was gay.
>
> Jeremy started calling Annalise by the nickname "Silky." He is also in his upper 30's. He's not young. He would come to Tiger Tease and stare at her. That happened to another instructor two semesters before; it was Rose Nash. Apparently, he backed off when she told him she wasn't interested.
>
> About three or four weeks ago, we did evaluations. I haven't taught classes with Annalise this semester, but I was evaluating her. He came up to her at the end of class, and he asked if she got his email. She said, "I did get it, but that's not up to me. It's up to my boss." He asked if he could suggest instructors to work with during private lessons. He had emailed Annalise about taking private lessons with her. He told her that she could "take him to where he needs to be, physically and

emotionally." He sent her a long letter. It was more of the same things, over and over again. I remember being disturbed when I read it.

Not many guys come to the dance classes. He was very enthusiastic, which we like. I didn't know about Rose until recently.

Regarding Rowles' request for private dance lessons, Long recalled that Breaux "was trying to be professional in her response to him and not say that she didn't want to teach him because he was creeping her out." She added, "He wasn't upset about not being able to do the classes, but he was put off by it. Clearly, he only wanted to do it if Annalise was the instructor."

I asked Long to further describe the interactions between Rowles and Breaux that she personally observed. She said,

When I was evaluating Annalise, he said afterwards, "All A's, right? One hundred percent because she is great, right?" In classes that I was teaching with Annalise, he would say, "Oh yeah!" or other things when we did sexual moves. A lot of people in class do that, but after I knew this was going on with Annalise outside of class, I thought it was strange. I was wondering if he was like that in all of the classes, but I don't know.

Last semester, in the spring of 2016, I co-taught with Annalise when Jeremy was in class. It's hard because Annalise is leading the dance so everyone is looking at her, not just him.

I asked Long to describe the concerns Breaux expressed to her about Rowles. She replied,

She said, "It makes me really uncomfortable." She told me that he stares at her and stuff. It was obvious that it was unwanted. The way the letter seemed…was that he was delusional to think that something more was going on between them. He thought she wanted him, and he was pushing her away and he was apologizing for that. But clearly, she didn't want anything to do with him.

Long stated that she was not aware of problems between Rowles and anyone else. When asked at the end of the meeting if there was any additional information she wanted to add to her statement, Long said,

I'm upset, and I think it needs to stop. It can be uncomfortable to be up there in front of everyone, but it's not fun when he makes advances and calls someone "Silky" all the time. I'm very hostile toward him now. He doesn't say "hi" to me anymore, and I don't look at him. Rose was not very happy when she found out that he was bothering Annalise. She has zero tolerance.

I asked Long if she remembered Rowles complimenting her and then thanking him for doing so, as reported by Rowles. She said, "No, I don't remember that, but I have a bad

memory. When I taught Dance Fitness, he would say "that's fun" or ask me how to do something. That's all I remember."

Danielle Zoellner

I met with Zoellner, a MizzouRec instructor, on November 17, 2016, in my office. She explained,

> I have known of Rowles since last fall [2015]. He took our instructor training course and wanted to be an instructor, but he wasn't hired. I know he started messaging another instructor, Rose Nash, on Facebook, and he went to her classes. We are usually friendly with the regulars, but his interactions went farther than normal. Rose reached out to me and told our boss. By the end of it, I don't think he would have gotten the job anyway, but Rose told Pangku that she wouldn't be comfortable with him working there.

I asked Zoellner to describe interactions she observed between Rowles and Breaux. Zoellner responded,

> He comes to the Life Works Contemporary class that I teach with Annalise. Last semester, it was brought up to me that he went to a lot of her classes. She saw him at Kaldi's too. He reached out to her in a way that was showing some romantic interest. I never saw these interactions, but at the beginning of the semester, Annalise told me that he was coming to all of her classes. He told her that one of her Zumba classes, he couldn't go to. She started to talk to me more about it, so I was keeping an eye on him.

> I've worked at the Rec for three years. We have people who come to multiple classes, but never someone who makes a point to go to all the classes taught by a particular person. When we teach together, Annalise would be on the left and I would be on the right. He would always go in front of her. He would look at her in a different way, and he would linger after class to see if he could talk to her. He left notes for her. I think because I knew of it, it made me notice it more. I think I would have noticed eventually. Annalise didn't feel comfortable teaching. After he gave her that letter, he stopped coming to class.

Zoellner explained,

> We want to build consistency in Life Works with the people who attend so we send an email to the members. We want people to keep coming back. Once things with Jeremy started, I took over the emails because I didn't want to give him a chance to communicate with Annalise [by replying to her emails].

> Our boss, Pangku, is copied on all emails we send to the classes. One week, Jeremy took Pangku off of the email thread and responded to something I said via

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

email, and he said something to Annalise, specifically, about a song for the next week. She told him she was uncomfortable. He purposefully took out our Coordinator, and he obviously didn't get it.

I don't think he understands when people say, "No." I think he needs help. It's not friendly anymore. It's more than that. It's intimidating. I don't think he gets that. He gave her a coupon from Kaldi's. He might see that as nothing, but to her and me, it looks like a reminder that he knows where she works. I don't think he's malicious about it, but multiple instructors have been uncomfortable.

Zoellner explained further,

I co-taught with Annalise this semester and last semester. He came to some classes last semester. At some point during that semester, she made it clear to him that she was the instructor, and he was in the class. He backed off and then came back in full force.

I asked Zoellner if she observed Rowles staring at Breaux. She said,

He always knew where she was. He would try to stand closer to her. There was a different intensity with the way he observed me, but I don't really pay attention to how he looks at me. He would linger for more time than other members do after class. He was consistently the last person to leave. He would stand around and, if there was an opportunity, he would go up and see Annalise. He would include me sometimes, but his goal was her.

When she told me that she was uncomfortable, I started teaching on the other side of the classroom. One time, he went and got a drink of water and then shifted toward the middle and closer to her when he came back in the room.

I asked Zoellner if she witnessed Breaux avoiding Rowles after class. She replied,

She especially did that with the classes she taught with Maddie. She would leave right after class. She would go outside or down the hall, saying she had to go to the bathroom or something. One time, she pretended to clean something away from the door. He waited, and I said, "Thanks." Then he walked out. A lot of people would pick up on those cues, but I don't think he was.

When asked to describe Rowles' interactions with other people in class, she said,

He would talk to other members, and he was super friendly. I feel like he's someone who looks for people and maybe misunderstands boundaries. When I talked to Pangku on Tuesday, we talked about the idea of friend zones. He thinks, "Maybe if I persuade her enough and stick around, then she'll realize she's into me." She gave me the impression that someone else was uncomfortable with him too, but she didn't give me the details.

**Rowles Petition Ex. F**

I asked Zoellner to clarify what she meant when she described Rowles as "friendly." She stated,

> He is very receptive to giving feedback. He'll high five members, and he is actively giving feedback to instructors. We encourage that in Zumba and dance classes, but not as much in Life Works. He would stop me at the Rec and ask how my knee was doing. I didn't think it was weird. I think when he likes someone, it's amplified to the point that he might not realize he's being too much.

