## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JEREMY A. ROWLES
V.
CURATORS OF THE UNIVERSITY OF MISSOURI, et al.

CASE NO. 2:17-CV-4250-BCW

DEPOSITION OF CATHY SCROGGS

NOVEMBER 30, 2018

## Page 2

INDEX OF EXAMINATION

                              Page
Questions by Mr. Hirth.............................. 5

INDEX OF EXHIBITS
(NOT ATTACHED)

Exhibit No. 4 (Rule 600.020)........................ 11
Exhibit No. 5 (Equity resolution process).......... 13
Exhibit No. 6 (Interrogatories).................... 17
Exhibit No. 7 (Informal resolution)................ 29
Exhibit No. 8 (Formal complaint of Annalise Breaux) 46
Exhibit No. 9 (Investigative report)............... 52
Exhibit No. 10 (Appeal letter)..................... 70
Exhibit No. 11 (Email)............................. 73
Exhibit No. 12 (Appeal decision)................... 83

## Page 3

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JEREMY A. ROWLES,      )
                           )
    Plaintiff,       )
                           ) Case No. 2:17-CV-4250-BCW
vs.                  )
                           )
CURATORS OF THE UNIVERSITY OF )
MISSOURI, et al.,     )
                           )
    Defendants.      )

    DEPOSITION OF CATHY SCROGGS, produced, sworn and examined on November 30, 2018, between the hours of 1:04 p.m. and 3:46 p.m. at 227 University Hall, Columbia, Missouri, 65211, before Wendy Golding, a Certified Court Reporter within the State of Missouri, in a certain cause now pending in the United States District Court for the Western District of Missouri Central Division, wherein Jeremy A. Rowles is the Plaintiff, and Curators of the University of Missouri, et al., are the Defendants.

## Page 4

A P P E A R A N C E S

For the Plaintiff:

    J. Andrew Hirth
    TGH Litigation LLC
    913 E. Ash Street
    Columbia, Missouri 65201
    573-256-2850

For the Defendant:

    Emily W. Little
    Antwaun L. Smith
    Office of the General Counsel
    227 University Hall
    Columbia, Missouri 65211
    573-882-2388

The Court Reporter:
    Wendy Golding, CCR
    Missouri CCR No. 1366
    Alaris Litigation Services
    2511 Broadway Bluffs, Suite 201
    Columbia, Missouri 65201
    (573) 449-0561
    1-800-280-3376

## Page 21

1 case, did you ever have an appeal in which the accused
2 raised concerns about discrimination within the Title IX
3 office?
4 A. Discrimination? No.
5 Q. Or harassment within the Title IX office?
6 A. That the Title IX office had harassed the respondent?
7 Q. Anyone. Harassed anyone?
8 A. No, I've never had a complaint like that.
9 Q. Or had discriminated against anyone?
10 A. No.
11 Q. You would agree in this case, though, that there was
12 such an allegation; isn't that right?
13 A. I would agree that in the appeal document that was
14 given to me, that's what the accusation was, yes.
15 Q. Right. And upon getting that accusation, did you
16 undertake any kind of investigation to see if that had
17 merit?
18 A. No.
19 Q. Okay. Did you talk to the Title IX office itself about
20 that allegation and whether it had any merit?
21 A. No.
22 Q. If you look at No. 5 -- interrogatory No. 5, this asks
23 at any time prior to issuing your April 18, 2017 decision,
24 were you told or otherwise aware that Plaintiff had
25 reported to Amber Lammers that he believed Salama Gallimore

## Page 22

1 had discriminated against him on the basis of race and/or
2 sex during Title IX office's investigation into his prior
3 complaint against him. And your response is no.
4 A. That's correct.
5 Q. Would you have wanted to know that information at the
6 time that you were considering his appeal?
7 A. Would I have wanted to know that he believed that
8 Salama Gallimore had discriminated against him?
9 Q. Would you want to know that he had reported to Amber
10 Lammers that he believed that?
11 A. It wouldn't have made -- it wouldn't have mattered for
12 me, I think, because I reviewed the investigative report.
13 Q. It wouldn't have made any difference to your decision,
14 you don't think?
15 A. I don't think so. I don't think so.
16 Q. Is there -- if I use the term mandatory reporter, do
17 you know what that means?
18 A. Yes. Oh, sure.
19 Q. What does that mean to you?
20 A. That means that if -- if I'm a mandatory reporter, I'm
21 required to report to my superior an incident of sexual
22 assault or discrimination.
23 Q. Discrimination of any sort or just discrimination based
24 on sex?
25 A. I don't remember, frankly.

