IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| JEREMY A. ROWLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-CV-4250-BCW |
| | ) | |
| CURATORS OF THE UNIVERSITY | ) | *ORAL ARGUMENT REQUESTED* |
| OF MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiff's Suggestions in Support
of His Motion for Partial Summary Judgment on Counts I, III, and VI**

Respectfully Submitted,

/s/ J. Andrew Hirth
J. Andrew Hirth, #57807
TGH Litigation LLC
913 E. Ash St.
Columbia, MO 65201
573-256-2850
andy@tghlitigation.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iv

STATEMENT OF FACTS ...................................................................................... vii

A.  Rowles attempts to initiate a romantic relationship with Breaux.................... vii

B.  Defendants Eardley finds Rowles responsible for sexual harassment
    and stalking on the basis of sex and suspend him from the University
    for four years.......................................................................................................... ix

C.  Defendants Scroggs upholds Eardley's findings of responsibility for
    sexual harassment and stalking on the basis of sex but reduces Rowles's
    suspension to two years.................................................................................... xiv

D.  Defendants disagree about the scope and enforcement of CRR 200.010.C.7.b
    and CRR 200.010.C.7.d. ................................................................................ xvi

E.  Rowles's sanction for sexual harassment and stalking on the basis of sex are
    substantially harsher than the sanctions imposed on similarly situated white
    students found responsible of the same (or greater) offenses................... xxiii

F.  Defendants cannot explain why Rowles was disciplined far more harshly that
    similarly situated white students found responsible for sexual harassment and
    stalking on the basis of sex. ........................................................................ xxiv

STANDARD OF REVIEW........................................................................................ 1

ARGUMENT............................................................................................................. 1

I.  Rowles is entitled to judgment as a matter of law on Count I because
    he was suspended for engaging in protected speech. ....................................... 1

II.  Rowles is entitled to judgment as a matter of law on Count III because Curators'
     policies prohibiting sexual harassment and stalking on the basis of sex authorize
     arbitrary and discriminatory enforcement by the Title IX Office................... 5

     A.  Defendants cannot even agree amongst themselves as to the scope
         of conduct prohibited by CRR 200.010.C.7.b................................................ 6

     B.  The definition of "stalking on the basis of sex" does not provide
         explicit standards for those who apply the rule and is based largely
         on the subjective feelings of the complaining student............................10

     III.  Rowles is entitled to judgment as a matter of law on Count VI because
           Defendants have not identified or produced any evidence supporting

a legitimate non-discriminatory reason why Plaintiff received substantially
greater punishment than white students found responsible for sexual
harassment and stalking on the basis of sex. ............................................................ 13

Case 2:17-cv-04250-BCW   Document 77   Filed 12/24/18   Page 3 of 41

# TABLE OF AUTHORITIES

**Cases**

*Ajiwoju v. Curators of Univ. of Missouri*, No. 06-1005-CV-W-FJG,
2009 WL 10705058, at *2 (W.D. Mo. Feb. 11, 2009) .................................................. 13

*Beauharnais v. Illinois*,
343 U.S. 250, 254–255 (1952) ........................................................................................ 1

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675, 686 (1986) ................................................................................................ 5

*Brandenburg v. Ohio*,
395 U.S. 444, 447–49 (1969) .......................................................................................... 2

*Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (1986). .............................................................................................. 1

City of Chicago v. Morales,
527 U.S. 41, 60 (1999) .................................................................................................. 12

*Clary v. City of Cape Girardeau*,
165 F. Supp. 3d 808, 822 (E.D. Mo. 2016) .................................................................. 12

*Coates v. City of Cincinnati*,
402 U.S. 611, 612 (1971) .............................................................................................. 11

*Cohen v. San Bernardino Valley Coll.*,
92 F.3d 968, 970–71 (9th Cir. 1996) .............................................................................. 8

*Colautti v. Franklin*,
439 U.S. 379, 395 (1979). ......................................................................................... 5, 11

*DeAngelis v. El Paso Mun. Police Officers Ass'n*,
51 F.3d 591, 596 (5th Cir.1995) ..................................................................................... 2

*Doe v. Univ. of Michigan*,
721 F. Supp. 852, 863 (E.D. Mich. 1989). ..................................................................... 2

*Fuller v. Rayburn*,
161 F.3d 516, 518 (8th Cir. 1998) ................................................................................ 13

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) ........................................................................................................ 2

*Goyal v. Univ. of Minnesota*, No. COV03-5484(JNE/FLE),
2005 WL 2290281, at *2 (D. Minn. July 22, 2005) ................................................ 13, 15

iv

*Grayned v. City of Rockford*,
    408 U.S. 104, 108–109 (1972) ............................................................... 5

*Kolender v. Lawson*,
    461 U.S. 352, 358 (1983) ...................................................................... 11

*Lower Brule Sioux Tribe v. S.D.*,
    104 F.3d 1017, 1021 (8th Cir. 1997) ...................................................... 1

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) .............................................................................. 13

*Reed v. Town of Gilbert, Ariz.*,
    135 S. Ct. 2218, 2226 (2015) ................................................................. 3

*Reno v. Am. Civil Liberties Union*,
    521 U.S. 844, 871–72 (1997) .................................................................. 6

*Rodgers v. Univ. of Mo. Bd. of Curators*,
    56 F. Supp. 3d 1037, 1047 (E.D. Mo. 2014) ....................................... 13

*Roth v. United States*,
    354 U.S. 476 (1957) ................................................................................ 1

*Salau v. Denton*,
    139 F. Supp. 3d 989, 1009 (W.D. Mo. 2015). ...................................... 2

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200, 206 (3d Cir. 2001) ...................................................2, 3, 4

*Scheffler v. Molin*,
    743 F.3d 619, 621 (8th Cir. 2014). ........................................................ 1

*Smith v. Goguen*,
    415 U.S. 566, 573 (1974) ........................................................................ 6

*Stahl v. City of St. Louis, Mo.*,
    687 F.3d 1038, 1041 (8th Cir. 2012) .................................................... 12

*Stephenson v. Davenport Cmty. Sch. Dist.*,
    110 F.3d 1303, 1308 (8th Cir. 1997) ................................................... 5, 6

*Thompson v. Bd. of the Special Sch. Dist. No. 1*,
    144 F.3d 574, 581 (8th Cir. 1998) ....................................................... 13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503, 511 (1969) ........................................................................ 2

v

*United States v. Barraza,*
    576 F.3d 798, 806 (8th Cir. 2009). ................................................................... 5

*United States v. Cassidy,*
    814 F. Supp. 2d 574, 582 (D. Md. 2011) ................................................... 2, 3, 4

*United States v. Playboy Entm't Grp., Inc.,*
    529 U.S. 803, 813 (2000) ......................................................................... 3, 4

*United States v. Shrader,*
    675 F.3d 300, 311 (4th Cir. 2012) .................................................................. 12

*United States v. Stevens,*
    559 U.S. 460 (2010) ..................................................................................... 2

*Video Software Dealers Ass'n v. Webster,*
    968 F.2d 684, 689 (8th Cir. 1992) ................................................................. 6

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489, 498 (1982) ............................................................................. 5

*Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748, 771 (1976) ............................................................................. 2

*Ward v. Rock Against Racism,*
    491 U.S. 781, 791 (1989). ............................................................................ 3

*Watts v. United States,*
    394 U.S. 705 (1969); .................................................................................... 2

vi

## STATEMENT OF FACTS

**A.      Rowles attempts to initiate a romantic relationship with Breaux.**

Plaintiff Jeremy Rowles ("Rowles") is an African-American man and a former Ph.D.

candidate in Cultural Anthropology at the University of Missouri ("University"). SUMF ¶¶7-8. In the

fall of 2015, he first encountered Annalise Breaux ("Breaux") at the Kaldi's Coffee House where she

worked. SUMF ¶13. His order did not come out right, so Breaux apologized to him and gave him a

token for a free drink. SUMF ¶14.

The following spring, Breaux began teaching dance fitness classes and the University's

Student Recreation Center ("Rec. Center"). SUMF ¶15. Rowles started attending Breaux' dance

classes, after which their interactions became more personal, and the two spoke to one another

more often. SUMF ¶16. Breaux thought Rowles was friendly, and she did not interpret his behavior

or comments as flirtatious because she thought he was gay. SUMF ¶17.

Then, on April 12, 2016, Rowles asked Breaux out on a date after their dance class. SUMF

¶18. Breaux felt extremely uncomfortable and told him she was "too busy this week." SUMF ¶19.

