IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| JEREMY A. ROWLES, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:17-CV-04250-BCW |
| | ) |
| THE CURATORS OF THE | ) |
| UNIVERSITY OF MISSOURI, *et al.*, | ) |
| Defendants, | ) |

## DEFENDANTS' JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

Defendants The Curators of the University of Missouri, Cathy Scroggs, Ellen Eardley, Salama Gallimore and Andrea Hayes, by and through counsel, and pursuant to Federal Rules of Civil Procedure 56 and Local Rule 56.1, hereby offer this joint statement of undisputed material facts in support of their respective motions for summary judgment.

### I. The Parties

**A. Defendants**

1. Defendant The Curators of the University of Missouri is the corporate body that operates the University of Missouri ("the University"), a public university system that includes the University of Missouri – Columbia. Mo. Const. art. IX, § 9(a)-(b); Mo. Rev. Stat. §§ 172.010, 172.020.

2. Defendant Cathy Scroggs ("Scroggs") was the Vice Chancellor for Student Affairs at the University for fifteen years prior to her retirement, and she previously worked at the University as the Director of Student Life, assistant to the Vice Chancellor for Student Affairs, and Director of Greek Life. (Ex. A, Scroggs' Deposition, p. 6, line 13 – p. 7, line 12.)

3. One of Scroggs' responsibilities as Vice Chancellor for Student Affairs was to consider appeals arising from the Title IX office. (Ex. A, Scroggs' Deposition, p. 8, lines 1-9.)

4. Defendant Ellen Eardley ("Eardley") was the Assistant Vice Chancellor for Civil Rights & Title IX and the Title IX Administrator at the University. (Ex. B, Eardley Deposition, p.9, lines 2-7.)

5. In her role as Title IX Administrator, Eardley was responsible for running the Office for Civil Rights and Title IX, overseeing the policies prohibiting all forms of discrimination, educating the campus about those policies and expectations, and engaging in efforts to prevent discrimination from occurring across campus. (Ex. B, Eardley Deposition, p. 9, lines 8-22.)

6. Defendant Salama Gallimore ("Gallimore") was hired by the University in August of 2014 to be the lead investigator for the Title IX office in order to investigate complaints of discrimination of students who were accused of violating the University's rules and regulations pertaining to harassment and discrimination and violence on the basis of sex. (Ex. C, Gallimore Deposition, p. 9, lines 11-17.)

7. In 2015, Gallimore was promoted to Director of Investigations for the Office of Civil Rights & Title IX and Deputy Title IX Coordinator. (Ex. C, Gallimore Deposition, p.9, line 18 - p.10, line 17.)

8. Defendant Andrea Hayes is the current Assistant Vice Chancellor for the Office of Civil Rights, Title IX and ADA at the University. (Ex. D, Hayes' Deposition, p. 6, lines 9-12.)

**B. Plaintiff**

9. Plaintiff, Jeremy A. Rowles, ("Plaintiff") was born on April 4, 1976. (Ex. E, Plaintiff's Deposition, p. 13, lines 11-12.)

10. In August of 2012, Plaintiff was accepted into the cultural anthropology master's

degree program at the University of Missouri -Columbia. (Ex. E, Plaintiff's Deposition, p. 37, line 18 – p. 38, line 2.)

11. From 2012-2014, Plaintiff was employed at Wilson's Fitness as an Instructor. (Ex. E, Plaintiff's deposition, p. 38, line 24 – p. 39, line 3.)

12. After a female employee of Wilson's Fitness complained about Plaintiff, he was asked to stop attending her classes. (Ex. E, Plaintiff's deposition, p. 40, line 10 – p.41, line 20.)

13. In February of 2013, the Wilson's instructor, DN, filed an application for a restraining order against Plaintiff in the Circuit Court of Boone County, Missouri. (Ex. E, Plaintiff's Deposition, p. 50, line 4 – p.52, line 17; Ex. F, Plaintiff's Response to Defendants' Request for Admissions, ¶1.)

