IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JEREMY A. ROWLES, )
    Plaintiff, )
        )
v. ) Case No. 2:17-CV-04250-BCW
        )
THE CURATORS OF THE )
UNIVERSITY OF MISSOURI, *et al.*, )
    Defendants, )

DEFENDANT THE CURATORS OF THE UNIVERSITY OF MISSOURI'S SUGGESTIONS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................................... ii

    I.    Introduction and Summary of Argument ............................................................... 1

    II.    Factual Background ................................................................................................ 1

    III.    Legal Standard ........................................................................................................ 5

    IV.    Argument ................................................................................................................ 5

        A.    Plaintiff can neither establish direct evidence of intentional discrimination by the University, nor show that the legitimate, non-discriminatory reasons for his sanction are pre-text for racial discrimination. ................................................................................................ 5

            i.    Plaintiff fails to present direct evidence of racial discrimination. ................................ 6

            ii.    Plaintiff cannot demonstrate, under the *McDonnell Douglas* framework that the legitimate reasons for the University's decision were pre-text for discrimination. .............. 9

        B.    Defendant is entitled to summary judgment on the punitive damages claim. ............. 11

CONCLUSION ............................................................................................................................ 12

TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ................................................................................ 6
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 5
*Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007) .................................................. 12
*Carter v. St. Louis Univ.*, 167 F.3d 398 (8th Cir. 1999) ............................................................... 10
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 5
*McCullough v. Univ. of Arkansas*, 559 F.3d 855 (8th Cir. 2009) .................................................. 6
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ........................................................... 6
*Quinn v. St. Louis County*, 653 F.3d 745 (8th Cir. 2011) ............................................................. 5
*Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328 (8th Cir. 1996) ........................................ 10
*Russell v. City of Kansas City, Mo.*, 414 F.3d 863 (8th Cir. 2005) ............................................... 6
*Scarlett v. School of Ozarks, Inc.*, 780 F. Supp. 2d 924 (W.D. Mo. 2011) .................................... 8
*Thompson v. Bd. Of Spec. Sch. Dist. No. 1*, 144 F.3d 574 (8th Cir. 1998) .................................... 6

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................................... 5

## I. Introduction and Summary of Argument

Plaintiff, Jeremy A. Rowles, filed a petition against Defendant, The Curators of the University of Missouri, alleging race-based discrimination (Count VI) for the sanctions imposed against him by the University's Title IX Office. However, the Title IX case against the Plaintiff was supported by substantial evidence, including a robust investigative file that articulated a variety of legitimate, nondiscriminatory reasons for the investigation and sanctions imposed against him. Because Plaintiff cannot provide satisfactory evidence to support his claim against Defendant, and there does not exist a dispute of any material facts, this Court should grant summary judgment in favor of Defendant, against Plaintiff.

## II. Factual Background

In 2016, Plaintiff was a 40-year-old cultural anthropology doctoral candidate at the University, which is operated by Defendant Curators. Defendants' SOF ¶¶ 1, 9, 27. On October 14, 2016, the Office for Civil Rights and Title IX received a complaint from the Mizzou Rec center regarding Plaintiff's contact with four female students, including sending Facebook messages, staring at them in class, and requesting dates, that were causing the female students to feel uncomfortable. Defendants' SOF ¶¶ 4-5, 28, 50. One of the students, "AB,"[1] filed a formal complaint regarding Plaintiff's conduct. Defendants' SOF ¶51. Plaintiff sent her messages on social media commenting on "the way her body moved" and making "other inappropriately intimate comments. *Id.* She declined Plaintiff's offer to go on a date, but he kept messaging her "incessantly." She told him to stop messaging and that she wanted the relationship to be "strictly

---

[1] In the interest of protecting their privacy, Defendants will refer to students (aside from Plaintiff) by their initials.

professional" because he was making her uncomfortable. *Id*. Disregarding this request by AB, in the fall of 2016, Plaintiff:

- Attended the weekly fitness classes that AB taught and stared at her during class;

- Waited after class to try to speak to her;

- Stood near her to give her high fives and intimately clasp his hands around hers;

- Left her a note with the name of a song written on it and a drink token to the coffee shop where she worked;

- Emailed her about giving him private dance lessons because he felt she could take him where he "want[s] to go both physically and emotionally;" and

- Gave AB a three page letter stating that she was the only woman he was attracted to, wanted to "embrace with love," and was "always drawn to" and he wrote that his goal was to: *"be at a place with you where I can hold you in my arms, gaze in your eyes that glow golden when the light strikes them, emotionally dance to the song that is your voice and marvel at your smile knowing that I was a reason why you are smiling. That is my goal and I do know that you are the only one I want to reach that goal with. You are the only one I want, [AB]. Only you."*

Defendants' SOF, ¶¶ 29-44.

