IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JEREMY A. ROWLES,               )
                                )
              Plaintiff,         )
                                )
    v.                          )         Case No. 2:17-CV-4250-BCW
                                )
CURATORS OF THE UNIVERSITY      )
OF MISSOURI, et al.,            )
                                )
              Defendants.        )

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT STATEMENT
OF UNDISPUTED MATERIAL FACTS
AND
PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Plaintiff respectfully submits the following responses to Defendants' Joint Statement of

Undisputed Material Facts ("Def. SUMF") and Plaintiff's Statement of Additional Material Facts

("Pl. SAMF"):

**Plaintiff's Response to Defendants' Joint Statement of Undisputed Material Facts**

1.      Undisputed.

2.      Undisputed.

3.      Undisputed.

4.      Undisputed.

5.      Undisputed.

6.      Undisputed.

7.      Undisputed.

8.      Undisputed.

9.      Undisputed.

10.     Undisputed.

1

11.     Undisputed

12.     Objection pursuant to Fed. R. Civ. P. 56(c)(2), Fed. R. Evid. 403, and 404(b)(1). This paragraph asserts *allegations* of "other bad acts" which are "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Defendants have produced no evidence that they were aware of these allegations or relied on them in any way when imposing sanctions on Plaintiff. Moreover, the probative value of these allegations—if there were any—is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the factfinder. Fed. R. Evid. 403.

13.     Objection pursuant to Fed. R. Civ. P. 56(c)(2), Fed. R. Evid. 403, and 404(b)(1). This paragraph asserts *allegations* of "other bad acts" which are "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Defendants have produced no evidence that they were aware of these allegations or relied on them in any way when imposing sanctions on Plaintiff. Moreover, the probative value of these allegations—if there were any—is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the factfinder. Fed. R. Evid. 403. In any event, the complaining witness dismissed her petition for protective order, and her attorney apologized to Plaintiff. Rowles Depo. Tr. (relevant portions of which are attached as Exhibit. N) at 52:8-54:11.

14.     Objection pursuant to Fed. R. Civ. P. 56(c)(2), Fed. R. Evid. 403, and 404(b)(1). This paragraph asserts *allegations* of "other bad acts" which are "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Defendants have produced no evidence that they were aware of these allegations or relied on them in any way when imposing sanctions on Plaintiff. Moreover, the probative value of these allegations—if there were any—is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the factfinder. Fed. R. Evid. 403.

2

15.     Undisputed.

16.     Undisputed.

17.     Undisputed.

18.     Undisputed.

19.     Undisputed.

20.     Objection pursuant to Fed. R. Civ. P. 56(c)(2), Fed. R. Evid. 403, 404(b)(1), 801(c), and 802. This paragraph offers an out-of-court statement by "HT" for the truth of the matter asserted therein, which is inadmissible hearsay under Fed. R. Evid. 802. The citation to Plaintiff's deposition testimony authenticating that HT wrote the statement does not does not provide any exception to the hearsay rule. This paragraph also relies on "other bad acts" which are "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  Moreover, the probative value of these allegations—if there were any—is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the factfinder. Fed. R. Evid. 403. In any event, none of the Defendants nor any investigator from the Title IX Office ever interviewed or spoke to HT during their investigation Breaux's allegations against Plaintiff. Investigative Report (a copy of which is attached as Exhibit C) at 54.

21.     Undisputed.

22.     Undisputed.

23.     Undisputed that Plaintiff sent a message stating: "I can't act right around you. It is not you, it is me. I don't want you to be uncomfortable. It's my fault."  Plaintiff objects to the remainder of this paragraph pursuant to Fed. R. Civ. P. 56(c)(2), Fed. R. Evid. 403, 404(b)(1), 801(c), and 802. This paragraph offers an out-of-court statement by "HT" for the truth of the matter asserted therein, which is inadmissible hearsay under Fed. R. Evid. 802. The citation to Plaintiff's

3

deposition testimony authenticating that HT wrote the statement does not does not provide any exception to the hearsay rule. This paragraph also relies on "other bad acts" which are "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Moreover, the probative value of these allegations—if there were any—is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the factfinder. Fed. R. Evid. 403. In any event, none of the Defendants nor any investigator from the Title IX Office ever interviewed or spoke to HT during their investigation Breaux's allegations against Plaintiff. Ex. C at 54.

24.    Undisputed.

25.    Undisputed.

26.    Objection pursuant to Fed. R. Civ. P. 56(c)(2), Local Rule 56.1(a), 801(c), and 802. Paragraph 26 contains multiple assertions of fact in a single paragraph in violation of Local Rule 56.1(a)("Each fact must be set forth in a separately numbered paragraph…."). Plaintiff does not dispute that Mr. Dean found him *not responsible* for sexual harassment. The remaining assertions in this paragraph are not supported by admissible evidence. The sole support offered by Defendants is Plaintiff's deposition testimony in which Plaintiff read aloud an email from Mr. Dean. Defendants are offering Mr. Dean's out-of-court statements in that email for the truth of the matter asserted therein, which are inadmissible hearsay under Fed. R. Evid. 801(c), 802. The citation to Plaintiff's deposition testimony authenticating that Dean wrote the email does not provide any exception to the hearsay rule. This paragraph also relies on "other bad acts" which are "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

27.    Undisputed.

28.    Undisputed.

4

29.     Undisputed.

30.     Undisputed.

31.     Undisputed.

32.     Undisputed.

33.     Undisputed.

34.     Undisputed.

35.     Objection pursuant to Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(a). Paragraph 35 contains multiple assertions of fact in a single paragraph in violation of Local Rule 56.1(a) ("Each fact must be set forth in a separately numbered paragraph…."). Plaintiff does not dispute that in the fall of 2016 he attended two or three fitness classes every week at Mizzou Rec where AB was an instructor.  However, the sole support for the remainder of this paragraph is a general citation to six pages of the Investigative Report without any specificity as to when or in what circumstances AB was allegedly "tense, nervous, would move across the room to avoid standing near him, and would leave quickly after class." Rule 56(c)(1) requires that "A party asserting that a fact cannot be … genuinely disputed must support the assertion by: (A) citing to particular parts of the record …." "When a party fails to cite the record with sufficient particularity, it fails to comply with Rule 56(c)(1)(A)." *Johnson v. Charps Welding & Fabricating, Inc.*, No. CV 14-2081 (RHK/LIB), 2017 WL 4402388, at *1 (D. Minn. Oct. 2, 2017) ("Judges are not like pigs, hunting for truffles buried in briefs.")

36.     Undisputed.

37.     Undisputed.

38.     Undisputed.

39.     Undisputed.

40.     Undisputed.

5

41.     Undisputed.

42.     Undisputed.

43.     Undisputed.

44.     Undisputed.

45.     Undisputed.

46.     Undisputed.

47.     Undisputed.

48.     Undisputed.

49.     Undisputed.

50.     Undisputed that a Mizzou Rec Associate Director filed a complaint with the University's Office for Civil Rights and Title IX. To the extent Defendants are citing this complaint for the truth of any matter asserted therein, the complaint is inadmissible hearsay under Fed. R. Evid. 802.

