## Page 1

1  IN THE UNITED STATES DISTRICT COURT FOR THE
2  WESTERN DISTRICT OF MISSOURI
3  CENTRAL DIVISION
4  ---------------------------:
5  JEREMY A. ROWLES,         :
6  Plaintiff,     : Case No.:
7  v.                : 2:17-CV-4250-BCW
8  CURATORS OF THE UNIVERSITY :
9  OF MISSOURI, et al.,     :
10  Defendants.   :
11  ---------------------------:
12  Deposition of:
13  ELLEN EARDLEY,
14  taken on behalf of the Plaintiff, at the offices
15  of Henderson Legal Services, 1560 Wilson Blvd,
16  Arlington, VA 22209, on Tuesday, December 11,
17  2018, at 9:00 a.m. before Sydney Crawford, RPR,
18  Notary Public in the Commonwealth of Virginia.
19
20
21
22
23
24
25

## Page 2

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFF:
4  J. ANDREW HIRTH, ESQUIRE
5  Trachtenberg Germinder Hirth
6  913 E. Ash Street
7  Columbia, Missouri 65201
8
9  ON BEHALF OF THE DEFENDANTS:
10  EMILY W. LITTLE, ESQUIRE
11  ANTWAUN SMITH, ESQUIRE
12  Office of General Counsel
13  University of Missouri System
14  227 University Hall
15  Columbia, Missouri 65211
16
17
18
19
20
21
22
23
24
25

## Page 3

1  INDEX
2  EXAMINATION BY                     PAGE
3  Mr. Hirth              4
4
5
6
7  EXHIBITS        DESCRIPTION          PAGE
8  Exhibit 21  2015 - '16 Annual Report    61
9  Exhibit 22  E-mail Chain              85
10  Exhibit 23  Exhibit E                90
11  Exhibit 24  Notice of Charges        94
12  Exhibit 25  Annotate Version Notice of Charges  97
13  Exhibit 26  E-mail               103
14  Exhibit 27  Investigative Report      136
15  Exhibit 28  Three-page Letter         139
16  Exhibit 29  Interrogatories         143
17  Exhibit 30  Letter               162
18
19  (Exhibits retained by counsel.)
20
21
22
23
24
25

## Page 4

1  P R O C E E D I N G S
2  WHEREUPON,
3  ELLEN EARDLEY,
4  having duly been sworn to tell the truth, the
5  whole truth and nothing but the truth, testifies
6  as follows:
7
8  EXAMINATION
9  BY MR. HIRTH:
10  Q   Good morning, Ms. Eardley.
11  A   Good morning.
12  Q   My name is Andy Hirth, I represent
13  Jeremy Rowles in his lawsuit against the
14  University of Missouri and several of its -- its
15  current and former employees including yourself.
16  I'm here today to take your deposition.
17  I believe that you are familiar with depositions,
18  you've had -- you've taken depositions before or
19  are familiar with the deposition process; is that
20  true?
21  A   That's correct.
22  Q   Okay.  So I won't go over the -- all the
23  sort of ground rules, but I will say that if you
24  have a question about -- if my question doesn't
25  make sense and you want me to rephrase it, feel

1 (Pages 1 to 4)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 1 of 15

Page 29

1 student?
2 A In a student -- the Collected Rules set
3 forth the name of, I guess they call it the
4 appellate officer. I'd have to look at the rules,
5 but the chancellor, I believe -- excuse me -- the
6 chancellor, I believe, has selected someone to
7 serve as the appellate officer, and for most of
8 the time that I was at the university, it was the
9 vice chancellor of student affairs.
10 Q And that was Cathy Scroggs?
11 A For most of the time that I was at the
12 university.
13 Q And the appellate officer then reviews
14 the investigative report and your decision and
15 makes a determination whether to uphold or
16 reverse; is that what happens?
17 A I don't recall exactly what materials
18 the appellate officer reviews.
19 Q Is there any additional level of appeal
20 after the appellate officer?
21 A No.
22 Q So their decision is final?
23 A Yes.
24 Q Okay. How often, or how many times when
25 you were in this role and issued a sanction was

Page 30

1 that sanction modified or reversed by the -- the
2 appellate officer?
3 A I don't recall.
4 Q Was it common?
5 A I don't recall.
6 Q Do you recall about how many decisions
7 you issued in your time in this role?
8 A I do not.
9 Q Do you think it's more than 50?
10 A I don't know.
11 Q All right. I want to look at the CRRs a
12 little bit.
13 Some of these exhibits being numbered in
14 previous depositions, so we're going to keep that
15 numbering unless we add new ones.
16 This first exhibit has been, was
17 previously marked as Exhibit 1.
18 (Exhibit 1 was previously marked for
19 identification.)
20 Q So this is, Exhibit 1 is a copy of CRR
21 200.010 Standard of Conduct. And I assume you're
22 familiar with this CRR?
23 A Yes. I'm familiar with CRR 200.010,
24 or -- or I should say I was familiar with it when
25 I worked at the university.

Page 31

1 Q I know it's been a little while, so I
2 want you to have an opportunity to look at this,
3 but I want to ask you a question about, or a
4 couple questions about specific parts of this
5 rule.
6 The case involving Jeremy Rowles
7 included allegations of sexual harassment and
8 stalking on the basis of sex.
9 So I want to look at those definitions.
10 They are in the second page with the Bates number
11 Rowles PROD616 at the bottom.
12 And so subpart -- these are numbered --
13 C7A, which is about -- or, excuse me -- C7B, about
14 halfway down, a little more than halfway down that
15 page.
16 Do you see that?
17 A I do.
18 Q So I want to go through this definition
19 and talk about it a little bit. So the -- under
20 part B here, there are two, sort of, broad
21 categories of sexual harassment.
22 1 says, "Unwelcome sexual advances or
23 requests for sexual activity by a person or
24 persons in a position of power or authority to
25 another person or"; so before we go on to the

Page 32

1 "or," let's just stop right there and talk about
2 that first category.
3 What does "person or persons in position
4 of power or authority" mean --
5 MS. LITTLE: Objection.
6 Q In that -- in that phrase?
7 MS. LITTLE: Object to the form of the
8 question.
9 A So I think it means what it says, a
10 person or persons in a position of power or
11 authority to another person.
12 Q So, for example, like a teacher and a
13 student, a teacher would be in a position of
14 authority; is that correct?
15 A A teacher and a student. Like a
16 professor --
17 Q Uh-hum.
18 A -- and a student?
19 Q Uh-hum.
20 A Yes.
21 Q And what about like an employer and an
22 employee, would that also be a situation where
23 there was a position of authority or power?
24 A Yes.
25 Q If -- does it also include a power

