## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
 2                 CENTRAL DIVISION
 3
 4   JEREMY A. ROWLES,          )
                                )
 5        Plaintiff,            )
                             )CASE NO.
 6        vs.          )2:17-CV-4250-BCW
                                )
 7   CURATORS OF THE UNIVERSITY OF   )
     MISSOURI, ET AL.,          )
 8                              )
          Defendants.           )
 9
10
11
12
13
             DEPOSITION OF SALAMA GALLIMORE
14
           TAKEN ON BEHALF OF THE PLAINTIFF
15
                  DECEMBER 4TH, 2018
16
17
18
19
20
21
22
23
24
25
```

## Page 2

```
 1              I N D E X
 2
 3   EXAMINATION BY:              PAGE:
 4   Mr. Hirth                      5
 5
 6              E X H I B I T S
 7   EXHIBIT                  PAGE
     NUMBER   DESCRIPTION          IDENTIFIED
 8
     Previously   Supplemental Interrogatory   89
 9   marked       Responses
     Exhibit 3
10
     Exhibit 13   February 5th, 2016        35
11                Investigative Report of
                  Alexis Williams' complaint
12
     Exhibit 14   Interrogatories           57
13
     Exhibit 15   E-mail chain              74
14
     Exhibit 16   E-mail chain              79
15
     Exhibit 17   December 14th, 2015, E-mail  83
16                from Ms. Gallimore to Mr.
                  Dean
17
     Exhibit 18   E-mail chain              88
18
     Exhibit 19   E-mail chain             102
19
     Exhibit 20   E-mail chain between Amber  104
20                Lammers & Salama Gallimore
     Exhibit 21   Annual Report of '15 to '16   110
21
22
23       NOTE:  Exhibits were retained by Mr. Hirth.
24
25
```

## Page 3

```
 1        IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
 2                 CENTRAL DIVISION
 3
 4   JEREMY A. ROWLES,          )
                                )
 5        Plaintiff,            )
                                )
 6        vs.           )CASE NO.
                             )2:17-CV-4250-BCW
 7   CURATORS OF THE UNIVERSITY OF   )
     MISSOURI, ET AL.,          )
 8                              )
          Defendants.           )
 9
10        DEPOSITION OF SALAMA GALLIMORE,
11   produced, sworn and examined on DECEMBER 4TH, 2018,
12   between the hours of 9:00 o'clock in the forenoon and
13   1:00 o'clock in the afternoon of that day, at the
14   offices of the Robertson Law Group, 1903 Wyandotte
15   Street, Kansas City, Missouri, 64108, before Mary
16   Lynn Cushing, a Certified Court Reporter (MO), and a
17   Notary Public within and for the State of Missouri,
18   in a certain cause now pending in the United States
19   District Court for the Western District of Missouri,
20   Central Division, between JEREMY A. ROWLES,
21   Plaintiff, vs. CURATORS OF THE UNIVERSITY OF
22   MISSOURI, ET AL., Defendants; on behalf of the
23   Plaintiff.
24
25
```

## Page 4

```
 1               A P P E A R A N C E S
 2
     For the Plaintiff:
 3
          J. Andrew Hirth
 4        TGH Litigation, LLC
          913 East Ash Street
 5        Columbia, Missouri 65201
          (573)256-2850
 6        andy@tghlitigation.com
 7   For the Defendants:
 8
          Emily W. Little
 9        Antwaun L. Smith
          Office of the General Counsel
10        University of Missouri, Columbia
          227 University Hall
11        Columbia, Missouri 65211
          (573)882-3211
12        littleew@umsystem.edu
          smithal@umsystem.edu
13
14
15
16
17   Mary Lynn Cushing
     Missouri CCR 1077
18   Alaris Litigation Services
     1608 Locust Street
19   Kansas City, Missouri 64108
     (816) 221-1160
20   1-800-280-3376
21
22
23
24
25
```

1 (Pages 1 to 4)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-13   Filed 01/14/19   Page 1 of 8

### Page 41

1  A.  Unless it was changed.
2  Q.  Until it was changed. So this says
3  this was revised November 3rd, 2015. So from that
4  point on until it was changed, presumably it's the
5  one that you would be enforcing?
