IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| JEREMY A. ROWLES, | ) |
|         Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:17-CV-04250-BCW |
| | ) |
| THE CURATORS OF THE | ) |
| UNIVERSITY OF MISSOURI, *et al.*, | ) |
|         Defendants, | ) |

DEFENDANTS' SUGGESTIONS IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON COUNTS I, III AND VI

Defendants The Curators of the University of Missouri, Cathy Scroggs, Ellen Eardley, Salama Gallimore and Andrea Hayes, by and through counsel and pursuant to Federal Rules of Civil Procedure 56 and Local Rule 56.1, hereby offer their opposing suggestions to Plaintiff's Motion for Partial Summary Judgment:

INTRODUCTION

The parties in this case have filed cross motions for summary judgment. The uncontroverted material facts and applicable law demonstrate that Defendants are entitled to summary judgment, and Plaintiff's Motion for Partial Summary Judgment must be denied.

**I. DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

1. Admit that Defendant Curators of the University of Missouri ("University") is the corporate name of the body politic governing the state university system, which has the power to sue and be sued.

2. Admit that the University is a recipient of federal funds.

3.     Admit that Defendant Ellen Eardley ("Eardley") was the Assistant Vice Provost for Civil Rights and Title IX ("Title IX Office") at the University when Plaintiff was investigated and sanctioned by the Title IX Office.

4.     Admit that Defendant Andrea Hayes ("Hayes") succeeded Eardley and is the current Assistant Vice Chancellor for Civil Rights & Title IX at the University.

5.     Admit that Defendant Cathy Scroggs ("Scroggs") was Vice Chancellor for Student Affairs at the University when Plaintiff was investigated and sanctioned by the University's Title IX Office.

6.     Admit that Defendant Salama Gallimore ("Gallimore") was Director of Investigations and Deputy Title IX Coordinator at the University when Plaintiff was investigated and sanctioned by the Title IX Office.

7.     Admit that Plaintiff identified himself as an African-American man in his Charge of Discrimination.

8.     Admit that Plaintiff was a Ph.D. candidate in Cultural Anthropology at the University at the time of his suspension on March 15, 2017.

9.     Admit that in September 2015, an undergraduate student submitted a complaint to the Title IX Office, alleging sexual harassment by Plaintiff, who was the Teaching Assistant for one of her classes.

10.     Admit that the student alleged that Plaintiff had invited her to his office hours in the evening and insinuated that he would provide questions or answers to an exam if she provided him sexual favors.

11.     Admit that following an investigation by the Title IX Office, Senior Associate Provost

Ken Dean determined in March 2016 that Plaintiff was not responsible for violating the

University's sexual harassment policy.

12.     Admit that though he exonerated Plaintiff of sexual harassment, Dean warned

> Nonetheless, I want to be very clear that [the Complainant] was not unreasonable
> to have inferred, as a subjective belief, that your behavior indicated sexual favors
> were sought. However, you never directly indicated that your offer to show her
> the exam was conditioned on sexual favors. None of the evidence or statements
> contained within the Investigative Report indicated that you requested, or hinted
> that you desired sexual favors in exchange for showing [the Complainant] the
> exam. I find that your behavior, specifically, closing the door to your TA Office
> and stating to [the Complainant] that you did not want money, were indicative of
> an internal recognition that you were doing something wrong by offering to show
> her the exam or read her exam questions, and not evidence that you were seeking
> sexual favors. I will be contacting your immediate supervisor and Department
> Chair so that they may take appropriate action regarding your behavior of offering
> to share exam questions.

13.     Admit that Plaintiff met A.B. at the Kaldi's Coffee House where she worked in the fall of

2015.

14.     Admit that Plaintiff stated during the Title IX investigation that when Rowles did not

receive what he had ordered, A.B. apologized to him and gave him a token for a free drink.

15.     Admit that A.B. began teaching dance fitness classes at the University's Student

Recreation Center ("Rec. Center") in the spring of 2016.

16.     Admit that Plaintiff stated that he started attending A.B.'s dance classes, after which their

interactions became more personal, and the two spoke to one another more often.

17.     Admit that A.B. thought Plaintiff was friendly, and she did not interpret his behavior or

comments as flirtatious because she thought he was gay.

18.     Admit that on April 12, 2016, Plaintiff asked A.B. out on a date after their dance class at

the Rec Center.

19.     Admit that A.B. felt extremely uncomfortable and told him she was "too busy this week."

20.     Admit that over the next week, Plaintiff sent A.B. several Facebook messages, which became more frequent and increasingly romantic in nature.