Regarding Rowles' interactions with Nash, Zoellner stated, "He communicated with her on Facebook and went to her classes. Rose is sweet. She tried to be nice to him, but she had to say something about it crossing the line." I asked if she was aware of anyone else who had concerns about Rowles. Zoellner responded, "It sounded like there might have been others, based on what I have been hearing. I just don't know who. In our programs, it has been the dance and Zumba instructors because he consistently does to those classes."

Ashlyn Balch

I attempted to interview Balch as a potential complainant in this matter, but she did not respond to my attempts to contact her. I called and left voicemails on October 21 and November 17; I emailed her on October 17, October 26, and November 22. To date, Balch has not expressed an interest in participating in this investigation.

Rose Nash

I attempted to interview Nash as a potential complainant in this matter, but she did not respond to my attempts to contact her. I called and left voicemails on October 21 and November 17; I emailed her on October 17, October 26, and November 22. To date, Nash has not expressed an interest in participating in this investigation.

Hannah Turnbull

I attempted to interview Turnbull but was unable to do so. I spoke to her briefly via telephone on October 21. However, at that time, she was heading into work and unavailable to speak with me at length. She stated that she would be available for an interview on October 24 at 4:15pm. When I called at the scheduled time, she did not answer. I left a voicemail, requesting that she return my call. I left another voicemail on November 17. I emailed Turnbull on October 17, October 21, October 24, and November 22. She did not respond to any of these attempts to contact her after our initial conversation.

Rowles Petition Ex. F

Taeler De Haes

 I attempted to interview De Haes but was unable to do so. I emailed her on November 14, and she responded the same day. We planned a phone interview for November 15, but she did not answer when I called at the scheduled time. Thereafter, I sent her three emails (on November 16, November 22, and January 13). In the last email, I notified her that the investigation would be closing soon, and I provided January 17 as the deadline for submitting any statements to be considered. She did not respond to any of these attempts to contact her after our initial email exchange.

Peyton Downs

I attempted to interview Downs, but she did not respond to my attempts to contact her. I emailed on November 14 and November 22. To date, she has not expressed an interest in participating in this investigation.

Jacqueline Hermanson

I attempted to interview Hermanson as a witness who was proposed by Rowles, but she did not respond to my attempts to contact her. I called and left a voicemail on January 17, and I emailed her on November 14 and January 13. To date, Hermanson has not expressed an interest in participating in this investigation.


**Credibility Assessment:**

The information provided in the interview summaries was obtained by an interview with the stated person that was free of prompting, coaching or behavior that could, in any way, compromise the validity of the statements made. At all times, the parties and witnesses were interviewed in a manner free of any coercion or undue intimidation. All parties and witnesses were interviewed in-person in my office or via telephone. The statements offered by all parties and witnesses during interviews were in their own words and of their own accord. Each party and witness in this investigation reviewed their interview summary presented within this report, and these individuals affirmed that the details contained within their summary was accurate to the best of their knowledge.


**Conclusion:**

At all times, this investigation was conducted in accordance with the relevant University of Missouri System Collected Rules and Regulations, specifically Chapter 200.025.

Report prepared by:

*Amber Lammers*

**Amber Lammers**
Equity Consultant and Investigator, Office for Civil Rights & Title IX

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

# UNIVERSITY *of* MISSOURI
### OFFICE FOR CIVIL RIGHTS & TITLE IX

December 13, 2016

**VIA ELECTRONIC MAIL**[1]
Jeremy Rowles

████████████████████

**RE: NOTICE OF CHARGES**

Dear Mr. Rowles:

This letter is to notify you of the status of the investigation regarding Annalise Breaux's complaint alleging that you violated the University's Student Standard of Conduct.

Ms. Breaux alleges that, on or about March 2015 to October 2016, you engaged in the following behaviors which impacted her:

- Starting on March 2, 2015, you sent multiple Facebook messages in a private thread to Ms. Breaux, including comments about her dance choreography and skills and the way her body moved. In several messages, you call her "Silky," in reference to her body and movements. Ms. Breaux stated that the increasing sexual/romantic nature of the messages was unwanted.

- On April 12, 2015, Ms. Breaux reported that you waited after class and "cornered" her to ask her out. After she declined to go on a date with you, you continued to message her "incessantly" until April 18 when she told you that you needed to stop messaging her, and she specifically expressed to you that she wanted to be professional in her interactions with you. Ms. Breaux reported that your advances were unwelcome, and they interfered with her ability to feel safe and comfortable in the Rec Center, which is her workplace.

- During the Fall 2016 semester, Ms. Breaux reported that you attended all four weekly TigerX classes she teaches. She reported that you "lingered" after class to talk to her multiple times. Ms. Breaux explained that she took extensive measures to avoid contact with you after classes, such as leaving the room quickly and sometimes making up excuses such as going to the restroom in order to do so, standing on the other side of the room from the door as students left class, and asking her coworkers to step in and talk with you instead.

- Additionally, Ms. Breaux alleges that on various occasions this semester you gave her many high fives; grabbed her hand in an "intimate" way before, during, and after classes; and stared at her intensely for the "entirety" of classes. She characterized the way you stared at her as more intense and personal than the way you looked at other instructors

---

[1] On November 11, 2016, you signed an agreement stating that all correspondence from the Office for Civil Rights & Title IX, which is typically required to be physically mailed, would be delivered to your University email address, including the Notice of Charges. Therefore, this document will only be sent via email.



Electronically Filed - Boone - December 06, 2017 - 04:09 PM

who led classes. Further, she reported that you made a purposeful effort to stand in front of her during class, rather than in front of the other instructors, so that you could more easily look at her. Ms. Breaux reported that on at least a few occasions she asked the second instructor of a particular class to switch sides so that she could put more space between you and her because she felt uncomfortable.

- On October 3, 2016, you emailed Ms. Breaux insisting on taking private lessons with her. You reportedly complained to her via email and "confronted" her after class. You stated that ZouLife would not allow you to sign up for private lessons with her. She interpreted your tone as frustrated, and she reported that she felt intimidated and confused by your persistence.

- On October 7, 2016, you reportedly gave one of Ms. Breaux's coworkers a note to give her after you were unable to talk directly to Ms. Breaux after class. The note contained song lyrics and a free drink token to Kaldi's, which is another location where Ms. Breaux works.

- On October 14, 2016, Ms. Breaux alleges that you stayed after class and handed her a three-page typed letter, which she did not want to take from you. However, Ms. Breaux eventually took the letter, which contained apologies and a "confession" of your love for her. She reported that your romantic sentiments were unwanted and persistent even after she asked you to stop communicating with her in that way.

Ms. Breaux stated that the accumulation of these incidents made her feel uncomfortable and interfered with her ability to focus on work at the Rec Center. In addition, the Office for Civil Rights & Title IX received reports about your interactions of a similar nature with multiple other female Rec Center employees, including frequent, unwanted Facebook and text messages sent to AB, RN, and HT. You discussed these reports during your meeting with Amber Lammers as well.