## Page 23

1 Q. Sure.
2 A. I took that training. But that's not something that
3 has stuck with me. So, I'm pretty sure it was based on
4 sex. But I don't know about the racial piece. Okay?
5 Q. Perfectly fair.
6 A. Okay.
7 Q. Question No. 6 asks you: Based on the investigative
8 report prepared by Amber Lammers and the informal
9 resolution findings by the administrative officer, signed
10 by Ellen Eardley, do you contend Plaintiff ever touched
11 Annalise Breaux inappropriately? You have objected to that
12 question on the grounds that it is a contention
13 interrogatory, but I'll ask you that same question here in
14 your deposition.
15    Is it your understanding or belief that Mr. Rowles ever
16 touched Annalise Breaux inappropriately?
17 A. I don't think he touched her inappropriately.
18 Q. Okay. The next question -- it's a similar question.
19 Based on your investigative report or on the investigative
20 report prepared by Amber Lammers and the informal
21 resolution findings by the administrative officer, signed
22 by Ellen Eardley, do you contend that Plaintiff ever
23 threatened Annalise Breaux with violence or nonconsensual
24 sexual contact. And, again, you objected, but I'm asking
25 you that question today.

## Page 24

1 A. I believe that his behavior was interpreted by Annalise
2 Breaux that she felt -- she felt threatened.
3 Q. His behavior was interpreted by her as threatening?
4 A. Yes. Yes, it was. As threatening and perhaps wanting
5 some type of sexual contact.
6 Q. Okay. Do you believe that he orally or verbally in
7 some way threatened her with violence or nonconsensual
8 sexual contact?
9 A. I don't think he threatened her with non -- with
10 violence. I think his actions had the impact of her
11 believing that he could threaten her with nonconsensual
12 sex.
13 Q. Was it your belief, after reviewing the investigative
14 file and the report -- the investigative report and the
15 informal findings that Mr. Rowles intended to convey that
16 he would engage in violence or nonconsensual sexual
17 contact?
18 A. I do believe he intended to convey that he was -- yes.
19 Not violence. I didn't -- I didn't sense violence, but
20 certainly sexual contact.
21 Q. But nonconsensual sexual contact?
22 A. Well, he wanted sexual contact.
23 Q. Even if it was nonconsensual?
24 A. I think she believed that.
25 Q. So, that -- I understand that. But that's a different

6 (Pages 21 to 24)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 75-11   Filed 12/24/18   Page 2 of 8

Page 25

1  question, what she believed. I'm asking do you believe
2  that he actually threatened those things?
3         MS. LITTLE: I'm just going to object to the
4     extent that it calls for speculation.
5  A. Yeah. Thank you.
6  BY MR. HIRTH:
7  Q. Does it -- in your decision, did it matter to you what
8  he believed?
9         MS. LITTLE: What he believed about what?
10 A. Yeah.
11 BY MR. HIRTH:
12 Q. Whether he intended to threaten her with violence or
13 nonconsensual contact -- sexual contact. Let me rephrase
14 the question.
15    You have said that you believe she interpreted his
16 behavior that way.
17 A. Absolutely.
18 Q. Right. I'm -- what I'm trying to ask is: Do you
19 believe he intended for his behavior to be interpreted that
20 way, based on your review of the investigative report and
21 the informal decision.
22 A. I believe he knew exactly what he was doing.
23 Q. Okay. Question No. 8 on the next page, similar sort of
24 question. We asked you did you believe the plaintiff posed
25 a danger of physical or sexual assault against Annalise