Over the next week, Rowles sent Breaux several Facebook messages, which became more frequent

and increasingly romantic in nature. SUMF ¶20. On April 18, Breaux sent Rowles a message stating:

> Jeremy, I really appreciate your feedback about my class and
> choreography, but these messages are getting excessive. I think our
> friendship needs to remain in the professional setting. Many of the
> things you say, like that Instagram comment for example, is over the
> top and I wouldn't be comfortable hanging out outside of my places
> of work.  *I still want you to come to Tiger Tease and enjoy your time there*, but
> I need my space outside of class and I think a line has been crossed
> here.

SUMF ¶21 (emphasis added). Rowles immediately apologized and acknowledged that he had

misread their prior interactions:

> Oh my god, I am so sorry Annalise!! I thought… I am so sorry.  I
> took our conversation last Tuesday as you agreeing to a date. I am so
> sorry, I read your reaction completely the wrong way.  I feel so bad

> that I caused you to be uncomfortable, I really apologize. I feel so
> horrible that was the way I came across. I did not mean to make you
> feel that way, and I really apologize. I am so sorry. I'll keep it strictly
> friendly from here on out. I appreciate you telling me this, the last
> think I wanted to do was to make you feel uncomfortable. Please
> accept my apologies, the very last thing I wanted to do was make you
> feel badly.

SUMF ¶22. Rowles continued attending Breaux's dance classes with her permission, but did not attempt to message Breaux after April 18, 2016. SUMF ¶23.

Rowles attended several of Breaux's dance classes during the fall semester of 2016. SUMF ¶24. That September, he emailed Breaux asking for tips on how to develop his skills for her contemporary dance. SUMF ¶25. Breaux suggested that he take private dance lessons, which she said were available through the Rec Center. SUMF ¶26. In October, when he was unable to sign up for any private dance lessons through the Rec Center, Rowles followed up with Breaux and asked to take private lessons from her. SUMF ¶27. Breaux told Rowles she was not currently and would not offer private lessons. SUMF ¶28.

On October 7, Rowles tried to talk with Breaux after class but she dashed off to the bathroom to avoid him. SUMF ¶29. Rowles gave Breaux's co-instructor a note to give Breaux, which contained the Kaldi's drink token Breaux had given her when they first met and the lyrics from the Coldplay song, "The Scientist." SUMF ¶30. Rowles referenced the Coldplay song because it contained the lyric, "Take me back to the start…." SUMF ¶31. Breaux did not understand the meaning of the note and thought it was "bizarre." SUMF ¶32.

On October 14, 2016, Rowles handed a three-page letter to Breaux after class. SUMF ¶33. The letter "contained apologies and a confession of 'love' for" her. SUMF ¶35. Breaux found Rowles's conduct "bizarre," and his letter made her "extremely uncomfortable." SUMF ¶43.

viii

**B.      Defendant Eardley finds Rowles responsible for sexual harassment and stalking on the basis of sex and suspends him from the University for four years.**

Breaux told Rowles she was taking the letter to her supervisor and that larger measures would be taken because of it. SUMF ¶34. Later that day, Rec Center Associate Director Emily Bach McElwaine emailed the University's Title IX office to "refer the conduct of Jeremy Rowles … as a potential violation or the University's Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/Employment Policy in Section 600.020 of the Collected Rules and Regulations." SUMF ¶36. McElwain's email related hearsay "collected and submitted to me by Pangku" Cardona, the coordinator of the TigerX dance program at the Rec Center. SUMF ¶37. In addition to Breaux, McElwaine's email accused Rowles of pursuing romantic relationships with three other instructors: Rose Nash, Ashlyn Balch, and Hannah Turnbull. SUMF ¶38. The Title IX office interviewed Breaux on October 20. SUMF ¶39. On October 21, 2016 she submitted a formal complaint accusing Rowles of "harassment on the basis of sex." SUMF ¶¶41-42. Breaux did not accused Rowles of "stalking on the basis of sex." SUMF ¶42.

On or about November 7, 2016, Title IX Investigator Amber Lammers sent Rowles a "Notice of Investigation of Potential Sex Discrimination," informing him that she would be "investigat[ing] allegations that on or about March 2015-October 2016 [Rowles] engaged in [harassing] behaviors which impacted Annalise Breaux." SUMF ¶48. The Notice of Investigation stated that Rowles' alleged conduct may have violated section 200.010.C.7.b-d of the University's Collected Rules and Regulations ("CRR"), which provide in pertinent part:

> **200.010.C. Conduct** for which students and student organizations, when applicable, are subject to sanctions falls into the following categories:
>
> . . .
>
> **7.   Violation of the University's Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/ Employment Policy in Section 600.020 of the Collected Rules and Regulations.**
> These violations include:

. . .

 b. **Sexual Harassment.** Sexual harassment is defined as:

  1) Unwelcome sexual advances or requests for sexual activity by a person or persons in a position of power or authority to another person, or

  2) Other unwelcome verbal or physical conduct of a sexual nature by a person to another person, when:

   a) Submission to or rejection of such conduct is used explicitly or implicitly as a condition for academic or employment decisions; or

   b) Such conduct creates a hostile environment by being sufficiently severe or pervasive and objectively offensive that it interferes with, limits or denies the ability of an individual to participate in or benefit from educational programs or activities or employment access, benefits or opportunities.

 …

 d. **Stalking on the Basis of Sex.** Stalking on the basis of sex is following or engaging in a course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed.

SUMF ¶49. CRR 200.010.C.7.b-d.

Lammers conducted an investigation into the allegations against Rowles. SUMF ¶50. Throughout the investigation, Breaux never alleged that Rowles touched her inappropriately or threatened her with violence. SUMF ¶¶46-47. She never said that she was afraid of Rowles or that he made her feel intimidated. SUMF ¶¶44-45. Breaux told Lammers that "[Rowles] has an inability to read social cues. It's not necessarily malicious, but he does pick up on some cues in other instances. It's not universal. He didn't understand that things were over, and that we couldn't be friends." SUMF ¶51.

Lammers attempted to interview Ashlyn Balch, Rose Nash, and Hannah Turnbull—the other three women Rowles was alleged by McElwain to have harassed—but none of them expressed any interest in participating in the investigation against Rowles. SUMF ¶52. When she concluded her investigation, Lammers prepared a 55-page report for review by Defendant Ellen Eardley,

x

("Eardley"), who was then the Assistant Vice Provost for Civil Rights and Title IX ("Title IX Office") at the University. SUMF ¶¶3, 53.

The Title IX Office had investigated a complaint against Rowles once before. SUMF ¶¶9-12. In September 2015, an undergraduate student submitted a complaint alleging that Rowles, who was the Teaching Assistant for one of her classes, had invited her to his office hours in the evening and insinuated that he would provide questions or answers to an exam if she provided him sexual favors. SUMF ¶¶9-10. Senior Associate Provost Ken Dean determined in March 2016 that Rowles was ***not*** responsible for violating the University's sexual harassment policy. SUMF ¶11.

Although he exonerated Rowles of sexual harassment, Dean warned that the Complainant

> was not unreasonable to have inferred, as a subjective belief, that your behavior indicated sexual favors were sought. However, you never directly indicated that your offer to show her the exam was conditioned on sexual favors. None of the evidence or statements contained within the Investigative Report indicated that you requested, or hinted that you desired sexual favors in exchange for showing [the Complainant] the exam. I find that your behavior, specifically, closing the door to your TA Office and stating to [the Complainant] that you did not want money, were indicative of an internal recognition that you were doing something wrong by offering to show her the exam or read her exam questions, and not evidence that you were seeking sexual favors. I will be contacting your immediate supervisor and Department Chair so that they may take appropriate action regarding your behavior of offering to share exam questions.

SUMF ¶12.

In her March 15, 2017 "Informal Resolution Findings by the Administrative Officer," Eardley found that

> [t]he letter [Rowles gave Breaux on October 14, 2016] and the sentiments contained within were unwelcome to [Breaux]. This made [her] extremely uncomfortable in her place of work, even more so because she had directly communicated to him in writing that his previous behavior had crossed the line and that she would not be comfortable spending time with him outside her employment.

SUMF ¶¶54-55. She also noted that Rowles "told at least one other female undergraduate instructor at TigerX that he found her 'attractive' and asked her to spend time with him outside of the Rec Center." SUMF ¶56. Eardley concluded that

> [Rowles] violated the sexual harassment policy by engaging in unwelcome verbal and physical conduct of a sexual nature towards [Breaux] and that it created a hostile environment by being sufficiently pervasive that it interfered with her ability to do her job at TigerX. In April 2016, [Breaux], an undergraduate student, directly informed [Rowles], a doctoral candidate, that his communications towards her were unwelcome, unprofessional and crossed the line. After learning that his behavior made [Breaux] uncomfortable, [Rowles]chose to attend AB's TigerX classes multiple times each week, stare at her, make efforts to speak with her, and make efforts to be near her. He then requested to take private classes with her, left a token for her, and then wrote a three-page letter describing his very detailed romantic feelings. From an objective standard, such conduct is unwelcome and hostile. It is also pervasive in that it lasted over the course of several months.