14. Plaintiff admitted sending Facebook messages to DN that read:

> *Okay, I'm trying to not make it a habit of sending you a message that is slobbering over you after every workout you do ... but I can't resist today. ... you are so amazing to me. ... You are like a sun goddess. ... Just. Truly. Amazing!*
>
> *...I am addicted to the amazing being that is you, and yes, that addiction is leading me into doing irrational things...*
>
> *...I am attracted to you! I'm not going to go into detail about why I'm attracted to you (no slobber! LOL), but once I experienced the attraction it was overwhelming to me. I'm still trying to figure out why it was so overwhelming, if the attraction is THAT strong or if I'm just in an emotionally starving situation right now or something else, Regardless, it is an overwhelming attraction I have for you. ...And that is why I'm apologizing....I reread the messages I send you the past few weeks, and I'm just embarrassed and ashamed, those emails were so wrong and so lame*
> *... For the record, I am still attracted to you, but ...I won't let it bother you again.*

(Ex. F, Plaintiff's Response to Defendants' Request for Admissions, ¶2 and attached exhibits).

15. In Fall 2015, Plaintiff began working as a teaching assistant for an undergraduate

entry level anthropology course. (Ex. E, Plaintiff's Deposition, p. 108, lines 6-14.)

16. In September of 2015, Plaintiff met with a student, LW, offered to show her a copy of an upcoming exam for her anthropology course and told her not to "give [Plaintiff] money" or "do anything that's going to get [Plaintiff] in trouble" in return; and, afterwards, asked her to walk with him to Starbucks. (Ex. E, Plaintiff's Deposition, pgs. 111-117.)

17. After the meeting with Plaintiff, LW filed a complaint with the Title IX office. (Ex. E, Plaintiff's Deposition pg. 109-11.)

18. On October 12, 2015, Plaintiff received an email from Defendant Salama Gallimore, a Title IX investigator at that time, which included a Notice of Investigation alleging potential violations of CRR 600.020 which relates to "Sexual Discrimination, Sexual Harassment, and Sexual Misconduct in Education/Employment," a No Contact Directive, and copies of the University's Collected Rules and Regulations (CRR) Sections 600.020 and 600.040. (Ex. E, Plaintiff's Deposition p. 108-109.)

19. Plaintiff identified Salama Gallimore as an African-American. (Ex. E, Plaintiff's Deposition p. 251, lines 15-17.)

20. In November of 2015, an undergraduate female student at the University, HT, wrote to Plaintiff, "I always thought you were a good friend and I was thrown off and mad at you for suggesting we could be more. It was inappropriate and made me really uncomfortable." "Any time a female speaks to you or is nice to you, you try to get close to them or think hmm, maybe….It would be beneficial to you and all your relationships to maybe consider talking to someone or figuring out the underlying reason of why you do this to avoid situations like this in the future." (Ex. E, Plaintiff's deposition, p. 129, line 5 – p.130, line 9.)

21. On December 7, 2015, after HT "blocked" him on Facebook, Plaintiff sent her a message that read: "Playing it safe around you is obviously not the best thing for our friendship. I might as well throw caution to the wind." (Ex. E, Plaintiff's deposition, p. 152, lines 2-26 and p. 157, lines 12-17.)

22. Plaintiff wrote to HT.:

> *I've fallen for you. I cannot help but be attracted to you. ...Honestly when we first met, I honestly doubted I could be just friends with you. I knew of you, I saw you around the Rec. I remember seeing you on other people's Facebook and Instagram and I remember always thinking you are just stunningly beautiful, your hair, your eyes, your smile, my God. But it was when I actually talked to you at Lucky's when I saw how beautiful you are on the inside too. I actually debated whether I could actually be friends with you. You're just so attractive. When I see you, I melt inside. When I hear your voice, it sounds like the sweetest melody. You just saying "what's up," I'm not kidding. That brings a wave of pleasure that ripples through my body. ... You're a d\*\*\* near perfect package...I'm attracted to you [H.T.], I've always been. ...I want to pursue a relationship with you [H.T.] I want to be more. ...You kind of made it known that you don't want to be just friends with me when you blocked me, so I'm taking this change, hoping that you might be willing to be more than just friends…My hand is reaching out to you[HT]. A hand that offers a promise of warmth, joy, passion and care. Will you take my hand? Will you go out with me?"*

(Ex. E, Plaintiff's Deposition, p. 157, line 22 – p. 158, line 16 and p. 159, line 23 – p.160, line 8.)