AB reported that Plaintiff's conduct was inappropriate, bizarre, and delusional, made her extremely uncomfortable, and caused her to take measures to avoid him after class such as hiding in the bathroom. Defendants' SOF, ¶ 51. Third party witnesses observed Plaintiff watching AB, standing in front of her during class, waiting for her after class and leaving notes for her. Defendants' SOF, ¶ 57. The witnesses observed that AB would move to the other side of the room, or run to the bathroom to avoid confrontations with Plaintiff and that AB did not feel comfortable teaching. *Id*. One witness described Plaintiff's behavior as intimidating and stated that multiple instructors have been uncomfortable. *Id*.

Plaintiff admitted that his actions made AB uncomfortable and emotionally distressed and that she would run away when he would approach. Defendants' SOF ¶¶45-49. He acknowledged

2

that his comments on her appearance made her uncomfortable and upset. *Id*. at ¶34. When he saw AB at Mizzou Rec, he noticed that she was tense, nervous, would move across the room to avoid standing near him and would leave quickly after class. *Id*. at ¶35. Furthermore, Plaintiff had prior knowledge that the type of conduct he was exhibiting toward AB made women feel uncomfortable and unsafe. *Id*. at ¶¶11-14, 20-23.

The Office for Civil Rights and Title IX provided Plaintiff with a notice that he would be investigated for potential violations of the University policies prohibiting "sexual harassment" and "stalking on the basis of sex." Defendants' SOF ¶54. Plaintiff was advised of the allegations and his rights during the process, including the right to have an advisor, which he chose not to have. Defendants' SOF ¶52, 54-55. Plaintiff had the right to choose between an informal resolution process, where Ms. Eardley would determine if he had violated the policies, or the formal process, where a hearing panel would decide. He chose informal resolution. Defendants' SOF ¶¶ 58-64.

Plaintiff was familiar with the process for conducting Title IX investigations because he had a prior complaint against him in 2015 alleging that, in his role as a Teaching Assistant, he had offered to show a female undergraduate student, LW, the answers to a test in exchange for sexual favors. Defendants' SOF ¶¶ 10, 15-17, 24-25. At the conclusion of the informal resolution process, Plaintiff was advised that LW's inferences were not unreasonable based on his behavior, but he was found not to have violated University policy. Defendants' SOF ¶ 26. Defendant Salama Gallimore, who Plaintiff identified as an African- American, was the investigator in the first Title IX investigation, but she was not the investigator, decision-maker, or appellate officer for the second investigation. Defendants' SOF ¶¶ 3, 4, 6, 7, 18, 19, 53, 54, 62, 65-90.

The Investigator for the second investigation was Amber Lammers, who spoke to Plaintiff, AB, and multiple witnesses, collected documentary evidence and prepared an investigative report.

3

Defendants' SOF ¶ 50, 54, 56, 57, 63. The final Investigative Report was 55 pages and included 38 pages of information from Plaintiff. Defendants' SOF ¶ 50, 63. After reviewing the Investigative Report and meeting with Plaintiff in person, Defendant Eardley issued her Findings. Defendants' SOF ¶¶ 64-65.

Eardley found that the preponderance of the evidence established that Plaintiff was responsible for policy violations. Defendants' SOF ¶¶ 66-78. In her Findings, Eardley concluded that "[f]rom an objective standard, [Plaintiff's] conduct is unwelcome and hostile. It is also pervasive in that it lasted over the course of several months." *Id*. She also concluded that Plaintiff's actions toward AB between March and October 2016 "constitute[d] a course of conduct . . . that would cause a reasonable person to be frightened, intimidated, or emotionally distressed." *Id*. Accordingly, Eardley found Plaintiff responsible for violating university policy against sexual harassment and stalking. *Id*. In determining that a four year suspension was an appropriate sanction, Eardley was guided by the factors set forth in the University's policy, which included "the nature and circumstances surrounding the violation, [Plaintiff's] disciplinary history, and the need to prevent future recurrence of violations." Defendants' SOF ¶¶ 67, 79.