51.     Objection pursuant to Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(a). Paragraph 51 contains multiple assertions of fact in a single paragraph in violation of Local Rule 56.1(a) ("Each fact must be set forth in a separately numbered paragraph…."). Plaintiff does not dispute that Plaintiff filed a formal complaint against Plaintiff with the Office for Civil Rights and Title IX that *alleged* Plaintiff's Facebook messages to her complimented her on the way her body moved and contained "inappropriately intimate comments" and that his conduct toward her at the Mizzou Rec was bizarre, delusional, made her extremely uncomfortable, and caused her to take measures to avoid him after class such as hiding in the bathroom." To the extent Defendants are citing this complaint for the truth of any matter asserted therein, the complaint is inadmissible hearsay under Fed. R. Evid. 802.

52.     Undisputed.

6

53.     Disputed. Gallimore testified that she received the initial complaint against Rowles and assigned it to investigator Amber Lammers. Gallimore Interrogatory Responses (a copy of which is attached as Exhibit O) No. 10.  Gallimore had a conversation with Ellen Eardley regarding interim measures prior to the investigation because she (Gallimore) "was the person who had knowledge of the respondent" from his prior Title IX Investigation. Gallimore Depo. Tr. (relevant portions of which are attached as Exhibit M) at 69:2-8. Gallimore "provided a summary of what the investigation charges were investigated and the resolution" of the prior complaint against Rowles. Ex. M at 69:24-70:3. When Lammers finished her draft investigative report, she sent it to Gallimore for review. Ex. M at 105:19-23. Gallimore reviewed and suggested changes to Lammers's draft investigative report. Ex. M at 68:6-11, 105:25-106:22. Specifically, Gallimore suggested that Lammers simplify or shorten three sections of Rowles's statements.  Ex. M at 106:6-108:12. Gallimore did not suggest changes to any other witnesses' statements. Ex. M at 109:17-21.

54.     Undisputed.

55.     Undisputed.

56.     Undisputed.

57.     Objection pursuant to Fed. R. Civ. P. 56(c)(2), Local Rule 56.1(a), Fed. R. Evid. 801(c), and 802. Paragraph 57 contains multiple assertions of fact about multiple events in violation of Local Rule 56.1(a)("Each fact must be set forth in a separately numbered paragraph…."). Plaintiff further objects that each of the assertions in this paragraph is supported solely by double hearsay— out of court statements by Amber Lammers repeating out-of-court statements by a variety of alleged witnesses, all of which are being offered for the truth of the matters asserted in those statements—in violation of Fed. R. Evid. 802. Even assuming that Amber Lammers' affidavit (See Ex. G to Def. SUMF) converts her investigative report into a "business record," Defendants provide no hearsay

7

exception for the out-of-court statements from the witnesses allegedly quoted within the investigative report.

58. Undisputed.

59. Undisputed.

60. Undisputed.

61. Undisputed.

62. Undisputed.

63. Undisputed that Plaintiff received an email from Ms. Lammers on February 28, 2017 providing him with the Investigative Report which included 38 pages of information from Plaintiff, and the accompanying exhibits. Defendants cite no evidence in support of their assertion that Lammers's email "remind[ed] [Plaintiff] that he still had until the following day to request a Formal Resolution process."

64. Undisputed.

65. Undisputed.

66. Undisputed.

67. Objection pursuant to Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1. Paragraph 67 contains multiple assertions of contingent facts in violation of Local Rule 56.1(a) ("Each fact must be set forth in a separately numbered paragraph….").

68. Undisputed.

69. Undisputed.

70. Undisputed.

71. Undisputed that the Findings paraphrase out-of-court statements by Eardley quoting out-of-court statements by Lammers quoting out-of-court statements by Breaux. To the extent

8

Defendants are offering the Findings for the truth of the matter asserted therein, Plaintiff objects that the statements are inadmissible triple hearsay under Fed. R. Evid. 801 and 802.

72. Undisputed.

73. Undisputed that Eardley purported to apply a reasonable person standard.

74. Undisputed that Eardley testified that there are dictionary definitions for "emotionally distressed"; however, she did not identify what—if any—dictionary definition she actually relied on, and she admitted that there is "nothing else in the Collected Rules" defining "emotionally distressed."

75. Undisputed that Eardley made the findings quoted in paragraph 75, but the assertion that she made those findings *by a preponderance of the evidence* is an issue of law.

76. Undisputed that Eardley testified that she applied an objective standard in finding Plaintiff's conduct was unwelcome and hostile.

77. The cited material does not support the assertions in this paragraph. Eardley testified that "*The letter itself does not describe a physical threat*, like, I, Jeremy, am going to hurt you physically in any way. I do think the letter in the context of things could be perceived as threatening." Eardley Depo. Tr. (relevant portions of which are attached as Exhibit J) at 141:25-142:4 (emphasis added).

78. Undisputed that Eardley testified that she considered the totality of circumstances.

79. Undisputed.

80. Undisputed.

81. Undisputed.

82. Undisputed.

83. Undisputed.

84. Undisputed.

85.     Objection pursuant to Fed. R. Civ. P. 56(c)(2), Fed. R. Evid. 801(c), and 802. The assertions in this paragraph are supported only by inadmissible hearsay from an unauthenticated email purportedly from Breaux.

86.     Undisputed.

87.     Objection pursuant to Fed. R. Civ. P. 56(c)(2). The testimony asserted in this paragraph lacks any foundation.

88.     Undisputed.

89.     Undisputed but incomplete. Scroggs further testified that she cut Plaintiff's suspension in half because it was she believed four years was outside the normal range of punishment for such offenses. Scroggs Depo. Tr. (relevant portions of which are attached as Exhibit K) 85:22-86:2.

90.     Undisputed.

## Plaintiff's Statement of Additional Material Facts

Plaintiff respectfully submits the following Statement of Additional Material Facts ("Pl. SAMF"):

1.      Defendant Curators of the University of Missouri ("University") is the corporate name of the body politic governing the state university system, which has the power to sue and be sued. Amended Complaint ("Am. Compl.") [Docket No. 1] ¶16; Defendants' Answer ("Ans.") [Docket No. 29] ¶16; Mo. Const. art. IX, sec. 9(a); Mo. Rev. Stat. §§ 172.010-.020 RSMo.

2.      The University is a recipient of federal funds. Compl. ¶225; Ans. ¶225.

3.      Defendant Ellen Eardley ("Eardley") was the Assistant Vice Provost for Civil Rights and Title IX ("Title IX Office") at the University when Plaintiff was investigated and sanctioned by the Title IX Office. Am. Compl. ¶19; Ans. ¶19.

10

4.     Defendant Andrea Hayes ("Hayes") succeeded Eardley and is the current Assistant Vice Chancellor for Civil Rights & Title IX at the University. Compl. ¶¶21-22; Ans. ¶¶21-22.

5.     Defendant Cathy Scroggs ("Scroggs") was Vice Chancellor for Student Affairs at the University when Plaintiff was investigated and sanctioned by the University's Title IX Office. Am. Compl. ¶18; Ans. ¶18.