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 2 of 15

Page 33

1  differential based on the -- just the physical
2  size of the two people?
3      A   I don't think I've ever considered that
4  before.  Under this prong.
5      Q   Under this prong, you've generally
6  considered it, about a relationship of power of
7  some sort; is that -- is that what you're saying?
8      A   Yes.
9      Q   Okay.  And then Subpart 2 says, "Other
10  unwelcome verbal or physical conduct of a sexual
11  nature by a person to another person when" -- and
12  then there are two subcategories of that, 2A says,
13  "When submission to or rejection of such conduct
14  is used explicitly or implicitly as a condition
15  for academic or employment decisions, or"; so
16  let's just talk about the first one there.
17      In the world of employment-related
18  litigation, are you familiar with the phrase "quid
19  pro quo harassment"?
20      A   Yes.
21      Q   And what does that phrase mean to you?
22      A   This for that.
23      Q   And is this subsection 2A getting at
24  quid pro quo harassment?
25      MS. LITTLE:  Object to the form of the

Page 34

1  question.
2      A   It doesn't say "quid pro quo."
3      Q   Is it based on a threat or promise of
4  something in exchange for something else?
5      A   That's how I read it, yes.
6      Q   Okay.  And then let's look at Sub B, so
7  to read that section in order, we're going back up
8  to 2 and then reading 2B, "Other unwelcome or
9  verbal or physical conduct of a sexual nature by a
10  person to another person when," "B," "such conduct
11  creates a hostile environment by being
12  sufficiently severe or pervasive and objectively
13  offensive that it interferes with limits or denies
14  the ability of an individual to participate in the
15  benefit" -- "participate in or benefit from
16  educational programs or activities or employment
17  access, benefits, or opportunities."
18      So let's break that down a little bit.
19  "Such conduct creates a hostile environment by
20  being sufficiently severe or pervasive and
21  objectively offensive."
22      So there's a string of three things:
23  severe or pervasive, and objectively offensive.
24  And I want to the ask you about those
25  conjunctions, the "or" and the "and" there.

Page 35

1      Normally "or" means this or that.  One
2  or the other.  Right?  You can satisfy something
3  with either one; is that correct?
4      A   This or that, it means -- it doesn't
5  have to be both.
6      Q   It doesn't have to be both, one or the
7  other is sufficient; is that right?
8      A   Uh-hum.
9      Q   Okay.  "And" generally means that you
10  have to have both; is that correct?
11      A   Yes.  Sorry.  The sun --
12      Q   Sorry.
13      A   -- was in my eyes.
14      Q   Why don't we just go off the record for
15  a second and fix that.
16      (Off the record.)
17      Q   Okay.  We were discussing things that
18  are joined by an "and."
19      If you have a series of elements or
20  requirements joined by an "and," that means you
21  have to have all of those things; is that correct?
22      MS. LITTLE:  Object to the form of the
23  question.
24      A   Are you asking about the "and" here?
25      Q   I just mean generally speaking.  I mean,

Page 36

1  you said a moment ago that "or" means one or the
2  other.  It doesn't have to be both.  I don't want
3  to contrast it with "and."
4      "And" means it has to be both; is that
5  correct?
6      MS. LITTLE:  Same objection.
7      A   I think generally speaking, "and"
8  unifies or brings together two parts.
9      Q   Okay.  So if we look at the specific
10  language here, "severe or pervasive and
11  objectively offensive."
12      Does the "and objectively offensive"
13  form a single element with "pervasive" here --
14      MS. LITTLE:  Object to the form of the
15  question.
16      Q   -- on the one hand, and "severe" on the
17  other hand?
18      A   What do you mean by "element"?
19      Q   So you said a minute ago that if you
20  have an "or," it has to be one or the other.  It
21  doesn't have to be both; right?
22      So severe or pervasive.
23      A   It means the conduct needs to be severe
24  or pervasive.
25      Q   Okay.  And then what I want to know is

9 (Pages 33 to 36)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 3 of 15

Page 37

1   what that "and objectively offensive" part -- is
2   that a separate thing that has to be there in
3   addition to the either "severe or pervasive"?
4       A   The hostile environment needs to be
5   objectively offensive.
6       Q   Okay.  So every hostile -- every hostile
7   environment must be objectively offensive; is that
8   right?
9       A   Yes.
10      Q   Okay.  And then in addition to being
11  objectively offensive, it must also be either
12  severe or pervasive; is that right?
13      A   Yes.
14      Q   Okay.  So conduct that is both severe
15  and pervasive, but not objectively offensive,
16  would not fall within this definition; is that
17  right?
18      MS. LITTLE:  Object to the form of the
19  question.  Lacks foundation.
20      A   Severe or pervasive.  It needs to be
21  objectively offensive.
22      Q   Okay.  That's what I thought you said.
23  I just wanted to make sure.
24      Okay.  Let's drop down to D, stalking on
25  the basis of sex.  The definition is, "Stalking on

Page 38

1   the basis of sex is following or engaging in a
2   course of conduct on the basis of sex with no
3   legitimate purpose that puts another person
4   reasonably in fear for his or her safety, or would
5   cause a reasonable person under the circumstances
6   to be frightened, intimidated, or emotionally
7   distressed."
8       Let me ask you about a couple of those
9   pieces there.  "Engaging in a course of conduct
10  based on sex."
11      Does that include asking somebody out on
12  a date?
13      A   Engaging in a course of conduct on the
14  basis of sex?
15      Q   Uh-hum.
16      A   With no legitimate purpose.  I kind of
17  think you have to read the whole definition here.
18      Q   All the way through "no legitimate
19  purpose" or even beyond that?
20      A   Even beyond that.
21      Q   So, "Engaging in a course of conduct on
22  the basis of sex with no legitimate purpose that
23  puts another person reasonably in fear for his or
24  her safety."
25      That whole thing?

Page 39

1       A   "Or" --
2       Q   Or?
3       A   -- "would cause a reasonable person
4   under the circumstances to be frightened,
5   intimidated, or emotionally distressed."
6       Q   Okay.  So that is all one thing, is what
7   you're saying?
8       A   Well, it either has to be putting a
9   "person reasonably in fear for his or her safety,"
10  or it has to be "would cause a reasonable person
11  under the circumstances to be frightened,
12  intimidated, or emotionally distressed."
13      Q   Okay.  So the -- everything that comes
14  after the "that" -- "no legitimate purpose
15  that" -- everything that comes after that, there's
16  two options there, "that puts a person reasonably
17  in fear for his or her safety, or would cause a
18  reasonable person under the circumstances to be
19  frightened, intimidated, or emotionally
20  distressed."
21      Those are two ways that you can satisfy
22  that; is that correct?
23      A   That's how I read it.
24      Q   Okay.  And then not just any conduct
25  that puts a person in reasonable fear for his or

Page 40

1   her safety qualifies though; isn't that correct?
2       A   It's engaged -- "following or engaging
3   in a course of conduct on the basis of sex with no
4   legitimate purpose."
5       Q   Okay.  So it has to be both of those
6   things?
7       A   Both of what things?
8       Q   Both the phrase "following or engaging
9   in a course of conduct on the basis of sex with no
10  legitimate purpose"; that's one.
11      And then that -- and then there's sort
12  of two options after that.  Is that how you're
13  reading it?
14      A   So it has to be "following or engaging
15  in a course of conduct on the basis of sex with no
16  legitimate purpose," and then it either has to be
17  "that puts another person reasonably in fear for
18  his or her safety," or it has to be "would cause a
19  reasonable person under the circumstances to be
20  frightened, intimidated, or emotionally
21  distressed."
22      Q   Okay.  Great.  I think we're on the same
23  page.  Now, let me ask you what "no legitimate
24  purpose" means in this context?
25      MS. LITTLE:  Object to the form of the