6  A.  Correct.
7  Q.  Okay. So I want to ask you about some
8  of the sections here. If you look at the second
9  page, Subsection 7(b) Sexual Harassment.
10  A.  Uh-huh.
11  Q.  And sexual harassment has -- sort of
12  divided into two subparts and one of those subparts
13  has two subparts, so I want to go through each part
14  separately.
15      So 7(b) provides "Sexual harassment is
16  defined as (1), Unwelcome sexual advances or request
17  for sexual activity by a person or persons in
18  positions of power or authority to another person
19  or" -- okay. So that's -- the first way that you
20  qualify for sexual whole harassment is by engaging in
21  an unwelcome sexual advance or request for sexual
22  activity by a person or persons in a position of
23  power or authority to another person.
24      What is that -- the phrase, "by a
25  person or persons in a position of power or authority

### Page 42

1  to another person" mean?
2  A.  I think it speaks for itself.
3  Q.  So does that mean like your boss, I
4  mean if it's your employer who is doing this? Is
5  that the person in position of authority?
6  A.  Yes.
7  Q.  Teacher?
8  A.  It could be, yes.
9  Q.  What about a student?
10  A.  That would depend, if they're a
11  student who was, for example, the president of a
12  student organization that you were a member of, that
13  could be a person in a place of authority.
14  Q.  What if -- if you're just talking
15  about two students who are essentially in the same
16  class, could one of those students have a position of
17  authority over the other?
18  A.  It would have to depend on the
19  situation, but I would say generally no.
20  Q.  Generally, no. You would have to be
21  -- the position of power and authority, does that
22  have -- do you have to have the ability to take some
23  action against the person?
24  A.  I would say that --
25      MS. LITTLE: Object to the form of the

### Page 43

1  question it's overbroad.
2  A.  I would say that you would have to
3  have some sort of evaluative or supervisory capacity
4  over that person or, for example, in the scenario
5  proposed of a student organization, you know, the
6  ability to allow a student to be a part of that or
7  not, or control what committees that student is on or
8  not, so that type of supervisory or evaluative
9  capacity.
10  Q.  (By Mr. Hirth) What if one of the
11  students is just physically larger than the other, is
12  that a position of power or authority?
13  A.  Being physically larger than someone?
14  Q.  Yes.
15  A.  I think that would speak to the second
16  version potentially, but not --
17  Q.  Not the first one?
18  A.  Not necessarily the first one.
19  Q.  I mean could it ever been the first
20  one?
21      MS. LITTLE: Objection, form of the
22  question, it's overbroad, vague, it lakes foundation.
23  A.  I mean I can't -- it depends on the
24  situation. Like I said there's a ton of situations
25  that could come up, but generally I would say that

### Page 44

1  that is based on that evaluative or supervisory
2  capacity.
3  Q.  (By Mr. Hirth) Okay. So then we'll
4  look at the second part. After the "or" is, "Other
5  unwelcome verbal or physical conduct of a sexual
6  nature by a person to another person, when," and then
7  there are two subparts to that. The first subpart is
8  (a), "Submission to or rejection of conduct it is
9  used explicitly or implicitly as a condition for
10  academic or employment decisions. Or." So let's
11  just look at that first part. So "Unwelcome verbal
12  or physical conduct of a sexual nature by a person to
13  a person when submission to or rejection of such
14  conduct is used explicitly or implicitly as a
15  condition for academic or employment decision." So
16  that's the universe we're talking about, that part of
17  the rule.
18      In order for this part to be
19  triggered, in other words to fall within this, does
20  there have to be some sort of implied exchange like a
21  quid pro quo situation, is that what this it getting
22  at?
23  A.  That's what I'm reading, that's what
24  I'm reading based on this. This is the type of
25  sexual harassment that this is geared to prohibit

11 (Pages 41 to 44)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-13   Filed 01/14/19   Page 2 of 8

Page 49

1  is -- you mentioned earlier that we are aware, so
2  we're parsing this and I don't know that that's
3  necessarily how students would read this, but I think
4  when they read a sentence like that, that would speak
5  for itself based on the knowledge they have about the
6  university and the knowledge that they have of
7  Mizzou. Any behavior, that is offensive, severe,
8  creates a hostile environment, is pervasive, is going
9  to be behavior that's not permitted and prohibited.