21.     Admit that on April 18, A.B. sent Rowles a message stating:

> Jeremy, I really appreciate your feedback about my class and choreography, but these messages are getting excessive. I think our friendship needs to remain in the professional setting. Many of the things you say, like that Instagram comment for example, is over the top and I wouldn't be comfortable hanging out outside of my places of work. I still want you to come to Tiger Tease and enjoy your time there, but I need my space outside of class and I think a line has been crossed here.

22.     Admit that Plaintiff sent the quoted message

> Oh my god, I am so sorry [A.B.]!! I thought… I am so sorry. I took our conversation last Tuesday as you agreeing to a date. I am so sorry, I read your reaching completely the wrong way. I feel so bad that I caused you to be uncomfortable, I really apologize. I feel so horrible that was the way I came across. I did not mean to make you feel that way, and I really apologize. I am so sorry. I'll keep it strictly friendly from here on out. I appreciate you telling me this, the last think I wanted to do was to make you feel uncomfortable. Please accept my apologies, the very last thing I wanted to do was make you feel badly.

23.     Admit that Plaintiff continued to attend A.B.'s dance classes.  Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that he attended her dance classes "with her permission," and the record does not support Plaintiff's statement that he "did not attempt to message AB after April 18, 2016."  *See, infra,* Plaintiff's Statement of Uncontroverted Material facts, ¶ 25 (email on 9-27-16), ¶27 (email on 10-03-16), ¶30 (note on 10-07-16), and ¶33 (three page letter on 10-14-16).

24.     Admit that Plaintiff attended several of A.B.'s dance classes during the fall semester of 2016.

25.     Admit that in September 2016, Plaintiff emailed A.B. asking for tips on how to develop his skills for the contemporary dance class that A.B. taught.

26.     Admit that A.B. suggested that he take private dance lessons, which are available through the Rec Center.

27.     Admit that in October, Plaintiff followed up with A.B. because he had not been able to sign up for private dance lessons, and he asked to take private lessons from her.

28.     Admit that A.B. told Plaintiff she was not currently and would not offer private lessons.

29.     Admit that on October 7, Plaintiff tried to talk with A.B. after class but she dashed off to the bathroom to avoid him.

30.     Admit that Plaintiff gave A.B.'s co-instructor a note to give A.B., which contained the Kaldi's drink token A.B. had given Plaintiff when they first met and the lyrics from the Coldplay song, "The Scientist."

31.     Admit that Plaintiff stated he referenced the Coldplay song because it contained the lyric, "Take me back to the start…."

32.     Admit that A.B. did not understand the meaning of the note and thought it was "bizarre."

33.     Admit that on October 14, 2016, Plaintiff handed a three-page letter to A.B. after class.

34.     Admit that A.B. told Rowles she was taking the letter to her supervisor and that larger measures would be taken because of it.

35.     Admit that A.B. told the Title IX Office the letter "contained apologies and a confession of 'love'" for her.

36.     Admit that Rec Center Associate Director Emily Bach McElwain emailed the University's Title IX office to "refer the conduct of Jeremy Rowles … as a potential violation of the University's Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/Employment Policy in Section 600.020 of the Collected Rules and Regulations."

Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his statement that McElwain's email was "after Rowles gave [A.B.] the letter."

37.     Admit that McElwain's email related information "collected and submitted to me by Pangku" Cardona, the coordinator of the TigerX dance program at the Rec Center.

38.     Admit that, in addition to A.B., McElwain's email accused Plaintiff of pursuing romantic relationships with three other instructors.

39.     Admit that the Title IX office interviewed A.B. on October 20, 2016.

40.     Admit that on October 21, 2016, A.B. submitted a formal complaint to the Title IX Office.

41.     Admit that in her Formal Complaint, A.B. accused Plaintiff of "harassment on the basis of sex."

42.     Admit that A.B. did not accuse Plaintiff of "stalking on the basis of sex."

43.     Admit that A.B. described Plaintiff's conduct as "bizarre" and said it made her "extremely uncomfortable."

44.     Admit that A.B. did not use the word "afraid."

45.     Admit A.B. did not use the word "intimidated."

46.     Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to establish that "A.B. never alleged that Rowles touched her inappropriately" and A.B.'s formal complaint states Plaintiff would "consistently high five and grab my hand intimately before, during and after my classes…" *See* Plaintiff's Exhibit B attached to Document 75.

47.     Admit that A.B. never alleged that Plaintiff threatened her with violence.

48.     Admit that on or about November 7, 2016, Title IX Investigator Amber Lammers sent Plaintiff a "Notice of Investigation of Potential Sex Discrimination," informing him that she would be "investigat[ing] allegations that on or about March 2015-October 2016 [Rowles] engaged in [harassing] behaviors which impacted [A.B.]."