You are being charged with potentially violating the University's Student Standard of Conduct as set forth below. This letter describes the process for resolving these charges (either Informal or Formal Resolution) and informs you of the range of sanctions that are possible if you are found responsible for violating University policy.

The investigation to date suggests that such behavior *may* constitute violations of the following subsections of Chapter 200.010(C) of the Collected Rules and Regulations (CRR) of the University of Missouri:

…

7.  **Violation of the University's Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/Employment Policy in Section 600.020 of the Collected Rules and Regulations.** These violations include:

    …

    b.  **Sexual Harassment**. Sexual harassment is defined as:
        1) Unwelcome sexual advances or requests for sexual activity by a person or persons in a position of power or authority to another person, or
        2) Other unwelcome verbal or physical conduct of a sexual nature by a person to another person, when:



Electronically Filed - Boone - December 06, 2017 - 04:09 PM

a) Submission to or rejection of such conduct is used explicitly or implicitly as a condition for academic or employment decisions; or
b) Such conduct creates a hostile environment by being sufficiently severe or pervasive and objectively offensive that it interferes with, limits or denies the ability of an individual to participate in or benefit from educational programs or activities or employment access, benefits or opportunities.

…

**d. Stalking on the Basis of Sex**. Stalking on the basis of sex is following or engaging in a course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed.

…

The following is a brief description of the Equity Resolution Process, which is the procedure that will be followed by the University to address these charges.[2] The Equity Resolution Process sets forth two primary methods of resolving charges against students—the Informal Resolution Process or the Formal Resolution Process. Conflict Resolution is utilized in some instances, but not this case.

The **Informal Resolution Process** will be used if, and only if, both parties (you and Ms. Breaux) agree to this form of resolution. In the Informal Process, I would decide whether you are responsible for violating the University's policies after reading a full report written by the Investigator (Amber Lammers) detailing the facts learned during an impartial investigation. After a determination of responsibility has been made, I would inform the parties of the decision.

Another option is the Formal Resolution Process. In the **Formal Resolution Process**, an Equity Resolution Hearing Panel (composed of three staff /administrators) would assemble at a formal hearing. During this hearing, the Investigator would serve as the main witness and the panel would hear a report of the investigation from the Investigator. Both you and Ms. Breaux may serve as witnesses and may also call people to serve as witnesses at the discretion of the Hearing Panel Chair. The Hearing Panel Chair may ask questions of all the witnesses and both complainant and respondent can question each other by directing their questions through the Hearing Panel Chair. The Hearing Panelists would make a finding of responsibility for the charged policy violation and prepare a written report detailing the findings, how each member voted, and information cited by the panel in support of its determination.

If a student is found responsible for violating the Student Standard of Conduct, sanctions can range from a written warning; probation; loss of privileges; restitution; discretionary sanctions such as work assignments, service to the university, or completion of educational programs or counseling; resident hall suspension or expulsion; campus suspension; University dismissal; University suspension; withdrawal of recognition for University organizations; or University expulsion.

---

[2] For a complete description of the Equity Resolution Process, go to: http://www.umsystem.edu/ums/rules/collected_rules/programs/ch200/200.025_equity_resolution_process_for_resolving_complaints_of_harassment. CRR 200.025: Equity Resolution Process for Resolving Complaints of Harassment, Sexual Misconduct, and other Forms of Discrimination against a Student or Student Organization.



Please inform me and Investigator Amber Lammers of your choice of resolution process (Informal or Formal Resolution) within **three** (3) business days of receipt of this letter (**December 16**).

A copy of the Standard of Conduct (CRR 200.010) and procedures governing the Equity Resolution Process (CRR 200.025) are enclosed for your convenience. You may have an advisor or counselor present during all meetings with the Office for Civil Rights & Title IX and at any hearings. If you choose to have an advisor, it is your responsibility to ensure that he/she attends such proceedings.

Retaliation against a person for making a report or for filing, testifying, assisting, or participating in any investigation is strictly prohibited. This includes, but is not limited to, any hostile actions such as verbal or visible threats to the wellbeing of an individual, any threat to spread false information about a person, or any such action that would deter reasonable people from pursuing their rights. Retaliation is a separate violation of the University's policies.

Should you have any questions about this letter or the ongoing investigation, please contact me or Ms. Lammers.

Sincerely,

**Ellen Eardley**
Assistant Vice Chancellor for Civil Rights & Title IX
Title IX Administrator

Enclosures

Electronically Filed - Boone - December 06, 2017 - 04:09 PM



Electronically Filed - Boone - December 06, 2017 - 04:09 PM

**Subject:** Re: Investigation Submitted for Review
**Date:** Friday, December 16, 2016 at 8:54:49 AM Central Standard Time
**From:** Lammers, Amber M.
**To:** Breaux, Annalise R. (MU-Student)

Dear Annalise,

Thanks for your message. Jeremy also selected Informal Resolution, so we will proceed with that process. The next step for me will be to draft the Investigative Report for Ms. Eardley to review. I will send you a summary of our interview to approve before the report is finalized.

In the meantime, best of luck finishing this week and safe travels if you're leaving town over the break. Thanks again!

Sincerely,
Amber

**Amber Lammers**
Investigator

**Office for Civil Rights & Title IX**
**University of Missouri**
civilrights.missouri.edu
145 Heinkel Building
LammersA@missouri.edu
Phone: (573) 882-0943

**From:** "Breaux, Annalise R. (MU-Student)" ███████████████
**Date:** Thursday, December 15, 2016 at 9:22 PM
**To:** "Lammers, Amber M." <LammersA@missouri.edu>
**Subject:** Re: Investigation Submitted for Review

Amber,

After much consideration, I have decided I would prefer to go with the Informal Equity Resolution Process. I have emailed Ms. Eardley about this decision as well. I really appreciate the help you've provided through this investigation.

Thanks,
Annalise Breaux

*Annalise Breaux*
150-Hour Accountancy Program | Undergraduate Student
College of Business | University of Missouri | Columbia

**Rowles Petition Ex. H**

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

**From:** Lammers, Amber M. <LammersA@missouri.edu>
**Sent:** Friday, December 9, 2016 10:48:28 AM
**To:** Breaux, Annalise R. (MU-Student)
**Subject:** Update: Investigation Submitted for Review

Dear Ms. Breaux:

This email is to update you on the status of my investigation regarding allegations against Jeremy Rowles. Earlier this week, I submitted the information gathered during the investigation to Ellen Eardley, the Assistant Vice Chancellor for Civil Rights and Title IX, to review. Shortly, you will be notified of Ms. Eardley's determination as to whether this case will move forward to the resolution phase.

If Ms. Eardley determines that the matter should not move to the resolution phase, the investigation and Equity Resolution Process will end. However, if the case does move to the resolution phase, you will be asked to choose how you would like to resolve the case—through informal resolution or formal resolution.

Below are brief descriptions of these two processes which we discussed at our meeting. Here is a link to more information:
https://www.umsystem.edu/ums/rules/collected_rules/programs/ch200/200.025_equity_resolution_process_for_resolving_complaints_of_harassment.