Page 26

1  Breaux. Again, you objected; but I'm asking you that
2  question today. Do you believe that he posed a danger to
3  her?
4  A. Again, I -- I believe that she was afraid of him and
5  that the impact of his behavior changed how she did her
6  work and how she had experiences on the campus. And, so,
7  if she believed that and -- so, maybe I should say yes, I
8  did.
9  Q. You did believe that he was a danger?
10 A. Yes.
11 Q. You believed that there was some possibility that he
12 could physically or sexually assault her?
13 A. No, I -- yes. I'll say that.
14 Q. And that belief of yours, I assume, was based on his
15 behavior.
16 A. Yes.
17 Q. Right? Was it based on anything he said?
18 A. A number of the things that he sent through messages on
19 Facebook.
20 Q. Did any of those things that he sent on Facebook
21 threaten violence or nonconsensual sexual contact?
22 A. They -- I think they're -- by implication they
23 suggested that he would like to have sex. There was a lot
24 of loaded comments.
25 Q. Sure. And I understand that. But that -- there's a

Page 27

1  distinction to be made here between whether he was
2  threatening to pursue a sexual relationship with her
3  against her will, nonconsensually -- in other words, was he
4  going to sexually assault her -- as opposed to expressing
5  an interest in having a romantic, sexual relationship with
6  her; right? Does that make -- the distinction between
7  those two things make sense?
8         MS. LITTLE: I'm just going to object to the
9     form of the question. I think it's counsel
10    testifying.
11 A. As soon as she said don't do this anymore and he
12 continued, then I think she had a -- to me, he -- and the
13 fact that he persisted, said, I want this.
14 BY MR. HIRTH:
15 Q. So, let's talk about when she said that.
16 A. Okay.
17 Q. What's your understanding of when or how she told him
18 she was not interested?
19 A. I don't know when. But certainly she let him know that
20 she didn't want him to persist. She told him that what he
21 was doing was not -- was wrong and she said there are
22 consequences if you continue. I mean, I think she kind of
23 laid it out very well.
24 Q. Do you know when that was?
25 A. I don't recall.

Page 28

1  Q. Okay. Did it happen more than once that she said those
2  things?
3  A. I think she did, but I don't recall that for certain.
4  Q. Okay. If -- let me ask you this: You testified you
5  believe she was afraid of him?
6  A. Yes.
7  Q. Do you believe that that fear of hers was reasonable?
8  A. Yes.
9  Q. Okay. And what do you base the -- your belief that her
10 fear was reasonable on?
11 A. He was a male that was larger than she was. That's --
12 for women, that's very threatening -- can be very
13 threatening. He did not -- he persisted in his behavior.
14 That's enough.
15 Q. Okay.
16 A. Perhaps his age, but I was not clear on that.
17 Q. Just to be clear, it was not based on any direct
18 statement he made about intending to harm her; is that
19 correct?
20        MS. LITTLE: I'll object to the form of the
21    question.
22 BY MR. HIRTH:
23 Q. To your knowledge, did he ever make a statement
24 expressly threatening to harm Annalise?
25 A. There was nothing that I read.

## Page 29

1  Q. It's your deposition. She doesn't get to answer for
2  you.
3  A. Okay. I thought she was going to say something. There
4  was nothing that I read where he said I'm going to harm
5  you, if that's what you're asking.
6  Q. It was all implied. Is that -- that's your testimony?
7  A. Yes. Yes.
8  Q. Okay. After -- well, let me get this other thing
9  first. Let's look at the actual informal resolution.
10  We'll mark this Exhibit 7.
11      (EXHIBIT NO. 7 WAS MARKED)
12      THE WITNESS: Is the interrogatory supposed
13  to be marked?
14      MR. HIRTH: I don't think I did mark it, but
15  it -- I don't think it needs to be marked.
16      THE WITNESS: Okay.
17      MS. LITTLE: So, then, we would be on No. 6.
18      THE WITNESS: I have 4, 5. I don't have a
19  6, but...
20      MR. HIRTH: I guess I did mark it, but I
21  gave you one that wasn't marked. My bad. Okay.
22  So, 6 was marked as the interrogatories; 7 is the
23  informal findings -- or informal resolution.
24  BY MR. HIRTH:
25  Q. And this document, obviously, I'm assuming you reviewed