SUMF ¶57. Furthermore, she concluded that "this same conduct **violated the policy prohibiting stalking on the basis of sex**. [Rowles]'s actions from March 2016 through October 2016 constitute a course of conduct towards [Breaux] that would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed." SUMF ¶58. Despite the nature of the rules she was enforcing, Eardley never considered—much less made any finding—that Rowles posed a danger of physical or sexual assault to Breaux:

> Q  … in your findings, do you believe that he posed a danger of physical or sexual assault?
> A  I wasn't asked to make a determination of whether he posed a danger of physical or sexual assault. That was not the purpose of the investigation or the findings.
> Q  What was the purpose?
> A  It was to determine whether he violated the sexual harassment policy, and to determine whether or not he violated the stalking on the basis of stalking.
> Q  Is whether somebody poses a danger of physical or sexual assault not relevant to the question of whether they're responsible for stalking?
> A  It's not part of the elements of stalking. But I suppose it could be a fact in a -- in a stalking case, I suppose.

xii

Q   Also in a sexual harassment case?
A   I suppose it could.
Q   But you didn't consider it in this case; did you?
A   No. I did not.

SUMF ¶59.

The facts Eardley considered in deciding what sanctions to impose "include[d] the nature of

and circumstances surrounding the violation, [Rowles]'s disciplinary history, and the need to prevent

future recurrence of violations, as well as any other information deemed relevant." SUMF ¶60.

Among the "other information deemed relevant," Eardley considered:

> the University's expectations of doctoral students. For example, the
> MU Office of Research and Graduate Studies encourages graduate
> students to familiarize themselves with the code of ethics for their
> profession. The American Anthropological Association's Principles
> of Professional Responsibility advises that individuals should
> "maintain respectful and ethical professional relationships." It further
> encourages professionals to "comport themselves in ways that
> promote an equitable, supportive and sustainable workplace
> environment."

SUMF ¶61. Referring to the prior Title IX investigation—which found Rowles **not** responsible for

sexual harassment—Eardley concluded that "[Rowles] does not appear to set appropriate

professional boundaries with undergraduate students in workplace environments throughout

campus—whether in academic settings or at the Rec Center." SUMF ¶62. In particular, she found it

"concerning that [Rowles] failed to learn from Mr. Dean and the Department Chair's previous

warning regarding his conduct with an undergraduate female student." SUMF ¶63. Considering the

"totality of the circumstances," Earley suspended Rowles from all four campuses of the University

for four years, permanently banned him from the University's residence halls and the Rec Center,

and required Rowles to complete a four-part remediation plan before he would be allowed to return

to campus after his suspension was over. SUMF ¶64.

## C. Defendants Scroggs upholds Eardley's findings of responsibility for sexual harassment and stalking on the basis of sex but reduces Rowles's suspension to two years.

Rowles timely appealed to Defendant Cathy Scroggs, then the Vice Chancellor for Student Affairs. SUMF ¶¶5, 65. In his appeal, Rowles argued:

> Stalking on the basis of sex requires that the complainant be put "reasonably in fear for his or her safety or would case a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed." Here, the conduct at issue here amounts to misunderstanding of social cues and unrequited romantic interest. Giving an instructor a high five in an exercise class does not constitute sexual contact. There is absolutely no allegation that there was inappropriate sexual contact other than high fives. There are also no allegations that there were interactions that put the complainant in fear for her safety. Although the original complaint, reported by a MizzouRec employee, suggests that the complainant felt "intimidated," the complainant herself only reports that she felt "uncomfortable." Therefore, the conduct at issue does not meet the definition of stalking on the basis of sex.

SUMF ¶66. Regarding Eardley's finding of responsibility for sexual harassment, Rowles argued:

> the alleged conduct was neither severe nor pervasive. Mr. Rowles attempted to engage Ms. Breaux in a romantic relationship. His efforts may be awkward, but even Ms. Breaux acknowledged that his behavior was not "malicious" and that he "has an inability to read social cues."
>
> Second, the alleged conduct is not "objectively offensive." While the romantic interest was unrequited, it was not expressed in an offensive manner. Mr. Rowles tried to express his feelings to Ms. Breaux to give her complete information and see whether she would be interested in pursuing a romantic relationship. He apologized for any misunderstandings and told her that he never wanted to make her uncomfortable.

SUMF ¶67. Finally, he argued:

> Ms. Eardley finds that "[f]rom an objective standard, such conduct is unwelcome and hostile." This finding misstates the standard set forth in the definition. The standard is not whether the conduct is unwelcome—an inherently subjective determination—but rather whether it is objectively offensive. Unwanted, but non-offensive, offers to change the nature of a relationship is not "objectively offensive." Ms. Eardley does not find that the conduct is

xiv

objectively offensive.

SUMF ¶68.

    Scroggs upheld Eardley's findings of conduct violations but modified the sanctions imposed.

SUMF ¶69. She rejected Rowles's argument that his alleged conduct was not severe or pervasive and

objectively hostile:

> The appeal quotes the statement from the informal resolution
> decision that "from an objective standard, such conduct is
> unwelcome and hostile." It alleges that this misstates the standard
> because it did not constitute a finding that your conduct was
> objectively offensive. I disagree. The informal resolution decision
> quoted the appropriate definition and expressly applied an objective
> standard. By noting that your conduct was hostile under an objective
> standard, the decision was indicating that it met the criterion of being
> objectively offensive.

SUMF ¶70. She concluded that:

> the informal resolution decision's view of your conduct represents a
> reasonable assessment of the investigative record and supports a
> conclusion that your conduct was objectively offensive. As more fully
> addressed in the informal resolution decision, your persistent pursuit
> of Ms. Breaux at her place of work — after she had expressly and
> clearly rejected your romantic overtures — can be viewed reasonably
> as objectively offensive. Likewise, I believe the informal resolution
> decision reaches a reasonable conclusion in finding that your conduct
> was sufficiently pervasive to constitute a violation.

SUMF ¶71.

    Scroggs similarly rejected Rowles's arguments that his alleged conduct did not meet the

definition of stalking on the basis of sex:

> the appeal alleges that the informal resolution decision failed to apply
> the standard correctly in finding you responsible for stalking on the
> basis of sex. It notes the absence of sexual contact and of allegations
> that Ms. Breaux was put in fear for her safety. The appeal also notes
> that she did not allege that she was intimidated, but instead that she
> was uncomfortable. The fact that an original complaint does not use
> specific wording from the definition of stalking does not preclude a
> finding of a violation. Again, the appeal casts your behavior in the
> light most favorable to you, but the informal resolution decision rests
> on a permissible assessment of the evidence as showing that your

persistent conduct would cause a reasonable person to be frightened, intimidated, or emotionally distressed.

SUMF ¶72. Scroggs found no fault with Eardley's reliance on Rowles's prior Title IX investigation

as a factor in imposing his sanction:

> While the circumstances of this complaint are not entirely the same as those in the previous complaint, there remains a distinct common thread in that you ignored Ms. Breaux's express request to maintain only a professional relationship with her. You reasonably could be expected to be particularly attuned to that request after you had been admonished in the prior decision about the importance of professional boundaries. That makes your failure to abide Ms. Breaux's request all the more troubling and this is a reasonable factor to be considered in measuring the sanction to be imposed.

SUMF ¶73.

Finally, Scroggs considered whether the sanction imposed by Eardley fell outside the range

typical for the kind of violation found:

> I acknowledge that you do not have a record of previous discipline. I also have considered the arguments presented in the appeal concerning the severity of the conduct and explanations of your actions. Further, I have considered whether the record indicates that there is a need for a four year suspension to end or remedy the effects of the discrimination or harassment, or prevent its future recurrence.
>
> Based on those factors, and with due deference to the original decision, I conclude that there is compelling justification to modify the sanction to the following extent: Instead of a four-year suspension, you will be suspended from the University of Missouri, including all four campuses, to run through the end of summer session 2019. All other sanctions of the original decision shall remain unchanged.

SUMF ¶74.