23. HT responded: "I haven't given you signs to think I wanted this. I'm a little uncomfortable," and Plaintiff wrote in return: "I can't act right around you. It is not you, it is me. I don't want you to be uncomfortable. It's my fault." (Ex. E, Plaintiff's Deposition, p. 160, lines 17-19 and p. 161, lines 1-7.)

24. On December 29, 2015, Plaintiff received an email from Kenneth Dean, Senior Associate Provost for the University, in relation to LW's Title IX complaint. In his email, Mr. Dean informed Plaintiff that he had "direct[ed] the Equity Resolution Process to continue" and

that Plaintiff needed to select between and administrative resolution or a hearing panel resolution. (Ex. E, Plaintiff's Deposition, pg. 161-62)

25. On January 3, 2016, Plaintiff emailed Mr. Dean to inform him of his choice to proceed with the "administrative resolution process." (Ex. E, Plaintiff's Deposition, pg. 168-69.)

26. On March 9, 2016, Plaintiff received an email from Mr. Dean detailing his findings and his ultimate conclusion regarding LW's Title IX complaint. Plaintiff was informed that the "preponderance standard ha[d] not been met" and the "evidence [did] not make it more likely than not that a policy violation occurred." Mr. Dean, however, was "very clear" that while Plaintiff was not found guilty of the allegations, "[LW] was not unreasonable to have inferred… that [Plaintiff's] behavior indicated sexual favors were sought." Mr. Dean explained that he believed the Plaintiff's behavior, e.g. closing the door to his office and stating that he "did not want money," was "indicative of an internal recognition [of wrongdoing]," but not sufficient evidence that sexual favors were sought. (Ex. E, Plaintiff's Deposition, pg. 201-202.)

## II. Plaintiff's Title IX Investigation and Administrative Findings

27. In 2016, Plaintiff, who was forty (40) years old at the time, was a doctoral candidate in the cultural anthropology program at the University of Missouri-Columbia. (Ex. E, Plaintiff's Deposition, p. 38, lines 1-11 and p. 207, lines 18-22.)

28. During his time as a doctoral student, Plaintiff was a regular visitor of the Student Recreation Center at the University of Missouri- Columbia (the "Mizzou Rec"), often utilizing the facilities to work out and take dance fitness classes. (Plaintiff's Petition, ¶ 31.)

29. Plaintiff became friends with AB who was an undergraduate student at the University and also an instructor at Mizzou Rec. (Plaintiff's Petition, ¶ 32; Ex. E, Plaintiff's Deposition, p. 79, lines 8-10.)

30. Plaintiff thought AB was 21 or 22 years old. (Ex. E, Plaintiff's Deposition, p. 79, lines 17-22.)

31. Plaintiff sent a Facebook friend request to AB. (Ex. E, Plaintiff's Deposition, p. 80, lines 5-11.)

32. On April 15, 2016, Plaintiff commented on AB's Instagram photo that she was beautiful and "if this picture is the last thing I see, then I'll float to heaven a happy man." (Ex.E, Plaintiff's Deposition, p. 204, line 1 – p. 205, line 9.)

33. AB responded that she appreciates the feedback about her class and choreography, but the messages are getting "excessive," and their friendship needs to "remain in the professional setting." (Ex. E, Plaintiff's Deposition, p. 205, lines 10-20.)

34. Plaintiff apologized and stated he felt so bad that he caused her to be uncomfortable, that he would keep it "strictly friendly from here on out," and that he felt so bad for "making [her] upset." (Ex. E, Plaintiff's Deposition, p. 206, lines 5-12; Ex. G-1, Investigative Report, p. 24.)

35. In the fall, Plaintiff attended two or three fitness classes every week at Mizzou Rec where AB was an instructor, and noted AB was tense, nervous, would move across the room to avoid standing near him, and would leave quickly after class. (Ex. E, Plaintiff's Deposition, p. 210, lines 11-13; Ex. G-1, Investigative Report, p. 26-29, 33-34.)

36. After one class, Plaintiff left AB a note with a song name written on it ("The Scientist" by Coldplay) and a drink token to Kaldi's, where AB worked. (Ex. E, Plaintiff's Deposition, p. 213, lines 19-25; Ex. G-1, Investigative Report, p. 33, 94.)

37. In October of 2016, Plaintiff sent an email to AB stating his preference that AB be his instructor for private dance lessons. (Ex. E, Plaintiff's Deposition, p. 208, lines 14-24; Ex. G-1, Investigative Report, p. 94.)