After receiving the Findings, Plaintiff through his attorney and pursuant to University policy, appealed Eardley's decision to Defendant Cathy Scroggs, the Vice Chancellor of Student Affairs. Defendants' SOF ¶¶ 2, 3, 80-82. Plaintiff's appeal was based on the grounds that "the imposed sanctions fall outside the range typically imposed for this offense or for the cumulative conduct record of the accused." *Id*. ¶¶ 83-84. AB provided a response to Plaintiff's appeal, stating that she believed the sanctions were both appropriate and reasonable, that she did not feel safe around him and that she lived in fear that he would retaliate against her. *Id*. ¶ 85. Defendant Scroggs reviewing the Investigative Report and Findings. *Id*. ¶86. She noted that Plaintiff's

interactions with AB occurred in at least two locations on campus. *Id*. ¶ 87. She believed that AB was afraid of Plaintiff, that the impact of his behavior changed how AB did her work and how she had experiences on the campus, and that he was a danger to her. *Id*. ¶88. Scroggs, however, reduced the length of the suspension to two years, explaining that length of time would allow for remediation, and allow for AB to no longer be on campus. *Id*. ¶89. Plaintiff's suspension concludes at the end of the summer semester 2019. *Id*. ¶90.

### III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact, including by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). Once the moving party meets this step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### IV. Argument
### A. Plaintiff can neither establish direct evidence of intentional discrimination by the University, nor show that the legitimate, non-discriminatory reasons for his sanction are pre-text for racial discrimination.

A prima facie claim for race discrimination under Title VI requires a plaintiff to show (1) that the defendant is a recipient of federal funds, (2) that the defendant discriminated against the plaintiff, and (3) that the discrimination was motivated by his or her race, color, or national origin.

5

*See Thompson v. Bd. Of Spec. Sch. Dist. No. 1*, 144 F.3d 574, 581 (8th Cir. 1998). A plaintiff may show direct evidence of intentional discrimination with "evidence showing a specific link between [] alleged discriminatory animus and the challenged decision," allowing a reasonable fact-finder to determine that "an illegitimate criterion ultimately motivated" the actions of the state actor. *Russell v. City of Kansas City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005).

Where no direct evidence of discrimination exists, a plaintiff may rely upon the burden-shifting framework from *McDonnell Douglas Corp.*, first establishing the prima facie elements of his or her Title VI claim and then tasking the defense with "articulat[ing] some legitimate, non-discriminatory reason for its actions." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant is able to respond with a legitimate reason for its decisions, the plaintiff must then show that this explanation is, in fact, simply pre-text for racial discrimination. *Id.* at 804. Proof of disparate impact, however, would <u>not</u> be sufficient to support an individual's Title VI race discrimination claim. *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). While individual plaintiffs may sue for claims of intentional discrimination, the Supreme Court has been clear that a private right of action to enforce Title VI regulation via a disparate impact claim does not exist. *Id.* at 293.

      **i.**      **Plaintiff fails to present direct evidence of racial discrimination.**

The Plaintiff's allegations against the University are devoid of any direct evidence that the Title IX investigation and sanction against him were the consequences of racial discrimination. Such evidence typically comes in the form of "remarks by decision makers that reflect… discriminatory bias." *McCullough v. Univ. of Arkansas*, 559 F.3d 855, 861 (8th Cir. 2009). In support of his racial discrimination claim, Plaintiff asserts that Ms. Gallimore referred to his appearance as being that of "someone who might commit sexual assault." Plaintiff's Petition, ¶

6

232. He also alleges "[o]n information and belief" that Ms. Gallimore's comments were "motivated by his race and the race of the complainant." Plaintiff's Petition, ¶ 233. It is important to note, however, that Ms. Gallimore did not have any role in the investigation of AB's complaint, the Title IX complaint process that led to the sanctions at issue in this lawsuit. SOF ¶ 53. Additionally, the only University employee Plaintiff accuses of racial discrimination – Ms. Gallimore – is African-American herself. SOF ¶ 19.

Even if Ms. Gallimore's alleged comment (in a prior case) were relevant to the Title IX action at issue in this lawsuit, her alleged comment does not make any reference to Plaintiff's race or reveal an opinion that reflects any racial bias. Ms. Gallimore's statement that Plaintiff "look[ed] like someone who might commit sexual assault" very reasonably could be in reference to Plaintiff's physical stature, attire, or even mannerism, none of which reflect biased consideration of his race. Plaintiff does not provide additional facts or details about her comments that would demonstrate that they were made in reference to Plaintiff's race. Ms. Gallimore also did not make any comments that identified the complainant in the first investigation by her race or indicated that the complainant's race was a factor in the investigation.