6.     Defendant Salama Gallimore ("Gallimore") was Director of Investigations and Deputy Title IX Coordinator at the University when Plaintiff was investigated and sanctioned by the Title IX Office. Am. Compl. ¶20; Ans. ¶20.

7.     Plaintiff Jeremy Rowles ("Rowles") is an African-American man. See Charge of Discrimination (a copy of which is attached as Exhibit A) at 1

8.     Rowles was a Ph.D. candidate in Cultural Anthropology at the University until his suspension on March 15, 2017. Am. Compl. ¶¶1, 30; Ans. ¶¶ 1, 30; Informal Resolution Findings by the Administrative Officer (a copy of which is attached as Exhibit B).

9.     In September 2015, an undergraduate student submitted a complaint to the Title IX Office, alleging sexual harassment by Rowles, who was the Teaching Assistant for one of her classes. Ex. B at 4.

10.     The student alleged that Rowles had invited her to his office hours in the evening and insinuated that he would provide questions or answers to an exam if she provided him sexual favors. Ex. B. at 4.

11.     Following an investigation by the Title IX Office, Senior Associate Provost Ken Dean determined in March 2016 that *Rowles was not responsible for violating the University's sexual harassment policy.* Ex. B. at 4 (emphasis added).

12.     Although he exonerated Rowles of sexual harassment, Dean warned

> Nonetheless, I want to be very clear that [the Complainant] was not
> unreasonable to have inferred, as a subjective belief, that your

behavior indicated sexual favors were sought. However, you never directly indicated that your offer to show her the exam was conditioned on sexual favors. None of the evidence or statements contained within the Investigative Report indicated that you requested, or hinted that you desired sexual favors in exchange for showing [the Complainant] the exam. I find that your behavior, specifically, closing the door to your TA Office and stating to [the Complainant] that you did not want money, were indicative of an internal recognition that you were doing something wrong by offering to show her the exam or read her exam questions, and not evidence that you were seeking sexual favors. I will be contacting your immediate supervisor and Department Chair so that they may take appropriate action regarding your behavior of offering to share exam questions.

Ex. B at 5.

13. Rowles met Annalise Breaux ("Breaux") at the Kaldi's Coffee House where she worked in the fall of 2015. Title IX Investigative Report (a copy of which is attached to this Statement as Exhibit C) at 7.

14. When Rowles did not receive what he had ordered, Breaux apologized to him and gave him a token for a free drink. Ex. C at 10.

15. Breaux began teaching dance fitness classes and the University's Student Recreation Center ("Rec. Center") in the spring of 2016. Ex. C at 7.

16. Rowles started attending Breaux' dance classes, after which their interactions became more personal, and the two spoke to one another more often. Ex. C. at 7.

17. Breaux thought Rowles was friendly, and she did not interpret his behavior or comments as flirtatious because she thought he was gay. Ex. C. at 7.

18. On April 12, 2016, Rowles asked Breaux out on a date after their dance class at the Rec Center. Ex. C. at 6; Breaux Title 9 Complaint (a copy of which is attached to this Statement as Exhibit D) at 1.

19. Breaux felt extremely uncomfortable and told him she was "too busy this week." Ex. C. at 6; Ex. D at 1.

20. Over the next week, Rowles sent Breaux several Facebook messages, which became more frequent and increasingly romantic in nature. Ex. C. at 6, 7.

21. On April 18, Breaux sent Rowles a message stating:

> Jeremy, I really appreciate your feedback about my class and choreography, but these messages are getting excessive. I think our friendship needs to remain in the professional setting. Many of the things you say, like that Instagram comment for example, is over the top and I wouldn't be comfortable hanging out outside of my places of work. *I still want you to come to Tiger Tease and enjoy your time there*, but I need my space outside of class and I think a line has been crossed here.

Ex. C at 23 (emphasis added).

22. Rowles immediately apologized and acknowledged that he had misread their prior interactions:

> Oh my god, I am so sorry Annalise!! I thought… I am so sorry. I took our conversation last Tuesday as you agreeing to a date. I am so sorry, I read your reaching completely the wrong way. I feel so bad that I caused you to be uncomfortable, I really apologize. I feel so horrible that was the way I came across. I did not mean to make you feel that way, and I really apologize. I am so sorry. I'll keep it strictly friendly from here on out. I appreciate you telling me this, the last think I wanted to do was to make you feel uncomfortable. Please accept my apologies, the very last thing I wanted to do was make you feel badly.

Ex. C at 24.

23. Rowles continued attending Breaux's dance classes with her permission, but did not attempt to message Breaux after April 18, 2016. Ex. C at 6.

24. Rowles attended several of Breaux's dance classes during the fall semester of 2016. Ex. C at 6.

25. In September 2016, Rowles emailed Breaux asking for tips on how to develop his skills for the contemporary dance class that Breaux taught. Ex. C at 6.

13

26.     Breaux suggested that he take private dance lessons, which are available through the Rec Center. Ex. C at 6.

27.     In October, Rowles followed up with Breaux because he had not been able to sign up for private dance lessons, and he asked to take private lessons from her. Ex. C at 6.

28.     Breaux told Rowles she was not currently and would not offer private lessons. Ex. C at 6.

29.     On October 7, Rowles tried to talk with Breaux after class but she dashed off to the bathroom to avoid him. Ex. C at 7.

30.     Rowles gave Breaux's co-instructor a note to give Breaux, which contained the Kaldi's drink token Breaux had given her when they first met and the lyrics from the Coldplay song, "The Scientist." Ex. C at 7.

31.     Rowles referenced the Coldplay song because it contained the lyric, "Take me back to the start…." Ex. C at 33.

32.     Breaux did not understand the meaning of the note and thought it was "bizarre." Ex. C at 7.

33.     On October 14, 2016, Rowles handed a three-page letter to Breaux after class. Ex. C at 7.

34.     Breaux told Rowles she was taking the letter to her supervisor and that larger measures would be taken because of it. Ex. C at 7.

35.     Breaux told the Title IX Office the letter "contained apologies and a confession of 'love' for" her. Ex. C at 7.

36.     After Rowles gave Breaux the letter, Rec Center Associate Director Emily Bach McElwaine emailed the University's Title IX office to "refer the conduct of Jeremy Rowles … as a potential violation or the University's Sex Discrimination, Sexual Harassment and Sexual Misconduct

14

in Education/Employment Policy in Section 600.020 of the Collected Rules and Regulations." Email of Emely McElwain (a copy of which is attached as Exhibit E) at 1.

37.     McElwain's email related information "collected and submitted to me by Pangku" Cardona, the coordinator of the TigerX dance program at the Rec Center. Ex. E at 1.

38.     In addition to Breaux, McElwaine's email accused Rowles of pursuing romantic relationships with three other instructors: Rose Nash, Ashlyn Balch, and Hannah Turnbull. Am. Compl ¶¶47-48; Answer ¶¶ 47-48; Ex. E at 1.