10 (Pages 37 to 40)

Page 41

1  question.
2      A   I think it depends on the circumstances.
3      Q   So is it possible to engage in a course
4  of conduct on the basis of sex that has a
5  legitimate purpose?
6      A   I think it's one phrase, "course of
7  conduct on the basis of sex with no legitimate
8  purpose."
9          And it does these two things.  So one of
10  these two things that we just talked about, so I
11  think it's a package.
12      Q   So I'm trying to understand what -- what
13  that "no legitimate purpose" means here.  Is
14  that -- it's a -- it's a qualifier for that first
15  part.  Is it an equal -- does it distinguish
16  between courses of conduct on the basis of sex
17  that are legitimate and are not legitimate?
18          MS. LITTLE:  I'll object.  It's been
19  asked and answered.
20      A   I don't know what you mean by that.
21      Q   Well, in enforcing this rule, how would
22  you determine whether the alleged course of
23  conduct on the basis of sex had a legitimate
24  purpose or not?
25      A   I would look at the circumstances before

Page 42

1  me.
2      Q   All right.  And what would -- what kind
3  of circumstances would you look at to determine if
4  it was legitimate or not legitimate?
5          MS. LITTLE:  I'll object to the form of
6  the question.  It's overbroad and asking for all
7  circumstances.
8      A   I would look at the facts alleged in --
9  by the complainant -- I'm sorry, that's my cell
10  phone ringing.
11          The facts alleged by the complainant and
12  the information collected in the investigative
13  report from the respondent and witnesses and the
14  complainant.
15      Q   Okay.  And then you would determine
16  whether you thought it was a legitimate purpose or
17  not; is that correct?
18      A   I would look at whether it seemed to be
19  a legitimate purpose or not, yes.
20      Q   Okay.  And that would essentially be
21  your decision as to whether it's a legitimate
22  purpose or not?
23      A   Well, I would try to think about the
24  circumstances as a whole, and what is reasonable
25  or unreasonable.

Page 43

1      Q   Okay.
2      A   And also think about the university
3  community and what the university -- the
4  university community would expect.
5      Q   Uh-hum.  The university community would
6  expect.  Okay.
7          Sort of a community standards kind of
8  thing?  Is that what you mean by "What the
9  university community would expect"?
10      A   I don't know what you mean by that.
11      Q   Well, I'm not sure what you mean by
12  "what the university would expect." that's what
13  I'm trying to understand what you mean.
14      A   Well, this isn't part of a student -- it
15  is the student code of conduct.
16      Q   Uh-hum.
17      A   The standard of conduct, so these are
18  expectations for the students, and so when I
19  looked at these definitions, I would put it in the
20  context of what would be expected by an
21  undergraduate student or graduate student.
22      Q   Is what's expected by an undergraduate
23  student and a graduate student different?
24      A   In certain circumstances, yes, the -- a
25  graduate student is expected to have more life

Page 44

1  experiences and to be more professional.
2      Q   Is that -- is what you just said
3  somewhere in Rule 200.010?
4      A   I don't think that's written in this
5  document, but we could look.
6      Q   Do you know of any CRR in which it is
7  written?
8      A   I don't.
9          MR. HIRTH:  Okay.  We've been going
10  about an hour, you want to take a little quick
11  break?
12          (Off the record.)
13      Q   All right.  Ms. Eardley, I'd like to
14  turn now to what has been previously marked as
15  Exhibit 5, this is the CRR 200.025, "Equity
16  Resolution Process for Resolving Complaints of
17  Harassment, Sexual Misconduct, and Other Forms of
18  Discrimination Against a Student or Student
19  Organization."
20          Are you familiar with this policy?
21      A   I was more familiar with it when I
22  worked at the university.
23      Q   This is the policy that governed how you
24  conducted investigations in the Title IX office;
25  is that correct?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 5 of 15

Page 45

1       A   It governed investigations for
2   complaints against students in the Office for
3   Civil Rights and Title IX for a particular time.
4   There was another version passed sometime in 2017
5   would be my recollection.
6       Q   Okay.  So let's just look at a couple of
7   points here, under "Definitions," B7, definition
8   of student is, "a person having once been admitted
9   to the university who has not completed a course
10  of study and who intends to or does continue a
11  course of study, in or through one of the campuses
12  of the university.  For the purposes of these
13  rules, student status continues whether or not the
14  university's academic programs are in session."
15      Did I read that correctly?
16      A   I believe so.
17      Q   And that definition doesn't make any
18  distinction between graduate student and
19  undergraduate; does it?
20      A   No.  It does not.
21      Q   All right.  If you look at the third
22  page which says Rowles PROD 621 at the bottom
23  left-hand corner.  Actually, I think I gave you my
24  copy that I wrote.  I'm going to give you one
25  that's not written on.

Page 46

1       A   Would you like this one?
2       Q   Yes.  Thank you.
3       Under "Resolution of Complaint," so this
4   is Section G; it says, "During or upon the
5   completion of investigation, the appropriate
6   administrative officer will review the
7   investigation, which may include meeting with the
8   investigators.  Based on that review, the
9   appellate administrative" -- excuse me -- "the
10  appropriate administrative" -- "administrative
11  officer will make a decision on whether a
12  reasonable person could, based on the evidence
13  gathered, find the accused responsible for
14  violating the university's antidiscrimination
15  policies."
16      Okay.  When it refers to the
17  "appropriate administrative officer," when you
18  were in your position at the Office for Civil
19  Rights and Title IX, that was you; correct?  The
20  appropriate administrative officer?
21      A   Yes.  In most circumstances.
22      Q   And the decision there at this point is
23  to determine whether a reasonable person could,
24  based on the evidence gathered, find the accused
25  responsible; is that correct?