10    Q.    (By Mr. Hirth)  So what does severe
11  mean?
12    A.    So I think that is a word that speaks
13  for itself as well.
14    Q.    Can you define it for me?
15        MS. LITTLE:  Object to the form of the
16  question, it's overbroad and it lacks foundation.
17    Q.    Can we go off the record?
18        (Off the record)
19    Q.    (By Mr. Hirth)  So I was asking you
20  what -- as used in this, in this rule 7(b) 2(b),
21  "Conduct that creates a hostile environment by being
22  sufficiently severe or pervasive and objectively
23  offensive."  And I asked you in this context what
24  does the word "severe" mean?
25        MS. LITTLE:  Same objections.

Page 50

1    A.    For severe, pervasive, objectively
2  offensive, I think what that's all getting to in this
3  rule is that the behavior is interfering with
4  limiting or denying the ability of an individual to
5  participate or benefit from an educational program or
6  activity, so.  And behavior that would lead to that
7  result would be considered severe, and any behavior
8  that would lead to that result would be considered
9  pervasive and likely and any, you know, behavior that
10  led to this result would also be considered
11  objectively offensive.
12    Q.    (By Mr. Hirth) So do those words have
13  no independent meaning in this phrase?
14    A.    They do have an independent meaning,
15  but they are all going towards the fact these types
16  of behaviors would interfere, limit or deny the
17  ability of an individual to participate and access
18  their education or employment.
19    Q.    Would you agree that because it says
20  severe or pervasive that it only has to be one or the
21  other to set a rule?
22        MS. LITTLE:  Objection, form of the
23  question.
24    A.    I think it would be severe or it could
25  be pervasive.  It could be also objectively offensive

Page 51

1  and severe.  It could be pervasive and objectively
2  offensive.
3    Q.    (By Mr. Hirth)  But it doesn't have to
4  be all three?
5        MS. LITTLE:  Same objections.
6    A.    I don't -- I mean I don't know that it
7  has to be all three ever.  It could be just one.  It
8  could be sufficiently severe at that limit and
9  interferes and denies.  It could be so pervasive that
10  it interferes, limits, denies or it could be
11  objectively offensive and that interferes, limits and
12  denies.
13    Q.    (By Mr. Hirth) So may I ask if I'm
14  understanding you correctly?  Are you saying that
15  conduct that interferes with limits or denies the
16  ability of an individual to participate in or benefit
17  from educational programs or activities or
18  employment, access benefits or opportunities is
19  necessarily always severe or pervasive or objectively
20  offensive?
21        MS. LITTLE:  Objection.  It misstates
22  her testimony.
23    A.    I can't say that it necessarily always
24  does, but I would say generally yes.  I mean this is
25  text that is really like the context of the Title IX

Page 52

1  law, right, so Title IX is there to guarantee that
2  people have access to their educational
3  opportunities.  Title 7 is so people have access to
4  their employment opportunities and that's what this
5  to me is getting at.
6    Q.    (By Mr. Hirth) If we look at 7(d),
7  "Stalking on the basis of sex", a little bit further
8  down that page.
9    A.    Yes.
10    Q.    So "Stalking on the basis of sex is
11  following or engaging in a course of conduct on the
12  basis of sex with no legitimate purpose that puts
13  another person reasonably in fear for his or her
14  safety or would cause a reasonable person under the
15  circumstance to be frightened, intimidated or
16  emotional distressed."
17        So let's talk about some of those
18  things.  A course of conduct based on the basis of
19  sex with no legitimate purpose, what does the no
20  legitimate purpose mean?