49.     Admit that the Notice of Investigation stated that Plaintiff's alleged conduct may have violated section 200.010.C.7.b-d of the University's Collected Rules and Regulations ("CRR") as quoted in ¶ 49.

50.     Admit that Title IX Investigator Amber Lammers conducted an investigation into A.B.'s complaint and the allegations submitted by McElwain regarding [three other instructors.]

51.     Admit that A.B. told Lammers during her interview with the Title IX Office that "[Rowles] has an inability to read social cues. It's not necessarily malicious, but he does pick up on some cues in other instances. It's not universal. He didn't understand that things were over, and that we couldn't be friends."

52.     Admit that Lammers attempted to interview the other three women Plaintiff was alleged by McElwain to have harassed, but none of them expressed an interest in participating in the investigation against Plaintiff.

53.     Admit that when Lammers concluded her investigation, she prepared a 55-page report for review by Eardley.

54.     Admit that on March 15, 2017, Defendant Eardley issued the "Informal Resolution Findings by the Administrative Officer," concluding that Plaintiff had violated the University's prohibitions against sexual harassment and stalking on the basis of sex.

55.     Admit that Eardley found, "The letter [Rowles gave [A.B.] on October 14, 2016] and the sentiments contained within were unwelcome to [A.B.]. This made [her] extremely uncomfortable in her place of work, even more so because she had directly communicated to him in writing that his previous behavior had crossed the line and that she would not be comfortable spending time with him outside her employment.

56.     Admit that Eardley also found, "Notably, the record also shows that [Rowles] told at least one other female undergraduate instructor at TigerX that he found her 'attractive' and asked her to spend time with him outside of the Rec Center."

57.     Admit that Eardley further found by a preponderance of the evidence that

> [Rowles] violated the sexual harassment policy by engaging in unwelcome verbal and physical conduct of a sexual nature towards [A.B.] and that it created a hostile environment by being sufficiently pervasive that it interfered with her ability to do her job at TigerX. In April 2016, [A.B.], an undergraduate student, directly informed [Rowles], a doctoral candidate, that his communications towards her were unwelcome, unprofessional and crossed the line. After learning that his behavior made [A.B.] uncomfortable, [Rowles]chose to attend AB's TigerX classes multiple times each week, stare at her, make efforts to speak with her, and make efforts to be near her. He then requested to take private classes with her, left a token for her, and then wrote a three-page letter describing his very detailed romantic feelings. From an objective standard, such conduct is unwelcome and hostile. It is also pervasive in that it lasted over the course of several months.

58.     Admit that Eardley further found by a preponderance of the evidence that "this same conduct violated the policy prohibiting stalking on the basis of sex. [Rowles]'s actions from March 2016 through October 2016 constitute a course of conduct towards [A.B.] that would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed."

59.     Admit that Eardley did not consider or make a finding that Plaintiff posed a danger of physical or sexual assault to A.B. and that Eardley testified as quoted.

60.     Admit that in deciding what sanctions to impose, the facts Eardley considered "include[d] the nature of and circumstances surrounding the violation, [Rowles]'s disciplinary history, and the need to prevent future recurrence of violations, as well as any other information deemed relevant."

61.     Admit that among the "other information deemed relevant," Eardley considered:

> The University's expectations of doctoral students. For example, the MU Office of Research and Graduate Studies encourages graduate students to familiarize themselves with the code of ethics for their profession. The American Anthropological Association's Principles of Professional Responsibility advises that individuals should "maintain respectful and ethical professional relationships." It further encourages professionals to "comport themselves in ways that promote an equitable, supportive and sustainable workplace environment."

62.     Admit that, referring to the prior Title IX investigation that found Plaintiff not responsible for sexual harassment, Eardley concluded that "[Rowles] does not appear to set appropriate professional boundaries with undergraduate students in workplace environments throughout campus—whether in academic settings or at the Rec Center."

63.     Admit that Eardley found it "concerning that [Rowles] failed to learn from Mr. Dean and the Department Chair's previous warning regarding his conduct with an undergraduate female student."

64.     Admit that considering the "totality of the circumstances," Eardley suspended Plaintiff from all four campuses of the University for four years, permanently banned him from the University's residence halls and the Rec Center, and required Plaintiff to complete four-part remediation plan before he would be allowed to return to campus after his suspension was over.

65.     Admit that Plaintiff timely appealed to Scroggs, then the Vice Chancellor for Student Affairs.

66.     Admit that in his appeal, Plaintiff made the arguments quoted from his appeal with regard to stalking on the basis of sex.