The **Informal Resolution** will be used if, and only if, both parties (Complainant and Respondent) agree to this form of resolution. In the informal process, the Assistant Vice Provost for Civil Rights and Title IX Administrator will make a decision of responsibility after reading a report written by the Investigator (me) detailing the facts learned during an impartial investigation. After a determination of responsibility has been made, parties will be informed of the decision.

In the **Formal Resolution Process**, an Equity Resolution Hearing Panel (composed of three staff members/administrators) will assemble at a Formal Hearing. During this hearing, the Investigator will serve as the main witness and the panel will hear a report of the investigation from the Investigator. Both complainant and respondent may serve as witnesses and may also call people to serve as witnesses at the discretion of the Hearing Panel Chair. The Hearing Panel Chair may ask questions of all the witnesses and both complainant and respondent can question each other by directing their questions through the Hearing Panel Chair. The Hearing Panelists will make a finding of responsibility for the charged policy violation and prepare a written report detailing the findings, how each member voted, and information cited by the panel in support of its determination.

Note that **you can have an advisor** of your choice help you make this decision and

accompany you to any meetings, interviews, or hearings.

As always, let me know if you have any questions or concerns. Thank you for your cooperation and patience. I will update you again soon.

Sincerely,
Amber

**Amber Lammers**
Investigator

**Office for Civil Rights & Title IX**
**University of Missouri**
civilrights.missouri.edu
145 Heinkel Building
LammersA@missouri.edu
Phone: (573) 882-0943

Rowles Petition Ex. H

# UNIVERSITY *of* MISSOURI
## OFFICE FOR CIVIL RIGHTS & TITLE IX

February 24, 2017

**VIA ELECTRONIC MAIL ONLY**
Jeremy Rowles
██████████████

**RE:** **NOTICE OF INTENT TO RENDER FINDINGS VIA
THE INFORMAL RESOLUTION PROCESS**

Dear Mr. Rowles:

This letter serves to notify you that a finding will be made soon regarding the charges that you violated Section 200.010 of the Collected Rules and Regulations (Student Standard of Conduct) by allegedly sexually harassing and stalking Annalise Breaux and three other MizzouRec staff members: AB, RN, and HT. You have selected informal resolution of this matter. You will receive the Investigative Report soon.

**This is your last opportunity to request that this matter be resolved through Formal Resolution before the Equity Resolution Hearing Panel.** Section 200.025(G)(5) of the Collected Rules and Regulations states:

> *At any point during the Investigation and Informal Resolution process prior to the finding (i.e.: the conclusion of the Informal Resolution process), either party may request that the matter be referred to the Formal Resolution for presentation before The Equity Resolution Hearing Panel.*
>
> *At least three business days prior to rendering a finding on disputed violations, the Appropriate Administrative Officer will provide the parties with written notice of intent to render a finding using Informal Resolution…*
>
> *If, after at least three business days neither of the parties request in writing that the matter be referred to the Formal Resolution process, the Appropriate Administrative Officer will render a finding on the disputed violations. Once findings have been made, the right to the Formal Resolution process is waived and the Informal Resolution process is complete. The finding of the Informal Resolution process remains subject to appeal.*

If I do not hear from you **on or before March 1, 2017**, this matter will be resolved by Informal Resolution, and I will render a final determination or finding. I will inform you of the final determination in writing via email to your University of Missouri email account as you have agreed to receive communications via email.

You have the opportunity to meet with me to review the charges and the investigation. If you wish to meet with me, you must contact Executive Assistant Liz Zufall at zufalle@missouri.edu or (573) 882-2824 on or before March 1, 2017 to schedule a meeting.



202 Jesse Hall Columbia, MO 65211   Phone: 573-882-2824   Email: eardley@missouri.edu

If you have any questions, please do not hesitate to contact me.

Sincerely,

Ellen Eardley
Assistant Vice Chancellor for Civil Rights & Title IX
Title IX Administrator

cc:     Amber Lammers, Equity Consultant & Investigator

Electronically Filed - Boone - December 06, 2017 - 04:09 PM

Rowles Petition Ex. 1

# INFORMAL RESOLUTION
## FINDINGS BY THE ADMINISTRATIVE OFFICER

| | |
|---|---|
| Complainant: | AB, undergraduate student |
| Respondent: | JR, graduate doctoral student |
| Administrative Officer: | Ellen Eardley, Title IX Administrator & Assistant Vice Chancellor |
| Date: | March 15, 2017 |

JR, graduate doctoral student, is responsible for violating the Student Standard of Conduct[1] for his actions towards undergraduate student AB from March 2016 to October 2016 as set forth below. JR was 39-years-old when the alleged conduct began. This decision is rendered pursuant to the University's Equity Resolution Process[2] and describes the policies that were violated and sets forth appropriate sanctions.

### PROCEDURAL HISTORY AND FACTUAL RECORD

The procedural history and factual record of this matter are set forth in the Investigative Report that was prepared by Equity Consultant and Investigator Amber Lammers. This decision assumes familiarity with the evidence collected and summarized in the Investigative Report.

### UNIVERSITY OF MISSOURI STUDENT CONDUCT CHARGES

JR was charged with potentially violating the sexual harassment and sex-based stalking prohibitions in the Standard of Conduct. These charges are analyzed below utilizing the preponderance of the evidence standard. The "preponderance of the evidence" means that the evidence shows it is more likely than not that a policy violation occurred.

The applicable policy defines **sexual harassment** as:

1) Unwelcome sexual advances or requests for sexual activity by a person or persons in a position of power or authority to another person, or
2) Other unwelcome verbal or physical conduct of a sexual nature by a person to another person, when:
   a) Submission to or rejection of such conduct is used explicitly or implicitly as a condition for academic or employment decisions; or
   b) Such conduct creates a hostile environment by being sufficiently severe or pervasive and objectively offensive that it interferes with, limits or denies the ability of an individual to participate in or benefit from educational programs or activities or employment access, benefits or opportunities.[3]

**Stalking on the basis of sex** is:

---

[1] Collected Rules and Regulations, Section 200.010.
[2] Collected Rules and Regulations, Section 200.025.
[3] Collected Rules and Regulations, Section 200.010.

following or engaging in a course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed.[4]

<u>ANALYSIS</u>

To assess this case, I carefully reviewed the Investigative Report and focused on the key facts, a number of which were not substantially disputed and for which there was written evidence.

In 2015, AB, an undergraduate student, worked at Kaldi's Coffee off-campus. JR, a graduate doctoral student, was a customer at Kaldi's during that time. During the Spring 2016 Semester, AB became an instructor for TigerX classes at the University of Missouri Recreation Center. JR began taking her TigerX classes.

The record shows that JR sent about 30 Facebook messages to AB between 3/2/16 and 4/18/16 with increasing frequency. In a number of messages, JR addressed AB as "Silky" instead of her name. (During the investigation, a Rec Center supervisor noted that JR had called another undergraduate female instructor "velvet lightening" in an Instagram post in 2015.) JR does not deny calling AB "Silky" in his messages.