## Page 30

1  during the process of your appeal, since this is the
2  document from which the appeal was taken?
3  A. Yes.
4  Q. Okay. And the first page there lays out the applicable
5  policy on sexual harassment, which on the footnote says
6  comes from the collected rules and regulations Section
7  200.010.
8  A. Uh-huh.
9  Q. I believe that's the section you said you had studied
10  earlier; correct?
11  A. Uh-huh.
12  Q. Okay. So, I want to go through the policy definition
13  there. And if this does not accurately state it, to your
14  knowledge, let me know. But I believe this accurately
15  states that -- that rule.
16      The applicable policy defines sexual harassment as --
17  and there's two possible things it can be. One is
18  unwelcome sexual advances or requests for sexual activity
19  by a person or persons in a position of power or authority
20  to another person.
21      Okay. So, I want to focus just on that one first. The
22  allegations against Jeremy Rowles, do you believe that
23  they've satisfied subsection 1 of sexual harassment?
24  A. I think he was perceived as having power over her.
25  Q. And what was the nature of his power over her? Was it

## Page 31

1  just his size?
2  A. His physical size.
3  Q. Okay. So, this part 1 doesn't require him to be a
4  teacher. When it says person of authority, it doesn't
5  mean, like, teacher or boss?
6  A. Well, I suppose it could; but in this case, no, I
7  didn't interpret it that way.
8  Q. Okay. So, could any man that is larger than a woman
9  fall under that first category if he made unwelcome sexual
10  advances or requests for sexual activity?
11  A. Ask -- would you ask that question again?
12  Q. Sure. So, this -- this subpart 1 lists the conduct
13  that is prohibited -- unwelcome sexual advances or requests
14  for sexual activity. Then it has a qualifier after that,
15  by a person or persons in position of power or authority to
16  another person.
17      What I want to know is or what I'm trying to get at is
18  your understanding of what that qualifier means -- to be a
19  person -- or by a person or persons in a position of power
20  or authority. Does that person, in order for this rule to
21  apply, have to be either a teacher or an employer or
22  someone else who has direct power over the complainant?
23  A. That person has to have some type of power over that
24  individual. So, if -- if the -- if physically they have
25  power, or if they have power by virtue of their rank.

## Page 32

1  Q. Okay. And, so, then, my question was is -- would any
2  man who is larger than the woman to whom he is speaking or
3  making sexual advances, would any man satisfy that? If a
4  man is larger than a woman and makes an unwelcome sexual
5  advance, is that all that's necessary to fall under No. 1?
6  A. I don't know that I can -- I don't know that I can
7  interpret that. I mean, I would say probably yes.
8  Q. Well, you -- let me ask you this --
9  A. If you made sexual advances at me, I would be scared.
10  Q. And --
11  A. Even though I'm older than you. Okay. Never mind.
12      MS. LITTLE: Well...
13  A. Sorry.
14  BY MR. HIRTH:
15  Q. Well, let me follow up on your statement. You said
16  you're not sure that you could interpret this. Is that
17  what you said?
18  A. Yes, I did, yeah. But you want a direct answer. I
19  would say yes. If a man's larger and he makes unwanted
20  sexual advances, I would say he would perceived as -- be
21  having power over her.
22  Q. So, let me ask you what unwanted sexual advance means.
23  Is that -- is a request for a date an unwanted sexual
24  advance, if it's unwanted. I mean, if someone asks you out
25  that you don't want to go out with, is that an unwanted

Page 33

1  sexual advance?
2  A. Probably not the first time, no.
3  Q. But the second time it would be?
4  A. If I keep turning him down and he keeps asking, I would
5  consider that unwanted.
6  Q. Okay. And -- okay. Stop there. The subpart 2. So,
7  this is in the alternative of part 1. Other welcome --
8  other unwelcome verbal or physical conduct of a sexual
9  nature by a person to another person when -- and then there
10 are two subparts. I just want to look at the first one.
11 -- when submission to or rejection of conduct is used
12 explicitly or implicitly as a condition for academic or
13 employment decisions.
14    Is there anything in this case that you believe
15 implicates Section 2a?
16 A. No, I don't believe so.
17 Q. There wasn't, to your knowledge, any sort of explicit
18 or implicit condition for academic or employment decisions
19 made?
20 A. No, I don't believe so.
21 Q. Correct?
22 A. Yeah.
23 Q. Mr. Rowles didn't have -- he wasn't Annalise's boss; is
24 that correct?
25 A. Not to my understanding.