## D.   Defendants disagree about the scope and enforcement of CRR 200.010.C.7.b and CRR 200.010.C.7.d.

Rowles filed this lawsuit against Eardley, Scroggs, the Curators of the University of Missouri,

SUMF ¶1; Eardley's successor as Assistant Vice Chancellor for Civil Rights & Title IX, Andy Hayes,

xvi

SUMF ¶4; and Salama Gallimore, the former Director of Investigations and Deputy Title IX Coordinator at the University, SUMF ¶6. In discovery, Rowles deposed each of the individual defendants regarding the scope and enforcement of the University's policies prohibiting sexual harassment and stalking on the basis of sex.

Scroggs testified that asking someone out on a date is a "sexual advance" within the meaning of CRR 200.010.C.7.b.1:

> Q. So, let me ask you what unwanted sexual advance means. Is that -
> - is a request for a date an unwanted sexual advance, if it's
> unwanted. I mean, if someone asks you out that you don't want
> to go out with, is that an unwanted sexual advance?
> A. Probably not the first time, no.
> Q. But the second time it would be?
> A. If I keep turning him down and he keeps asking, I would
> consider that unwanted.

SUMF ¶75. She stated that the phrase "course of conduct on the basis of sex" includes the use of "sexual innuendo, sexual language, sexual content." SUMF ¶85. Scroggs also believes that asking someone out on a date who is physically smaller than oneself qualifies as a "power or authority" within the meaning of CRR 200.010.C.7.b.1:

> Q. The allegations against Jeremy Rowles, do you believe that
> they've satisfied subsection 1 of sexual harassment?
> A. I think he was perceived as having power over her.
> Q. And what was the nature of his power over her? Was it just his
> size?
> A. His physical size.
> Q. Okay. So, this part 1 doesn't require him to be a teacher. When it
> says person of authority, it doesn't mean, like, teacher or boss?
> A. Well, I suppose it could; but in this case, no, I didn't interpret it
> that way.

SUMF ¶76.

Defendant Hayes agrees with Scroggs's reading of CRR 200.010.C.7.b.1, and testified in her deposition that a man's physical size is sufficient to bring him within the ambit of that rule:

> Q. Would you agree with me that that section only applies to situations in which the accused has some position of authority over the accuser?
> A. Or power.
> Q. What's the difference between those things?
> A. Well, I think in certain situations that a man could have power over a woman, even if there wasn't an authority situation. I think there could be a feeling of that just by the nature of your gender.
> Q. So subpart one could apply to any situation with any man and any woman?
> A. It could.

SUMF ¶77.

By contrast, Defendant Gallimore testified in her deposition that the phrase "power or authority" requires the accused to have "some sort of evaluative or supervisory capacity" over his accuser. SUMF ¶78. She believes that CRR 200.010.C.7.b.1 does not generally apply to sexual advances between fellow students:

> Q. What if -- if you're just talking about two students who are essentially in the same class, could one of those students have a position of authority over the other?
> A. It would have to depend on the situation, but I would say generally no.
> …
> Q. What if one of the students is just physically larger than the other, is that a position of power or authority?
> A. Being physically larger than someone?
> Q. Yes.
> A. I think that would speak to the second [part of the rule] potentially, but not --
> Q. Not the first one?
> A. Not necessarily the first one.

SUMF ¶79.

For her part, Defendant Eardley had not considered whether the word "power" in CRR 200.010.C.7.b.1 could refer to physical size:

> Q  If -- does ["person or persons in position of power or authority"] also include a power differential based on the -- just the physical size of the two people?
> A  I don't think I've ever considered that before. Under this prong.

xviii

SUMF ¶80. Eardley further testified that the phrase "severe or pervasive and objectively hostile" as

used CRR 200.010.C.7.b.2.b has two distinct requirements:

> Q   Okay. And then what I want to know is what that "and
>      objectively offensive" part – is that a separate thing that has to be
>      there in addition to the either "severe or pervasive"?
> A   The hostile environment needs to be objectively offensive.
> Q   Okay. So every hostile -- every hostile environment must be
>      objectively offensive; is that right?
> A   Yes.
> Q   Okay. And then in addition to being objectively offensive, it must
>      also be either severe or pervasive; is that right?
> A   Yes.

SUMF ¶81.

By contrast, Defendant Scroggs testified in her deposition that the phrase "severe or

pervasive and objectively offensive" as used in CRR 200.010.C.7.b.2.b is a disjunctive list in which

only one of the three elements must be satisfied:

> Q.   Now, I want to ask you about that "or" and "and," what your
>      understanding of that means. Because I think there's two ways
>      you could read that, and I want to know if you have -- if you
>      think it's one way or the other. Does the "or" between "severe or
>      pervasive" mean on the one hand it has to be severe or on the
>      other hand it has to be both pervasive and objectively offensive?
>      Or does the "or" separate only severe or pervasive and then
>      objectively offensive is its own requirement? Which -- which way
>      do you read it?
> A.   I read it -- it can be severe; it can be pervasive; and it can be
>      objectively offensive. I mean, it --
> Q.   What if it's only – I'm sorry.
> A.   If it's only one, it's still a problem.
> Q.   That's enough? If it's one, it satisfies the rule?
> A.   That's exactly right.
> Q.   So, if somebody engaged in conduct that was severe but not
>      pervasive and not objectively offensive, that would satisfy this
>      rule?
> A.   Yes.

SUMF ¶82.

For her part, Defendant Gallimore interprets the phrase "severe or pervasive and objectively offensive" as a single idea meaning conduct that interferes with someone's ability to participate or benefit from educational programs:

> Q. So I was asking you what -- as used in this, in this rule 7(b) 2(b),
> "Conduct that creates a hostile environment by being sufficiently
> severe or pervasive and objectively offensive." And I asked you
> in this context what does the word "severe" mean?
> [Defense counsel objected to the form of the question as "overbroad
> and lack[ing] foundation."]
> A. For severe, pervasive, objectively offensive, I think what that's all
> getting to in this rule is that the behavior is interfering with
> limiting or denying the ability of an individual to participate or
> benefit from an educational program or activity, so. And behavior
> that would lead to that result would be considered severe, and
> any behavior that would lead to that result would be considered
> pervasive and likely and any, you know, behavior that led to this
> result would also be considered objectively offensive.

SUMF ¶83.

According to Defendant Eardley, the meaning of "no legitimate purpose" depends on the circumstances of a complaint and what "the university community would expect":

> Q …Now, let me ask you what "no legitimate purpose" means in
> this context?
> MS. LITTLE: Object to the form of the question.
> A I think it depends on the circumstances.
> …
> Q Well, in enforcing this rule, how would you determine whether
> the alleged course of conduct on the basis of sex had a legitimate
> purpose or not?
> A I would look at the circumstances before me.
> Q All right. And what would -- what kind of circumstances would
> you look at to determine if it was legitimate or not legitimate?
> MS. LITTLE: I'll object to the form of the question. It's overbroad
> and asking for all circumstances.
> A I would look at the facts alleged in -- by the complainant --
> …The facts alleged by the complainant and the information
> collected in the investigative report from the respondent and
> witnesses and the complainant.
> Q Okay. And then you would determine whether you thought it was
> a legitimate purpose or not; is that correct?
> A I would look at whether it seemed to be a legitimate purpose or
> not, yes.

> Q  Okay. And that would essentially be your decision as to whether it's a legitimate purpose or not?
>
> A  Well, I would try to think about the circumstances as a whole, and what is reasonable or unreasonable.
>
> Q  Okay.
>
> A  And also think about the university community and what the university – the university community would expect.

SUMF ¶86. Eardley further testified that "no legitimate purpose" may mean something different

when applied to graduate students from when applied to undergraduate students:

> Q  Well, I'm not sure what you mean by "what the university would expect." that's what I'm trying to understand what you mean.
>
> A  Well, this isn't part of a student – it is the student code of conduct.
>
> Q  Uh-hum.
>
> A  The standard of conduct, so these are expectations for the students, and so when I looked at these definitions, I would put it in the context of what would be expected by an undergraduate student or graduate student.
>
> Q  Is what's expected by an undergraduate student and a graduate student different?
>
> A  In certain circumstances, yes, the – a graduate student is expected to have more life experiences and to be more professional.
>
> Q  Is that -- is what you just said somewhere in Rule 200.010?
>
> A  I don't think that's written in this document, but we could look.
>
> Q  Do you know of any CRR in which it is written?
>
> A  I don't.

SUMF ¶87. Eardley concedes that the CRRs do not distinguish between graduate and undergraduate

students:

> Q  Okay. So let's just look at a couple of points here, under "Definitions," B7, definition of student is, "a person having once been admitted to the university who has not completed a course of study and who intends to or does continue a course of study, in or through one of the campuses of the university. For the purposes of these rules, student status continues whether or not the university's academic programs are in session." Did I read that correctly?
>
> A  I believe so.
>
> Q  And that definition doesn't make any distinction between graduate student and undergraduate; does it?
>
> A  No. It does not.