38. He wrote in an email to AB, "I'm kind of frustrated about this as I'm eager to make this happen. I'm more than certain that I want to do the private lessons, especially with you as my instructor, as I feel that you can take me both where I want to go both physically and emotionally." (Ex. E, Plaintiff's Deposition, p. 209, lines 10-17.)

39. In October of 2016, after a class, Plaintiff handed AB a three page letter that he wrote to request that AB explain what she "would want from [him]." (Ex. E, Plaintiff's Deposition, p. 211, lines 10-25; Ex.G-1, Investigative Report, p.88-90 (Letter).)

40. He gave her this letter after she had requested that things remain professional. (Ex. E, Plaintiff's Deposition, p. 213, lines 13-18.)

41. He wrote to apologize and stated that he wanted to talk to her face-to-face but was "having difficulty moving [his] tongue around her" and that she was "paralyzing both [his] muscles and [his] mind." (Ex. E, Plaintiff's Deposition, p. 218, lines 8-15; Ex.G-1, Investigative Report, p.88.)

42. He wrote to AB that she was:

> *"the woman that I'm interested in, the woman who I am attracted to, the woman who I want to embrace with love, the woman who I want to bring joy and warmth into her life any way I can. You have been that woman and I'm realizing now, even through the walls I've built up, that you are still that woman to me. I've always been drawn to you. You are so magnetic."*

(Ex. E, Plaintiff's Deposition, p. 228, lines 1-7; Ex.G-1, Investigative Report, p.89.)

43. Plaintiff made the following statements in the letter to AB:
- You are like this immaculate fire angel to me
- You have this warming charm
- You fascinated me from the very beginning and it has only grown
- This deep whirlpool of emotion I sometimes see within you …pulls me into you the most

(Ex. E, Plaintiff's Deposition, p. 228, line 8 – 25; Ex.G-1, Investigative Report, p.89.)

44. He wrote to AB that his goal was to

*"be at a place with you where I can hold you in my arms, gaze in your eyes that glow golden when the light strikes them, emotionally dance to the song that is your voice and marvel at your smile knowing that I was a reason why you are smiling. That is my goal and I do know that you are the only one I want to reach that goal with. You are the only one I want, [AB]. Only you."*

(Ex. E, Plaintiff's Deposition, p. 230, lines 4-13; Ex.G-1, Investigative Report, p.90.)

45. Plaintiff expected that the letter could make AB feel uncomfortable. (Ex. E, Plaintiff's Deposition, p. 231, lines 9-11.)

46. Plaintiff thought that the way he was feeling had a possibility of making AB uncomfortable as well. (Ex. E, Plaintiff's Deposition, p. 231, lines 12-13.)

47. Plaintiff knew that AB was already in emotional distress by interacting with him and just him being present was "obviously distressing her" because she was running away when he would approach. (Ex. E, Plaintiff's Deposition, p. 232, line 25 – p. 233, line 11; Ex. G-1, p.33-34.)

48. Plaintiff stated that they were "already uncomfortable" and it could not be "any worse." (Ex. E, Plaintiff's Deposition, p. 234, lines 3-7.)

49. Plaintiff admitted that his actions made AB uncomfortable and emotionally distressed. (Ex. E, Plaintiff's Deposition, p. 235, line 21 – p. 236, line 1.)

50. In November of 2016, on behalf of several female students, including AB, the Mizzou Rec Associate Director filed a complaint with the University's Office for Civil Rights and Title IX alleging Plaintiff's Facebook messages, looks/staring in class, and date requests were causing the female students to feel uncomfortable, which led to an investigation into Plaintiff's potential violation of University policies prohibiting discrimination on the basis of sex. (Ex. G, Affidavit and G-1, Investigative Report, p.91-93.)

51. AB filed a formal complaint against Plaintiff with the Office for Civil Rights and Title IX, and reported that Plaintiff's Facebook messages to her complimented her on the way her body moved and contained "inappropriately intimate comments" and that his conduct toward her at the Mizzou Rec was bizarre, delusional, made her extremely uncomfortable, and caused her to take measures to avoid him after class such as hiding in the bathroom. (Ex. G-1, Investigative Report, p.6-9; 94-95.)