Further, Plaintiff fails to make a single allegation regarding conduct or rhetoric by Ms. Lammers or Ms. Eardley that demonstrate that race played a role in their respective investigation and adjudication of his case. While he asserts that the "circumstances" surrounding his suspension gave rise to his "inference that the University discriminated against him on the basis of race," he fails to explain what specific circumstances he is referring to, or how those circumstances gave rise to such an inflammatory inference.

Direct evidence of racial discrimination would need to provide a "specific link" between the racially discriminatory animus of those involved in his Title IX case and the subsequent

7

decision to suspend Plaintiff from the University. These would be facts of conduct or statements that "*without inference* evidence[] a discriminatory bias." *Scarlett v. School of Ozarks, Inc.*, 780 F. Supp. 2d 924, 932 (W.D. Mo. 2011) (emphasis added). Such evidence would not arise from the circumstances surrounding his case, but instead from conduct by the state actors that reflects discriminatory animus that motivated their actions and decisions. Asserting that the circumstances of his investigation gave rise to an "inference" of discrimination is not direct evidence that would allow a reasonable jury to determine whether the Plaintiff's sanction was the result of racially biased state actors.

Plaintiff also does not allege facts showing the existence of racially discriminatory animus on the part of Ms. Gallimore, Ms. Eardley, Ms. Lammers, or Ms. Scroggs, nor does he provide evidence that shows the potential for discriminatory animus to exist. Plaintiff instead asserts that "racial and gender stereotypes about African-American men" played a "substantial[]" role in the outcome of his case without articulating the impetus for this belief. Plaintiff's Petition, ¶125-33. He in turn draws conclusions regarding the role that these stereotypes *may* have played in the decision-making of Ms. Eardley and Ms. Gallimore without indicating what either party said or did to reflect a propensity to racially stereotype Plaintiff. Plaintiff's Petition, ¶126-33. He alleges that these stereotypes caused the Defendants to, in essence, disbelieve the asserted innocent motivations behind Plaintiff's conduct and presume the worst of him. *Id.* Yet, he does not provide specific facts about experience with the Defendant that would give legitimacy to these conclusions. Speculative assumptions such as these do not demonstrate how or why the sanctions imposed against him were the result of "illegitimate criterion" such as racial stereotypes. Plaintiff cannot present any direct facts that would allow a reasonable fact-finder to conclude that anyone involved

in his Title IX case improperly considered his race at any point during it resolution. As a result, Plaintiff is unable to provide direct evidence of discrimination to support this claim.

> ii. **Plaintiff cannot demonstrate, under the *McDonnell Douglas* framework that the legitimate reasons for the University's decision were pre-text for discrimination.**

The Title IX Office's investigation into plaintiff, and the sanctions imposed, reflect a thorough examination into several months of conduct by Plaintiff with several different individuals. Defendant's SOF ¶ 50. The investigation into Plaintiff was initiated by an email correspondence from Emily Bach McElwaine, Mizzou Rec Associate Director, which stated that some of her female staff members had complained to her about Plaintiff's conduct towards them. *Id*. The complainant, AB, would subsequently file a formal complaint with the Title IX Office against Plaintiff. *Id.* at ¶ 51. It was upon these grounds that the Title IX investigation into Plaintiff would be undertaken. There is no evidence, nor does Plaintiff allege, that anyone within the Title IX Office was instrumental in targeting the investigation against Plaintiff or encouraging AB to pursue her complaint against him, indicating that the discriminatory bias alleged by Plaintiff could not have played a significant role in the decision to move forward with this investigation.

The sanctions levied against Plaintiff were supported by legitimate evidence of University policy violations that justified the University's final decision to suspend him. Plaintiff does not allege conduct by Defendant (or any of its employees) that demonstrates that the investigation into his behavior was tainted by discriminatory intent or bias against him.

Specifically, the information provided demonstrated the persistent, extended, and unwelcome nature of Plaintiff's interactions with AB. After AB communicated to Plaintiff her desire to maintain professionalism in their relationship, and that he bring an end to his romantic pursuit of her, he continued to express his feelings towards her, culminating in his three-page letter

to her. Defendant's SOF ¶ 33-46. The decision to sanction Plaintiff was not based simply upon his desire to take AB on a date, but reflected the totality of circumstances surrounding his several months long unwelcome pursuit (*Id.* at ¶ 68-78), even as he acknowledged that he was "obviously distressing her" (*Id.* at ¶¶ 47-49).