39.     The Title IX office interviewed Breaux on October 20. Am. Compl ¶¶1, 30; Answer ¶¶ 1, 30.

40.     On October 21, 2016 Breaux submitted a formal complaint to the Title IX Office. Am. Compl ¶5; Answer ¶ 5; Ex. D.

41.     In her Formal Complaint, Breaux accused Rowles of "harassment on the basis of sex." Ex. D.

42.     Breaux did not accused Rowles of "stalking on the basis of sex." Ex. D; Ex. J at 143:4-9; Ex. K at 46:16-22.

43.     Breaux described Rowles's conduct as "bizarre" and said it made her "extremely uncomfortable." Ex. D at 1.

44.     Breaux never alleged that she was afraid of Rowles. Ex. J at 137:7-19, 138:7-9

45.     Breaux never alleged that Rowles made her feel intimidated. Ex. K at 47:13-14; Ex. J at 136:22-137:9, 138:10-11.

46.     Breaux never alleged that Rowles touched her inappropriately. Ex. K at 23:17-17;

47.     Breaux never alleged that Rowles threatened her with violence. Ex. K at 24:6-19, 28:23-25; Ex. J at 148:13-19.

48.     On or about November 7, 2016, Title IX Investigator Amber Lammers sent Rowles

a "Notice of Investigation of Potential Sex Discrimination," informing him that she would be

"investigat[ing] allegations that on or about March 2015-October 2016 [Rowles] engaged in

[harassing] behaviors which impacted Annalise Breaux." Notice of Investigation (a copy of which is

attached as Exhibit F) at 1.

49.     The Notice of Investigation stated that Rowles' alleged conduct may have violated

section 200.010.C.7.b-d of the University's Collected Rules and Regulations ("CRR"), which provide

in pertinent part:

> **200.010.C. Conduct** for which students and student organizations,
> when applicable, are subject to sanctions falls into the following
> categories:
>                             . . .
> 7.  **Violation of the University's Sex Discrimination, Sexual
>     Harassment and Sexual Misconduct in Education/
>     Employment Policy in Section 600.020 of the Collected
>     Rules and Regulations.**
>     These violations include:
>                             . . .
>     b.  **Sexual Harassment.**  Sexual harassment is defined as:
>         1)  Unwelcome sexual advances or requests for sexual
>             activity by a person or persons in a position of power or
>             authority to another person, or
>         2)  Other unwelcome verbal or physical conduct of a sexual
>             nature by a person to another person, when:
>             a)  Submission to or rejection of such conduct is used
>                 explicitly or implicitly as a condition for academic or
>                 employment decisions; or
>             b)  Such conduct creates a hostile environment by being
>                 sufficiently severe or pervasive and objectively
>                 offensive that it interferes with, limits or denies the
>                 ability of an individual to participate in or benefit
>                 from educational programs or activities or
>                 employment access, benefits or opportunities.
>     …
>     d.  **Stalking on the Basis of Sex.**  Stalking on the basis of sex is
>         following or engaging in a course of conduct on the basis of
>         sex with no legitimate purpose that puts another person
>         reasonably in fear for his or her safety or would cause a
>         reasonable person under the circumstances to be frightened,
>         intimidated or emotionally distressed.

16

Ex. F at 2; CRR 200.010.C.7.b-d.

50.     Title IX Investigator Amber Lammers conducted an investigation into Breaux's complaint and the allegations submitted by McElwaine regarding Rose Nash, Ashlyn Balch, and Hannah Turnbull. Am. Compl ¶¶47-48; Answer ¶¶ 47-48; Ex. C at 1.

51.     Breaux told Lammers during her interview with the Title IX Office that "[Rowles] has an inability to read social cues. It's not necessarily malicious, but he does pick up on some cues in other instances. It's not universal. He didn't understand that things were over, and that we couldn't be friends." Ex. C. at 9.

52.     Lammers attempted to interview Ashlyn Balch, Rose Nash, and Hannah Turnbull— the other three women Rowles was alleged by McElwain to have harassed—but none of them expressed any interest in participating in the investigation against Rowles. Ex. C at 54.

53.     When Lammers concluded her investigation, she prepared a 55-page report for review by Eardley. See Ex. C.

54.     On March 15, 2017, Defendant Eardley issued the "Informal Resolution Findings by the Administrative Officer," concluding that Rowles had violated the University's prohibitions against sexual harassment and stalking on the basis of sex. Ex. B at 1.

55.     Eardley found, "The letter [Rowles gave Breaux on October 14, 2016] and the sentiments contained within were unwelcome to [Breaux]. This made [her] extremely uncomfortable in her place of work, even more so because she had directly communicated to him in writing that his previous behavior had crossed the line and that she would not be comfortable spending time with him outside her employment. Ex. B. at 3.

56.     Eardley also found, "Notably, the record also shows that [Rowles] told at least one other female undergraduate instructor at TigerX that he found her 'attractive' and asked her to spend time with him outside of the Rec Center." Ex. B. at 4.

17

57.     Eardley further found by a preponderance of the evidence that

> **[Rowles] violated the sexual harassment policy by engaging in unwelcome verbal and physical conduct of a sexual nature towards [Breaux] and that it created a hostile environment by being sufficiently pervasive that it interfered with her ability to do her job at TigerX.** In April 2016, [Breaux], an undergraduate student, directly informed [Rowles], a doctoral candidate, that his communications towards her were unwelcome, unprofessional and crossed the line. After learning that his behavior made [Breaux] uncomfortable, [Rowles]chose to attend AB's TigerX classes multiple times each week, stare at her, make efforts to speak with her, and make efforts to be near her. He then requested to take private classes with her, left a token for her, and then wrote a three-page letter describing his very detailed romantic feelings. From an objective standard, such conduct is unwelcome and hostile. It is also pervasive in that it lasted over the course of several months.

Ex. B. at 4.

58.     Eardley further found by a preponderance of the evidence that "this same conduct **violated the policy prohibiting stalking on the basis of sex**. [Rowles]'s actions from March 2016 through October 2016 constitute a course of conduct towards [Breaux] that would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed." Ex. B at 4.

59.     Eardley never considered—much less made any finding—Rowles posed a danger of physical or sexual assault to Breaux:

> Q   … in your findings, do you believe that he posed a danger of physical or sexual assault?
>
> A   I wasn't asked to make a determination of whether he posed a danger of physical or sexual assault. That was not the purpose of the investigation or the findings.
>
> Q   What was the purpose?
>
> A   It was to determine whether he violated the sexual harassment policy, and to determine whether or not he violated the stalking on the basis of stalking.
>
> Q   Is whether somebody poses a danger of physical or sexual assault not relevant to the question of whether they're responsible for stalking?
>
> A   It's not part of the elements of stalking. But I suppose it could be a fact in a -- in a stalking case, I suppose.

18

Q   Also in a sexual harassment case?
A   I suppose it could.
Q   But you didn't consider it in this case; did you?
A   No. I did not.