Page 47

1       A   Yeah.
2       Q   Okay.  And then if you would look at the
3   next page, so this is G, part 3, the page at the
4   bottom is Rowles PROD 622.
5       Part 3A says, "Procedures for informal
6   resolution and formal resolution.  For both the
7   informal and formal resolution process, the
8   following will apply: The standard of proof will
9   be 'preponderance of the evidence' defined as
10  determining whether evidence shows it is more
11  likely than not that a policy violation has
12  occurred."
13      Is that -- did I read that correctly?
14      A   No.  It doesn't say "has."
15      Q   "That a policy violation occurred."  No
16  "has."  Sorry.  I inserted the "has" myself, but
17  otherwise I read that correctly?
18      A   I believe so.
19      Q   Okay.  So let me ask you the difference
20  between the standard in G and the standard in part
21  3A.  The first one is whether a reasonable person
22  could, based on the evidence gathered, find the
23  accused responsible.
24      And this is preponderance of the
25  evidence, whether the evidence shows it is more

Page 48

1   likely than not.  Are those the same standards or
2   are those different standards?
3       A   This is talking about two different
4   stages in the process.
5       Q   The first one is the decision about
6   whether to go forward with the complaint; is that
7   right?
8       A   Yes.
9       Q   And that's -- the standard there is
10  whether a reasonable person could believe, based
11  on the evidence, that the accused was responsible;
12  is that right?
13      A   Yes.
14      Q   Okay.  And then the next stage, when the
15  administrative officer is actually deciding
16  whether there has been a violation, the standard
17  is preponderance of the evidence; correct?
18      A   It's when the administrative officer is
19  making the decision or when a hearing panel is
20  making the decision.
21      Q   In both of those circumstances, it's
22  preponderance of the evidence?
23      A   Yes.
24      Q   Okay.  Is preponderance of the evidence
25  a higher standard than a reasonable person could,

12 (Pages 45 to 48)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 6 of 15

Page 97

1    A    A reasonable person could find that
2  Mr. Rowles was responsible based on the evidence,
3  and she did report that she felt intimidated.
4  That was on page 2.
5    Q    I'm sorry, second bullet point.
6    A    The second bullet.  But I believe there
7  are other behaviors that could reasonably be
8  described as intimidating when you look at all of
9  them as the totality.
10    Q    Okay.  And so based on the totality of
11  these allegations, you concluded that Ms. Breaux
12  felt intimidated?
13    A    Well, it says, "She reported that she
14  felt intimidated."  So that's my understanding
15  from speaking with Ms. Lammers about her
16  investigation.
17    Q    Isn't it true that there was a prior
18  draft of this document that did not include the
19  word "intimidated"?
20    A    I don't remember.
21    Q    All right.  Let's mark this as Exhibit
22  24.
23         MS. LITTLE:  We're on 25, actually.
24         MR. HIRTH:  25.
25         (Exhibit 25 was marked for

Page 98

1  identification.)
2    Q    I've handed you what's been marked as
3  Exhibit 25, which appears to be an annotated
4  version of a notice of charges to Mr. Rowles.
5  Do you recognize this document?
6    A    It's smaller, but it looks like a copy
7  of my notes on a draft notice of charges.
8    Q    And that draft notice is dated
9  December 12th; is that correct?
10    A    Yes.
11    Q    Day before the actual notice went out?
12    A    Yes.
13    Q    Okay.  And if we look at the -- the two
14  different, I guess, this has, one, two, three,
15  four, five -- there was only six bullet points on
16  the earlier draft.
17         But some of the annotations here, for
18  example, on the second bullet point you wrote,
19  "How does she feel, unwelcome, emotionally
20  distressed, uncomfortable," question mark,
21  question mark, question mark.  Is that correct?
22    A    I don't know where you are.
23    Q    The second bullet point.
24    A    Oh, how did -- "How did she feel,"
25  question mark, "emotionally distressed," question

Page 99

1  mark.
2    Q    Uh-hum.  On the right there's a couple
3  of other terms; right?  "Unwelcome," "Emotionally
4  distressed," Uncomfortable."
5    A    Yes.
6    Q    Okay.  And you wrote those because they
7  were not in the original draft; is that correct?
8    A    Yes.  Well, I don't know.  I'd have to
9  read whether any of those phrases appeared in the
10  original draft or if I was talking about
11  particular facts.
12         So, for instance, there's a line that
13  comes from Bullet 2 and then there are -- there's
14  handwriting after Bullet 1, so I think I was maybe
15  talking about at particular times how did she
16  feel.
17    Q    And for Bullet Point 3, off on the left
18  margin, it said, "How did she feel, emotionally
19  distressed," question mark; correct?
20    A    Yes.
21    Q    And that annotation immediately follows
22  the sentence in the draft, "She reported that you
23  lingered after class to talk to her multiple
24  times."
25         Correct?

Page 100

1    A    Yes.
2    Q    And you were suggesting to Ms. Lammers
3  that she add something there about how this made
4  Ms. Breaux feel; is that correct?
5    A    Well, I don't know if this -- these
6  edits were directed toward Ms. Lammers or toward
7  my executive assistant, because I say, "Ask AL,"
8  which would be Amber Lammers.  So maybe I was
9  asking Amber, Ms. Lammers, certain questions after
10  reading this, but some of the directions were to
11  my executive assistant to edit the letter.
12    Q    To edit the letter, okay, to include
13  things like she felt emotionally distressed?
14    A    No.  That I needed to ask Amber about
15  that.
16    Q    Okay?
17    A    "Ask AL."
18    Q    At the paragraph at the bottom of that
19  first page, in the draft it says, "Breaux stated
20  that the accumulation of these incidents made her
21  feel uncomfortable and interfered with her ability
22  to focus on work at the rec center."
23         And you have a marginal note that says,
24  "Anything else, unsafe," question mark,
25  "intimidated," question mark, "distressed,"

25 (Pages 97 to 100)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW    Document 88-10    Filed 01/14/19    Page 7 of 15

## Page 101

1 question mark.  Correct.
2    A   Yes.  So I would have to ask Ms. Lammers
3 about that.
4    Q   And in the final version of the document
5 that we looked at first, you pointed out that in
6 the Bullet Point Number 5, that Ms. Breaux
7 interpreted your tone as frustrated and she
8 reported that she felt intimidated and confused by
9 your persistence.  That's what you had said;
10 correct?
11    A   Yes.  That's what I would have learned
12 from Ms. Lammers.
13    Q   Okay.  That sentence, or that -- that
14 clause, "She reported that she felt intimidated
15 and confused by your persistence," is not in the
16 original draft; is it?
17    A   I don't see it there.
18    Q   When -- was this draft originally
19 prepared by Ms. Lammers and then reviewed by you?
20    A   I believe so, but I don't remember.
21    Q   And is it typical for you to make edits
22 to those draft letters before you send them out?
23    A   It's going out under my signature, so,
24 yes, I have letters that go out under my
25 signature.

## Page 102

1    Q   And it would be -- would it be typical
2 in those kinds of edits to ask the investigator
3 followup questions or for -- for their
4 explanation, as you do here?
5    A   Yes.
6    Q   Okay.  And specifically to ask questions
7 about the -- using the same language that's used
8 in the role, as you've done here?
9    A   I would have asked questions that I
10 wanted to understand the answer to in making my
11 determination.
12    Q   Okay.  And so after asking these
13 questions of Ms. Lammers, you found that it
14 satisfied the reasonable person's standard to go
15 forward; is that correct?
16    A   The standard of whether a reasonable
17 person could find, based on the evidence gathered,
18 the accused responsible.
19    Q   And that's -- you made that
20 determination after you got the answers from Amber
21 Lammers to your followup questions?
22    A   Yeah.
23    Q   Now, during the investigation into
24 Ms. Lammers -- excuse me -- into Ms. Breaux's
25 complaint, you were contacted by Ms. Breaux's