21    A.    So no legitimate purpose to me would
22  go to if we go back to the kind of the front page on
23  the paragraph here, no legitimate purpose would be
24  that it didn't adhere to the community standards and
25  in conjunction with the university's mission, so to

13 (Pages 49 to 52)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW    Document 88-13    Filed 01/14/19    Page 3 of 8

**Page 65**

1  biases -- you don't think it's possible those
2  implicit biases has any effect on the outcomes of
3  Title IX investigations?
4      A.   Not that I observed.
5      Q.   Did you or Ellen Eardley or anybody
6  else in the office ever review outcomes to determine
7  whether implicit bias had affected outcomes?
8          MS. LITTLE:  I object to the form of
9  the question.  Asked and answered.
10     A.   How do you suggest that review would
11 occur?  What do you mean by -- like what form of
12 review would that take?
13     Q.   (By Mr. Hirth)  Well, for example, did
14 you ever look to see the frequency with which white
15 students are found responsible for sexual harassment
16 as opposed to black students?
17     A.   So, again, just going back to the fact
18 that when I worked with staff to create that intake
19 form, that was the first point at which we were going
20 to be in the standard base of collecting that
21 information.  That wasn't something that we could
22 have done back then, it would have been impossible to
23 do.
24     Q.   Well, at some point you began
25 collecting it voluntarily, correct?

**Page 66**

1      A.   Yes.
2      Q.   After you began collecting it
3  voluntarily, was there any effort to review that data
4  to determine whether there was implicit bias in the
5  outcome?
6      A.   So I left a month after that form was
7  beginning to be used, so I can't speak to that.
8      Q.   Was part of your intent in creating
9  that form to allow that kind of review to happen?
10     A.   It would certainly have made it more
11 feasible.
12     Q.   Would you agree with me that the
13 Office of Civil Rights & Title IX should ensure that
14 it does not make discriminatory decisions?
15         MS. LITTLE:  Object to the form of the
16 question.
17     A.   So I would agree with you that the
18 Office of Civil Rights & Title IX is beholden to the
19 same policies and CRRs as the rest of the people on
20 campus and that we should not be engaging in any sort
21 of discrimination or harassment.  That would be
22 prohibited behavior.
23     Q.   (By Mr. Hirth)  Prior to collecting
24 this kind of information about race on the form that
25 you helped create, how would it have been possible

**Page 67**

1  for the Title IX office to determine whether it had
2  desperate outcomes based on race?
3      A.   The information, and still even with
4  the voluntary disclosure form, is not going to be
5  necessarily complete because people do not have to
6  identify a certain race.
7      Q.   Is there anything that could be done
8  to perform that kind of evaluation?
9      A.   If you're suggesting that we require
10 people to identify their race before we serve them,
11 is that you're what you're --
12     Q.   Well, I'm asking for example, if you
13 require people to identify their race, would that
14 enable you to perform this kind of analysis?
15     A.   I don't know that is something the
16 university does on any level ever.  It's all
17 voluntary reporting, so I haven't contemplated that.
18     Q.   Question number -- Interrogatory No. 8
19 asks, "What role, if any, did you play in the
20 investigation of Annalise Breaux's complaint against
21 plaintiff", and you said no, correct?
22     A.   Correct.
23     Q.   You did not have any involvement in
24 the investigation into Annalise Breaux's complaint,
25 is that correct?

**Page 68**

1      A.   That's correct.
2      Q.   Did you work with the investigator who
3  was performing that investigation at all during the
4  time that she was investigating?
5      A.   Not that I recall.
6      Q.   Did you have any input into the
7  document she drafted?
8      A.   Yes, I recall that I had reviewed it
9  and made just general remarks regarding whether
10 things had been repeated and were superfluous because
11 I believe it was very long.
12     Q.   You may have suggested that in the
13 investigator report?
14     A.   I believe so and track changes.
15     Q.   Do you know whether those changes were
16 adopted?
17     A.   I can't say for sure.
18     Q.   No. 10, Interrogatory No. 10, asks did
19 you ever discuss the investigation of Annalise
20 Breaux's complaint against the plaintiff with Amber
21 Lammers, Ellen Eardley or Cathy Scroggs?  And if so,
22 describe the circumstances."
23     A.   You answered, "I received the
24 complaint and assigned the investigation to Amber.