67.     Admit that Plaintiff made the arguments quoted from his appeal regarding the finding of responsibility for sexual harassment.

68.     Admit that Plaintiff made the arguments quoted from his appeal regarding whether the conduct was objectively offensive.

69.     Admit that in her final decision, Scroggs upheld Eardley's findings of conduct violations by modified the sanctions imposed.

70.     Admit that Scroggs rejected Rowles's argument that his alleged conduct was not severe or pervasive, nor objectively hostile and made the statements quoted from her appellate decision.

71.     Admit that Scroggs made the statements quoted from her appellate decision.

72.     Admit that Scroggs rejected Plaintiff's arguments that his alleged conduct did not meet the definition of stalking on the basis of sex and made the statements quoted from her appellate decision.

73.     Admit that Scroggs made the statements quoted from her appellate decision.

74.     Admit that Scroggs considered whether the sanction imposed by Eardley fell outside the range typical for the kind of violation and made the statements quoted from her appellate decision.

75.     Admit that Scroggs testified as quoted during her deposition.

76.     Admit that Scroggs testified as quoted, but Scroggs did not testify and Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that

"asking someone out on a date who is physically smaller than oneself qualifies as a 'power or authority' within the meaning of CRR 200.010.C.7.b.1"

77.    Admit that Hayes testified as quoted, but Hayes did not testify and Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that "Hayes agrees with Scroggs' reading of CRR 200.010.C.7.b.1," or testified in her deposition that "a man's physical size is sufficient to bring him within the ambit of the rule."

78.    Admit that Gallimore testified as quoted, but Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that Gallimore's testimony is "by contrast."

79.    Admit that Gallimore testified as quoted that CRR 200.010.C.7.b.1 does not generally apply to sexual advances between fellow students and that "it would have to depend on the situation."  Plaintiff's Exhibit M at 42:14-18, 43:10-18.

80.    Admit that Eardley testified as quoted.

81.    Admit that Eardley testified as quoted with regard to the phrase "severe or pervasive and objectively hostile" as used in CRR 200.010.C.7.b.2.b, but Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that there are "two distinct requirements."

82.    Admit that Scroggs testified as quoted, but Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that she testified "by contrast…a disjunctive list in which only one of the three elements must be satisfied."

83.     Admit that Gallimore testified as quoted, but Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that she "interprets the phrase" as a "single idea."

84.     Admit that CRR 200.010.C.7.d defines "Stalking on the basis of sex" as quoted.

85.     Admit that Scroggs testified as quoted.

86.     Admit that Eardley testified as quoted.

87.     Admit that Eardley testified as quoted, but Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that " 'no legitimate purpose' may mean something different when applied to graduate student from when applied to undergraduate students."

88.     Admit that the definition quoted does not make a distinction between graduate student and undergraduate student.

89.     Admit that Scroggs testified as quoted, but Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that "no legitimate purpose" was "defined" to mean "uninvited or unwanted by the object of the conduct."

90.     Admit that Hayes testified as quoted.

91.     Admit that Hayes testified as quoted, but Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that "Hayes could not explain how a student could determine whether he has a legitimate purpose."

92.     Admit that Hayes testified as quoted.

93.     Admit that Hayes testified as quoted.

94.     Admit that Hayes testified that as reflected in her deposition.  Plaintiff's Exhibit L at 70:8-22.

95.     Admit that Eardley testified as quoted.

96.     Admit that Scroggs testified as quoted.

97.     Admit that the exhibit so reflects.

98.     Admit that the exhibit so reflects.

99.     Defendants admit that the exhibit reflects a race for each individual that was based upon information that the individual identified as or was perceived to be a certain race.

100.    Admit that Plaintiff identified as an African-American and was suspended for the violations.

101.    Admit that Plaintiff was suspended from all four campuses for two years (reduced from the original sanction of four years), and banned for life from all residence halls and the student recreation center.

102.    Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that the students were "similarly situated" and received "substantially lower" sanctions.

103.    Admit.

104.    Admit.

105.    Admit.

106.    Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that the other student's "sanction was even more striking in its contrast to Plaintiff's…"

107.     Admit that Hayes testified as quoted but she was not "unable to explain." Pursuant to this Court's ruling, the details regarding the individual matters were deemed not discoverable. (Order, Document 57).

108.     Admit that Eardley testified as quoted but Plaintiff does not have a citation to support his opinion statement that she was "unable to explain," as her quoted testimony was that "it's very difficult to compare any particular case to another case because they're so unique and so fact specific." Pursuant to this Court's ruling, the details regarding the individual matters were deemed not discoverable. (Order, Document 57).