AB responded to a number of his Facebook messages, but she initiated only one interaction. During the investigation, AB stated that when she first met JR, she thought he was gay and this influenced her initial perceptions of his comments towards her. She thought it was platonic. She also stated, during my meeting with her, that the Rec Center encouraged her to be polite and friendly when customers engaged in conversations about the classes and she was trying to do so.

On April 15, 2016, JR stated in a Facebook message, "…THANK YOU for blessing the world with the pic you posted Instagram last night! Simply beautiful [AB]. I might have said too much in my comment on the pic…You are so beautiful to me, in pictures AND in real life…I'm looking forward to when I get to see you again, and I'm definitely looking forward to us continuing our conversation about us going out somewhere together next weekend…"

On April 18, 2016, AB made clear that JR's comments were unwelcome. In a Facebook message, she stated, "…I really appreciate your feedback about my class and choreography, but these messages are getting excessive. I think our friendship needs to remain in the professional setting. Many of the things you say, like that Instagram comment for example, is over the top and I wouldn't be comfortable hanging out outside of my place of work. I still want you to come to [the class] and enjoy your time there, but I need my space outside of class and I think a line has been crossed here."

After an apology, JR temporarily honored AB's request. He did continue to attend her TigerX class, but did not contact her outside of class. Then, during the Fall 2016 Semester, JR

---

[4] Collected Rules and Regulations, Section 200.010.

enrolled in several of AB's TigerX classes – sometimes attending three per week, if not more. According to AB, he would stare at her, try to stand in front of her during instruction, grab her hand during a classroom high-five, and linger after class to say something to her, all of which made her uncomfortable and was distressing to her in her place of employment. JR objected to how AB characterized this behavior and countered that it was normal conduct of a student in an exercise class. AB reported that she changed her work habits in an attempt to avoid JR, such as leaving the room immediately after class, trying to not stand in front of JR and so forth. Other witnesses observed JR trying to stand close to AB, staring at her, attending her classes, and lingering after class.

On September 27, 2016, in response to an email that AB and her co-instructor had sent the TigerX class, JR emailed AB about dance technique and stated, "I also have a song suggestion…It is a powerful, emotional song, and I would really love to learn how to interpret it through dance from you."

On October 3, 2016, JR wrote an email to AB stating that he was "frustrated" that he could not take private dance lessons with her and that: "I'm more than certain that I want to do the private lessons, especially with you as my instructor, as I feel that you can take me where I really want to go, both physically and emotionally…"

On October 7, 2016, AB exited the room after class and JR waited for her to return. AB's co-instructor convinced JR to leave. Before JR left, he gave the co-instructor a Kaldi's Coffee drink token and a piece of paper with "'The Scientist' by Coldplay" written on it. This also made AB feel uncomfortable in her place of employment. During the investigation, JR stated that he wanted to give AB a token to show that he was inviting her to Kaldi's to talk about why she was upset with him and the song was supposed to show her that he wanted to go back to the beginning – though he did not communicate this to AB at the time.

On October 14, 2016, JR lingered after class again and provided AB with a letter. She tried not to accept it, and told him it was inappropriate. Among other things, the three-page letter expressed in detail his romantic, physical and emotional feelings for AB and invited her on a date. For brevity, this letter, which describes JR's opinion of AB's body, eyes, voice, smile, dance ability, emotions and in which he professes his love for her, is not reproduced here. It is attached to the Investigative Report as Exhibit 8. The letter and the sentiments contained within were unwelcome to AB. This made AB extremely uncomfortable in her place of work, even more so because she had directly communicated to him in writing that his previous behavior had crossed the line and that she would not be comfortable spending time with him outside her employment.

When I met with JR, he asserted that there was gossip about him within the Rec Center and stated that he feels hurt. He claimed that he did not understand what he did to upset people. He expressed frustration at not being selected to be an employee at the Rec Center. He also expressed frustration that the TigerX instructors either assume male customers are gay or that they are there to prey upon women. He explained that he enjoys working out and that it is important to his mental and physical health.

Notably, the record also shows that JR told at least one other female undergraduate instructor at TigerX that he found her "attractive" and asked her to spend time with him outside of the Rec Center.

I find by a preponderance of the evidence that **JR violated the sexual harassment policy by engaging in unwelcome verbal and physical conduct of a sexual nature towards AB and that it created a hostile environment by being sufficiently pervasive that it interfered with her ability to do her job at TigerX**. In April 2016, AB, an undergraduate student, directly informed JR, a doctoral candidate, that his communications towards her were unwelcome, unprofessional and crossed the line. After learning that his behavior made AB uncomfortable, JR chose to attend AB's TigerX classes multiple times each week, stare at her, make efforts to speak with her, and make efforts to be near her. He then requested to take private classes with her, left a token for her, and then wrote a three-page letter describing his very detailed romantic feelings. From an objective standard, such conduct is unwelcome and hostile. It is also pervasive in that it lasted over the course of several months.

I find by a preponderance of the evidence that this same conduct **violated the policy prohibiting stalking on the basis of sex**. JR's actions from March 2016 through October 2016 constitute a course of conduct towards AB that would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed.

<u>SANCTIONS</u>

Because JR violated the Standard of Conduct, sanctions are appropriate. In issuing sanctions, factors to consider include, but are not limited to, the nature of and circumstances surrounding the violation, JR's disciplinary history, and the need to prevent future recurrence of violations, as well as any other information deemed relevant.[5]

In issuing sanctions, I consider the University's expectations of doctoral students. For example, the MU Office of Research and Graduate Studies encourages graduate students to familiarize themselves with the code of ethics for their profession.[6] The American Anthropological Association's Principles of Professional Responsibility advises that individuals should "maintain respectful and ethical professional relationships."[7] It further encourages professionals to "comport themselves in ways that promote an equitable, supportive and sustainable workplace environment."

JR does not appear to set appropriate professional boundaries with undergraduate students in workplace environments throughout campus—whether in academic settings or at the Rec Center. In September 2015, it was alleged that he invited an undergraduate student to office hours in the evening and insinuated that as her Teaching Assistant he would provide questions and answers to an exam if she provided him sexual favors. After an investigation, Senior Associate Provost Ken Dean determined in March 2016 that JR was not responsible for violating the sexual harassment policy. Yet, Mr. Dean stated:

---

[5] Collected Rules and Regulations Section 200.025.
[6] See http://gradstudies.missouri.edu/academics/scholarly-integrity-ethics/scholarly-honesty-prof-ethics.php.
[7] Available at http://ethics.americananthro.org/category/statement/.

Nonetheless, I want to be very clear that [REDACTED NAME] was not unreasonable to have inferred, as a subjective belief, that your behavior indicated sexual favors were sought. However, you never directly indicated that your offer to show her the exam was conditioned on sexual favors. None of the evidence or statements contained within the Investigative Report indicated that you requested, or hinted that you desired sexual favors in exchange for showing [REDACTED NAME] the exam. I find that your behavior, specifically, closing the door to your TA Office and stating to [REDACTED NAME] that you did not want money, were indicative of an internal recognition that you were doing something wrong by offering to show her the exam or read her exam questions, and not evidence that you were seeking sexual favors. I will be contacting your immediate supervisor and Department Chair so that they may take appropriate action regarding your behavior of offering to share exam questions.