Page 34

1  Q. He wasn't her teacher?
2  A. I don't believe so.
3  Q. In fact, she was his teacher; right?
4  A. Well, yeah, at the rec.
5  Q. Okay. So, then, looking at part 2, the alternatives --
6  so, I'll read that whole thing together. Other unwelcome
7  verbal or physical conduct of a sexual nature by a person
8  to another person when B, such conduct creates a hostile
9  environment by being sufficiently severe or pervasive and
10 objectively offensive that it interferes with, limits, or
11 denies the ability of an individual to participate in or
12 benefit from educational programs or activities or
13 employment access, benefits or opportunities. Did I read
14 that correctly?
15 A. I think so.
16 Q. Okay. So, there's several pieces of that. Such
17 conduct that creates a hostile environment by being
18 sufficiently severe or pervasive and objectively offensive.
19    Now, I want to ask you about that "or" and "and," what
20 your understanding of that means. Because I think there's
21 two ways you could read that, and I want to know if you
22 have -- if you think it's one way or the other.
23    Does the "or" between "severe or pervasive" mean on the
24 one hand it has to be severe or on the other hand it has to
25 be both pervasive and objectively offensive? Or does the

Page 35

1  "or" separate only severe or pervasive and then objectively
2  offensive is its own requirement? Which -- which way do
3  you read it?
4  A. I read it -- it can be severe; it can be pervasive; and
5  it can be objectively offensive. I mean, it --
6  Q. What if it's only -- I'm sorry.
7  A. If it's only one, it's still a problem.
8  Q. That's enough? If it's one, it satisfies the rule?
9  A. That's exactly right.
10 Q. So, if somebody engaged in conduct that was severe but
11 not pervasive and not objectively offensive, that would
12 satisfy this rule?
13 A. Yes.
14 Q. Okay. All right. Then we'll look at stalking on the
15 basis of sex, which is the next one here. And it carries
16 over to the next page. It is defined as following or
17 engaging in a course of conduct on the basis of sex with no
18 legitimate purpose that puts another person reasonably in
19 fear for his or her safety or would cause a reasonable
20 person, under the circumstances, to be frightened,
21 intimidated, or emotionally distressed. Did I read that
22 correctly?
23 A. Yes.
24 Q. Okay. And the footnote says that that is from rule --
25 also from rule 200.010.

Page 36

1  A. Uh-huh.
2  Q. Okay. So, let's talk about the little -- the
3  individual pieces of that. Engaging in a course of conduct
4  on the basis of sex -- following or engaging. So, there's
5  two parts there. Following, I think, is pretty
6  self-explanatory.
7  A. Uh-huh.
8  Q. Following somebody.
9  A. Uh-huh.
10 Q. Engaging in a course of conduct on the basis of sex. A
11 course of conduct on the basis of sex. What does that mean
12 to you?
13 A. It means behaviors that include sexual innuendo, sexual
14 language, sexual content.
15 Q. Okay. And then after that it says with no legitimate
16 purpose. What does with no legitimate purpose mean to you?
17 A. It means that why would they be -- that they are saying
18 something and they are -- the individual that it's directed
19 toward doesn't have any real purpose for them.
20 Q. Doesn't have any purpose to the person that the
21 comment's directed to?
22 A. That the -- that the person that it's directed to
23 hasn't invited it.
24 Q. Hasn't invited it?
25 A. Yeah. How about that?

9 (Pages 33 to 36)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 75-11   Filed 12/24/18   Page 5 of 8

Page 37

1  Q. Okay. So, does that mean for it to be a legitimate
2  purpose it has to have been invited?
3  A. Invited --
4      MS. LITTLE: I'm just going to object to the
5      form of the question as overbroad and vague and
6      it calls for a hypothetical.
7  BY MR. HIRTH:
8  Q. You can still answer the question.
9  A. I can?
10     MS. LITTLE: If you can.
11 A. I don't know that I can. I don't quite -- I don't
12 understand it.
13 BY MR. HIRTH:
14 Q. You don't understand what that phrase means?
15 A. I don't understand what your question means.
16 Q. Okay. My question is: This rule -- what qualifies
17 under this rule is engaging in a course of conduct on the
18 basis of sex with no legitimate purpose. Does engaging in
19 a course of conduct on the basis of sex with a legitimate
20 purpose, does that take you outside of this rule?
21 A. A legitimate purpose is two people that have agreed
22 that they are trying to be in a relationship, and, so, they
23 are engaging in this type of behavior.
24 Q. Okay.
25 A. No legitimate purpose is when two people -- one person