SUMF ¶88.

Scroggs defined "no legitimate purpose" to mean uninvited or unwanted by the object of the conduct:

> Q. …What does with no legitimate purpose mean to you?
> A. It means that why would they be -- that they are saying something and they are -- the individual that it's directed toward doesn't have any real purpose for them.
> Q. Doesn't have any purpose to the person that the comment's directed to?
> A. That the -- that the person that it's directed to hasn't invited it.
> Q. Hasn't invited it?
> A. Yeah. How about that?
> …
> Q. Does engaging in a course of conduct on the basis of sex with a *legitimate* purpose, does that take you outside of this rule?
> A. A legitimate purpose is two people that have agreed that they are trying to be in a relationship, and, so, they are engaging in this type of behavior.
> Q. Okay.
> A. No legitimate purpose is when two people -- one person agrees and one person doesn't.

SUMF ¶89.

When asked how she determines whether a course of conduct based on sex has a legitimate purpose, Hayes answered, "I don't know that there is a definition specifically for legitimate. I think you can't dissect it by that individual word. I think you have to look at the sentence as a whole and the facts of the whole entire situation. I don't think that is a fair question." SUMF ¶90. Hayes Depo. 66:1-6. Hayes could not explain how a student could determine whether he has a legitimate purpose in asking someone out on a date:

> Q. Is asking someone out on a date a course of conduct on the basis of sex? Let me just ask you that.
> A. Yes.
> Q. So you could ask someone out on a date with a legitimate purpose and not fall within this rule; is that correct?
> A. You could.
> Q. Okay. What I'm trying to get at here is, a student reading this policy, how did they know what is a legitimate purpose within the meaning of the rule?

xxii

A. Well, I'm going to speculate. But if they wanted it clarified, they could call my office. They could ask someone about it if they needed clarification. I don't know that many students read the rules before they take action.

SUMF ¶91. Even if a student took her advice and called the Title IX Office, Hayes could not say whether that student would get the same "clarification" from different members of her staff:

Q. … If someone called the Title IX office and reached Megan Grant or someone else, another person in your office and asked what no legitimate purpose meant, would you assume that they would give the same answer as you?
A. I don't know.
Q. Might they have a different definition?
A. I don't know.
Q. It's possible?
A. I don't know.
Q. You don't know if it's possible?
A. Well, I don't know what someone else would say. I don't know how they would answer that question.

SUMF ¶92.

Hayes testified that "emotionally distressed" means something different from "frightened" or "intimidated." SUMF ¶93. It can mean any negative feeling at all, including "upset," "angry," "sad," "uncomfortable" or even "annoyed." SUMF ¶94. Eardley testified that it means "a state of emotional discomfort." SUMF ¶95. Scroggs testified that "emotional distressed" prong "could just be more of amplification of the fear and distress or the fear and intimidation so they -- they have emotional outbursts as a result of that." SUMF ¶96.

**E. Rowles's sanction for sexual harassment and stalking on the basis of sex are substantially harsher than the sanctions imposed on similarly situated white students found responsible for the same (or greater) offenses.**

The Title IX Office investigated 60 complaints of sex discrimination during the period of August 2014 through March 2017. SUMF ¶97. Of those 60 complaints, only three students—Nos. 22, 24, and 53—were found responsible for *both* sexual harassment and stalking on the basis of sex. SUMF ¶98. Two of those students (Nos. 22 and 24) were white while the third student—Rowles

xxiii

(No. 53)—was black. SUMF ¶¶99-100. Rowles was suspended from all four campuses for two years (reduced from the original sanction of four years), and banned for life from all residence halls and the student recreation center. SUMF ¶101. By contrast, the two similarly situated white students— the only other students found responsible for both sexual harassment and stalking on the basis of sex during the relevant period—received substantially lighter sanctions that Plaintiff. SUMF ¶102. Student No. 22 was not suspended at all. SUMF ¶103. Rather, he was required to undergo counseling. SUMF ¶104. Student No. 24 was suspended for only six months, barred from residence halls (but not the student recreation center), and required to undergo counseling. SUMF ¶105. Student No. 22's sanction is even more striking in its contrast to Plaintiff's because that student was *also* accused of non-consensual sexual contact, non-consensual sexual intercourse, and threatening or intimidating behaviors. SUMF ¶106.

## F. Defendants cannot explain why Rowles was disciplined far more harshly that similarly situated white students found responsible for sexual harassment and stalking on the basis of sex.

When questioned about the information provided in *her own* interrogatory responses, Defendant Hayes was unable to explain what the two white students found responsible for sexual harassment and stalking on the basis of sex had actually done or why they received more lenient sanctions than Plaintiff:

> Q. Looking at [Student No.] 22 again, you can't tell me what the
>    person in 22 was accused of doing, can you?
> A. No.
> Q. Or the person in 24?
> A. No, I have no idea.
> Q. You can tell me what they were accused of; is that correct, like in
>    terms of rules violations?
> A. Right.
> Q. And you would agree with me that the rules violations alleged in
>    22 and 53 are both sexual harassment, stalking on the basis of
>    sex?
> A. Yes.
> Q. 22, the sanction imposed is counseling?
> A. Yes, I see that.

xxiv

      Q.  And on 53, the sanction imposed is two-year suspension?
      A.  On which one?
      Q.  53.
      A.  Yes.
      Q.  As you look at this today sitting here, can you explain why the
           student in 22 got counseling and the student in 53 was suspended
           for two years?
    MS. LITTLE: Object to the form of the question.
      A.  No. I'd have to know more information.
      Q.  (By Mr. Hirth) You would need to know more information to
           know why the sanctions were different?
      A.  Uh-huh.

SUMF ¶107.

Defendant Eardley was no more able that Defendant Hayes to explain what the two white

students were accused of doing or why they received more lenient sanctions than Plaintiff for

violating the same (or more) rules:

      Q  Okay. You can't tell, can you, from the information provided
         here what the student in 22 and 24 actually did; can you?
      A  I cannot.
      Q  And you would need to know additional information to know
         whether they are in fact similarly situated to Mr. Rowles; wouldn't
         you?
      A  Yes. I would.
    …
      Q  Okay. Looking at the data in number 22, 24, and 53, can you
         provide any explanation of why these three students received
         different sanctions?
    MS. LITTLE: I'll just object it's been asked and answered.
      A  Well, I don't know the circumstances of 22 or 24. And so I
         cannot -- what I can tell you is that each decision is made based
         on the facts and circumstances in that particular case. The
         sanctions are tailored to that case, based on the sanction factors
         that we've discussed earlier. The nature of the circumstances, the
         need to prevent the behavior from reoccurring, the severity of the
         circumstances, the disciplinary history of the accused, other
         circumstances that are relevant.
      Q  You would need all that information to be able to tell why these
         received different sanctions?
      A  I mean, I don't know if I would even then be able to tell. I would
         say that it's very difficult to compare any particular case to
         another case because they're so unique and so fact-specific.

SUMF ¶108.

Scroggs was likewise unable to explain any of the circumstances surrounding the other two complaints of sexual harassment and stalking on the basis of sex, and she could provide only two possible explanations for why Plaintiff was punished more severely than the white students:

> Q. From this information, can you -- is it possible for you to discern why Mr. Rowles was given such a substantially greater sanction than the other two people accused of the same conduct?
> A. No. I don't know any of the facts of those cases.
> Q. You would need to know the facts of those cases to be able to compare them, wouldn't you?
> A. Yes, I would.
> Q. And if you didn't have that information, there is no way you could tell the difference between them. Is there?
> A. Based on this.
> Q. Okay. In fact, the only thing that you can tell about these three that distinguishes them in any way is the race of the person accused, isn't it?
> A. Well -- so, are you saying No. 22 and No. 24 are white?
> Q. They are both white.
> A. And then Mr. --
> Q. Mr. Rowles, No. 53, is black.
> A. Okay. Well, that's one distinguishing thing. Okay.
> Q. Do you see any others?
> …
> A. There was a different investigator.
> Q. Right. Anything else?
> A. Not that I can see, but -- not just on this, on the face of it.

SUMF ¶109. Defendants Gallimore provides similar answers to the same line of questioning:

> Q. Based on this document you can't tell why these students were treated differently?
> MS. LITTLE: I object to the form of the question.
> A. Based on this document, I can't tell -- it says yes, but it doesn't say yes, comma, and then the charges that they were responsible for. If I have that, then I could potentially answer your question.
> Q. (By Mr. Hirth) You would need to know what they were found responsible of to know their treatment was different?
> MS. LITTLE: Same objections.
> A. No. I would need to know what they were found responsible of so that I could answer your question because right now you're asking me to compare things when I don't know which one of these charges they were found responsible for, so it's not a comparison that can be made.