52. On November 7, 2016, Plaintiff received an Interim Suspension letter from Defendant Eardley, informing him that his access to the Mizzou Rec had been temporarily suspended in conjunction with a Title IX investigation against him, and that Plaintiff should refrain from visiting Mizzou Rec or interacting with its staff members. (Ex. E, Plaintiff's Deposition, pgs. 237-38; Ex. G-1, Investigation Report, p. 96-97.)

53. Defendant Gallimore did not have a role in the investigation of AB's complaint. (Ex. C, Gallimore Deposition, p. 67, line 18 – p. 68, line 5.)

54. On November 7, 2016, the Title IX Investigator, Amber Lammers, sent Plaintiff an email containing a Notice of Investigation, advising him of his rights and that he was going to be investigated for potential violations of the University's prohibition against "sexual harassment" and "stalking on the basis of sex" defined as

> **Sexual Harassment.** Sexual harassment is defined as:
> a. Unwelcome sexual advances or request or sexual activity by a person or persons in a position of power or authority to another person, or
> b. Other unwelcome verbal or physical conduct of a sexual nature by a person or another person when:
>    1) Submission to or rejection of such conduct is used explicitly or implicitly as a condition for academic or employment decisions; or
>    2) Such conduct creates a hostile environment by being sufficiently severe or pervasive and objectively offensive that it interferes with, limits or denies the ability of an individual to participate in or benefit from education programs or activities or employment access, benefits or opportunities.

> **Stalking on the Basis of Sex.** Stalking on the basis of sex is following or engaging in a course of conduct on the basis of sex with no legitimate purpose that makes another person reasonably concerned for their safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed.

(Ex. E, Plaintiff's Deposition, pgs. 238, lines 18-25 and attached deposition exhibit #25; Ex. G-1, Investigation Report, p. 98-100.)

55. Plaintiff understood that he could have an advisor through the Title IX process and he did not have an advisor. (Ex. E, Plaintiff's Deposition, p. 243, lines 8-12.)

56. After the Notice of Investigation is sent to the parties, there is an investigation that includes talking to witnesses, collecting documentary evidence and preparing an investigation report. (Ex. B, Eardley Deposition, p. 18, line 23-p.19, line 18.)

57. Witnesses interviewed by Ms. Lammers personally observed Plaintiff watching AB, standing in front of her during class, waiting for her after class and leaving notes for her. The witnesses observed that AB would move to the other side of the room or run to the bathroom to avoid confrontations with Plaintiff and that AB did not feel comfortable teaching. One witness described his behavior as intimidating and stated that multiple instructors have been uncomfortable. (Ex. G-1, Investigative Report, p. 49-53.)

58. In student matters, the Title IX Administrator will determine if there is sufficient evidence to move forward with a Notice of Charges. (Ex. B, Eardley Deposition, p. 19, line 19 – p.20, line 17; Ex. G-1, Investigation Report, p. 103-106.)

59. On December 13, 2016, Plaintiff received an email from Ms. Eardley informing him that the Title IX case against him would proceed and that he had three business days to select either Informal or Formal Resolution process. (Ex. E, Plaintiff's Deposition, pg. 245, lines 7-15.)

60. For the decisional phase, the parties may choose between informal resolution by the administrator, or resolution by a hearing panel. (Ex. B, Eardley Deposition, p. 21, lines 13-24.)

61. If the parties do not agree on informal or administrative resolution, then the default process is a hearing panel. (Ex. D, Hayes' Deposition, p. 33, lines 3-6.)

62. On February 24, 2017, Plaintiff received an email from Ms. Eardley informing him that the investigation against him was coming to a close, that she would begin her review of the Investigative Report, and that this was Plaintiff's last opportunity to request a hearing panel. (Ex. E, Plaintiff's Deposition, p. 252, lines 16-21.)

63. On February 28, 2017, Plaintiff received an email from Ms. Lammers providing him with the Investigative Report, which included 38 pages of information from Plaintiff, and the accompanying exhibits, and reminding him that he still had until the following day to request a Formal Resolution process. (Ex. E, Plaintiff's Deposition p. 254, lines 8-16; Ex. G-1, Investigative Report, p.9-47.)

64. Plaintiff wrote back to Ms. Lammers informing her that he had decided to "stick to the informal resolution option," and would be meeting with Student Legal Services to receive legal advice and would meet with Eardley the next day. (Ex. E, Plaintiff's Deposition, pgs. 254, lines 17-25.)