With the legitimate, nondiscriminatory reasons for the Title IX investigation and sanctions presented above, the burden rests upon Plaintiff to demonstrate that these reasons are simply pretext for the racial discrimination that he alleges. Proving this aspect of the *McDonnell Douglas* framework is "really a two-part showing" that requires the Plaintiff to establish that "the [defendant's] proffered reason is pretextual and that the [defendant] discriminated against the plaintiff." *Carter v. St. Louis Univ.*, 167 F.3d 398, 401 (8th Cir. 1999). Surviving summary judgment would therefore require Plaintiff to provide evidence that, when considered as a whole, "(1) creates a fact issue as to whether the [University's] proffered reasons are pretextual and (2) creates a reasonable inference that [race] was a determinative factor in the adverse employment decision." *Id.* (quoting *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1336-37 (8th Cir. 1996). When this very court determined in a 2011 case that summary judgment was not appropriate for a plaintiff's claim of race discrimination, it found that "a reasonable juror could find that [the defendant's] proffered explanations… [were] pretextual, and that his decisions were motivated by racial animus." *Scarlett*, 780 F.Supp.2d at 934. This court reasoned that the record before it would require the involvement of a jury to "hear the witnesses' testimony and make a credibility determination." *Id.*

In our case, however, there is a robust array of evidence and testimony regarding Plaintiff's conduct over several months that allowed the Title IX Office to reach its conclusions, and absolutely no evidence that racial animus or bias was present in its adjudication. Instead of

10

evidence of racial animus, Plaintiff's petition cites various newspaper and journal articles to allege the potential for discrimination in the University's Title IX Process. *See* Plaintiff's Petition, ¶ 100. While these articles speak to the potential for university's Title IX proceedings to become racially discriminatory in their outcomes, they discuss this phenomenon in general, and do not address what aspects of Plaintiff's specific case reflect a discriminatory resolution. There are also no issues of credibility regarding any of the evidence relied upon, nor does Plaintiff argue that he did not engage in any of the conduct alleged by AB or other Mizzou Rec staff members. Much of the conduct in question took place online in social media websites or through text messages, all of which are reproduced in the Defendants' exhibits. Plaintiff cannot argue that this extensive evidentiary foundation was simply pre-text to pursue racial discrimination because such an argument would seem to indicate that the evidence is illegitimate or fabricated, a claim that he does <u>not</u> make in his petition. Plaintiff fails to argue any facts that would demonstrate that the University's "proffered reasons were false, carelessly inaccurate or willfully exaggerated." *Carter*, 167 F.3d at 402. There is therefore no dispute as to whether Plaintiff engaged in any of the alleged conduct that gave rise to his sanctions, nor evidence that the conduct allegations were a pretexual attempt at race-based discrimination.

In light of the complete absence of evidence of racial discrimination, either direct or indirect, Plaintiff's claim of Race Based Discrimination under Title IV remains entirely unsupported. Plaintiff is unable to allege facts that create a genuine dispute as to whether or not any of the named Defendants in this case acted in a manner that reflects racially discriminatory bias. Therefore, summary judgment in favor of the Defendant, the Curators of the University of Missouri, would be appropriate for this claim.

### B. Defendant is entitled to summary judgment on the punitive damages claim.

11

Case 2:17-cv-04250-BCW   Document 84   Filed 12/24/18   Page 14 of 16

The Court should grant summary judgment on the entirety of Plaintiff's claims against Defendant. If, however, the Court only grants partial summary judgment, it is clear that Plaintiff's claims for punitive damages must be denied. There exists no evidence in this case to support a submissible case on punitive damages. Plaintiff's conclusory allegations of "evil motive" or "reckless indifference" are not sufficient to establish a claim for punitive damages. *See Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007). Furthermore, Defendant has shown that there is an absence of evidence establishing constitutional violations, and the undisputed material facts demonstrate that there is no genuine issue for trial on Plaintiff's punitive damages claim. *See Celotex Corp.*, 477 U.S. at 325 (summary judgment proper where there is an absence of evidence to support the nonmoving party's case).

CONCLUSION

WHEREFORE, in view of the foregoing and the Joint Statement of Undisputed Material Facts filed herewith, Defendant moves this Court to grant summary judgment in its favor and to grant such further relief as the Court deems just and proper in the premises.

Respectfully submitted,

*/s/ Emily W. Little*
Emily W. Little, # 49929
*/s/ Antwaun Smith*
Antwaun Smith, # 59851
Office of the General Counsel
University of Missouri System
227 University Hall
Columbia, MO 65211
573-882-3211
573-882-0050 (fax)
littleew@umsystem.edu
smithantw@umsystem.edu
**Attorneys for Defendant**

**CERTIFICATE OF SERVICE**

I certify on that December 24, 2018, I served this document upon all attorneys of record through the Court's electronic filing system.

*/s/ Emily W. Little*