Eardley 148:24-149:21

60.     In deciding what sanctions to impose, the facts Eardley considered "include[d] the nature of and circumstances surrounding the violation, [Rowles]'s disciplinary history, and the need to prevent future recurrence of violations, as well as any other information deemed relevant." Ex. B at 4

61.     Among the "other information deemed relevant," Eardley considered:

> the University's expectations of doctoral students. For example, the MU Office of Research and Graduate Studies encourages graduate students to familiarize themselves with the code of ethics for their profession. The American Anthropological Association's Principles of Professional Responsibility advises that individuals should "maintain respectful and ethical professional relationships." It further encourages professionals to "comport themselves in ways that promote an equitable, supportive and sustainable workplace environment."

Ex. B. at 4.

62.     Referring to the prior Title IX investigation that found Rowles not responsible for sexual harassment, Eardley concluded that "[Rowles] does not appear to set appropriate professional boundaries with undergraduate students in workplace environments throughout campus—whether in academic settings or at the Rec Center." Ex. B at 4.

63.     Eardley found it "concerning that [Rowles] failed to learn from Mr. Dean and the Department Chair's previous warning regarding his conduct with an undergraduate female student." Ex. B at 5.

64.     Considering the "totality of the circumstances," Earley suspended Rowles from all four campuses of the University for four years, permanently banned him from the University's

19

residence halls and the Rec Center, and required Rowles to complete four-part remediation plan before he would be allowed to return to campus after his suspension was over. Ex. B at 5-6.

65. Rowles timely appealed to Defendant Scroggs, then the Vice Chancellor for Student Affairs. Appeal of Information Resolution Findings by the Administrative Officer (a copy of which is attached as Exhibit G) at 1.

66. In his appeal, Rowles argued:

> Stalking on the basis of sex requires that the complainant be put "reasonably in fear for his or her safety or would case a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed." Here, the conduct at issue here amounts to misunderstanding of social cues and unrequited romantic interest. Giving an instructor a high five in an exercise class does not constitute sexual contact. There is absolutely no allegation that there was inappropriate sexual contact other than high fives. There are also no allegations that there were interactions that put the complainant in fear for her safety. Although the original complaint, reported by a MizzouRec employee, suggests that the complainant felt "intimidated," the complainant herself only reports that she felt "uncomfortable." Therefore, the conduct at issue does not meet the definition of stalking on the basis of sex.

Ex. G at 3.

67. Regarding the finding of responsibility for sexual harassment, Rowles argued:

> the alleged conduct was neither severe nor pervasive. Mr. Rowles attempted to engage Ms. Breaux in a romantic relationship. His efforts may be awkward, but even Ms. Breaux acknowledged that his behavior was not "malicious" and that he "has an inability to read social cues."

> Second, the alleged conduct is not "objectively offensive." While the romantic interest was unrequited, it was not expressed in an offensive manner. Mr. Rowles tried to express his feelings to Ms. Breaux to give her complete information and see whether she would be interested in pursuing a romantic relationship. He apologized for any misunderstandings and told her that he never wanted to make her uncomfortable.

Ex. G at 3.

68.     Finally, he argued:

> Ms. Eardley finds that "[f]rom an objective standard, such conduct is
> unwelcome and hostile." This finding misstates the standard set forth
> in the definition. The standard is not whether the conduct is
> unwelcome—an inherently subjective determination—but rather
> whether it is objectively offensive. Unwanted, but non-offensive,
> offers to change the nature of a relationship is not "objectively
> offensive." Ms. Eardley does not find that the conduct is
> objectively offensive.

Ex. G at 4.

69.     In her final decision, Scroggs upheld Eardley's findings of conduct violations by

modified the sanctions imposed. Scroggs Appellate Ruling (a copy of which is attached as Exhibit

H) at 1.

70.     Scroggs rejected Rowles's argument that his alleged conduct was not severe or

pervasive, nor objectively hostile:

> The appeal quotes the statement from the informal resolution
> decision that "from an objective standard, such conduct is
> unwelcome and hostile." It alleges that this misstates the standard
> because it did not constitute a finding that your conduct was
> objectively offensive. I disagree. The informal resolution decision
> quoted the appropriate definition and expressly applied an objective
> standard. By noting that your conduct was hostile under an objective
> standard, the decision was indicating that it met the criterion of being
> objectively offensive.

Ex. H at 1.

71.     Scroggs further found:

> I believe the informal resolution decision's view of your conduct
> represents a reasonable assessment of the investigative record and
> supports a conclusion that your conduct was objectively offensive. As
> more fully addressed in the informal resolution decision, your
> persistent pursuit of Ms. Breaux at her place of work — after she had
> expressly and clearly rejected your romantic overtures — can be
> viewed reasonably as objectively offensive. Likewise, I believe the
> informal resolution decision reaches a reasonable conclusion in
> finding that your conduct was sufficiently pervasive to constitute a
> violation.

21

Ex. H at 1.

72.     Scroggs similarly rejected Rowles's arguments that his alleged conduct did not meet

the definition of stalking on the basis of sex:

> Similarly, the appeal alleges that the informal resolution decision
> failed to apply the standard correctly in finding you responsible for
> stalking on the basis of sex. It notes the absence of sexual contact
> and of allegations that Ms. Breaux was put in fear for her safety. The
> appeal also notes that she did not allege that she was intimidated, but
> instead that she was uncomfortable. The fact that an original
> complaint does not use specific wording from the definition of
> stalking does not preclude a finding of a violation. Again, the appeal
> casts your behavior in the light most favorable to you, but the
> informal resolution decision rests on a permissible assessment of the
> evidence as showing that your persistent conduct would cause a
> reasonable person to be frightened, intimidated, or emotionally
> distressed.

Ex. H at 2.

73.     Scroggs found no fault with Eardley's reliance on Rowles's prior Title IX

investigation as a factor in imposing his sanction:

> While the circumstances of this complaint are not entirely the same
> as those in the previous complaint, there remains a distinct common
> thread in that you ignored Ms. Breaux's express request to maintain
> only a professional relationship with her. You reasonably could be
> expected to be particularly attuned to that request after you had been
> admonished in the prior decision about the importance of
> professional boundaries. That makes your failure to abide Ms.
> Breaux's request all the more troubling and this is a reasonable factor
> to be considered in measuring the sanction to be imposed.

Ex. H at 2.

74.     Finally, Scroggs considered whether the sanction imposed by Eardley fell outside the

range typical for the kind of violation found:

> I acknowledge that you do not have a record of previous discipline. I
> also have considered the arguments presented in the appeal
> concerning the severity of the conduct and explanations of your
> actions. Further, I have considered whether the record indicates that
> there is a need for a four year suspension to end or remedy the
> effects of the discrimination or harassment, or prevent its future
> recurrence.

22

Based on those factors, and with due deference to the original decision, I conclude that there is compelling justification to modify the sanction to the following extent: Instead of a four-year suspension, you will be suspended from the University of Missouri, including all four campuses, to run through the end of summer session 2019. All other sanctions of the original decision shall remain unchanged.

Ex. H at 3.

75.     In her deposition, Scroggs testified that asking someone out on a date could be

considered a "sexual advance" within the meaning of CRR 200.010.C.7.b.1:

> Q. So, let me ask you what unwanted sexual advance means. Is that -
> - is a request for a date an unwanted sexual advance, if it's unwanted. I mean, if someone asks you out that you don't want to go out with, is that an unwanted sexual advance?
> A. Probably not the first time, no.
> Q. But the second time it would be?
> A. If I keep turning him down and he keeps asking, I would consider that unwanted.