## Page 103

1 mother; is that correct?
2    A   I don't really recall that.  I know
3 there was an e-mail.
4    Q   Show you what we'll mark as Exhibit 26.
5    (Exhibit 26 was marked for
6 identification.)
7    Q   Give you a chance to look at this.
8    Do you recall getting this e-mail now?
9    A   I don't recall it.  But it's my e-mail
10 address.
11    Q   You don't have any reason to believe you
12 didn't get this e-mail; do you?
13    A   I don't, I just don't have an
14 independent recollection of it.
15    Q   Okay.  And in -- according to the
16 document, in response, you wrote to Ms. Gallimore
17 and Ms. Lammers for an update on the matter; is
18 that correct?
19    A   I did.
20    Q   And is it fair to say that the e-mail
21 sent to you by Ms. Breaux's mother is concerned
22 that things aren't moving fast enough with the
23 investigation?
24    A   She -- she says -- she sets forth a time
25 that Ms. Breaux made her complaint and says that

## Page 104

1 there's no notice of investigation or no contact
2 directive.
3    Q   And she wanted those things sent out?
4    A   I suppose.
5    Q   And after she sent you the e-mail, you
6 did send those things out; correct?
7    A   We were working on those things.
8    Q   Is it unusual to get pressure from the
9 family members of a -- you know, a complainant?
10    MS. LITTLE:  I'll object to the form of
11 the question.
12    A   I wouldn't call this pressure.
13    It would have been more common for
14 undergraduate students' parents to attempt to
15 contact us at some point in the process, but it
16 depended on the parent and the child and how much
17 the parent was sharing with the child.  We
18 couldn't share very much information, oftentimes,
19 because of -- because of the federal privacy law.
20    Q   And I think you said earlier in the
21 deposition that one of your concerns or
22 responsibilities was to think about the liability
23 that the university faced from Title IX
24 allegations; is that correct?
25    A   I don't know exactly what I said, but

26 (Pages 101 to 104)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 8 of 15

## Page 109

1  in the exhibits to the investigative report.
2      Q    The paragraph at the bottom of that
3  page, you wrote, "After an apology, JR temporarily
4  honored AB's request.  He did continue to attend
5  her TigerX classes, but did not contact her
6  outside of class."
7          Do you know or do you recall whether
8  Ms. Breaux told Mr. Rowles that he could continue
9  attending her classes?
10     A    It says "class."  But I don't recall.
11     Q    Would it make a difference to you if she
12 said that he still could come to class even though
13 she wanted a professional relationship with him?
14     A    I don't -- I think I would have relied
15 on the facts that were in the investigative
16 report.
17     Q    The top of the next page, second line,
18 "According to AB, he would stare at her, try to
19 stand in front of her during instruction, grab her
20 hand during a classroom, high-five, and linger
21 after class to say something to her, all of which
22 made her uncomfortable and was distressing to her
23 in her place of employment."
24         When you say "uncomfortable," does that
25 mean intimidated?

## Page 110

1      A    I think generally she felt intimidated
2  or unsafe.
3      Q    Are you aware of any place in the
4  investigative file or anywhere else that she ever
5  said she felt unsafe, in those words?
6          MS. LITTLE:  I'll object to the form of
7  the question as overbroad.
8      A    I -- I don't recall where, but I do
9  recall that there was a mention about her safety
10 at some place in the investigative report or one
11 of the attachments.
12     Q    A few paragraphs down, beginning on
13 October 7th, there is a reference to Mr. Rowles
14 giving Ms. Breaux a coffee drink token from
15 Kaldi's and a piece of paper with the Scientist by
16 Cold Play written on it.  "This also made AB feel
17 uncomfortable in her place of employment."
18         Again, she -- I don't know if this is
19 her word or your word, "uncomfortable."
20         Do you understand than to mean or did
21 you write that to mean intimidated?
22     A    I think overall, she felt like his
23 conduct was interrupting her at her workplace and
24 made her distressed about going to her workplace.
25     Q    Let's talk about that word, "distressed"

## Page 111

1  for a minute, because that's one of the words
2  that's used in the -- in the rule, "emotionally
3  distressed."
4          What does it mean to be emotionally
5  distressed?
6      A    I think that it is a state of emotional
7  discomfort.
8      Q    And I assume being afraid would
9  constitute emotional distress; is that correct?
10     A    Yes.  It would.
11     Q    What about being frustrated?
12     A    I don't know if frustrated alone would
13 constitute emotional distress, it might need to be
14 with other emotions.
15     Q    What about being annoyed, does that
16 constitute emotional distress?
17     A    I think it would depend on the
18 circumstances and whether there were other
19 emotions or facts.
20     Q    And the determination about whether any
21 one of those states or the combination of them
22 constitute emotional distress is a decision that
23 you made in your role as the administrative
24 officer; correct?
25     A    I determined for this particular

## Page 112

1  decision whether the reasonable person under the
2  circumstances would be frightened, intimidated, or
3  emotionally distressed.
4      Q    And so whether being annoyed alone or
5  frustrated alone could qualify as emotional
6  distress is a determination that you would make?
7      A    I would make a determination in this
8  case whether a reasonable person, under the
9  circumstances, was frightened, intimidated or
10 emotionally distressed.
11     Q    But there isn't, like, a definition
12 you'd go to that would tell you what emotionally
13 distressed means; is there?
14     A    Well, I think there's a reasonable
15 definition -- or the dictionary, but, no, there's
16 nothing else in the Collected Rules.
17     Q    On the bottom of what says page 38 of
18 150.
19     A    Uh-hum.
20     Q    The paragraph beginning, "When I met
21 with JR."
22     A    Yes.
23     Q    "He asserted there was gossip about him
24 within the rec center and stated that he feels
25 hurt.  He claimed that he did not understand what

28 (Pages 109 to 112)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 9 of 15

## Page 133

1  the registrar's office; and for graduate students,
2  the graduate -- graduate college -- graduate
3  office.
4      Q   Uh-hum.  And so for undergraduates, you
5  know, a two-year suspension, they just come back
6  and continue taking courses at the end of that two
7  years?
8      A   I don't know if that's the case.  I seem
9  to recall that after a certain period of time away
10  from the university, for whatever reason, for
11  undergraduates, they would have to put in an
12  application for the registrar's office to
13  reactivate their record; this was technical stuff
14  that had to occur.
15      Q   Okay.  And with graduate students,
16  there's a similar process?
17      A   I don't recall.  I would have had to
18  consult with the graduate studies office.  I would
19  have been communicating with them if he wished to
20  return and I were still there.
21      Q   Graduate programs are not generally open
22  to everybody who wants to take them; are they?
23      A   Usually, there's a limited number of
24  positions in the graduate program.  I think it
25  varies on the discipline and the school.