25 There were no discussions regarding the investigation

Page 69

1  that I recall."
2      Q.   Do you recall having any conversation
3  with Ellen Eardley about the complaint against
4  Jeremy?
5      A.   I believe that I had a conversation
6  with Ellen regarding interim measures prior to the
7  investigation because I had -- I was the person who
8  had knowledge of the respondent, but that's -- to my
9  knowledge besides assigning the complaint, that was
10 the extent and making suggestions on track changes
11 for the report.
12     Q.   What about the appeal of Cathy
13 Scroggs, did you have any interaction with Cathy
14 Scroggs?
15     A.   None.
16     Q.   You had been involved in a prior Title
17 IX complaint against Jeremy Rowles, correct?
18     A.   I investigated it.
19     Q.   You investigated it?
20     A.   Yes.
21     Q.   And did you discuss that prior
22 investigation with either Amber, Ellen or Cathy
23 Scroggs during the context of this investigation?
24     A.   So you refer to No. 11, I did discuss
25 I believe that prior complaint because the office was

Page 70

1  aware there was one, so I provided a summary of what
2  the investigation charges were investigated and the
3  resolution.
4      Q.   Okay.  During the prior investigation
5  into Jeremy Rowles, the investigation that you
6  conducted, you met with and interviewed plaintiff for
7  that investigation, correct?
8      A.   I did.
9      Q.   Okay.  And during that interview with
10 him, do you recall ever discussing his physical
11 appearance with him?
12     A.   So did you say complainant?
13     Q.   I'm sorry, with Mr. Rowles.  Did you
14 interview Mr. Rowles during your investigation?
15     A.   I did, yes.
16     Q.   And during your conversation with him
17 did you ever discuss his physical appearance?
18     A.   I discussed I believe his size.
19     Q.   Why was his size relevant?
20     A.   Because I was explaining to him that
21 the complainant said that she felt like he was
22 blocking the door, and I wanted to have his opinion
23 about the allegation and the context of her saying
24 she felt trapped.  She brought up the fact that he
25 was large.  He was sitting in front of the door.

Page 71

1  That's the way I asked the question to him.
2      Q.   And did he draw you a map of the room
3  they were in?
4      A.   Yes.
5      Q.   And did the map indicate that he was
6  blocking her exit from the room?
7      A.   I believe so.
8      Q.   So Mr. Rowles has alleged in his
9  complaint that during that conversation you said
10 something to the effect that he looked like somebody
11 who might commit a sexual assault.  Do you recall
12 saying anything like that?
13     A.   I never said that.
14     Q.   Did you say anything about his --
15 people being afraid of him?
16     A.   I did not.
17     Q.   Did you suggest to him that his
18 physical size made him seem like more of a threat?
19     A.   I explained to him that the
20 complainant made that comment and that that was
21 something that the complainant said regarding his
22 size and where he was physically sitting.
23     Q.   The complainant in the first
24 investigation, the one that you investigated, was she
25 white or black do you recall?

Page 72

1      A.   I don't believe I ever asked her that
2  question.
3      Q.   Did you meet her?
4      A.   I did.
5      Q.   What was your impression of her race?
6          MS. LITTLE:  I object to the form of
7  the question.
8      A.   My impression of her race, my
9  speculation is that she was white.
10     Q.   (By Mr. Hirth )  And you never met
11 Annalise Breaux, is that correct?
12     A.   No.
13     Q.   Did you think it was possible that Mr.
14 Rowles's race played any part in Lexus Williams'
15 interpretations of events that happened that she
16 complained about?
17         MS. LITTLE:  I object to the form of
18 the question, calls for speculation.
19     A.   I can't say for sure how she felt or
20 what she considered.  I did not ask her if his race
21 was a factor of why she was scared, so I can't say
22 the answer to that.
23     Q.   (By Mr. Hirth)  Do you think it's
24 possible that it was?
25         MS. LITTLE:  Same objections.

18 (Pages 69 to 72)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-13   Filed 01/14/19   Page 5 of 8

Page 93

1  harassment, stalking on the basis of sex, there's
2  also allegations of nonconsensual sexual contact,
3  nonconsensual sexual intercourse and threatening or
4  intimidating behaviors. That's what is indicated,
5  correct?