109.     Admit that Scroggs testified as quoted but she was not "unable to explain." Pursuant to this Court's ruling, the details regarding the individual matters were deemed not discoverable. (Order, Document 57).

110.     Admit that Gallimore testified as quoted but she was not "unable to explain." Pursuant to this Court's ruling, the details regarding the individual matters were deemed not discoverable. (Order, Document 57).

111.     Admit that Plaintiff was in the first year of the PhD program and Plaintiff does not have a citation to the record as required by Rule 56 (c)(1) to support his opinion statement that he would have continued in that program.

## II.   ARGUMENT

### A.  Plaintiff cannot prove a First Amendment violation.

Plaintiff argues that he is entitled to judgment as a matter of law because he was suspended for protected speech.  However, Plaintiff's argument fails because he cannot establish the requisite elements of a First Amendment retaliation claim and because he cannot overcome the defense of qualified immunity.  The uncontroverted material facts in this case demonstrate that summary judgment is proper for Defendants Scroggs, Eardley, Gallimore and Hayes (hereinafter "individual Defendants") on Count I.  *See* Individual Defendants' Motions for Summary Judgment, Joint Statement of Facts and Suggestions in Support incorporated by reference herein (Documents 71, 72, 73. 74, 76, 78, 79, 80, 81, 82, 83 and 84).

The parties agree that in order to prove a First Amendment retaliation claim, Plaintiff must show that "1) he engaged in a protected activity; 2) the defendant took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and 3) the adverse action was motivated by the protected activity."  Scheffler v. Molin, 743 F.3d 619, 621 (8th Cir. 2014).  Plaintiff argues that he "easily satisfies" the first two elements, but then states the "only question is whether the speech that precipitated [his] suspension is protected by the First Amendment."  *See* Plaintiff's Suggestions in Support, p. 27 (Document 77).

Plaintiff characterizes his speech in this case as "compliments and expressions of attraction," but does not explain how his speech is protected by the First Amendment especially when it "collide with the rights" of another student.  See Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 512–13, 89 S. Ct. 733, 740, 21 L. Ed. 2d 731 (1969) (stating "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights

of others is, of course, not immunized by the constitutional guarantee of freedom of speech.")
Although Plaintiff suggests that his violations of University policy consisted "solely" of oral and
written communications, his First Amended Petition and the material facts demonstrate that he
was sanctioned for a course of conduct that occurred over several months and involved more than
just speech. Plaintiff's Petition, ¶144. Plaintiff's conduct included attending 2-3 classes a week
that A.B. taught, staring at her during class, waiting after class to try to speak her, and standing
near her to give her high fives. Defendants' SOF, ¶¶ 29-44 (Document 78). A.B. reported that
Plaintiff's conduct was inappropriate, bizarre, and delusional, made her extremely uncomfortable,
and caused her to take measures to avoid him after class such as hiding in the bathroom.
Defendants' SOF, ¶ 51. Witnesses observed that A.B. would move to the other side of the room,
or run to the bathroom to avoid confrontations with Plaintiff and that A.B. did not feel comfortable
teaching. Defendants' SOF, ¶ 57. Plaintiff concedes that "non-expressive, physically harassing
conduct is entirely outside the ambit of the free speech clause." Plaintiff's Suggestions in Support,
p. 28 (Document 77) (citation omitted.)

In an effort to shift the burden to Defendants, Plaintiff states that the University's policies
are content-based and that Defendants have not produced any evidence to establish that the policies
are narrowly tailored to achieve the compelling government interest of preventing discrimination
in education. See Plaintiff's Suggestions in Support, p. 30, (Document 77). Plaintiff contends
that the policies prohibiting sexual harassment and stalking on the basis of sex are content-based
because they may apply respectively to "verbal conduct of a sexual nature," and to prohibit speech
that would "cause a reasonable person under the circumstances to be emotionally distressed." Id.
However, the plain language of the policies demonstrates that they are viewpoint neutral and do
not single out only speech directed toward a disfavored topic.

"The hallmark of the protection of free speech is to allow free trade in ideas." Virginia v. Black, 538 U.S. 343, 358, 123 S. Ct. 1536, 1547 (2003). Accordingly, the principle that underlies the concern about content-based speech regulations is that "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48–49, 106 S. Ct. 925, 929, 89 L. Ed. 2d 29 (1986). The University's policies are consistent with the Supreme Court's definition of "'content-neutral' speech regulations as those that 'are *justified* without reference to the content of the regulated speech.'" 475 U.S. at 48 (emphasis in original.) See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, (1989).