Mr. Dean also informed MU Athletics, where JR had served as a tutor to undergraduate students, that JR should not tutor female students unless the tutoring would be in an open area.

The Department Chair at the time met with JR and expressed concerns about his conduct. It is concerning that JR failed to learn from Mr. Dean and the Department Chair's previous warning regarding his conduct with an undergraduate female student.

Thus, considering the totality of the circumstances, the following sanctions are imposed against JR for violating the sexual harassment and sex-based stalking prohibitions in the Student Standard of Conduct:

 **(1) University Suspension**

**JR is suspended from the University of Missouri**, including all four campuses, for four years.  This is a temporary separation from the University. He may not attend classes or enroll in the University. The Registrar, Dean of the College of Arts & Science, and the Anthropology Department Chair will be notified of the suspension.

The suspension will go into effect May 13, 2017, and will last through the end of summer session 2021.  Should JR wish to apply for readmission after his period of suspension is complete, he must complete the remedial measures described below.

 **(2) *Immediate* Prohibition from Entering Campus (Trespass)**

**Effective immediately, JR may not be present on the University of Missouri campus** *except* to obtain medical care.

This means that JR may **not** come to campus to complete the courses in which he is currently enrolled for the Spring 2017 semester.  At the discretion of the faculty teaching his current courses and the Department, JR may be permitted to complete this semester's

coursework remotely if such an accommodation is reasonable, not burdensome on the faculty and would allow him to successfully complete the learning outcomes required for the course.

Should JR or the Department of Anthropology have questions regarding this restriction or should he wish to seek permission to come to campus, they should contact the Office for Civil Rights & Title IX.

The University of Missouri Police Department will be notified that JR is not to be present on campus during his suspension and will have authority to enforce this provision. If he comes to campus, it will be considered criminal trespass and he may be prosecuted in a criminal court.

**(3) Permanent Residence Hall Expulsion**

JR may never reside in or visit any University of Missouri residence hall. The Director of Residential Life will be notified of this restriction.

**(4) Permanent Recreation Center Expulsion**

JR is permanently expelled from the Recreation Center. He may never visit the University of Missouri Recreation Center or Complex. The Director of the Recreation Center will be notified of this restriction.

**(5) Remediation Plan**

If JR wishes to return to the University of Missouri after the suspension period ends, he must satisfactorily complete the following steps as required remediation, including:

a. ***Complete programming on sex-based discrimination and sexual harassment***: the "Not Anymore" training for students (http://civilrights.missouri.edu/education/not-anymore.php) and the UM System's "Building a Foundation: Discrimination Prevention and Title IX" training module online (https://myhr.umsystem.edu) and provide evidence of having done so to the Office for Civil Rights & Title IX. If either of these programs has already been completed, he is expected to repeat the program;

b. ***Review the University of Missouri's key policies***, particularly the equal opportunity, sex discrimination and consensual relationship policies, as well the Office of Research and Graduate Studies academic integrity and ethics policies (http://gradstudies.missouri.edu/policies/academic-integrity-ethics.php) and the faculty bylaws describing professional ethics and academic responsibilities;

c. ***Secure a faculty coach, professional mentor, therapist and/or counselor*** to aid him in professional and/or personal development to understand:
(i) appropriate boundaries and behavior when working with undergraduate and graduate students in the classroom and across campus;
(ii) the seriousness of abuse of power, authority and position or the appearance thereof; and

(iii) the professional commitment to respect for individuals, integrity in academic conduct, the proper role as a teacher-scholar; and

d. ***Attend at least one external professional development program*** on how to interact professionally with students, faculty and others to establish appropriate interpersonal boundaries and demonstrate respect and integrity in the workplace, academy, and campus life.

JR should maintain a record of all remediation efforts and should develop a ***personal, written campus professionalism policy*** for himself based on the lessons learned. This personal policy should include actionable items as to how he will ensure behavioral changes and monitor adherence to the policy.

After JR completes the aforementioned items, he must submit ***written documentation*** of achievement of the remediation requirements to the Office for Civil Rights & Title IX which will determine whether each element of the remediation has been satisfied before he will be eligible to apply to an academic program at the University of Missouri.

After satisfactory completion of the remediation program, if JR seeks a graduate assistantship or employment, JR must be ***evaluated*** before he may be employed by the University, directly supervise others, or oversee undergraduate or graduate students. This evaluation should be conducted by the chair of the department that wishes to assign JR to a graduate assistantship position (or by the head of any unit that wishes to employ JR) in consultation with the Provost's Office and the Office for Civil Rights and Title IX. If JR seeks to enroll in classes only, the evaluation will be completed by the Office for Civil Rights & Title IX.

The evaluation must include careful review and assessment of lessons learned and evidence of significant behavioral change before he will be permitted to be employed by the University, supervise others and oversee undergraduate or graduate students.

## RETALIATION IS PROHIBITED

The parties are reminded that retaliation against a person because of participation in the MU equity process is strictly prohibited and will be sanctioned. This includes, but is not limited to, any hostile actions such as verbal or visible threats to the wellbeing of an individual, any threat to spread false information about a person, or any action that would deter reasonable people from pursuing their rights.

## OPTION TO APPEAL

Either party may appeal this decision on one or more of the following grounds:

1. A procedural error occurred that significantly impacted the outcome of the Informal Resolution (e.g. substantiated bias, material deviation from established procedures, etc.).

2. To consider new evidence, unavailable during the original hearing that could substantially impact the original finding or sanction.
3. The sanctions fall outside the range typically imposed for these offenses, or for the cumulative conduct record of the Respondent/Accused.

The Equity Resolution Appellate Officer who hears the appeal is Vice Chancellor of Student Affairs Catherine Scroggs. The parties have three business days to request an appeal. **A request for an appeal must be in writing to Dr. Scroggs by Monday, March 20, 2017, and it must identify one of the three reasons for appeal.** Dr. Scroggs may grant an extension of time to request an appeal, but it may not exceed five business days. Dr. Scroggs can be reached at scroggsC@missouri.edu and her Executive Assistants, Ellen Guthrie and Anita Cowan, can be reached at guthrieE@missouri.edu and cowanA@missouri.edu.

A copy of the full appeals procedures contained in section 200.025 of the Collected Rules and Regulations is included with this decision.

**Rowles Petition Ex. J**

**APPEAL OF INFORMAL RESOLUTION**

**FINDINGS BY THE ADMINISTRATIVE OFFICER**

Complainant:            Annalise Breaux

Respondent:           Jeremy Rowles

Administrative Officer:     Ellen Eardley

Equity Resolution
Appellate Officer:         Dr. Cathy Scroggs

Date:                   March 24, 2017

---

On March 15, 2017, Ellen Eardley issued a decision pursuant to the University of Missouri's Equity Resolution Process holding that Jeremy Rowles violated the Student Standard of Conduct for his actions towards Annalise Breaux from March 2016 to October 2016. The deadline to appeal this decision was extended to March 24, 2017 at 12:00 pm. This appeal is based on the grounds that the imposed sanctions fall outside the range typically imposed for this offense or for the cumulative conduct record of the accused.[1]

**Sanctions Imposed**

The administrative decision imposes a four-year suspension from all four campuses of the University of Missouri, immediate prohibition from entering campus (meaning that he may not complete current courses that he is taking or teaching), permanent residence hall expulsion, permanent recreation center expulsion, and a remediation plan.