Page 38

1  agrees and one person doesn't.
2  Q. Is that true in -- of the first interaction? So, in
3  other words, the first time somebody engages in a course of
4  conduct on the basis of sex that is not reciprocated or
5  wanted by the other person, is it -- does it have no
6  legitimate purpose if the person engaging in the conduct
7  doesn't know it's unwanted?
8  A. I don't know -- I can't -- I don't know how to answer
9  that question. I'm sorry.
10 Q. Is there any other, to your understanding of this rule,
11 any other legitimate purpose to engaging in a course of
12 conduct on the basis of sex other than when you know the
13 other person is interested?
14     MS. LITTLE: Same objection. The question
15     is overbroad.
16 A. I don't -- again, I don't know how to answer that
17 question.
18 BY MR. HIRTH:
19 Q. Okay. If someone approaches someone else for the first
20 time and they are attracted to that person and they want to
21 ask them out or pursue a relationship with them, and the
22 other person has said nothing, so, there is a blank slate
23 here, is that a legitimate purpose for engaging in a course
24 of conduct on the basis of sex? Or is it automatically
25 illegitimate because the other person doesn't want it?

Page 39

1  A. It -- it's -- again, I'm -- I don't -- I don't
2  understand what you're asking. So, if a person says do you
3  want to go out with me, and the other person says no, that
4  is a -- that's a fair conversation.
5  Q. So, in that case, it was a legitimate purpose?
6  A. Right.
7  Q. And then if they do it again, it's not a legitimate
8  purpose. Is that what you're saying?
9  A. Yes, it's sliding down that slope.
10 Q. I got you. Let me ask you this: Can people who have
11 once rebuffed a suitor -- can they change their mind?
12 A. I'm sure they can.
13 Q. Is it possible, then, that someone who has been once
14 rebuffed to come back some later time and ask again without
15 running afoul of this rule?
16 A. It's possible.
17 Q. The second part of that says puts another person
18 reasonably in fear for his or her safety or would cause a
19 reasonable person, under the circumstances, to be
20 frightened, intimidated, or emotionally distressed. What
21 does emotionally distressed mean within this rule?
22 A. To me it -- it just amplifies the fear and
23 intimidation.
24 Q. So, is it the same thing as frightened or intimidated,
25 or is it something different?

Page 40

1  A. It could mean that. It could just be more of
2  amplification of the fear and distress or the fear and
3  intimidation so they -- they have emotional outbursts as a
4  result of that.
5  Q. Would being annoyed fall within being emotionally
6  distressed?
7  A. It could, I suppose.
8  Q. What about bored?
9  A. Bored?
10 Q. Uh-huh.
11 A. I don't think so, but...
12 Q. All right. If you will turn to the page addressed as
13 the -- it has the heading of sanctions on it.
14 A. Uh-huh.
15 Q. Couple of things I want to ask you about here. So,
16 first of all, the informal resolution findings by the
17 administrative officer identifies -- and this is that first
18 paragraph for sanction -- in issuing sanctions, factors to
19 consider include, but are not limited to, the nature and
20 circumstances surrounding the violation, JR's disciplinary
21 history, and the need to prevent future recurrence of
22 violations as well as any other information deemed
23 relevant.
24    Do you agree that those are the appropriate bases for
25 sanctions?