SUMF ¶110.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party meets its initial burden, the nonmoving party must set forth specific facts showing a genuine issue for trial. *Lower Brule Sioux Tribe v. S.D.*, 104 F.3d 1017, 1021 (8th Cir. 1997).

## ARGUMENT

**I.      Rowles is entitled to judgment as a matter of law on Count I because he was suspended for protected speech.**

A First Amendment retaliation claim requires the plaintiff to show the following: (1) he engaged in a protected activity; (2) "the defendant took adverse action against him that would chill a person of ordinary firmness from continuing in the activity;" and (3) the adverse action was at all motivated by the protected activity. *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014). Rowles easily satisfies the first two elements of a First Amendment retaliation.  There is no dispute that he was suspended from the University for two years and permanently banned from all residence halls and the Student Rec Center by Defendants Eardly and Scroggs and now Hayes.  SUMF ¶¶4, 55-58, 69-74. Nor is there any dispute that Rowles's violations of University policy consisted solely of oral and written communications—amorous Facebook and Instagram posts, an oral request for a date, emails and conversations regarding the availability of private dance lessons, and a three-page letter that "contained apologies and a confession of 'love' for" Breaux.  SUMF ¶¶35, 42, 46-47. The only question is whether the speech that precipitated Rowles's suspension is protected by the First Amendment.

1

There are a few "well-defined and narrowly limited classes of speech" not protected by the First Amendment: obscenity, *Roth v. United States*, 354 U.S. 476 (1957); defamation, *Beauharnais v. Illinois*, 343 U.S. 250, 254–255 (1952); fraud, *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976); incitement, *Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969) (per curiam ); true threats, *Watts v. United States*, 394 U.S. 705 (1969); and speech integral to criminal conduct, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949). Speech outside of these exceptions remains protected even when the subject is uncomfortable or violates standards of good taste. *See e.g., United States v. Stevens*, 559 U.S. 460 (2010) (invalidating statute prohibiting depictions of animal cruelty). "[T]he Supreme Court has consistently classified emotionally distressing or outrageous speech as protected…." *United States v. Cassidy*, 814 F. Supp. 2d 574, 582 (D. Md. 2011). "These principles acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 863 (E.D. Mich. 1989). "[S]tudents are entitled to freedom of expression of their views," unless there is a constitutionally valid reason to regulate the expression. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Student speech is "generally protected as long as [it does] not materially and substantially interfere with the requirements of appropriate discipline or collide with the rights of others." *Salau v. Denton*, 139 F. Supp. 3d 989, 1009 (W.D. Mo. 2015).

"There is of course no question that non-expressive, physically harassing conduct is entirely outside the ambit of the free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001). "But there is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive…." *Id.* "When laws against harassment attempt to regulate oral or written expression on such topics, … we cannot turn a blind eye to the First Amendment implications." *Id.*; *see also DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir.1995) ("Where pure expression is involved," anti-discrimination law "steers into the

territory of the First Amendment."). "[W]hen anti-discrimination laws are applied to ... harassment claims founded solely on verbal insults, pictorial or literary matter, the statute[s] impose[ ] content-based, viewpoint-discriminatory restrictions on speech." *DeAngelis*, 51 F.3d at 596–97. The same is true when the harassment claim is founded solely on compliments and expressions of attraction. "This sort of content- or viewpoint-based restriction is ordinarily subject to the most exacting First Amendment scrutiny." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001).

"If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* In addition, laws that are facially content neutral will still be considered content-based regulations of speech if they cannot be "justified without reference to the content of the regulated speech," or if they were adopted by the government "because of disagreement with the message [the speech] conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

In *United States v. Cassidy*, 814 F. Supp. 2d 574, 582 (D. Md. 2011), for example, the court considered an as-applied challenge to a federal statute that criminalized anyone who: "with the intent … to kill, injure, harass, or intimidate, or cause substantial emotional distress to a person … uses … any interactive computer service … to engage in a course of conduct that causes substantial emotional distress to that person…." 18 U.S.C. § 2261A(2)(A). The defendant in that case was indicted for making derogatory Twitter and blog posts about a member of his religious sect, which caused that member extreme emotional distress. *Cassidy*, 814 F. Supp. 2d at 579–80. Finding that "Mr. Cassidy allegedly violated the statute by intentionally causing substantial emotional distress …

3

on Twitter and Blogs," the court concluded that the challenged statute was a content-based restriction on speech. *Id.* at 584. Applying strict scrutiny, the court concluded that protecting listeners from speech that inflicts emotional distress is not a compelling governmental interest: "Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists." *Id.* (quoting *Playboy Entertainment Group*, 529 U.S. at 813). Even if it were a compelling governmental interest, the court found that the challenged statute was not narrowly tailored to serve that interest. *Cassidy*, 814 F. Supp. 2d at 586.

Here, the University's CRR prohibiting sexual harassment is a content-based restriction on speech because it applies to "verbal … conduct *of a sexual nature*." CRR 200.010.C.7.b.1-2 (emphasis added). The CRR prohibiting stalking on the basis of sex is similarly content-based to the extent it prohibits speech that would cause a reasonable person under the circumstances to be "emotionally distressed." CRR 200.010.C.7.d. Preventing discrimination in education is a compelling government interest. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209–10 (3d Cir. 2001). However, Defendants have not produced any evidence to establish that CRR 200.010.C.7.b and CRR 200.010.C.7.d are narrowly tailored to achieve that goal *as applied to Rowles*.

Breaux never alleged that Rowles stalked her. SUMF ¶42. Breaux never alleged that Rowles touched her inappropriately. SUMF ¶46. Breaux never alleged that Rowles threatened her with violence. SUMF ¶47. Breaux never alleged that Rowles made her feel intimidated. SUMF ¶45. Breaux never alleged that she was afraid of Rowles. SUMF ¶44. At most, Breaux thought Rowles's behavior was "bizarre," and it made her feel "uncomfortable." SUMF ¶43. Breaux told the Title IX Office that Rowles "has an inability to pick up on social cues" and was not "malicious." SUMF ¶51. Indeed, Eardley never even considered—much less made any finding—that Rowles posed any danger of physical or sexual assault to Breaux. SUMF ¶59. Essentially, Rowles was suspended for

4

directing amorous—but not threatening—speech toward someone who wasn't interested in him. Assuming his conduct falls within the CRRs' definitions of sexual harassment and stalking on the basis of sex, those CRRs are not narrowly tailored to prevent sex-based discrimination in education. All of Rowles's challenged speech is protected, and his suspension in retaliation for engaging in such protected speech violates the First Amendment.

## II. Rowles is entitled to judgment as a matter of law on Count III because Curators' policies prohibiting sexual harassment and stalking on the basis of sex authorize arbitrary and discriminatory enforcement by the Title IX Office.

"The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997). Vague regulations offend due process in two separate ways:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. *A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.*

*Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972) (emphasis added). Thus, to defeat a void for vagueness challenge, a statute must survive a two-prong test: "The statute must first provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement." *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009). "[T]he constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979).

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). For example, less specificity

5

may be required of public school disciplinary rules. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) ("Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions."). On the other hand, where a school's disciplinary code "is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Stephenson*, 110 F.3d at 1308-09 (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *see also Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 689 (8th Cir. 1992) ("A stringent vagueness test applies to a law that interferes with the right of free speech."); *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871–72 (1997) ("The vagueness of [content-based speech restrictions] raises special First Amendment concerns because of its obvious chilling effect on free speech."). "Accordingly, while a lesser standard of scrutiny is appropriate because of the public school setting, a proportionately greater level of scrutiny is required because the regulation reaches the exercise of free speech." *Stephenson*, 110 F.3d at 1308–09.

### A. Defendants cannot even agree amongst themselves as to the scope of conduct prohibited by CRR 200.010.C.7.b.

The University's Collected Rules and Regulations ("CRRs") identify three kinds of prohibited "sexual harassment." The first kind involves "[u]nwelcome sexual advances or requests for sexual activity by a person or persons *in a position of power or authority* to another person." CRR 200.010.C.7.b.1 (emphasis added). The second involves "unwelcome verbal or physical conduct of a sexual nature by a person to another person, *when: Submission to or rejection of such conduct is used explicitly or implicitly as a condition for academic or employment decisions.*" CRR 200.010.C.7.b.2.a (emphasis added). The third kind of sexual harassment involves:

> unwelcome verbal or physical conduct of a sexual nature by a person
> to another person, when: … *Such conduct creates a hostile environment by
> being sufficiently severe or pervasive and objectively offensive that it interferes with,*

6

*limits or denies the ability of an individual to participate in or benefit from*
*educational programs or activities or employment access, benefits or opportunities.*

CRR 200.010.C.7.b.2.b (emphasis added). Only the first and third definitions are arguably implicated in the present case, but Defendants disagree as to what conduct satisfies each definition.