65. Before making a decision, Defendant Eardley would review the investigative report and meet with the parties if they chose to meet with her. (Ex. B, Eardley Deposition, p 23, line 16 – p.24, line 11.)

66. The standard of proof in determining whether a policy violation has occurred is a preponderance of the evidence. (Ex. B, Eardley Deposition, p. 47, lines 5-18.)

67. If Eardley made a determination that a policy had been violated, then she was guided by the University's Collected Rules that set forth the types of information to consider in issuing the sanction, including the nature, severity of and circumstances surrounding the violation, the disciplinary history of the accused, any other information deemed relevant [by the decision maker], the need for sanctions/remedial actions to bring an end to the discrimination, harassment and/or retaliation, the need for sanctions/remedial actions to prevent the future recurrence of discrimination, and the harassment or retaliation, and the need to remedy the effects of the discrimination, harassment and/or retaliation on the Complainant and the University community. (Ex. B, Eardley Deposition, p. 27, lines 14-19 and attached deposition exhibit #5, Equity Resolution Process p.8-9.)

68. In her Findings, Eardley wrote, "[AB] stated that the accumulation of these incidents made her feel uncomfortable and interfered with her ability to focus on work at the rec center. In addition, the Office of Civil Rights and Title Ix received reports about your interactions of a similar nature with multiple other female rec center employees…" (Ex. B, Eardley Deposition, p.95, lines 11-18.)

69. Eardley viewed the overall allegations regarding Plaintiff as threatening. (Ex. B, Eardley Deposition, p.96, lines 3-7.)

70. The Findings reflect that Plaintiff "sent about 30 Facebook messages to AB between March 2, 2016 and April 18, 201 which increasing frequency. In a number of messages, JR addressed AB as 'Silky' instead of her name." (Ex. B, Eardley Deposition, p. 107, lines 13-17 and attached deposition exhibit #7, Informal Resolution Findings by the Administrative Officer.)

71. The Findings reflect that "according to AB, he would stare at her, try to stand in front of her during instruction, grab her hand during a classroom high-five and linger after class to say

something to her, all of which made her uncomfortable and was distressing to her…"(Ex. B, Eardley Deposition, p. 109, lines 18-23, and attached deposition exhibit #7, Informal Resolution Findings by the Administrative Officer.)

72. Eardley thought that AB generally felt intimidated or unsafe. (Ex. B, Eardley Deposition, p. 109, line 24 – page 10, line 2, and attached deposition exhibit #7, Informal Resolution Findings by the Administrative Officer.)

73. Eardley made a determination whether a reasonable person, under the circumstances, was frightened, intimidated or emotionally distressed. (Ex. B, Eardley Deposition, p. 112, lines 4-10.)

74. She would use a reasonable definition of emotional distress, or the dictionary. (Ex. B, Eardley Deposition, p. 112, lines 11-16.)

75. Eardley found by a preponderance of the evidence that Plaintiff "violated the sexual harassment policy by engaging in unwelcome verbal and physical conduct of a sexual nature toward AB, and that it created a hostile environment by being sufficiently pervasive that it interfered with her ability to do her job at Tiger X" and "that the same conduct violated the policy prohibiting stalking on the basis of sex. JR's actions from March 2016 through October 2016 constitute a course of conduct towards AB that would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed." (Ex. B, Eardley Deposition, p. 115, line 18 – p. 118, line 3.)

76. Eardley found that from an objective standard, [Plaintiff's] conduct was unwelcome and hostile. (Ex. B, Eardley Deposition, p. 116, lines 14-16.)

77. Eardley found that Plaintiff's October 2016 Letter could be perceived as threatening in the context of things and that the letter was against the boundaries that AB had established. (Ex. B, Eardley Deposition, p. 141, line 23 – p. 142, line 18.)

78. Eardley did not look at the letter separate from everything. She looked at the totality of the circumstances so it was one piece of the course of conduct that Plaintiff engaged in. (Ex. B, Eardley Deposition, p. 142, line 19 – p. 143, line 3.)

79. Eardley found a four-year suspension to be appropriate based on the nature and circumstances surrounding the violation, Mr. Rowles' disciplinary history, as well as the need to prevent future recurrences of violations as well as other information she deemed relevant, including that the actions he was being held responsible for with regard to AB were supported by witnesses. (Ex. B, Eardley Deposition, p. 127, line 22 – p. 128, line 14.