Ex. K at 32:22-33-5.

76.     Scroggs further testified that asking someone out on a date who is physically smaller

than oneself qualifies as a "power or authority" within the meaning of CRR 200.010.C.7.b.1:

> Q. The allegations against Jeremy Rowles, do you believe that they've satisfied subsection 1 of sexual harassment?
> A. I think he was perceived as having power over her.
> Q. And what was the nature of his power over her? Was it just his size?
> A. His physical size.
> Q. Okay. So, this part 1 doesn't require him to be a teacher. When it says person of authority, it doesn't mean, like, teacher or boss?
> A. Well, I suppose it could; but in this case, no, I didn't interpret it that way.

Ex. K at 30:21-31:7.

77.     Defendant Hayes agrees with Scroggs's reading of CRR 200.010.C.7.b.1, and testified

in her deposition that a man's physical size is sufficient to bring him within the ambit of that rule:

> Q. Would you agree with me that that section only applies to situations in which the accused has some position of authority over the accuser?
> A. Or power.
> Q. What's the difference between those things?
> A. Well, I think in certain situations that a man could have power over a woman, even if there wasn't an authority situation. I think there could be a feeling of that just by the nature of your gender.
> Q. So subpart one could apply to any situation with any man and any woman?
> A. It could.

Hays Depo. at 57:19-58:8.

      78.     By contrast, Defendant Gallimore testified in her deposition that the phrase "power or authority" requires the accused to have "some sort of evaluative or supervisory capacity" over his accuser. Ex. M at 43:3-9.

      79.     Gallimore explained that CRR 200.010.C.7.b.1 does not generally apply to sexual advances between fellow students:

> Q. What if -- if you're just talking about two students who are essentially in the same class, could one of those students have a position of authority over the other?
> A. It would have to depend on the situation, but I would say generally no.
> …
> Q. What if one of the students is just physically larger than the other, is that a position of power or authority?
> A. Being physically larger than someone?
> Q. Yes.
> A. I think that would speak to the second [part of the rule] potentially, but not --
> Q. Not the first one?
> A. Not necessarily the first one.

Ex. M at 42: 14-18, 43:10-18.

      80.     For her part, Defendant Eardley had not considered whether the word "power" in CRR 200.010.C.7.b.1

> Q. If -- does ["person or persons in position of power or authority"] also include a power differential based on the -- just the physical size of the two people?

> A   I don't think I've ever considered that before. Under this prong.

Ex. J at 32:25-33:4.

81.     Eardley further testified that the phrase "severe or pervasive and objectively hostile" as used CRR 200.010.C.7.b.2.b has two distinct requirements:

> Q   Okay. And then what I want to know is what that "and objectively offensive" part – is that a separate thing that has to be there in addition to the either "severe or pervasive"?
> A   The hostile environment needs to be objectively offensive.
> Q   Okay. So every hostile -- every hostile environment must be objectively offensive; is that right?
> A   Yes.
> Q   Okay. And then in addition to being objectively offensive, it must also be either severe or pervasive; is that right?
> A   Yes.

Ex. J at 36:25-37:13

82.     By contrast, Defendant Scroggs testified in her deposition that the phrase "severe or pervasive and objectively offensive" as used in CRR 200.010.C.7.b.2.b is a disjunctive list in which only one of the three elements must be satisfied:

> Q.   Now, I want to ask you about that "or" and "and," what your understanding of that means. Because I think there's two ways you could read that, and I want to know if you have -- if you think it's one way or the other. Does the "or" between "severe or pervasive" mean on the one hand it has to be severe or on the other hand it has to be both pervasive and objectively offensive? Or does the "or" separate only severe or pervasive and then objectively offensive is its own requirement? Which -- which way do you read it?
> A.   I read it -- it can be severe; it can be pervasive; and it can be objectively offensive. I mean, it --
> Q.   What if it's only – I'm sorry.
> A.   If it's only one, it's still a problem.
> Q.   That's enough? If it's one, it satisfies the rule?
> A.   That's exactly right.
> Q.   So, if somebody engaged in conduct that was severe but not pervasive and not objectively offensive, that would satisfy this rule?
> A.   Yes.

Ex. K at 34:19-35:13.

83.     For her part, Defendant Gallimore interprets the phrase "severe or pervasive and objectively offensive" as a single idea meaning conduct that interferes with someone's ability to participate or benefit from educational programs:

> Q.  So I was asking you what -- as used in this, in this rule 7(b) 2(b), "Conduct that creates a hostile environment by being sufficiently severe or pervasive and objectively offensive." And I asked you in this context what does the word "severe" mean?
> [Defense counsel objected to the form of the question as "overbroad and lack[ing] foundation."]
> A.  For severe, pervasive, objectively offensive, I think what that's all getting to in this rule is that the behavior is interfering with limiting or denying the ability of an individual to participate or benefit from an educational program or activity, so. And behavior that would lead to that result would be considered severe, and any behavior that would lead to that result would be considered pervasive and likely and any, you know, behavior that led to this result would also be considered objectively offensive.

Ex. M at 49:19-50:18.

84.     CRR 200.010.C.7.d defines "Stalking on the basis of sex" as "following or engaging in a course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed." Ex. B. at 2.

85.     The phrase "course of conduct on the basis of sex" includes the use of "sexual innuendo, sexual language, sexual content." Ex. K at 36:10-14.

86.     According to Defendant Eardley, the meaning of "no legitimate purpose" depends on the circumstances of a complaint and what "the university community would expect":

> Q   …Now, let me ask you what "no legitimate purpose" means in this context?
> MS. LITTLE: Object to the form of the question.
> A   I think it depends on the circumstances.
> …
> Q   Well, in enforcing this rule, how would you determine whether the alleged course of conduct on the basis of sex had a legitimate purpose or not?
> A   I would look at the circumstances before me.

26

Q   All right. And what would -- what kind of circumstances would you look at to determine if it was legitimate or not legitimate?

MS. LITTLE: I'll object to the form of the question. It's overbroad and asking for all circumstances.

A   I would look at the facts alleged in -- by the complainant -- …The facts alleged by the complainant and the information collected in the investigative report from the respondent and witnesses and the complainant.

Q   Okay. And then you would determine whether you thought it was a legitimate purpose or not; is that correct?

A   I would look at whether it seemed to be a legitimate purpose or not, yes.

Q   Okay. And that would essentially be your decision as to whether it's a legitimate purpose or not?

A   Well, I would try to think about the circumstances as a whole, and what is reasonable or unreasonable.

Q   Okay.

A   And also think about the university community and what the university – the university community would expect.

Ex. J at 40:23-41:2, 41:21-43:4.

87.   Eardley testified that "no legitimate purpose" may mean something different when applied to graduate students from when applied to undergraduate students:

Q   Well, I'm not sure what you mean by "what the university would expect." that's what I'm trying to understand what you mean.