## Page 134

1      Q   And you have to be admitted into that
2  program; is that correct?
3      A   Yes.  You are selected by that program.
4      Q   So in cultural anthropology, for
5  example, the faculty, I guess, at the anthropology
6  department would select somebody to be a graduate
7  student?
8      A   I don't know how the decisions are made
9  in that department or school or college.  But they
10  would be made in consultation with what was called
11  graduate studies, I don't know what it's called
12  now.
13      Q   You don't know one way or the other
14  whether Mr. Rowles' doctoral program is open and
15  waiting for him when the suspension is over; do
16  you?
17      A   I don't know that.
18      Q   Assuming it were open, he would still
19  have to go through the remediation plan; correct?
20      A   That's correct.
21      Q   On the page -- page 142 of 150 --
22      A   Yes.
23      Q   -- midway down the page, paragraph
24  beginning with, "After satisfactory completion of
25  the remediation program, if JR seeks a graduate

## Page 135

1  assistance-ship or employment, JR must be
2  evaluated before he may be employed by the
3  university, directly supervise others, or oversee
4  undergraduate or graduate students."
5          This is limited to whether he's -- if
6  he's actually, like, a teacher or has a job at the
7  university; correct?
8      A   Correct.
9      Q   If he just takes courses, that part
10  doesn't necessarily apply?
11      A   That part only applies if he's seeking
12  employment or a TA position or RA position or
13  something like that.
14      Q   Did you have any communications with his
15  department around the time that you issued the
16  sanctions against him about whether they wanted
17  him to stay?
18      A   I don't recall that particular
19  discussion.  I know that I did speak with someone
20  in the department.  I don't remember what about.
21      Q   Okay.  I want to look briefly at
22  Ms. Breaux's formal complaint.  I think we
23  previously marked it, but I don't remember the
24  number.  So I'm just going to re-mark it as
25  something new.

## Page 136

1          (Exhibit 27 was marked for
2  identification.)
3      Q   This is marked -- what we're marking
4  Exhibit 27, it also says "Exhibit 10" in the top
5  left corner, which I'll represent to you is
6  Exhibit 10 to the investigative report prepared by
7  Amber Lammers.  This complaint dated October 21,
8  2016, is from Annalise Breaux; is that correct?
9      A   Yes, that's my understanding.
10      Q   And this is her formal complaint against
11  Mr. Rowles for the conduct that we've been talking
12  about today; correct?
13      A   Yes.
14      Q   In this complaint, about halfway down
15  that first large paragraph, she writes, "This
16  semester, fall, 2016."
17          Do you see where I am?
18      A   No.
19      Q   It's a little less than halfway down
20  that first big paragraph.
21      A   Oh, I see.
22      Q   "He began attending all four of the
23  TigerX classes that I teach and would do things
24  such as linger after class to make sure he was
25  able to say something to me, consistently

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 137

```
 1    high-five or grab my hand intimately before,
 2    during, or after class.  And stare me down the
 3    entirety of my class while I was directly" --
 4    "whether" -- "whether I was directly teaching or
 5    not.  All of these things made me feel
 6    uncomfortable."
 7         She doesn't say "intimidated"; correct?
 8    A    She says that it made it -- not in those
 9    two sentences or three sentences.  Two sentences.
10    Q    Or that she was afraid?
11    A    She doesn't say that.
12    Q    She doesn't say that he threatened her?
13    A    She says that he grabbed her hand
14    intimately and stared her down and lingered after
15    her class.
16    Q    But she doesn't say she's afraid of him;
17    does she?
18    A    She in those two sentences does not say
19    that.
20    Q    And then further down, there's mention
21    of that Kaldi's Coffee token.  It begins, "The
22    note contained a Kaldi's Coffee free drink."
23         Do you see that?
24    A    Yes.
25    Q    "And the Scientist by Cold Play written
```

## Page 138

```
 1    down.  Jeremy knows I work at Kaldi's and I was
 2    not sure what this note was supposed to mean, but
 3    it was very bizarre."
 4         She says that she found his conduct in
 5    giving her this token to be bizarre; correct?
 6    A    Yes.
 7    Q    She doesn't say that she was afraid;
 8    does she?
 9    A    That's not what she said there.
10    Q    She doesn't say that she was
11    intimidated?
12    A    She did not say that in those sentences.
13    Q    She doesn't even say she's uncomfortable
14    there; does she?
15    A    Right after that, she does.
16    Q    When she's talking about the letter that
17    he brought her?
18    A    Yes.  "His actions were making me
19    uncomfortable."
20    Q    And this is -- "After this on
21    October 14th, this is when he lingers after class
22    and approached me and handed me a three-page typed
23    noted and said it was an apology note for the
24    other week."
25         Is that correct?
```

## Page 139

```
 1    A    What's the question?
 2    Q    That was sort of the -- the final straw
 3    that precipitated this complaint?
 4    A    I don't know.  I read, "His actions were
 5    making me uncomfortable" as talking about the
 6    actions overall, not just one specific action.
 7    Q    Okay.  The three-page letter that is
 8    referenced here, I assume that was part of the
 9    investigative report?
10    A    I reviewed that when I reviewed the
11    investigative report.
12    Q    Okay.  Let's look at that letter.  We'll
13    mark this Exhibit 28.
14         (Exhibit 28 was marked for
15    identification.)
16    Q    What has been marked as Exhibit 28,
17    we'll take a moment to look at it.  Is this the
18    three-page letter referenced in Ms. Breaux's
19    complaint?
20    A    It looks like it.  I don't remember it
21    word for word.
22    Q    And just looking at a couple portions of
23    this, the letter begins, "I'm writing this to you
24    to communicate my apologies, my thoughts and my
25    feelings, not just on what happened last week
```