6      A.   Yes.
7      Q.   And that respondent was sanctioned
8  with a six month suspension and expulsion from
9  resident halls, counseling referral and no-contact
10 order.
11     A.   Okay.
12     Q.   So my question to you is, 22 and 24
13 involved white male respondents. They involved
14 sexual harassment allegations and stalking on the
15 basis of sex allegations and in the case of 24 even
16 more serious allegations than that. 53, which is
17 Jeremy Rowles, involves allegations of sexual
18 harassment and stalking on the basis of sex against a
19 black or African American male. He was found
20 responsible and received originally a four year
21 suspension, but was reduced to two years by Cathy
22 Scroggs.
23          So these, as I said, are the only
24 three in here that include allegations of both sexual
25 harassment and stalking on the basis of sex.

Page 94

1      A.   Amongst other allegations.
2      Q.   Amongst other allegations. But these
3  are the only three that have both of those. Two of
4  the respondents are white and one is black. The two
5  white respondents received no suspension and
6  counseling and suspension of six months and
7  counseling. The black student received a four year
8  suspension from the university?
9      A.   I don't understand. It's not clear to
10 me from this what they were found responsible for
11 because, for example, 24 could have just been found
12 responsible for threatening and intimidating
13 behaviors.
14     Q.   Right. It's not clear from this
15 information what the person was responsible for,
16 correct?
17     A.   It's not clear which one of the
18 charges.
19     Q.   Right. You can't tell from this
20 document?
21     A.   Which one of the charges?
22     Q.   That they were found responsible for?
23     A.   Right.
24     Q.   Okay. So it's possible that they were
25 found responsible for only threatening or

Page 95

1  intimidating behaviors?
2      A.   Uh-huh.
3      Q.   Okay. Do you -- are you at all
4  concerned that of the three students accused of these
5  kind of violations, these two violations, the two
6  white students received substantially lower sanctions
7  than the black student?
8          MS. LITTLE: Object to the form of the
9  question.
10     A.   I can't answer that question because I
11 don't know -- I can't -- it could be compared apples
12 to oranges because I'm not sure which one of these
13 violations they were found responsible for. Like for
14 24, this person could have been found responsible for
15 threatening or intimidating behaviors or -- what did
16 you say 23?
17     Q.   22.
18     A.   22, that person could have been found
19 responsible for sexual harassment and not stalking,
20 so I can't -- there's not an opinion that I can make
21 without knowing which one of these they were found
22 responsible for.
23     Q.   Based on this document you can't tell
24 why these students were treated differently?
25         MS. LITTLE: I object to the form of

Page 96

1  the question. It assumes facts not in evidence.
2      A.   Based on this document, I can't tell
3  -- it says yes, but it doesn't say yes, comma, and
4  then the charges that they were responsible for. If
5  I have that, then I could potentially answer your
6  question.
7      Q.   (By Mr. Hirth) You would need to know
8  what they were found responsible of to know their
9  treatment was different?
10         MS. LITTLE: Same objections.
11     A.   No. I would need to know what they
12 were found responsible of so that I could answer your
13 question because right now you're asking me to
14 compare things when I don't know which one of these
15 charges they were found responsible for, so it's not
16 a comparison that can be made.
17     Q.   (By Mr. Hirth) Is there any
18 information available to the public that could -- a
19 person could use to answer those questions, the
20 questions that you have been asking me on what they
21 were found responsible for?
22     A.   Probably in the annual report.
23     Q.   The annual report would tell me what
24 22 and 24 did?
25     A.   It would tell you -- well, I would

24 (Pages 93 to 96)

ALARIS LITIGATION SERVICES
www.alaris.us                Phone: 1.800.280.3376                Fax: 314.644.1334
Case 2:17-cv-04250-BCW    Document 88-13    Filed 01/14/19    Page 6 of 8

Page 105

1    going to go ahead and provide us with all the labels.