Under the sexual harassment policy, unwelcome verbal conduct of a sexual nature is not proscribed unless it violates the rights of others. Likewise, the policy to prevent stalking on the basis of sex is not focused on prohibiting particular content or views, but instead prohibits conduct that "puts another person in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed." The Supreme Court has recognized that "the government can tailor its reaction to different types of speech according to the degree to which its special and overriding interests are implicated." City of Renton v. Playtime Theatres, Inc., 475 U.S. at 50 (citing Tinker, 393 U.S. 503, 509–511 (1969)).

The prohibitions on sexual harassment and stalking on the basis of sex are not intended to prevent the expression of particular *ideas*, but to protect the rights of others, including the rights granted by Title IX. Title IX provides "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ... [.]" 20 U.S.C. §

1681(a); see also Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,[1] 526 U.S. 629, 650–51, 119 S. Ct. 1661, 1675, 143 L. Ed. 2d 839 (1999) (private Title IX damages action may lie against a school in cases of student-on-student harassment). The University has a strong and compelling interest in affording students an educational environment that is free from harassment and stalking. Many cases have recognized that schools may discipline students for speech in order to protect the rights of others. See, e.g., Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); Wildman ex rel. Wildman v. Marshalltown Sch. Dist., 249 F.3d 768, 771 (8th Cir. 2001). Accordingly, Plaintiff cannot establish that he was disciplined in violation of the First Amendment and cannot establish the first element of his claim.

Plaintiff also cannot meet his burden of establishing the third element of his retaliation claim. Significantly, Plaintiff does not address the causation element of his First Amendment claim which prevents him from establishing a right to summary judgment. Plaintiff must show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action." Salau v. Denton, 139 F. Supp. 3d 989, 1009 (W.D. Mo. 2015) (citations omitted.) "The defendant's retaliatory motive must be a but-for cause of the retaliation; a plaintiff cannot recover if the defendant would have taken the same adverse action even in the absence of the improper motive." Id. Plaintiff has not set forth any facts to demonstrate that each individual Defendant harbored a retaliatory animus such that there is a causal connection between such animus and Plaintiff's suspension. As explained in the individual Defendants' Motions for

---

[1] The Supreme Court stated: "The most obvious example of student-on-student sexual harassment capable of triggering a damages claim would thus involve the overt, physical deprivation of access to school resources. Consider, for example, a case in which male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource—an athletic field or a computer lab, for instance." 526 U.S. at 650-51.

Summary Judgment, the undisputed material facts demonstrate that no such animus can be established and, accordingly, Plaintiff cannot prevail on Count I.

Moreover, Plaintiff cannot overcome the defense of qualified immunity, in that Plaintiff cannot show that the facts demonstrate the deprivation of a constitutional right, and that the right was clearly established at the time of the deprivation. Nord v. Walsh Cty., 757 F.3d 734, 739 (8th Cir. 2014). The right allegedly violated must be established "not as a general proposition," but in a "particularized" sense so the right is clear to a reasonable official. Reichle v. Howards, 566 U.S. 658, 665, 132 S. Ct. 2088, 2094, 182 L. Ed. 2d 985 (2012). Plaintiff has not shown that his First Amendment rights were violated, and has not cited to clearly established law that would inform a reasonable official that sanctioning Plaintiff for a course of conduct found to be harassment and stalking in the context of a Title IX investigation could give rise to a First Amendment violation. Therefore, Plaintiff's Motion for Partial Summary Judgment on Count I must be denied.

### B. Plaintiff cannot establish that the student conduct policies at issue were void for vagueness.

Plaintiff attempts to confuse and obfuscate the void-for-vagueness analysis by misstating the record and making misleading arguments. First, he spends a significant amount of time addressing an issue that is irrelevant to this case. He states that under the University's regulations, there are three kinds of prohibited sexual harassment and that the first involves unwelcome sexual advances or requests for sexual activity by a person "in a position of power or authority to another person." Plaintiff's Suggestions in Support, p. 6. The "power and authority" involves *quid pro quo* sexual harassment and is not a part of the current case. *See* Defendants' SOF (Doc. 78) ¶ 75; Plaintiff's SOF (Doc. 75) ¶ 57.

Plaintiff tries to make an issue of purportedly conflicting deposition testimony from defendants as to what would constitutes a "position of power." *Id.* at p. 7. Plaintiff then leaps to

completely irrelevant hypotheticals as to whether or not the University might impose discipline on someone who was physically larger than another person. This entire discussion in Plaintiff's brief serves no purpose other than to confuse and distract.