A four-year suspension effectively ends the academic career of a graduate student pursuing a Ph.D. and is not a fair or appropriate sanction for the alleged conduct. Furthermore, by preventing him from completing his responsibilities this semester both as a TA and a student, Mr. Rowles' reputation is damaged in his department and potential references. This damage to Mr. Rowles' reputation will also prevent him for pursuing completion from his degree elsewhere, as well as seeking employment in careers related to his degree field. In addition, the excessive severity of the suspension will put Mr. Rowles' financial aid towards his education in jeopardy, in particular his educational benefits granted to him by the Department of Veterans' Affairs.

Mr. Rowles is an African-American man and it is clear that, at least in part, he is the subject of stereotyping regarding his motives for taking dance classes. Also, in his previous Title IX investigation, he was told by an investigator that he "looked like someone who might commit

---

[1] Collected Rules and Regulations, Section 600.030.

**Rowles Petition Ex. K**

sexual assault." This type of stereotyping affected the severity of the sanctions issued in this case. Even though Mr. Rowles was found not to have violated the sexual harassment policy in the previous investigation, Ms. Eardley clearly focused on the facts from the previous investigation in issuing sanctions in this case.

Indeed, reference to the Principals of Professional Responsibility from the American Anthropological Association is inappropriate in this matter. Mr. Rowles is accused of behavior that occurred entirely in the course of his participation in the MizzouRec. These allegations do not relate to his role in the Anthropology Department and are unrelated to his comportment as a TA or teacher in Anthropology. Social interactions at a sports facility are not governed by miscellaneous codes of conduct related to work in the Anthropology Department.

## Conduct At Issue

The details of the conduct are mostly undisputed, and center around Mr. Rowles attempting to form a friendship and/or a romantic relationship with the complainant, whom he met when she worked as a barista at Kaldi's then got to know further when she became a fitness instructor at MizzouRec.

Notably, nowhere in the complaint or testimony is Mr. Rowles described as threatening nor engaging in physical contact of any kind other than high-fives before, during, or after fitness classes. The essence of the complaint is that he wanted more from his relationship with the complainant than she wanted and he made an effort to interest her. Mr. Rowles is not a supervisor or teacher for Ms. Breaux. There are no allegations that he was anything other than a client of the MizzouRec Center.

First, Mr. Rowles engaged in two months of flirtatious Facebook messages that were reciprocated and included face-to-face interactions between the parties that were friendly. The complainant now alleges that she had these interactions because she believed that Mr. Rowles was gay (and, presumably, thus not interested in any romantic relationship). But at no time did Ms. Breaux ask Mr. Rowles about his sexual orientation or tell him that she believed that he was gay. Indeed, his Facebook profile always indicated that he was interested in a relationship with women. These messages culminated in Mr. Rowles asking Ms. Breaux to go on a date with him.

There is a small disparity in the testimony about whether Ms. Breaux agreed or whether she merely said that she was too busy. Either way, Ms. Breaux did not immediately say that she had no interest and, while she describes feeling uncomfortable, she does not allege that she felt intimidated or threatened by his request. When Mr. Rowles followed up, Ms. Breaux responded that she was only interested in a professional relationship. Mr. Rowles immediately apologized. At the time, Ms. Breaux specifically encouraged Mr. Rowles to continue to attend her dance classes.

Mr. Rowles sent no further messages for over five months, though he did continue to attend dance classes. Ms. Breaux specifically encouraged Mr. Rowles to attend more classes, including classes she was teaching. At the end of September, in response to an email Ms. Breaux sent to dance class participants that stated she was available for questions about the class, Mr.

Rowles sent an email asking for advice about learning dance moves. It was Ms. Breaux who suggested that he might be able to take private dance lessons. Mr. Rowles understood this communication as an offer suggesting that Ms. Breaux might be available to teach these lessons. Several exchanges after that centered around his desire to take dance lessons, and a misunderstanding of Ms. Breaux's intent when she suggested the lessons.

Finally, in October, Mr. Rowles wrote an ill-advised letter to Ms. Breaux attempting to express his romantic feelings, but also seeking a response from her about whether she wanted to have a relationship with him or whether she wanted him to give up. While the letter demonstrates that Mr. Rowles misunderstood Ms. Breaux's wishes, the letter is not threatening or intimidating in any way. Indeed, the letter is a clear attempt by Mr. Rowles to express his feelings in a way that would not be intimidating because it would not involve a face-to-face interaction that might make Ms. Breaux uncomfortable.

## Analysis

Stalking on the basis of sex requires that the complainant be put "reasonably in fear for his or her safety or would case a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed."[2] Here, the conduct at issue here amounts to misunderstanding of social cues and unrequited romantic interest. Giving an instructor a high five in an exercise class does not constitute sexual contact. There is absolutely no allegation that there was inappropriate sexual contact other than high fives. There are also no allegations that there were interactions that put the complainant in fear for her safety. Although the original complaint, reported by a MizzouRec employee, suggests that the complainant felt "intimidated," the complainant herself only reports that she felt "uncomfortable." Therefore, the conduct at issue does not meet the definition of stalking on the basis of sex.

In this case, to violate the sexual harassment policy, Mr. Rowles must be found to have engaged in conduct that is "sufficiently severe or pervasive and objectively offensive that it interferes with, limits, or denies the ability of an individual to participate in or benefit from … employment access, benefits or opportunities."[3]

First, the alleged conduct is neither severe nor pervasive. Mr. Rowles attempted to engage Ms. Breaux in a romantic relationship. His efforts may be awkward, but even Ms. Breaux acknowledged that his behavior was not "malicious" and that he "has an inability to read social cues."

Second, the alleged conduct is not "objectively offensive." While the romantic interest was unrequited, it was not expressed in an offensive manner. Mr. Rowles tried to express his feelings to Ms. Breaux to give her complete information and see whether she would be interested in pursuing a romantic relationship. He apologized for any misunderstandings and told her that he never wanted to make her uncomfortable. He described his feelings in complimentary terms

---

[2] C.R.R. 200.010.
[3] C.R.R. 200.010.

and explained that he was looking for an answer from her and that it was "[her] choice, and [he] will respect [her] choice."[4]

Ms. Eardley finds that "[f]rom an objective standard, such conduct is unwelcome and hostile."[5] This finding misstates the standard set forth in the definition. The standard is not whether the conduct is unwelcome—an inherently subjective determination—but rather whether it is objectively offensive. Unwanted, but non-offensive, offers to change the nature of a relationship is not "objectively offensive." Ms. Eardley does not find that the conduct is objectively offensive.