10 (Pages 37 to 40)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 75-11   Filed 12/24/18   Page 6 of 8

Page 45

1 hadn't been involved in a prior Title IX claim?
2 A. Yes. Yes.
3 Q. Okay. And a little bit further down, right below that
4 sort of block paragraph, there is a paragraph that says the
5 department chair at the time met with JR and expressed
6 concerns about his conduct. It is concerning that JR
7 failed to learn from Mr. Dean and department -- and the
8 department chair's previous warning regarding his conduct
9 with an undergraduate female student.
10   Okay. Now, the -- this case with Annalise, I think you
11 said earlier he was not -- Jeremy was not Annalise's
12 teacher?
13 A. Correct.
14 Q. Right? He was her student at the rec center?
15 A. Yes.
16 Q. The prior case involved an undergraduate female student
17 of his.
18 A. Uh-huh.
19 Q. Correct? Okay. So, the sentence that says it is
20 concerning that he failed to learn from Mr. Dean and the
21 department chair's previous warning regarding his conduct
22 with an undergraduate female student, do you understand --
23 let me -- let me back off that question. I was getting --
24 it was getting too wordy. I'll come back to it in a
25 different place.

Page 46

1   All right. Let's look at Exhibit No. 8.
2   (EXHIBIT NO. 8 WAS MARKED)
3 BY MR. HIRTH:
4 Q. I'll represent to you that this is the formal complaint
5 that Annalise Breaux wrote with the Title IX office. So,
6 this is the complaint that initiated the investigation.
7 A. Uh-huh.
8 Q. It begins to say what she has -- what she is doing.
9 I'm writing to state that I would like to file a complaint
10 against Jeremy Rowles for events that occurred on or about
11 March 2015 through October 2016, which harassment on the
12 basis of my sex. I think probably means which constitutes
13 -- there's evidently a word missing but I think we
14 understand what she is saying there; right?
15 A. Okay.
16 Q. She says harassment on the basis of sex. She doesn't
17 say stalking, does she?
18 A. I don't see that anywhere.
19 Q. Okay. In fact, you can look through this. Is there
20 anywhere in her formal complaint that she ever accuses him
21 of stalking her?
22 A. Not that I -- not that I recall, but...
23 Q. Okay. Looking at that second paragraph, when she is
24 describing the events that led her to file this complaint,
25 about four sentences into that next paragraph. On April

Page 47

1 12, Jeremy cornered me at the Mizzou rec center while I was
2 on my way to clock out after class. I thought that he had
3 attended and asked me -- oh, I'm sorry. I read that as two
4 sentences. Jeremy cornered me at the Mizzou rec while I
5 was on my way to clock off after class -- after a class I
6 taught that he attended and asked me out on a date. This
7 made me extremely uncomfortable and I declined by saying I
8 was too busy this week. Did I read that correctly?
9 A. Uh-huh. Yes.
10 Q. Okay. She says this made her feel uncomfortable,
11 extremely uncomfortable; correct?
12 A. Yes.
13 Q. Did she say she was intimidated?
14 A. No.
15 Q. Did she say she felt threatened?
16 A. No.
17 Q. And did she tell him she did not want to go out on a
18 date with him?
19 A. Not directly.
20 Q. Not directly. Okay. The next sentence: He continued
21 to message me on Facebook after that, and the incessant
22 messaging lasted until April 18, 2015, when I told him he
23 needed to stop messaging me and keep our relationship
24 strictly professional because he was making me feel
25 uncomfortable.

Page 48

1   She talks about his incessant messaging that lasted
2 until April 18.
3 A. Okay.
4 Q. Which is six days later?
5 A. That's correct.
6 Q. Okay. She told him that he needed to stop. He was
7 making her feel uncomfortable. He apologized and did not
8 attempt to message me after that but continued to attend
9 the TigerX classes that I taught.
10   So, would you agree that, based on her statement, he
11 stopped messaging her -- he stopped messaging her when she
12 asked him to?
13 A. Yes.
14 Q. Okay. It does say he continued attending classes. Do
15 you have any knowledge about whether she told him he could
16 continue attending her classes?
17 A. I don't have any knowledge one way or the other.
18 Q. You don't know one way or the other?
19 A. No.
20 Q. Okay. Would it matter to you if she said to him I want
21 to keep this professional, but you can keep coming to my
22 classes?
23 A. I don't think so, no.
24 Q. Okay. Then it says this semester, fall 2016 -- so, a
25 few months later -- he began attending all four of the