The first definition of "sexual harassment" prohibits "Unwelcome sexual advances or requests for sexual activity *by a person or persons in a position of power or authority to another person.*" CRR 200.010.C.7.b.1 (emphasis added). Neither "sexual advance" nor "power" is defined in the CRRs, permitting Title IX officers broad discretion to decide whose conduct falls within this rule. For example, Scroggs testified in her deposition that asking someone out on a date is a sexual advance. SUMF ¶75. She further testified that being physically larger than the person one is asking out on a date qualifies as a position of "power." SUMF ¶76. By contrast, Gallimore testified in her deposition that the phrase "power or authority" requires the accused to have "some sort of evaluative or supervisory capacity" over his accuser. SUMF ¶78. Thus, this first definition of sexual harassment does not generally apply to sexual advances between fellow students. SUMF ¶79. Hayes sides with Scroggs rather than Gallimore. At her deposition, Hayes explained that a man's size is sufficient to bring him within the ambit of CRR 200.010.C.7.b.1 if the woman he asks out is physically smaller than he is. SUMF ¶77.

If Scroggs and Hayes are correct, then the Title IX Office may impose any level of discipline—up to and including expulsion from the University—for an "unwelcome [request for a date] by a person [who is physically larger than] another person." If Gallimore is correct, an unwelcome date request does not constitute sexual harassment unless if comes from a teacher, employer, or someone else with "evaluative or supervisory authority." How can a student be expected to know whether his conduct is prohibited under CRR 200.010.C.7.b.1 when the University officials charged with enforcing it cannot even agree as to the rule's meaning? Even if the rule's meaning were obvious to "a person of ordinary intelligence," Defendants' conflicting

7

testimony strongly suggests "resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned*, 408 U.S. at 109.

The other definition of sexual harassment arguably applicable to this case prohibits: "unwelcome verbal … conduct of a sexual nature" that is "sufficiently severe *or* pervasive *and* objectively offensive" that it interferes with the ability of an individual to participate in educational programs or activities. CRR 200.010.C.7.b.2.b.2 (emphasis added). The rule does not define what is meant by the phrase "verbal …conduct of a sexual nature," leaving the Title IX Office wide discretion to determine what kind of speech may qualify. A production of the play *Equus* by the University's theater department would seem to fall within this definition, as would an English professor's in-class reading of Walt Whitman's "I Sing the Body Electric," or a sociology professor's lecture about the incest taboo, if a student is traumatized by the material. This is not idle speculation. In *Cohen v. San Bernardino Valley Coll.*, for example, a professor who focused on topics of a sexual nature in class and played devil's advocate when discussing sexual taboos was terminated for violating the college's sexual harassment policy. 92 F.3d 968, 970–71 (9th Cir. 1996). The policy defined sexual harassment as "verbal, written, or physical conduct of a sexual nature," including "circumstances in which … [s]uch conduct has the purpose or effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, or offensive learning environment." *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 970–71 (9th Cir. 1996). Reversing the district court's verdict in favor of the college, the Ninth Circuit held that the sexual harassment policy was vague *as applied to Cohen. Id.* at 972 (9th Cir. 1996).

Admittedly, not all "verbal … conduct of a sexual nature" is prohibited under the CRRs. The speech must also be "unwanted" and "*sufficiently severe or pervasive and objectively offensive*" that it interferes with, limits or denies educational opportunities. CRR 200.010.C.7.b.2.b (emphasis added). In their depositions, Defendants offered a range of interpretations for the latter phrase and could

not agree on the importance of the "and" and "or" in the policy. Eardley testified that CRR 200.010.C.7.b.2.b first requires the alleged harasser's conduct to be objectively offensive; then, in addition, it must also be *either* severe or pervasive. SUMF ¶81. Scroggs, on the other hand, considers CRR 200.010.C.7.b.2.b to apply if *any one of the three terms* (severe, pervasive, or objectively offensive) is satisfied. SUMF ¶82. Gallimore believes any conduct that interferes with, limits, or denies the ability of an individual to participate or benefit from an educational program or activity *necessarily* satisfies the "severe or pervasive and objectively offensive" requirement. SUMF ¶83.

Like their disparate interpretations of the terms "sexual advance" and "power" in CRR 200.010.C.7.b.1, Defendants' conflicting testimony as to the requirements of CRR 200.010.C.7.b.2.b increases the likelihood of arbitrary or discriminatory enforcement. If Scroggs is correct, "verbal … conduct of a sexual nature" does not have to be "objectively offensive" as long as it is either "severe" or "pervasive." If Gallimore is correct, "verbal … conduct of a sexual nature" does not need to be "severe" or "pervasive" or "objectively offensive" as long as it "interferes, limits or denies the ability of an individual to participate in or benefit from educational programs or activities or employment access, benefits or opportunities." Indeed, it's not clear which version of these standards Defendants applied in Rowles's case. For example, Eardley found that

> [Rowles] violated the sexual harassment policy by engaging in
> unwelcome verbal and physical conduct of a sexual nature towards
> [Breaux that] created a hostile environment by being sufficiently
> pervasive that it interfered with her ability to do her job at TigerX.
> … From an objective standard, such conduct is unwelcome and hostile.
> It is also pervasive in that it lasted over the course of several months.

SUMF ¶57. Eardley did not find that Rowles' conduct was "severe" or that it was "objectively offensive," only that it was "pervasive." Scroggs brushed aside this deficiency in her appeal: "By noting that [Rowles's] conduct was hostile under an objective standard, the decision was indicating that it met the criterion of being objectively offensive." SUMF ¶70. Any regulation that permits such

9

linguistic shell games "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999).

**B.** **The definition of "stalking on the basis of sex" does not provide explicit standards for those who apply the rule and is based largely on the subjective feelings of the complaining student.**

The University defines "stalking on the basis of sex" as "following or engaging in a course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed." CRR 200.010.C.7.d. As noted above, there is no evidence that Breaux was ever in fear (reasonably or otherwise) for her safety. SUMF ¶¶44. Nor is there any evidence that she was "frightened" or "intimidated." SUMF ¶45. Therefore, in order to have violated this rule, Rowles must have engaged in "a *course of conduct on the basis of sex* with *no legitimate purpose* that … would cause a reasonable person under the circumstances to be … *emotionally distressed*." CRR 200.010.C.7.d (emphasis added). As with the definition of sexual harassment, the University's definition of stalking on the basis of sex impermissibly vests the Title IX office with basic policy making authority to determine what courses of conduct have a "legitimate purpose" and what kind of reaction qualifies as "emotionally distressed."

Eardley could not identify any specific guidelines for determining whether a course of conduct has "no legitimate purpose"; she decides whether conduct has a "legitimate purpose" based on what "the university community would expect." SUMF ¶86. She testified that that standard for whether someone's course of conduct has a legitimate purpose is different for graduate and undergraduate students even though the CRRs themselves do not differentiate between kinds of students. SUMF ¶¶87-88. For Scroggs, an expression of romantic interest has no legitimate purpose *unless* the romantic interest is reciprocated by the audience of the expression. SUMF ¶89. In other words, for Scroggs the legitimacy of a suitor's purpose in asking someone out depends not on his

10

own feelings or intentions but on the feelings of the object of his affection. Hayes was even more equivocal, stating "I don't know that there is a definition specifically for legitimate. I think you can't dissect it by that individual word. I think you have to look at the sentence as a whole and the facts of the whole entire situation. I don't think that is a fair question." SUMF ¶90.  Unable explain how a student might determine whether he has a "legitimate purpose" in asking someone out on a date, Hayes suggested that the student contact the Title IX Office. SUMF ¶91.  Even if a student took her advice, however, Hayes did not know whether that student would get the same answer from different members of her staff. SUMF ¶92.  These responses demonstrate that CRR 200.010.C.7 has "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)

Defendants were similarly at odds as to the term "emotionally distressed." Eardley testified it means "a state of emotional discomfort." SUMF ¶95.  Hayes testified it could mean "upset," "angry," "sad," "uncomfortable" or even "annoyed."  SUMF ¶94.  Scroggs testified that "emotional distressed" prong "could just be more of amplification of the fear and distress or the fear and intimidation so they -- they have emotional outbursts as a result of that." SUMF ¶96.  Such vague and inconsistent standards invite arbitrary and discriminatory enforcement. *See Coates v. City of Cincinnati*, 402 U.S. 611, 612 (1971) (holding an ordinance as void for vagueness where it prohibited "conduct...annoying to persons passing by").