80. On March 15, 2017, Plaintiff was informed that he had been found responsible for violating University Policy. (Ex. E, Plaintiff's Deposition, p. 257, lines 7-12.)

### III. Plaintiff's Appeal

81. On March 24, 2017, Plaintiff submitted an appeal to Defendant Scroggs via his attorney, Joanna Trachtenberg. (Ex. E, Plaintiff's Deposition, p. 260, lines 4-12.)

82. University policy provides three grounds for appeal: 1) a procedural error that significantly impacted the outcome of the resolution; 2) new evidence unavailable during the original hearing, and 3) the sanctions fell outside the range typically imposed for the offense or for the cumulative conduct record of the accused. (Ex. A, Scroggs' Deposition, p. 14, lines 2-12.)

83. Plaintiff's appeal states that it is "based on the grounds that the imposed sanctions fall outside the range typically imposed for this offense or for the cumulative conduct record of

00207454-1                                15

Case 2:17-cv-04250-BCW   Document 78   Filed 12/24/18   Page 15 of 17

the accused." (Ex. A, Scroggs' Deposition, p.70, lines 4-17 and attached deposition exhibit #10, Appeal.)

84.  The appellate officer determines if a sanction is outside the range typically imposed. (Ex. B, Eardley Deposition, p. 60, lines 16-21.)

85.  AB provided a response to Plaintiff's appeal stating that she believed the sanctions were both appropriate and reasonable and she wrote:

> …Although I used the word "uncomfortable" instead of "intimidated," my testimony implied that I was in fact intimidated by Mr. Rowles actions and behaviors. His close presence and constant staring at my body during my classes was so unsettling and overwhelming that I would attempt to move positions or leave class early to avoid any interaction with Mr. Rowles. His unrelenting pursuit of my attention and romantic interest was intimidating. Though he did not explicitly threaten me by his actions, his behavior made clear that he was obsessed and delusional, and I consequently did not feel safe around him. Furthermore, during this process and since the decision, I have lived in fear that Mr. Rowles would retaliate against me. Given his emotional instability and investment in winning my interest, I have no assurance that he would not react violently.

(Ex. A, Scroggs' Deposition, p. 73, lines 11-16, and attached deposition exhibit #11, AB email.)

86.  Scroggs reviewed the Investigative Report and the Findings. (Ex. A, Scroggs' Deposition, p. 10, line 18 – p.11, line 5.)

87.  Plaintiff's interactions with AB occurred in four places: at Kaldi's Coffee, in cyberspace, at the Mizzou Rec and at the University women's center. (Ex. A, Scroggs' Deposition, p. 90, lines 15-22.)

88.  Scroggs believes that AB was afraid of Plaintiff, that the impact of his behavior changed how AB did her work and how she had experiences on the campus, and that he was a danger to her. (Ex. A, Scroggs' Deposition, p. 26, lines 4-24.)

89. Scroggs reduced Plaintiff's suspension to from four years to two years explaining that two years allows for remediation, and allows for AB to no longer be on campus. (Ex. A, Scroggs' Deposition, p. 89, line 8 – p.90, line 5.)

90. On April 18, 2017, Plaintiff received a letter from Scroggs detailing her final decision to uphold the Title IX Office's conclusion that Plaintiff's actions violated the University policy, but to modify his sanction from a four (4) to a two (2) year suspension, which will conclude at the end of the summer of 2019. (Ex. A, Scroggs' Deposition, p. 89, lines 8-21 and attached deposition exhibit #12, Appellate Decision.)

Respectfully submitted,

Office of the General Counsel
Stephen J. Owens, General Counsel

*/s/ Emily W. Little*
Emily W. Little, Mo. Bar 49929
littleew@umsystem.edu

*/s/ Antwaun Smith*
Antwaun Smith, Mo. Bar 59851
smithantw@umsystem.edu

227 University Hall
Columbia, Missouri 65211
(573)882-3211(telephone)
(573)882-0050 (facsimile)

**Attorneys for Defendants**

# CERTIFICATE OF SERVICE

I certify on that December 24, 2018, I served this document upon all attorneys of record through the Court's electronic filing system.

*/s/ Emily W. Little*