A   Well, this isn't part of a student – it is the student code of conduct.

Q   Uh-hum.

A   The standard of conduct, so these are expectations for the students, and so when I looked at these definitions, I would put it in the context of what would be expected by an undergraduate student or graduate student.

Q   Is what's expected by an undergraduate student and a graduate student different?

A   In certain circumstances, yes, the – a graduate student is expected to have more life experiences and to be more professional.

Q   Is that -- is what you just said somewhere in Rule 200.010?

A   I don't think that's written in this document, but we could look.

Q   Do you know of any CRR in which it is written?

A   I don't.

Ex. J at 43:11-44:8

88.   The CRRs do not distinguish between graduate and undergraduate students:

27

Q   Okay. So let's just look at a couple of points here, under
    "Definitions," B7, definition of student is, "a person having once
    been admitted to the university who has not completed a course
    of study and who intends to or does continue a course of study,
    in or through one of the campuses of the university. For the
    purposes of these rules, student status continues whether or not
    the university's academic programs are in session." Did I read
    that correctly?
A   I believe so.
Q   And that definition doesn't make any distinction between
    graduate student and undergraduate; does it?
A   No. It does not.

Ex. J at 45:6-20.

89.     Scroggs defined "no legitimate purpose" to mean uninvited or unwanted by the

object of the conduct:

Q   …What does with no legitimate purpose mean to you?
A   It means that why would they be -- that they are saying
    something and they are -- the individual that it's directed toward
    doesn't have any real purpose for them.
Q.  Doesn't have any purpose to the person that the comment's
    directed to?
A.  That the -- that the person that it's directed to hasn't invited it.
Q.  Hasn't invited it?
A.  Yeah. How about that?
    …
Q.  Does engaging in a course of conduct on the basis of sex with a
    *legitimate* purpose, does that take you outside of this rule?
A.  A legitimate purpose is two people that have agreed that they are
    trying to be in a relationship, and, so, they are engaging in this
    type of behavior.
Q.  Okay.
A.  No legitimate purpose is when two people -- one person agrees
    and one person doesn't.

Ex. K at 36:16-25, 37:18-38:1.

90.     When asked how she determines whether a course of conduct based on sex has a

legitimate purpose, Hayes answered, "I don't know that there is a definition specifically for

legitimate. I think you can't dissect it by that individual word. I think you have to look at the

28

sentence as a whole and the facts of the whole entire situation. I don't think that is a fair question."

Hayes Depo. Tr. (a copy of which is attached as Exhibit L) at 66:1-6.

91.     Hayes could not explain how a student could determine whether he has a legitimate

purpose in asking someone out on a date:

> Q.  Is asking someone out on a date a course of conduct on the basis
>     of sex? Let me just ask you that.
> A.  Yes.
> Q.  So you could ask someone out on a date with a legitimate
>     purpose and not fall within this rule; is that correct?
> A.  You could.
> Q.  Okay. What I'm trying to get at here is, a student reading this
>     policy, how did they know what is a legitimate purpose within the
>     meaning of the rule?
> A.  Well, I'm going to speculate. But if they wanted it clarified, they
>     could call my office. They could ask someone about it if they
>     needed clarification. I don't know that many students read the
>     rules before they take action.

Ex. L at 63:11-64:2.

92.     Even if a student took her advice and called the Title IX Office, Hayes did not know

whether that student would get the same answer from different members of her staff:

> Q.  … If someone called the Title IX office and reached Megan
>     Grant or someone else, another person in your office and asked
>     what no legitimate purpose meant, would you assume that they
>     would give the same answer as you?
> A.  I don't know.
> Q.  Might they have a different definition?
> A.  I don't know.
> Q.  It's possible?
> A.  I don't know.
> Q.  You don't know if it's possible?
> A.  Well, I don't know what someone else would say. I don't know
>     how they would answer that question.

Ex. L at 65:9-22.

93.     Hayes testified in her deposition that "emotionally distressed" means something

different from "frightened" or "intimidated." Ex. L at 69:25-70:6.

29

94.     It can mean any negative feeling at all, including "upset," "angry," "sad," "uncomfortable" or even "annoyed." Ex. L at 70:8-22.

95.     Eardley testified that it means "a state of emotional discomfort." Ex. J at 111:4-7.

96.     Scroggs testified that "emotional distressed" prong "could just be more of amplification of the fear and distress or the fear and intimidation so they -- they have emotional outbursts as a result of that." Ex. K at 39:20-40:4.

97.     The Title IX Office investigated 60 complaints of sex discrimination during the period of August 2014 through March 2017. Curators Second Supplemental Interrogatory Responses (a copy of which is attached as Exhibit I).

98.     Of those 60 complaints, only three students—Nos. 22, 24, and 53—were accused of both sexual harassment and stalking on the basis of sex. Ex. I at 7, 14.

99.     Two of those students (Nos. 22 and 24) were white while the third student (No. 53) was black. Ex. I at 7.

100.    Rowles (No. 53) is the only black student suspended for both sexual harassment and stalking on the basis of sex. Ex. I at 14.

101.    Rowles was suspended from all four campuses for two years (reduced from the original sanction of four years), and banned for life from all residence halls and the student recreation center. Ex. I at 14.

102.    By contrast, the two similarly situated white students—the only other students accused of both sexual harassment and stalking on the basis of sex during the relevant period— received substantially lower sanctions that Plaintiff. Ex. I at 7.

103.    Student No. 22 was not suspended at all. Ex. I at 7.

104.    Rather, he was required to undergo counseling. Ex. I at 7.

105.     Student No. 24 was suspended for only six months, barred from residence halls (but not the student recreation center), and required to undergo counseling. Ex. I at 7-8.

106.     Student No. 22's sanction is even more striking in its contrast to Plaintiff's because that student was *also* accused of non-consensual sexual contact, non-consensual sexual intercourse, and threatening or intimidating behaviors. Ex. I at 7-8.

107.     When questioned about the information provided *in her own interrogatory responses*, Defendant Hayes was unable to explain what the two white students accused of sexual harassment and stalking on the basis of sex had actually done or why they received more lenient sanctions than Plaintiff:

> Q.  Looking at [Student No.] 22 again, you can't tell me what the person in 22 was accused of doing, can you?
> A.  No.
> Q.  Or the person in 24?
> A.  No, I have no idea.
> Q.  You can tell me what they were accused of; is that correct, like in terms of rules violations?
> A.  Right.
> Q.  And you would agree with me that the rules violations alleged in 22 and 53 are both sexual harassment, stalking on the basis of sex?
> A.  Yes.
> Q.  22, the sanction imposed is counseling?
> A.  Yes, I see that.
> Q.  And on 53, the sanction imposed is two-year suspension?
> A.  On which one?
> Q.  53.
> A.  Yes.
> Q.  As you look at this today sitting here, can you explain why the student in 22 got counseling and the student in 53 was suspended for two years?
> MS. LITTLE: Object to the form of the question.
> A.  No. I'd have to know more information.
> Q.  (By Mr. Hirth) You would need to know more information to know why the sanctions were different?
> A.  Uh-huh.