## Page 140

```
 1    about the private dance lessons, but on everything
 2    in regards to me and you."  Correct?
 3    A    Yes.
 4    Q    Did I read that right?
 5         Next paragraph begins, "To begin, the
 6    private lessons," there's an ellipsis, then it
 7    says, "Yes, I sincerely apologize about that.  It
 8    is my fault to assume that you were available to
 9    give me private lessons.  I should have asked you
10    before making the assumption, and I really
11    apologize to you."
12         Did I read that right?
13    A    "Making that assumption."
14    Q    "Making that assumption, and I really
15    apologize to you."
16         Is that correct?
17    A    That's what it says.
18    Q    If you go to the third paragraph, about
19    midway through that third paragraph, he begins the
20    sentence with, "I never ever want"?
21    A    Yes.
22    Q    Seven lines down.  He says, "I never
23    ever want to make a woman uncomfortable around me,
24    that is a priority of very grave importance to me.
25    I often have complications communicating my
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 11 of 15

## Page 141

1  emotions with people, as I tend to speak directly
2  from my heart with very little nuance, and to
3  realize that the blunt and outspoken way of
4  speaking to you made you uncomfortable, it is
5  something that I still feel guilty about,
6  Annalise."
7      Did I read that right?
8  A  "And to realize that that," is how it is
9  phrased, not "that the."
10  Q  Two "that's" there. Okay. In each of
11  the portions I have read so far, there is an
12  apology; isn't there?
13  A  He uses the word "apologies,"
14  "apologize." I don't know, there's only two
15  "apologies."
16  Q  And she refers to this in her complaint
17  as a, quote, "love letter"; doesn't she?
18  A  I don't recall how she characterized it.
19  Q  Does this letter ever threaten her with
20  anything?
21  A  I'd have to read it.
22  Q  Take a minute to look at it.
23      Is there any threat against Ms. Breaux
24  in this letter?
25  A  The letter itself does not describe a

## Page 142

1  physical threat, like, I, Jeremy, am going to hurt
2  you physically in any way. I do think the letter
3  in the context of things could be perceived as
4  threatening.
5  Q  It's clear from the letter that he wants
6  to have a romantic relationship with Ms. Breaux;
7  is that a fair characterization?
8  A  He very much wants to have a romantic
9  relationship with Ms. Breaux.
10  Q  And she did not want a relationship with
11  him; is that correct?
12  A  No. I think she made that very clear as
13  well.
14  Q  Does he suggest in this letter that he's
15  going to do anything against her will?
16  A  The fact of this letter is against what
17  she has communicated to him and the boundaries
18  that she has established.
19  Q  So if she, based on her prior
20  communications with him about wanting to have a
21  professional relationship, was it a violation of
22  the CRRs to give her this letter at all?
23  A  I didn't look at this letter separate
24  from everything. I looked at the totality of the
25  circumstances. So the course of conduct that he

## Page 143

1  engaged in violated the sexual harassment
2  prohibition and the stalking prohibition. This
3  was one piece of that.
4  Q  Okay. If you will look back just
5  briefly, that Exhibit 27, the complaint by Breaux,
6  does she accuse him of stalking her anywhere in
7  that letter -- in that complaint?
8  A  She does not use the word "stalking," I
9  do not believe.
10  Q  All right. Look at your interrogatory
11  responses, which we'll mark as Exhibit 29.
12      (Exhibit 29 was marked for
13  identification.)
14  Q  If you look at Question 7, it's on
15  page 4.
16  MS. LITTLE: Do you have a copy?
17  MR. HIRTH: Oh, yeah.
18  MS. LITTLE: Thank you.
19  Q  Question 7 asks, "Of the complaints of
20  sexual harassment or stalking based on sex, as
21  those terms are described in the university's
22  Collected Rules and Regulations, for which the
23  accused was found responsible through either" --
24  "through any resolution process for sexual
25  harassment or stalking based on sex, how many of

## Page 144

1  the accused students were," and then there's four
2  categories, "expelled," "suspended one or more
3  years," "suspended less than one year," or
4  "neither expelled nor suspended."
5      Your answer is, "Information regarding
6  complaint resolution and sanctions may be obtained
7  from the annual reports which are available on the
8  website of the Office for Civil Rights and Title
9  IX."
10      That was your answer; correct?
11  A  Yes.
12  Q  And we had looked at the report a
13  little -- annual report for 2015-'16 a little bit
14  earlier. That's the kind of report you're
15  referring to here; correct?
16  A  Yes.
17  Q  And that report does not actually say
18  how many students found responsible for sexual
19  harassment or stalking based on sex were expelled,
20  does it?
21  A  It tells you how many students were
22  expelled under the Collected Rules and Regulations
23  that the Office for Civil Rights and Title IX were
24  responsible for enforcing.
25  Q  And that includes expulsions for

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 12 of 15

Page 145

1    nonconsensual sexual intercourse, for example?
2        A    It could.
3        Q    So it's impossible to tell from that
4    report how many students were specifically
5    expelled for violating these two provisions; is
6    it?
7        A    I don't think so.
8        Q    You said earlier that you worked with
9    your staff to create a -- an intake form that
10   asked voluntarily -- or asked voluntarily for the
11   race of the person making the report; is that
12   correct?
13       A    It was for everyone that came to the
14   office.
15       Q    Why did you include that?
16       A    I thought that it would be useful, as a
17   new office. I was thinking about down the road,
18   it would be helpful to have more information to
19   look at patterns and trends.
20       Q    What kinds of patterns and trends?
21       A    If we were seeing any differences based
22   on race as well as gender, I think we were
23   collecting, slash, gender identity or gender
24   expression, I can't remember what other
25   demographic information, but we wanted to start

Page 146

1    collecting that information.
2        Q    And you thought it would be useful to be
3    able to look at trends like that?
4        A    Yeah, after several years of the
5    office's existence, I thought if there was a body
6    of information to look at, you could look at
7    pattern and trends -- patterns and trends.
8        Q    And is one of the things that you could
9    use those trends for to determine whether the
10   office itself, the title, the Office for Civil
11   Rights and Title IX itself had any kind of
12   implicit bias?
13       A    I'm not sure that that would be shown by
14   that data. What I was interested in was, you
15   know, are there parts of the university population
16   that we would like to make sure that they feel
17   that they can trust our office. And are we not
18   getting reports from certain parts of the
19   community. Are we carrying out our mission.
20       Q    To your knowledge, has that data ever
21   been collected and analyzed in any way?
22       A    I don't know.
23       Q    But you thought it would be something
24   useful to do?
25       A    I thought that kind of demographic

Page 147

1    information would be helpful, yes.
2        A    No one at the university ever told you
3    not to collect that kind of information; did they?
4        A    Not that I recall.
5        Q    If you look at Question Number 18.
6             Number 18 asks, "After prefatory setup
7    about what information you had at your disposal,
8    do you contend that plaintiff ever touched
9    Annalise Breaux inappropriately?"
10            You objected to that question, but I am
11   going to ask you today:  In reviewing the
12   investigative report and making your findings with
13   regards to Mr. Rowles' conduct, did you find that
14   he ever touched Annalise Breaux inappropriately?
15       A    Yes. I recall that he intimately
16   touched her hand, and she described it was
17   intimate.
18       Q    What does that mean?
19       A    It seemed to be different than how he
20   would grab other people's hands.
21       Q    Did she describe how he grabbed her
22   hand?
23       A    She said "intimately." That's what I
24   recall from looking at the investigative report
25   and the attachments.

Page 148

1        Q    And she didn't explain what "intimately"
2    meant?
3        A    I don't recall that.
4        Q    The intimate hand grabbing, that
5    occurred in the student rec center?
6        A    As far as I can recall, yes.
7        Q    Did it happen more than once?
8        A    I don't recall.
9        Q    Question 19 asks, "Do you contend that
10   the plaintiff ever threatened Annalise Breaux with