2        MR. HIRTH:  I was gathering them
3    altogether and will send them to you.
4        Q.   (By Mr. Hirth) Okay.  So handing you
5    what's been marked as Exhibit 20, which is an e-mail
6    and an attachment.  Start with the e-mail.  This is
7    an e-mail chain of Amber Lammers to you, so this will
8    looking at this one in the middle of the page here,
9    on February 6th, 2017, with the subject line, Please
10   Review, Breaux v. Rowles, Investigative Report.  Ms.
11   Lammers writes, "Updated version.  Rowels added and
12   modified a lot.  I tried to critique his section, but
13   there are -- there may be some lingering grammatical
14   changes needed in his block quotes." To which you
15   responded, "See attached, good job.  This is a lot of
16   information.  I just suggested some edits for
17   brevity."  Did I read that correctly?
18       A.   Uh-huh.
19       Q.   So when Ms. Lammers had put together
20   her investigative report, she sent it to you to look
21   over?
22       A.   Uh-huh.
23       Q.   That's correct?
24       A.   Yes.
25       Q.   And you did look it over?

Page 106

1        A.   Yes.  It looks like I made some
2    comments.
3        Q.   And you suggested that it's different,
4    correct?
5        A.   Uh-huh.
6        Q.   So directing your attention to the
7    page with the Bates No. 2667 and 2668.
8        A.   Okay.
9        Q.   There is a block towards the bottom
10   under the heading Information from Respondent Jeremy
11   Rowles.  "I met with Rowles November 9th."  He
12   explains that he first met Breaux in late 2015, early
13   2016, and then there's a large block quote.  Do you
14   see that?
15       A.   Uh-huh.
16       Q.   And it goes onto the next page.  And
17   there's a comment to the side SMG4, that is your
18   comment, correct?
19       A.   Uh-huh.
20       Q.   And the comment is, "This can be
21   summed up in a couple of sentences.  I was stressed
22   out.  I went to -- I started going there regularly
23   and the employees got to know me including Abigail.
24   I would talk to her when she was working."
25       A.   Uh-huh.

Page 107

1        Q.   You were suggesting that all this
2    could be reduced, summarized into something much
3    shorter?
4        A.   Yes.
5        Q.   And the summary that you suggested did
6    not mention Annalise, did it?
7        A.   I don't believe so.  I don't know how
8    long I spent writing this comment.
9        Q.   And the text itself that you were
10   referring to, that does talk about Annalise, doesn't
11   it?
12       A.   Yes, it does.
13       Q.   Okay.  And then if you would look at
14   pages 2687 through 2688.  Again, there's another
15   fairly large block quote that has been highlighted in
16   gray-ish color and there's a comment on the top of
17   2688, SMG7.  Again, that is your comment, correct?
18       A.   Yes.
19       Q.   And you wrote again, "Can be
20   summarized in a couple sentences", correct?
21       A.   Yes.
22       Q.   If you look at page 2704 and 2705.
23       A.   Okay.
24       Q.   Another block quote that you commented
25   on?

Page 108

1        A.   Uh-huh.
2        Q.   You wrote, "This can be shortened"?
3        A.   Yes.
4        Q.   And is this is a block quote of Mr.
5    Rowles emphatically saying that this allegation
6    against him is false, this particular subject,
7    whatever this is?
8        A.   The first sentence says that's
9    absolutely false.
10       Q.   Right.  And then he goes on to explain
11   his answer or why he says that, correct?
12       A.   Yes.
13       Q.   Okay.  So in each of these examples
14   we've looked at, your suggestion to Amber Lammers was
15   to significantly reduce or simplify or paraphrase Mr.
16   Rowles's testimony, correct?
17           MS. LITTLE:  Object to the form of the
18   question.
19       A.   How many pages was this?
20       Q.   (By Mr. Hirth)  I think it goes
21   through 2714 is the last.
22       A.   This is really long.
23       Q.   It is really long.
24       A.   I'm sorry, would you -- can you re-ask
25   that question?