Plaintiff also misleads in stating that "there is no evidence that [AB] was ever in fear (reasonably or otherwise) for her safety" and "nor is there any evidence that she was 'frightened' or 'intimidated.'" *Id.* at p. 10. The record shows: 1) Plaintiff expected that the letter could make AB feel uncomfortable. Defendants' SOF ¶¶ 45-49 (Doc. 78), 2) Plaintiff knew that AB was in emotional distress and was "<u>running away when he would approach</u>." *Id.* at ¶ 47 (emphasis added), 3) AB would <u>hide in the bathroom to escape Plaintiff</u>. *Id.* at ¶ 51, 57 (emphasis added), 4) Eardley thought that <u>AB generally felt intimidated or unsafe</u>. *Id.* at ¶ 72 (emphasis added).

Plaintiff also makes an inapposite argument that the student conduct policy lacks a "*mens rea* or intent requirement" and is therefore facially vague. Plaintiff's Br. at p. 11. Even if it were true that there is not a subjective *mens rea* or scienter stated in the conduct regulations, the Eighth Circuit has held that this does not necessarily mean a statute is unconstitutionally vague. "The omission of subjective scienter language from a statute does not preclude a court from reading such a knowledge requirement into the statute." <u>United States v. Posters N Things Ltd</u>, 969 F.2d 652, 657 (8th Cir. 1992).

In <u>Posters N Things</u>, the Court found that the statute (challenged on vagueness grounds) did not have a subjective scienter, but did have an objective scienter based on definitions of drug paraphanelia, saving it from being unconstitutional. <u>Id.</u> Similarly, the "stalking on the basis of sex" regulation at issue in this case contains an objective scienter grounded in what would "cause a *reasonable* person under the circumstances to be frightened, intimidated, or emotionally distressed." (emphasis added). Finally, as the Eighth Circuit stated, it is only laws that implicate

criminal conduct prohibited at common law that require a subjective *mens rea*. Id. The subject

student conduct policy does not fall within this common law category, and therefore the purported

lack of a subjective intent element is immaterial. Instead, the Court should consider the undisputed

material facts and apply the following two-part analysis.

### 1. **The policies are not facially void.**

First, the Court should consider the University's conduct policy and find that it is not

facially void. A governmental policy may be deemed facially void for vagueness if it is

"impermissibly vague in all of its applications." Village of Hoffman Estates, 455 U.S. at 497.

However, the mere assertion that the policy in question "employs broad language" is insufficient

to satisfy a claim of unconstitutionality. Keating v. U. of S. Dakota, 569 Fed. Appx. 469, 471 (8th

Cir. 2014). If said policy "articulates a more comprehensive set of expectations that, taken together,

provide… meaningful notice of the conduct required," then it should survive claims of facial

vagueness. *Id.*

As drafted, the University's policy creates a framework under which the Title IX Office

can analyze student conduct to determine its impact and whether another student's rights have

been invaded. When the language of a policy is such that "many instances of [] misconduct would

fall clearly within [its] proscriptions" it would thereby "preclud[e] the conclusion that… [the

policy] is facially unconstitutional." Keating, 569 Fed. Appx. at 471.

Additionally, even where decision-makers "will be interpreting the relatively broad policy

language, plaintiff can still use his common sense and ordinary intelligence to determine what will

be a violation, based on the definitions in the policy." Poulard v. Trs. Of Ind. Univ., 2018 WL

4680010 at *1, (N.D. Ind. 2018). For example, the University's policy refers to "course of

conduct," "legitimate purpose," and "emotionally distressed." *See* Defendants' SOF ¶ 54. These

Case 2:17-cv-04250-BCW   Document 89   Filed 01/14/19   Page 21 of 25

terms are not further defined within the policy, but Missouri courts have defined similar terms by reference to dictionary definitions. See, e.g., State v. Bernhard, 338 S.W.3d 830, 833 (Mo. App. E.D. 2011) ("dictionaries illuminate the plain and ordinary meaning" and "a person of ordinary intelligence would understand these words and be familiar with their use.")

Defendant Eardley testified that she used a reasonable definition of emotional distress or the dictionary. Defendants' SOF, ¶ 74. She employed the same interpretive standard that Missouri courts have used to define terms in statutes. It cannot be said as a matter of law that the University's regulations are "so standardless that it authorizes or encourages seriously discriminatory enforcement." Holder, 561 U.S. at 18. Plaintiff's vagueness challenge must be denied.