**<u>Conclusion</u>**

I request that the finding that this conduct constitutes stalking be reviewed and reversed because the conduct does not meet the definition. I also request that the finding that this conduct constitutes sexual harassment be reviewed and reversed because the alleged conduct is not severe or pervasive and is not objectively offensive.

Even if the findings of violation are not reversed, I also request that the imposed sanctions be reviewed and revised. The imposition of sanctions that amount to an end to my academic career is not appropriate for this course of conduct. Therefore, I request that the Equity Resolution Appellate Officer review this case and modify the decision and the imposed sanctions.

---

[4] Exhibit 8 to the Investigative Report, p. 33.
[5] Informal Resolution Decision, p. 4.

# UNIVERSITY *of* MISSOURI

### OFFICE OF THE VICE CHANCELLOR FOR STUDENT AFFAIRS

April 18, 2017

Mr. Jeremy Rowles

**VIA ELECTRONIC MAIL ONLY**

Dear Mr. Rowles:

This letter presents my decision on your appeal of the March 15, 2017 informal resolution decision finding conduct violations and imposing sanctions. As explained below, I am upholding the findings of conduct violations but modifying the sanctions.

I first conducted an initial review of your request for appeal. I concluded that the requirements for submitting an appeal were met and I accepted your request for appeal.

I proceeded to review the appeal and reach this decision, applying the principles stated in Section 200.025.G.8.e. Unlike the initial review, in which I am required to view the statements in your request for appeal in the light most favorable you, my final decision on your appeal is governed by the following standard stated in Section 200.025.G.8.e.1: "Decisions by the Equity Resolution Appellate Officer are to be deferential to the original decision, making changes to the finding only where there is clear error and to the sanction/remedial action only if there is a compelling justification to do so."

The appeal essentially alleges procedural error in the informal resolution's application of the definitions of sexual harassment. The appeal argues that your conduct was not severe or pervasive, nor was it objectively offensive. I find no procedural error in this regard. The appeal quotes the statement from the informal resolution decision that "[f]rom an objective standard, such conduct is unwelcome and hostile." It alleges that this misstates the standard because it did not constitute a finding that your conduct was objectively offensive. I disagree. The informal resolution decision quoted the appropriate definition and expressly applied an objective standard. By noting that your conduct was hostile under an objective standard, the decision was indicating that it met the criterion of being objectively offensive.

Further, I find that the decision's discussion of your conduct supports its conclusion that your conduct constituted sexual harassment as defined in the University's rules. The appeal casts your conduct in a more benign light, but I believe the informal resolution decision's view of your conduct represents a reasonable assessment of the investigative record and supports a conclusion that your conduct was objectively offensive. As more fully addressed in the informal resolution decision, your persistent pursuit of Ms. Breaux at her place of work – after she had expressly and clearly rejected your romantic overtures – can be viewed reasonably as objectively offensive. Likewise, I believe the informal resolution decision reaches a reasonable conclusion in finding that your conduct was sufficiently pervasive to constitute a violation.



Similarly, the appeal alleges that the informal resolution decision failed to apply the standard correctly in finding you responsible for stalking on the basis of sex. It notes the absence of sexual contact and of allegations that Ms. Breaux was put in fear for her safety. The appeal also notes that she did not allege that she was intimidated, but instead that she was uncomfortable. The fact that an original complaint does not use specific wording from the definition of stalking does not preclude a finding of a violation. Again, the appeal casts your behavior in the light most favorable to you, but the informal resolution decision rests on a permissible assessment of the evidence as showing that your persistent conduct would cause a reasonable person to be frightened, intimidated, or emotionally distressed.

In any event, I consider that if the finding of stalking on the basis of sex were not affirmed, there still would be a need for sanction based on the finding of sexual harassment. I consider that the sanction, as modified by my decision here, is appropriate under the circumstances even if based only on the sexual harassment violation.

The appeal alleges that you have been the subject of racial stereotyping regarding your motives for taking dance classes. I do not find indications of stereotyping in the informal resolution. Nor do I consider that stereotyping is implied or necessary to explain the decision reached in the informal resolution. Rather, the decision reflects a reasonable interpretation of the evidence. The appeal alleges that in a previous Title IX complaint, you were told by an investigator that you "looked like someone who might commit sexual assault." No such comment appears to have been made in this case and there is no indication that the alleged prior comment had a bearing on the informal resolution decision.

The appeal also contends that the sanctions identified in the informal resolution decision fall outside the range typically imposed for this offense or for the cumulative conduct record of the accused. The appeal notes that you faced a previous complaint and were found not to have violated the sexual harassment policy in that instance. The appeal criticizes the informal resolution decision for focusing on the facts from the previous investigation in issuing sanctions in this case. I do not find error here and I do not agree with the appeal's characterization of the informal resolution decision. The decision in this matter refers to the decision in the previous case and particularly points out how you were warned about observing professional boundaries in your interactions in the future. While the circumstances of this complaint are not entirely the same as those in the previous complaint, there remains a distinct common thread in that you ignored Ms. Breaux's express request to maintain only a professional relationship with her. You reasonably could be expected to be particularly attuned to that request after you had been admonished in the prior decision about the importance of professional boundaries. That makes your failure to abide Ms. Breaux's request all the more troubling and this is a reasonable factor to be considered in measuring the sanction to be imposed.

The appeal criticizes the reference to the American Anthropological Association's Principles of Professional Responsibility contained in the informal resolution. I agree that those Principles of Professional Responsibility are not directly applicable, but the informal resolution did not treat those Principles as an independent basis for finding a violation of the student conduct code or imposing sanctions. Rather, the informal resolution appears to have noted those Principles

in the context of assessing the severity of the conduct violation and weighing the extent of sanctions to be imposed. It essentially relied on those Principles as illustrating that you reasonably could be expected to understand the need observe professional boundaries, thus making your choice to ignore such boundaries in your interactions with Ms. Rowles more troubling. In any event, I do not find it necessary to conclude whether the informal resolution erred in considering the Principles of Professional Responsibility because I find that the informal resolution decision, as modified by my decision here, is adequately supported even if consideration of those Principles is set aside.

Section 200.025.G.6.g lists factors that may be considered in sanctioning, including the nature, severity of, and circumstances surrounding the violation and disciplinary history. I acknowledge that you do not have a record of previous discipline. I also have considered the arguments presented in the appeal concerning the severity of the conduct and explanations of your actions. Further, I have considered whether the record indicates that there is a need for a four year suspension to end or remedy the effects of the discrimination or harassment, or prevent its future recurrence.

Based on those factors, and with due deference to the original decision, I conclude that there is compelling justification to modify the sanction to the following extent: **Instead of a four-year suspension, you will be suspended from the University of Missouri, including all four campuses, to run through the end of summer session 2019.** All other sanctions of the original decision shall remain unchanged.

This letter completes my review of the appeal as required by Section 200.025.G.8.e. The outcome of the proceeding is now final; further appeals are not permitted.

Sincerely,

Catherine C. Scroggs, Ph.D.
Vice Chancellor for Student Affairs

CS/eg

C:    Annalise Breaux
      Joanna Trachtenberg
      Amber Lammers
      Ellen Eardley