## Page 93

1  A. No, I don't think so.
2  Q. And take as much time as you want to look through it,
3  but I will point out to you that there are about 60 entries
4  in this of various Title IX complaints over about a
5  two-year period.
6  A. Okay.
7  Q. And if you look at that, on the front page there's sort
8  of a little key to what the subparts mean -- date of the
9  complaint, provision allegedly violated, race and sex of
10 the complaining party, race and sex of the accused, name of
11 the investigator, whether the Title IX office substantiated
12 the violation, and the sanction imposed, if any.
13 A. Okay.
14 Q. Okay. Now, you said in reducing it from four years to
15 two, one of the things that you thought was that that was
16 sort of a more typical sanction.
17 A. When the case gets to me, uh-huh.
18 Q. How often would you say, in your appeals process, that
19 you changed the sanction imposed by the Title IX office?
20 A. Not -- not very often. Not very often.
21 Q. More than five times?
22 A. No.
23 Q. No. Pretty rare, then?
24 A. Pretty rare. Pretty rare.
25 Q. So, Mr. Rowles was accused of stalking on the basis of

## Page 94

1  sex and sexual harassment. Is that your understanding?
2  A. Uh-huh.
3  Q. Okay. Of these 60 folks identified, there are a number
4  of different kinds of violations. I'll represent to you
5  that there's only two in which the allegation was both --
6  included both sexual harassment and stalking on the basis
7  of sex.
8  A. Okay.
9  Q. In addition to Mr. Rowles. And those are Nos. 22 and
10 24.
11 A. Okay.
12 Q. Mr. Rowles, I believe, is No. 53. So, if you look at
13 22 and 24 -- and I'm assuming that you have no way of
14 knowing who these people are in this, what the facts are,
15 or anything --
16 A. No. Probably never saw these cases.
17 Q. Okay. So, in 22A, this individual, a white male, was
18 accused of sexual harassment and stalking on the basis of
19 sex. That's what that indicates; correct?
20 A. Uh-huh.
21 Q. Doesn't actually say what he was found responsible for,
22 does it? It just says what he was accused of; right? I
23 mean, in that information it doesn't say, does it?
24 A. No, it doesn't.
25 Q. And there was a sanction imposed of counseling.

## Page 95

1  A. Okay.
2  Q. No suspension and expulsion from the university;
3  correct?
4  A. Okay. Correct.
5  Q. Okay. 24 -- there were allegations of sexual
6  harassment and stalking on the basis of sex, plus also
7  allegations of threatening or intimidating behaviors,
8  sexual misconduct, including nonconsensual sexual contact
9  and nonconsensual sexual intercourse.
10 A. Uh-huh.
11 Q. And that, too, the student was found responsible for
12 and was given a six-month suspension.
13 A. Okay.
14 Q. Both of those students are white.
15 A. Okay.
16 Q. From this information, can you -- is it possible for
17 you to discern why Mr. Rowles was given such a
18 substantially greater sanction than the other two people
19 accused of the same conduct?
20 A. No. I don't know any of the facts of those cases.
21 Q. Does it concern you at all that three people accused of
22 the same conduct are treated so differently?
23     MS. LITTLE: I'll object to the form of the
24 question.
25 A. This is a -- again, this is an educational institution.

## Page 96

1  I don't know any of the facts of those cases, so I'm not --
2  I can't make a conclusion one way or the other.
3  BY MR. HIRTH:
4  Q. You would need to know the facts of those cases to be
5  able to compare them, wouldn't you?
6  A. Yes, I would.
7  Q. And if you didn't have that information, there is no
8  way you could tell the difference between them. Is there?
9  A. Based on this.
10 Q. Okay. In fact, the only thing that you can tell about
11 these three that distinguishes them in any way is the race
12 of the person accused, isn't it?
13 A. Well -- so, are you saying No. 22 and No. 24 are white?
14 Q. They are both white.
15 A. And then Mr. --
16 Q. Mr. Rowles, No. 53, is black.
17 A. Okay. Well, that's one distinguishing thing. Okay.
18 Q. Do you see any others?
19 A. Amber Lammers investigated and Salama didn't -- was the
20 investigator; right? Oh, Meagan Grant.
21 Q. In 53, you're talking about?
22 A. No -- yeah.
23 Q. Yeah.
24 A. There was a different investigator.
25 Q. Right. Anything else?