The vagueness of "stalking on the basis of sex" in the CRRs is exacerbated by the lack of any mens rea or intent requirement. The Supreme Court has "long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979).  In *Colautti*, for example, the Supreme Court considered a Pennsylvania statute prohibiting abortion "if there is sufficient reason to believe that the fetus may be viable." *Id.* at 392.  Because the provision directing the physician to determine

11

whether the fetus is or may be viable had no scienter requirement, the Supreme Court concluded the statute was little more than "a trap for those who act in good faith." *Id.* at 395. In *Clary v. City of Cape Girardeau*, the court found a city noise ordinance lacking any mens rea requirement void for vagueness, noting that "it matters not whether the hooter, singer, or whistler intends to offend, only that a third-party, the victim, is annoyed or disturbed." 165 F. Supp. 3d 808, 822 (E.D. Mo. 2016) ("The fact that a person only violates the ordinance if his or her action evokes a particular response from a third party is especially problematic because of the ordinance's resulting chilling effect on core First Amendment speech."). Similarly, in *Stahl v. City of St. Louis, Mo.*, the Eighth Circuit invalidated an ordinance prohibiting expressive activity "if it has the consequence of obstructing traffic" because "violation of the ordinance does not hinge on the state of mind of the potential violator, but the reaction of third parties." 687 F.3d 1038, 1041 (8th Cir. 2012).

The University's definition of "stalking on the basis of sex" does not require any showing that the alleged stalker *intended* to frighten, intimidate, or cause emotional distress in his accuser. The rule prohibits any "course of conduct on the basis of sex with no legitimate purpose that … would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed" regardless of the speakers intent. CRR 200.010.C.7.d. *Cf. United States v. Shrader*, 675 F.3d 300, 311 (4th Cir. 2012) (rejecting vagueness challenge to a stalking statute in part because "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is prescribed"). The lack of mens rea requirement is especially problematic as applied to this case because Breaux told the Title IX Office that Rowles's conduct was "not necessarily malicious" and that he just didn't pick up on social cues. Defendants' conflicting testimony as to what conduct CRR 200.010.C.7.d prohibits and its lack of a scienter requirement—not to mention the absence of any evidence that Rowles ever intended to frighten, intimidate or distress Breaux—further supports a finding that this CRR is vague *as applied to Rowles*.

Case 2:17-cv-04250-BCW   Document 77   Filed 12/24/18   Page 38 of 41

**III. Rowles is entitled to judgment as a matter of law on Count VI because Defendants have not identified or produced any evidence supporting a legitimate non-discriminatory reason why Plaintiff received substantially greater punishment than white students found responsible for sexual harassment and stalking on the basis of sex.**

A Title VI plaintiff must show: (1) the defendant receives federal funds; (2) the plaintiff was discriminated against; and (3) the plaintiff's race, color, or national origin motivated the discrimination. *Rodgers v. Univ. of Mo. Bd. of Curators*, 56 F. Supp. 3d 1037, 1047 (E.D. Mo. 2014) (citing *Thompson v. Bd. of the Special Sch. Dist. No. 1*, 144 F.3d 574, 581 (8th Cir. 1998). Curators admit receiving federal funds, SUMF ¶2, so Plaintiff need only show he was discriminated against on the basis of his race. Title VI claims are analyzed under the same burden-shifting analysis the Supreme Court applied to Title VII claims in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998) (noting Title VI and Title VII analysis are the same). "The first step in the *McDonnell Douglas* analysis is for the plaintiff to demonstrate a prima facie case of discrimination." *Goyal v. Univ. of Minnesota*, No. COV03-5484(JNE/FLE), 2005 WL 2290281, at *2 (D. Minn. July 22, 2005). "If the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* "If the defendant meets this burden, the final step is for the plaintiff to show that the proffered nondiscriminatory reason is pretextual." *Id.*

To establish a prima facie case of discrimination based on race, Plaintiff must show:

> [1] he is a member of a protected class, [2] he suffered an adverse action at the hands of defendants in pursuit of his education, [3] he was qualified to continue in pursuit of his education, and [4] he was treated differently from similarly situated students who were not members of his protected class.

*Ajiwoju v. Curators of Univ. of Missouri*, No. 06-1005-CV-W-FJG, 2009 WL 10705058, at *2 (W.D. Mo. Feb. 11, 2009), aff'd sub nom. *Ajiwoju v. Univ. of Missouri-Kansas City*, 363 F. App'x 420 (8th Cir. 2010). Rowles has satisfied the first three elements. He is an African-American man. SUMF ¶7. He

13

suffered an adverse action when he was suspended from all four campuses for two years and permanently banned from all residence halls and the student recreation center. SUMF ¶64. At the time of his suspension, Plaintiff was in an ongoing Ph.D. program. SUMF ¶8.

Plaintiff has also satisfied the fourth element—that he was treated differently from similarly situated students who were not members of his protected class. In discovery, Plaintiff asked Curators to identify each complaint of sexual harassment or stalking based on sex filed with the University's Title IX Office" during the same period as Rowles, and for each complaint, identify the CRR allegedly violated; the race of the accused; and the sanction imposed, if any. Curators identified 60 complaints during the period of August 2014 through March 2017. SUMF ¶97. Of those 60 complaints, only three students—Nos. 22, 24, and 53—were found responsible for both sexual harassment and stalking on the basis of sex. SUMF ¶98. Two of those students (Nos. 22 and 24) were white while the third was black. SUMF ¶99.

Plaintiff—the only black student found responsible for both sexual harassment and stalking on the basis of sex—was suspended from all four campuses for two years (reduced from the original sanction of four years), and banned for life from all residence halls and the student recreation center. SUMF ¶¶100-101. The two white students found responsible for both sexual harassment and stalking on the basis of sex received substantially lighter sanctions than Plaintiff. SUMF ¶102. Student No. 22 was not suspended at all; he was required to undergo counseling. SUMF ¶¶103-04. Student No. 24 was suspended for only six months, barred from residence halls (but not the student recreation center), and required to undergo counseling. SUMF ¶105. The difference between the sanctions imposed on Rowles and Student No. 24 is even more striking in that Student No. 24 was also found responsible for *non-consensual sexual contact, non-consensual sexual intercourse, and threatening or intimidating behaviors*. SUMF ¶106. In other words, Rowles—whose amorous speech was neither threatening nor malicious—was suspended *four times longer* than a white student who committed

14

*sexual assault*. Plaintiff has satisfied his burden to show he was treated differently from similarly situated students outside his protected class.

Once a plaintiff establishes his prima facie case for race discrimination under Title VI, the burden shifts to the Defendants to produce evidence of a legitimate non-discriminatory reason for Plaintiff's disparate treatment. *Goyal v. Univ. of Minnesota*, No. COV03-5484(JNE/FLE), 2005 WL 2290281, at *2 (D. Minn. July 22, 2005). Defendants have utterly failed to meet their burden in this case. They have not identified *any* legitimate non-discriminatory reason for disciplining Rowles so much more severely than the two similarly situated white students accused of violating the same rules, nor have they produced a scintilla of evidence to justify his disparate treatment. Defendants refused to produce any records regarding the complaints against Students Nos. 22 and 24, the investigations into those complaints, or the final decisions rendered by Title IX Office. In denying Rowles's motion to compel production of this information, this Court noted, "To the extent Plaintiff argues the requested production is necessary before he can assess whether the potential comparators are similarly-situated to Plaintiff, *Defendants represent they have produced what Plaintiff needs to make such an assessment*." Order Denying MTC [Docket No. 57] at 4-5 (emphasis added).

Defendants are unable to provide any of the circumstances surrounding the complaints of sexual harassment or stalking on the basis of sex against Students 22 and 24. SUMF ¶¶107-110. When questioned about the information *in her their interrogatory responses*, Hayes, Eardley, Scroggs, and Gallimore were unable to explain what the two white students found responsible for sexual harassment and stalking on the basis of sex had actually done or why they received more lenient sanctions than Rowles. SUMF ¶107-110. Having produced no evidence in discovery of any legitimate non-discriminatory reason for sanctioning Rowles far more harshly that the two white students found responsible for violating the same rules, Defendants' cannot meet their burden of production and Rowles is entitled to judgment as a matter of law on his Title VI claim.

15