Ex. L at 78:13-79:19.

108.     After reviewing the Curators' and Defendant Hayes's interrogatory responses,

Defendant Eardley was no more able that Defendnat Hayes to explain what the two white students

were accused of doing or why they received more lenient sanctions than Plaintiff for violating the

same (or more) rules:

> Q   Okay. You can't tell, can you, from the information provided
>      here what the student in 22 and 24 actually did; can you?
> A   I cannot.
> Q   And you would need to know additional information to know
>      whether they are in fact similarly situated to Mr. Rowles; wouldn't
>      you?
> A   Yes. I would.
> …
> Q   Okay. Looking at the data in number 22, 24, and 53, can you
>      provide any explanation of why these three students received
>      different sanctions?
> MS. LITTLE: I'll just object it's been asked and answered.
> A   Well, I don't know the circumstances of 22 or 24. And so I
>      cannot -- what I can tell you is that each decision is made based
>      on the facts and circumstances in that particular case. The
>      sanctions are tailored to that case, based on the sanction factors
>      that we've discussed earlier. The nature of the circumstances, the
>      need to prevent the behavior from reoccurring, the severity of the
>      circumstances, the disciplinary history of the accused, other
>      circumstances that are relevant.
> Q   You would need all that information to be able to tell why these
>      received different sanctions?
> A   I mean, I don't know if I would even then be able to tell. I would
>      say that it's very difficult to compare any particular case to
>      another case because they're so unique and so fact-specific.

Ex. J at 157:12-19; 171:1-24.

109.     Defendant Scroggs was likewise unable to explain any of the circumstances

surrounding the other two complaints of sexual harassment and stalking on the, and she could

provide only two explanations for why Plaintiff was punished more severely than the white students:

> Q.   From this information, can you -- is it possible for you to discern
>      why Mr. Rowles was given such a substantially greater sanction
>      than the other two people accused of the same conduct?
> A.   No. I don't know any of the facts of those cases.
> Q.   You would need to know the facts of those cases to be able to
>      compare them, wouldn't you?

32

A. Yes, I would.
Q. And if you didn't have that information, there is no way you
   could tell the difference between them. Is there?
A. Based on this.
Q. Okay. In fact, the only thing that you can tell about these three
   that distinguishes them in any way is the race of the person
   accused, isn't it?
A. Well -- so, are you saying No. 22 and No. 24 are white?
Q. They are both white.
A. And then Mr. --
Q. Mr. Rowles, No. 53, is black.
A. Okay. Well, that's one distinguishing thing. Okay.
Q. Do you see any others?
…
A. There was a different investigator.
Q. Right. Anything else?
A. Not that I can see, but -- not just on this, on the face of it.

Ex. K at 95:16-20, 96:4-97:2.

110.    Defendants Gallimore provides similar answers to the same line of questioning:

111.    At the time of his suspension, Plaintiff was in the first year of his five-year Ph.D.

program and would have continued in that program but for his suspension.

Q. Based on this document you can't tell why these students were
   treated differently?
MS. LITTLE: I object to the form of the question. It assumes facts
   not in evidence.
A. Based on this document, I can't tell -- it says yes, but it doesn't
   say yes, comma, and then the charges that they were responsible
   for. If I have that, then I could potentially answer your question.
Q. (By Mr. Hirth) You would need to know what they were found
   responsible of to know their treatment was different?
MS. LITTLE: Same objections.
A. No. I would need to know what they were found responsible of
   so that I could answer your question because right now you're
   asking me to compare things when I don't know which one of
   these charges they were found responsible for, so it's not a
   comparison that can be made.

Ex. M at 95:23-96:16.

112.     Gallimore testified that she received the initial complaint against Rowles and assigned it to investigator Amber Lammers. Gallimore Depo. Ex. O and No. 10.

113.     Gallimore had a conversation with Ellen Eardley regarding interim measures prior to the investigation because she (Gallimore) "was the person who had knowledge of the respondent" from his prior Title IX Investigation. Ex. M at 69:2-8.

114.     Gallimore "provided a summary of what the investigation charges were investigated and the resolution" of the prior complaint against Rowles. Ex. M at 69:24-70:3.

115.     When Lammers finished her draft investigative report, she sent it to Gallimore for review. Ex. M at 105:19-23.

116.     Gallimore reviewed and suggested changes to Lammers's draft investigative report. Ex. M at 68:6-11, 105:25-106:22.

117.     Specifically, Gallimore suggested that Lammers simplify or shorten three sections of Rowles's statements.  Ex. M at 106:6-108:12.

118.     Gallimore did not suggest changes to any other witnesses' statements. Ex. M at 109:17-21.

119.     Gallimore denied having any role in the investigation of Breaux's complaint against Plaintiff. Ex. O at No. 10.

120.     During that prior investigation, Gallimore told Rowles that he "looks like someone who would assault a woman." Ex. N. at 124:16-18.

121.    Though Rowles was found not responsible for sexual harassment in the first investigation, Eardley still wanted to prohibit him from teaching.  See March 13 email between Eardley and Dean (a copy of which is attached as P) at 1.

122.    In an email to Ken Dean, Eardley wrote: "I would prefer that he not be permitted to tutor undergraduate students one-on-one or serve as a GA, TA, or RA." Ex. P at 1.

123.    Dean refused Eardley's request because he "worr[ied] about using the title IX process to impose sanctions beyond the limits of the alleged title IX violation." Ex. P at 1.

124.    During the Breaux investigation, Eardley made changes to the Notice of Charges prepared by Amber Lammers to include allegations not made directly by Breaux that better align with the University's CRRs. See December 12, 2016 Draft Notice of Charges (a copy of which is attached as Exhibit Q) at 1; Ex. J at 98:2-101:17.

125.    Among other edits, she urged Lammers to add that Breaux felt "unsafe," "intimidated" or "emotionally distressed," which Lammers had not included in the original draft. Eardley Depo. Ex. Q at 1; Ex. J at 98:2-101:17.

126.    For example, in the original version of the Notice of Charges, Lammers wrote, "On October 3, 2016, you emailed Breaux insisting on talking private dance lessons with her.  You reportedly complained to her via email and 'confronted' her after class, stating that ZouLife would not allow you to sign up for private lessons with her." Ex. Q at 1.

127.    After Eardley's edits, the same paragraph read as follows:

On October 3, 2016, you emailed Breaux insisting on talking private dance lessons with her.  You reportedly complained to her via email

35

and "confronted" her after class, stating that ZouLife would not allow you to sign up for private lessons with her. *She interpreted your tone as frustrated, and she reported that she felt intimidated and confused by your persistence.*

See December 13, 2016 Notice of Charges (a copy of which is attached as Exhibit R) at 2 (emphasis added).

128.    The term "intimidated" does not appear anywhere in Breaux's formal complaint. Ex. C at 1.

Respectfully Submitted,

/s/ J. Andrew Hirth
J. Andrew Hirth, #57807
TGH Litigation LLC
913 E. Ash St.
Columbia, MO 65201
573-256-2850
andy@tghlitigation.com

*Counsel for Plaintiff*

36