11   violence or nonconsensual sexual contact?"
12            You objected, but I'm asking you today,
13   do you contend -- do you -- in your findings, did
14   you find that plaintiff ever threatened Annalise
15   Breaux with violence or nonconsensual sexual
16   contact?
17       A    I didn't make a determination. There
18   was no allegations of a nonconsensual sexual
19   contact, or of violence.
20       Q    Question 21 asks, "Do you contend that
21   plaintiff posed a danger of physical or sexual
22   assault against Annalise Breaux?"
23            You objected, but I'm asking you today,
24   in your findings, do you believe that he posed a
25   danger of physical or sexual assault?

37 (Pages 145 to 148)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW    Document 88-10    Filed 01/14/19    Page 13 of 15

## Page 157

1   panelists each time.  Those wouldn't be the same
2   each time.
3       Q    So is it fair to say that the sanction
4   imposed, then, depends in part on who the
5   decision-maker is?
6       A    I do think that people approach a set of
7   facts differently, but I think that when you are
8   looking at the set of facts, it's probably -- the
9   facts and circumstances of the complaint are
10   probably the most significant in determining what
11   the sanctions are.
12       Q    Okay.  You can't tell, can you, from the
13   information provided here what the student in 22
14   and 24 actually did; can you?
15       A    I cannot.
16       Q    And you would need to know additional
17   information to know whether they are in fact
18   similarly situated to Mr. Rowles; wouldn't you?
19       A    Yes.  I would.
20       Q    And that other information is
21   information that the Title IX office, civil rights
22   office, the Office for Civil Rights and Title IX
23   would have that information; correct?
24       A    I don't know; I believe that they would.
25   I'm not there any more.

## Page 158

1       Q    But when you were there, you maintained
2   files of each investigation; is that correct?
3       A    We maintained information about the
4   investigation, the investigative report and the
5   decision, the appeal, if there is an appeal.
6       Q    So if you wanted to go back and look at
7   a prior case; is that true?
8       A    I'm sorry, maybe I didn't hear you.
9       Q    So if you wanted to, you could then go
10   back and look at a prior case?
11       A    I could look at the records that the
12   office maintained, yes.
13       Q    Did you ever do that in an effort to
14   determine what sanction was appropriate?
15       A    I don't recall looking at particular
16   cases.
17       Q    If you look at number 11, this is an
18   investigation arising out of a complaint for
19   conduct on or around February of 2015 that
20   included alleged violations of university rules
21   prohibiting physical abuse or other conduct that
22   threatens or endangers the health or safety of any
23   person, sexual misconduct NC/SC," which I
24   understand means nonconsensual sexual contact,
25   "threatening or intimidating behaviors."  All four

## Page 159

1   of those things.
2       This student received a two-year
3   suspension, was barred from campus for one year,
4   and required, it looks like, to go through some
5   sort of rehab according to this.
6       There's no allegation in Mr. Rowles'
7   case of nonconsensual sexual contact; is there?
8       A    Not that I'm aware of.
9       Q    Does it surprise you that someone who is
10   not accused of nonconsensual sexual contact would
11   have -- that you would give that person twice the
12   length of a suspension of someone who was accused
13   of nonconsensual sexual contact?
14       A    No.  It does not.
15       Q    Why not?
16       MS. LITTLE:  I'll just object this has
17   been asked and answered.
18       A    So I don't know that I made this
19   decision, so there's nothing here to me that
20   indicates that I would have made this decision.
21       If I did make the decision, it still
22   would not surprise me that there would be a
23   difference in Mr. Rowles' case.  I explained the
24   reasons earlier for the sanctions that I imposed.
25       Q    If you look at 13, another allegation of

## Page 160

1   physical abuse or other conduct that threatens or
2   endangers the health or safety of any person,
3   sexual misconduct, there's a litany of things
4   here.
5       This student received one year,
6   six-month suspension, and expulsion, so, again,
7   received a lighter sanction than Mr. Rowles;
8   correct?
9       A    He received -- well, one year, six-month
10   suspension and Mr. Rowles received two.
11       Q    Well, he originally got four; right?
12   And then it was reduced by the appellate officer?
13       A    Yeah.
14       Q    Sixteen, in April 2015, "Involves
15   harassment on the basis of sex, bullying on the
16   basis of sex, threatening or intimidating
17   behaviors, taking of, damage to, or possession
18   without permission of property of the university
19   or of a member of the university community or of a
20   campus visitor."
21       This person was found responsible for
22   all of those things other than on the basis of
23   sex, and they were given a six-month suspension
24   and an 18-month probation.
25       A    Yeah.  Not any more training.

40 (Pages 157 to 160)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 14 of 15

Page 169

1   A   Yes.
2   Q   And that's what I'm asking you.  Who
3  makes that determination?
4   A   At the outset?
5   Q   Uh-hum.
6   A   Typically, I think it's the
7  investigator.
8   Q   The investigator, okay.  And as the
9  process goes along and gets to the point of the
10  administrative officer making a decision about
11  whether to give a notice of charges, at that
12  point, the administrative officer makes a
13  determination of whether it fits, whether, under
14  the reasonable person standard, under -- if their
15  conduct fits that rule?
16   A   I don't think it's the reasonable person
17  standard, but under the standard articulated in
18  the rule, the administrative officer makes the
19  decision about what allegations, what potential
20  violations to charge.
21   MR. HIRTH:  Okay.  Give me just about
22  five minutes, see if I have anything else.
23   (Off the record.)
24   Q   All right.  Just a couple more questions
25  Ms. Eardley.  Looking again at Exhibit 3.

Page 170

1  Previously we talked about Investigation Number 22
2  and Investigation Number 53.
3   A   I think we talked about -- oh, yeah, 22
4  and --
5   Q   22 to 24 and 53 were the three that
6  included both sexual harassment and stalking on
7  the basis of sex.  22 and 53 have the exact same
8  sexual harassment and stalking on the basis of
9  sex, whereas 24 has some additional things besides
10  those two; is that correct?
11   A   Yes.
12   Q   There's also nonconsensual sexual
13  contact and nonconsensual sexual intercourse in
14  24; is that right?
15   A   Yes.
16   Q   And there's also threatening or
17  intimidating behaviors; is that correct?
18   A   Yes.
19   Q   And there's no allegation of
20  nonconsensual sexual contact and nonconsensual
21  sexual intercourse against Mr. Rowles; correct?
22   A   No.  Or, that's correct.
23   Q   And there's no allegation of threatening
24  or intimidating behaviors against him?
25   A   No.  There's not.

Page 171

1   Q   Okay.  Looking at the data in number 22,
2  24, and 53, can you provide any explanation of why
3  these three students received different sanctions?
4   MS. LITTLE:  I'll just object it's been
5  asked and answered.
6   A   Well, I don't know the circumstances of
7  22 or 24.  And so I cannot -- what I can tell you
8  is that each decision is made based on the facts
9  and circumstances in that particular case.
10   The sanctions are tailored to that case,
11  based on the sanction factors that we've discussed
12  earlier.  The nature of the circumstances, the
13  need to prevent the behavior from reoccurring, the
14  severity of the circumstances, the disciplinary
15  history of the accused, other circumstances that
16  are relevant.
17   Q   You would need all that information to
18  be able to tell why these received different
19  sanctions?
20   A   I mean, I don't know if I would even
21  then be able to tell.  I would say that it's very
22  difficult to compare any particular case to
23  another case because they're so unique and so
24  fact-specific.
25   MR. HIRTH:  Okay.  That's all I have.

Page 172

1   MS. LITTLE:  We don't have any
2  questions.  But the witness will review and sign
3  the transcript.  Thank you.  And all exhibits
4  will be retained.
5   MR. HIRTH:  I will order the transcript
6  expedited.
7   MS. LITTLE:  I will also like to order a
8  copy expedited as well.
9   (Off the record at 4:00 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

43 (Pages 169 to 172)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-10   Filed 01/14/19   Page 15 of 15