27 (Pages 105 to 108)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW    Document 88-13    Filed 01/14/19    Page 7 of 8

## Page 109

1 Q. Sure. These examples that we've
2 looked at consist largely of -- your suggestion,
3 these comments is to simplify or shorten Mr. Rowles's
4 statement?
5 A. The three comments that you just
6 picked out of all the comments I made, yes.
7 Q. Would you agree that those are the
8 three largest changes that you suggested in this
9 document?
10 A. I haven't looked at the whole thing
11 but I can.
12 Q. You can look at it.
13 A. Okay. So it looks like in the 39
14 pages that were the summary of Mr. Rowles's
15 statements, I did on three occasions advise Amber to
16 shorten it probably because it was 39 pages long.
17 Q. Did you advise her to shorten any of
18 the other witnesses?
19 A. I don't think they were anywhere near
20 39 pages long. In fact, it looks like it was -- the
21 majority of the report was his statements, yes.
22 Q. Okay.
23 A. Annalise's was three-and-a-half or
24 three-quarter pages, and his was 39. And the other
25 witnesses were eight. So all other witnesses were

## Page 110

1 eight-and-a-quarter and Annalise's was four and some
2 change and his was 39 pages. So, yeah, I think I
3 probably suggested that it could be shorter.
4 Q. Did you -- the portions that you
5 suggested to be shortened, did you believe those
6 portions weren't relevant?
7 A. I can't say what I was thinking at the
8 time. I just thought that they can be shortened;
9 that that information could be accurately reflected
10 in a shorter amount of text.
11 Q. You talked earlier about the annual
12 report. I want to show you an annual report from
13 2015.
14     (Exhibit 21 was marked for
15 identification by the reporter.)
16 Q. (By Mr. Hirth) Again, I only have one
17 copy of that if you want to write down the Bates
18 numbers. So I hand you what's been marked as Exhibit
19 21. It reports to be the University of Missouri
20 Office for Civil Rights & Title IX 2015- 2016 Annual
21 Report. Is this the kind of report you were talking
22 about earlier when you mentioned that we could look
23 at the report to sort of know the demographic
24 information?
25 A. Yes.

## Page 111

1 Q. Did you help prepare this report?
2 A. I did.
3 Q. The 2015-'16 report?
4 A. I did.
5 Q. Okay. And so this report breaks down
6 the number of complainants of sex discrimination as
7 opposed to race discrimination for example, correct?
8 A. What page are you looking at?
9 Q. I'm looking at page 6 of the Executive
10 Summary.
11 A. Uh-huh.
12 Q. The Executive Summary says the office
13 receives 674 reports during the annual reporting
14 period of August 1, 2015, through July 31st, 2016,
15 and that these were fairly classified into 924
16 potential violations.
17 A. Uh-huh.
18 Q. And this Executive Summary breaks down
19 how -- what percentage of those allegations were
20 specific kinds of discrimination. So, for example,
21 sex, gender, discrimination accounts for 549 of the
22 924 potential violations, correct?
23 A. Correct.
24 Q. Okay. Then on the next page it shows
25 the -- so this is page 868, Rowles Production 868.

## Page 112

1 The report further breaks down during the 2015-'16
2 year and 2014-'15 year the respective allegations of
3 sex, gender, discrimination in which the respondent
4 was a student, is that correct?
5 A. Yes, that's what it says.
6 Q. And, for example, it's broken down
7 into nonconsensual sexual intercourse, five
8 complaints, correct?
9 A. Yes.
10 Q. Sexual harassment, 68 complaints?
11 A. Yes.
12 Q. And goes all the way down to things
13 like voyeurism, two complaints; knowingly
14 transmitting an STI, two complaints?
15 A. That's correct.
16 Q. Pretty specific information?
17 A. Yes.
18 Q. If you look at page 21 of the report,
19 which is Rowles Production 882, this describes the
20 population that the Office of Civil Rights & Title IX
21 is responsible for investigating complaints about, is
22 that correct?
23 A. Yes, the potential reporting
24 population.
25 Q. And that is almost 63,000 individuals?

28 (Pages 109 to 112)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 2:17-cv-04250-BCW   Document 88-13   Filed 01/14/19   Page 8 of 8