## 2. The policy is not void as applied

Second, the Court should find that the conduct policy as applied to Plaintiff is not void for vagueness. In determining whether the University's application of the policy is unconstitutionally vague, a court must consider the alleged policy violation "within the broader context of [the] case." Keating, 569 Fed. Appx. at 471. When considered within the larger context of facts surrounding his Title IX case, the application of CRR 200.010 was not unconstitutionally vague. Plaintiff alleges that the application of the University policy was based upon his "asking another student out on a date" and "expressing romantic interest" in a "nonthreatening letter." Plaintiff's Petition, ¶171. However, the Title IX Office's conclusion that he violated University policy was actually based on a range of conduct by Plaintiff that spanned multiple months and eventually culminated in his three-page letter. Defendants' SOF ¶¶ 70-78. Cf. Keating, 569 Fed. Appx. at 472 (finding a university's policy was not vague because "[t]aken in context," the behavior was of such a nature that the plaintiff "reasonably should have recognized" he would be violating said policy.) Because Plaintiff's conduct, based on the totality of the circumstances, was prohibited by the University's

policy against sexual harassment and stalking, his argument that the policy was unconstitutionally vague as applied should fail as a matter of law.

### C.   Plaintiff cannot prove intentional race discrimination under Title VI.

Plaintiff's arguments on the race discrimination claim fail as a matter of law. First, he has not satisfied the fourth element of his prima facie case that he was treated differently from similarly situated students. In the Court's order on the parties' discovery dispute, the Court stated that the relevant potential comparators involve complaints of sexual harassment and stalking on the basis of sex, "made against **graduate** students." Order (Document 57) at p. 4 (emphasis added).

Plaintiff states that there are two white students who were similarly situated to him and treated differently. Plaintiff's Suggestions in Support, p. 14.  Plaintiff, however, has not offered any material facts that would establish the two white students found responsible for sexual harassment and stalking on the basis of sex were graduate students, as opposed to undergraduates. Id. For this reason alone, he fails to make a prima facie case.

Second, even if Plaintiff made a prima facie case, Defendant has shown legitimate, non-discriminatory reasons for the sanctions. The Title IX Office's investigation into plaintiff, and the sanctions imposed, reflect a thorough examination into several months of conduct by Plaintiff with several different individuals. Defendant's SOF ¶ 50. The investigation into Plaintiff was initiated by an email correspondence from Emily Bach McElwain, Mizzou Rec Associate Director, which stated that some of her female staff members had complained to her about Plaintiff's conduct towards them. Id. The complainant, AB, subsequently filed a formal complaint with the Title IX Office against Plaintiff. Id. at ¶ 51. It was upon these grounds that the Title IX investigation into Plaintiff was undertaken. There is no evidence, nor does Plaintiff allege, that anyone within the Title IX Office was instrumental in targeting the investigation against Plaintiff or encouraging AB

to pursue her complaint against him, indicating that the discriminatory bias alleged by Plaintiff could not have played a significant role in the decision to move forward with this investigation.

The sanctions levied against Plaintiff were supported by legitimate evidence of University policy violations that justified the University's final decision to suspend him. Plaintiff does not allege conduct by Defendant (or any of its employees) that demonstrates that the investigation into his behavior was tainted by discriminatory intent or bias against him.

Specifically, the information provided demonstrated the persistent, extended, and unwelcome nature of Plaintiff's interactions with AB. After AB communicated to Plaintiff her desire to maintain professionalism in their relationship, and that he bring an end to his romantic pursuit of her, he continued to express his feelings towards her, culminating in his three-page letter to her. Defendant's SOF ¶ 33-46. The decision to sanction Plaintiff was not based simply upon his desire to take AB on a date, but reflected the totality of circumstances surrounding his several months long unwelcome pursuit (Id. at ¶ 68-78), even as he acknowledged that he was "obviously distressing her" (Id. at ¶¶ 47-49).

Third, Plaintiff has made no showing that Defendant's legitimate, non-discriminatory reasons were a pretext for racial discrimination. The issue of pretext is not addressed by Plaintiff in any meaningful way. This failure is also fatal to his claim. Therefore, Plaintiff cannot establish his right to judgment on Count VI.

## CONCLUSION

WHEREFORE, Defendants move this Court to deny Plaintiff's Motion for Partial Summary Judgment, grant Defendants' Motions for Summary Judgment and grant such further relief as the Court deems just and proper in the premises.

Respectfully submitted,

*/s/ Emily W. Little*
Emily W. Little, # 49929
/s/ *Antwaun Smith*
Antwaun Smith, # 59851
Office of the General Counsel
University of Missouri System
227 University Hall
Columbia, MO 65211
573-882-3211
573-882-0050 (fax)
littleew@umsystem.edu
smithantw@umsystem.edu
**Attorneys for Defendants**

## CERTIFICATE OF SERVICE

I certify on that January 14, 2019, I served this document upon all attorneys of record

through the Court's electronic filing system.

*/s/ Emily W. Little*